

Douglas B. Moylan
Attorney General of Guam
Robert M. Weinberg
Assistant Attorney General
Civil Division
Guam Judicial Center, Suite 2-200E
120 West O'Brien Drive
Hagåtña, Guam 96910 ● USA
(671) 475-3324 ● (671) 472-2493 (Fax)

**Attorneys for the Government of Guam**



FILED
DISTRICT COURT OF GUAM

OCT 26 2004

MARY L. M. MORAN
CLERK OF COURT

# IN THE DISTRICT COURT
# FOR THE TERRITORY OF GUAM

JAY MERRILL, etc., et al.                )
                                         )
                    Plaintiffs,          )
                                         )       Case No. **04-00046**
          vs.                            )
                                         )       (Superior Court of Guam
THE GUAM ELECTION COMMISSION,            )       Civil Case No. CV-1111-04)
et al.                                   )
                                         )
                    Defendants.          )       **NOTICE OF REMOVAL**
                                         )
_____)

**PLEASE TAKE NOTICE** that pursuant to 28 U.S.C. § 1441, et seq., the above-styled

action has been removed to the District Court for the Territory of Guam. Pursuant to 28 U.S.C. §

1446, defendants respectfully submit as follows:

1. This action was originally filed in the Superior Court of Guam on October 25, 2004 by

plaintiff against the Guam Election Commission; Gerald Taitano in his individual and official

capacity as Executive Director of the Guam Election Commission; the Legislature of Guam; and

Felix P. Camacho, in his official capacity as the Governor of Guam.

2. By federal law, in the Organic Act of Guam, the Attorney General of Guam is the

"Chief Legal Officer for the Government of Guam," 48 U.S.C. § 1421g(d)(1).

---

Page 1

> The Organic Act makes the Attorney General the Chief Legal Officer of the government of Guam. The Governor is head of the executive branch but **the Attorney General is the chief legal officer of the government of Guam, which includes not only the executive branch, but also the legislative and judicial branches. Thus, the sphere of the Attorney General's legal cognizance is within the entire government of Guam, legislative and judicial, not just the executive branch.**

*Moylan v. Camacho*, Superior Court of Guam, Special Proceeding Case No. SP230-03, "Decision and Order," dated November 10, 2003, p. 38 (Manibusan, J.) (emphasis added). Accordingly, the Attorney General represents all defendants in this matter.

3. Plaintiff, individually, and on behalf of a putative class of similarly situated voters "desirous of casting a vote in favor of a casting a vote in favor of [voter initiative known as] Proposal A at a fair and legal election" seeks a declaratory judgment and preliminary and permanent injunctive relief against the defendants pursuant to 42 U.S.C. § 1983, *see* Complaint, pp. 2, 3, ¶ 6, and for attorneys fees and costs pursuant to 42 U.S.C. § 1988, *see*, Complaint, p. 16. Plaintiff alleges violations of its right to vote protected by the First and Fourteenth Amendments to the United States Constitution, and of its right to vote and initiative election guaranteed by to federal statutory law, specifically the Organic Act of Guam, 48 U.S.C. §§ 1421(b) and 1422(a). *See*, Complaint, pp. 11, 12, ¶¶ 40, 41 Accordingly, this Court has federal question jurisdiction over the complaint pursuant to 28 U.S.C. §§ 1331 and 1441(b).

5. This Court has supplemental jurisdiction over plaintiff's remaining claims alleging violations of local law pursuant to 28 U.S.C. § 1367.

5. As of the filing of this notice of removal, no defendant has filed any responsive pleading in this matter. And, as a matter of federal and local law, because the Attorney General for the Government of Guam conducts and controls all litigation on behalf of the entire Government of Guam, all defendants concur in this removal.

6. All documents filed in the Superior Court of Guam are attached hereto.

Page 2

Dated this 26th day of October, 2004.

OFFICE OF THE ATTORNEY GENERAL
**Douglas B. Moylan, Attorney General**

ROBERT M. WEINBERG
Assistant Attorney General
For All Defendants

### Certificate of Service

This is to certify that I have this day served counsel for the opposing party(ies) with a copy of the foregoing by hand delivery, or by depositing same in the United States Mail, postage prepaid and properly addressed to:

Thomas L. Roberts, Esq.
Dooley, Roberts & Fowler, LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Drive
Tamuning, Guam 96913

ROBERT M. WEINBERG
Assistant Attorney General

Courtesy copies:     Cesar Cabot, Esq.
                      For Guam Election Commission
                     Gerald Taitano
                     Shannon Taitano, Esq.
                      For Governor of Guam
                     Therese Terlaje', Esq.
                      Legislature of Guam
                     Joaquin C. Arriola, Jr., Esq.
                      For proposed Intervenor, Lina'La' Sin Casino

Page 3

Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Drive
Tamuning, Guam 96913
Telephone:    (671) 646-1222
Facsimile:    (671) 646-1223

Attorneys for Plaintiffs Jay Merrill,
on his own behalf and on behalf of all other
similarly situated voters desirous of casting a
vote in favor of Proposal A at a fair and legal election

FILED
SUPERIOR COURT
OF GUAM

2004 OCT 25 AM 11: 08

ALFREDO M. BORJAS
CLERK OF COURT
BY:



RECEIVED
OCT 2 6 2004
10:36 am CV

ATTORNEY GENERAL'S OFFICE

## IN THE SUPERIOR COURT

### OF GUAM

| | | |
|---|---|---|
| JAY MERRILL, on his own behalf and on behalf of all other similarly situated voters desirous of casting a vote in favor of Proposal A at a fair and legal election, | ) ) ) ) ) | CIVIL CASE NO. CV 1111-04 |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | **COMPLAINT FOR** |
| THE GUAM ELECTION COMMISSION; GERALD A. TAITANO, in his individual capacity and in his capacity as the Executive Director of THE GUAM ELECTION COMMISSION, I MINA' BENTE SIETE NA LIHESLATURAN GUAHAN (The 27th Guam Legislature); FELIX P. CAMACHO, in his official capacity as the GOVERNOR OF GUAM. | ) ) ) ) ) ) ) ) ) ) ) ) | **(1) DECLARATORY RELIEF** **(2) INJUNCTIVE RELIEF, AND** **(3) ORDER COMPELLING SPECIAL ELECTION ON PROPOSAL A;** **CLASS ACTION** |
| Defendants. | ) ) ) ) | |

RECEIVED
Law Office of
Cesar C. Cabot, P. C.
Date: 10-26-04
Time: 10:05
Initials: rt

COMES NOW Plaintiff Jay Merrill, on his own behalf and on behalf of all other

similarly situated voters desirous of casting a vote in favor of Proposal A at a fair and legal

election (hereinafter "the Class Plaintiffs"), and for their complaint against the Guam Election

Commission, Gerald A. Taitano, in his individual capacity and in his capacity as the Executive

Director of the Guam Election Commission, I Mina' Bente Siete Na Liheslaturan Guahan (The

27th Guam Legislature) and Felix P. Camacho, in his official capacity as the Governor Of Guam,

and allege as follows.

## PARTIES

1.      Plaintiffs are registered voters on Guam. Plaintiffs desire to cast a valid and

meaningful vote on the Guam Casino Gaming Control Commission Act, otherwise known and

referred to herein as "Proposal A".

2.      The Guam Election Commission ("Election Commission") is "an autonomous

instrumentality and an independent commission of the Government of Guam" pursuant to 3

G.C.A. § 2101(a). Under 3 G.C.A. § 2106, the Election Commission has the capacity to sue and

be sued in its own name.

3.      Gerald A. Taitano is the Executive Director of the Election Commission (the

"Director") and a resident of the territory of Guam.

4.      I Mina' Bente Siete Na Liheslaturan Guahan is the Twenty Seventh Guam

Legislature (the "Legislature").

5.      Felix P. Camacho is the Governor of Guam (the "Governor").

## JURISDICTION

6.      This Court has jurisdiction over this matter pursuant to 7 G.C.A. §3105, 5 G.C.A.

§9303, 42 U.S.C. §1983, and Rule 23 of the Guam Rules of Civil Procedure. Each of the three

counts contained in this complaint, for declaratory relief, for injunctive relief, and for an order
compelling a special election, are brought under Guam law as well as the federal civil rights statute,
42 U.S.C. §1983. The court also has jurisdiction over this matter because lawsuits challenging
election procedures known to be invalid prior to the election must legally be filed before the
election.

## CLASS ACTION

7.      The Class Plaintiffs are so numerous that joinder of all members is impracticable,
there are questions of law or fact common to the class, the claims of the representative parties are
typical of the claims and defenses of the class, and the representative parties will fairly and
adequately protect the interests of the class.

8.      The prosecution of separate actions by members of the class would create a risk of
inconsistent or varying adjudications with respect to individual members of the class which would
establish incompatible standards of conduct for the party opposing the class, and adjudications with
respect to individual members of the class would as a practical matter be dispositive of the interests
of the other members not parties to the adjudications or substantially impair or impede their ability
to protect their interest.

9.      The Defendants have acted and refused to act on grounds generally applicable to the
class, thereby making appropriate final injunctive relief or corresponding declaratory relief with
respect to the class as a whole.

10.　　Questions of law or fact common to the members of the class predominate over any questions affecting only individual members.

11.　　A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## FACTS

12.　　Proposal A is on the ballot for the scheduled November 2, 2004 Guam general election. The Director and the Election Commission placed Proposal A on the ballot upon their determination that Proposal A met all legal requirements under Guam law for the placement of initiatives on the ballot.

13.　　Plaintiffs are informed and believe that Election Commission's requested fiscal year 2004 budget to the 27th Guam Legislature was $850,000. Plaintiffs are informed and believe that in its request, the Election Commission informed the Legislature that $850,000 was sufficient to cover all operational costs for fiscal year 2004, and expressly stated that $850,000 was sufficient to ensure that Proposal A would be properly and legally placed on the ballot for the November 2, 2004 general election.

14.　　On information and belief, the Legislature funded the Election Commission with a fiscal year 2004 budget of $450,000 rather than $850,000.

15.　　On information and belief, shortly before the ballot pamphlet on Proposal A was to be mailed to the voters, the Director informed the Legislature and the Governor that the Election

Commission needed an additional $25,000 in funding to print and mail Proposal A ballot pamphlets

to voters before the November 2, 2004 election.

16.  On information and belief, the Governor delivered the Director's requested

additional $25,000 in funding.

17.  On information or belief, the Election Commission mailed Proposal A ballot

pamphlets to the voters of Guam on or before October 1, 2004.

18.  Copies of the text of Proposal A itself were not included in the ballot pamphlets

mailed to the voters by the Election Commission.

19.  By the Director's own public admission, he and the Election Commission, acting in

their official capacities, intentionally, knowingly and willfully decided to not include the complete

text of Proposal A in the ballot pamphlets they mailed to the voters thirty (30) days prior to the

scheduled November 2, 2004 election on Proposal A.

20.  There are now less than thirty (30) days prior to the scheduled November 2, 2004

election.

21.  A true and correct copy of the complete text of Proposal A is attached hereto and

made a part hereof as Exhibit 1.

22.  Plaintiffs have requested the Election Commission to pass upon the validity of the

thirty (30) day mailing requirement of 3 G.A.R. §2114 discussed below. The Election Commission

has effectively ruled that that 3 G.A.R. §2114 is valid, but has publicly stated that it did not and does

not have the funds to comply with it, and that the November 2, 2004 election on Proposal A will go forward as scheduled unless and until a court rules otherwise.

23. The Guam Attorney General's Office has written an opinion letter stating that the Proposal A ballot pamphlets are legally flawed and that the November 2, 2004 vote on Proposal A will be invalid and unenforceable for four numbered reasons and one unnumbered reason. A true and correct copy of the Attorney General's opinion letter and its attachments are attached hereto and made a part hereof as Exhibit 2. True and correct copies of the information on Proposal A actually mailed to the voters by the Election Commission are attached to the Attorney General's opinion letter itself and made a part hereof by this reference. As alleged above, the actual text of Proposal A was not mailed to the voters.

24. The Attorney General's Office has widely distributed its opinion letter to the public and to the media. The opinion letter has caused massive public and private speculation on whether any vote on Proposal A will be legal or otherwise binding. The Attorney General's Office has also publicly stated that any vote for Proposal A will be invalid and ineffective. Moreover, the Attorney General's Office has publicly stated that if Proposal A is passed by the voters on November 2, 2004, the Attorney General's Office will file a lawsuit to declare the election void. The Attorney General's Office has publicly stated that it will not be necessary to file a lawsuit to declare the election void if Proposal A is not passed by the voters on November 2, 2004, because the issue will then be moot.

## COUNT I

## DECLARATORY RELIEF

25.    Plaintiffs refer to and incorporate paragraphs 1 through 24 of this complaint as though fully set forth herein.

26.    Plaintiffs request an immediate, pre-election declaratory judgment from the court on the legality of the Proposal A ballot pamphlets mailed to the voters and the legality of the scheduled November 2, 2004 election on Proposal A.

27.    Chapter 17 of Title 3 of the Guam Code Annotated ("G.C.A.") (the "Election Code"), §§ 17101 through 17514, is entitled "Initiative, Referendum and Legislative Submission." Section 17101 of the Election Code provides:

> It is the intent of the Legislature through the enactment of this measure that the people of the territory of Guam shall have the right to exercise the power of initiative and referendum with regard to legislative matters and that the legislature shall submit matters to the voters for approval or rejection.

28.    3 G.C.A. § 17509 is entitled "Contents of Pamphlet." It provides as follows:

> The Ballot pamphlets shall contain:
> (a) A complete copy of any measure submitted to the voters by:
>     (1) The Legislature.
>     (2) Initiative or referendum petition.
> (b) A copy of the specific statutory provision, if any, proposed to be affected.
> (c) A copy of the arguments provided for in this Chapter.
> (d) The analysis and ballot title provided for in this Chapter.

29.     3 G.C.A. §17511 is entitled "Mailing of Ballot Pamphlet".  It provides:

As soon as copies of the ballot pamphlet are available, the Election
Commission shall mail immediately the following number of copies
to the following persons and places:

(a)  One copy to each registered voter;
(b)  One copy to each village Commissioner;
(c)  One copy to each judge of the Superior Court; and
(d)  One copy to each Senator.

30.     Title 3 of the Guam Administrative Rules and Regulations ("G.A.R.) was adopted

by the Guam Election Commission under Guam's Administrative Adjudication Law.  See generally,

Title 1, Guam Administrative Rules and Regulations, §§ 1101, 1102 (1997); 5 G.C.A §§ 9100

through 9312.  3 G.A.R. governs elections and the Election Commission.

31.     3 G.A.R. § 2112(5) is entitled "Ballot Pamphlets."  It provides:

(a) The Director shall cause to be printed one and one-tenth (1-1/10)
times as many ballot pamphlets as there are registered voters, to be
available not less than thirty (30) days prior to the election at which
an initiative measure is to be presented to the voters.

(b) The ballot pamphlets shall contain, in the following order:

(1) On the first page, the ballot title described in 6 GAR § 2109;
(2) Beginning on the next page, the analysis of the proposed
measure, described in 6 GAR § 2111;
(3) Beginning on the next page following the end of the analysis, the
selected argument for the initiative measure provided such an
argument has been submitted to the Commission;
(4) Beginning on the next page following the end of the selected
argument for the initiative measure, the selected argument against the

measure provided such an argument has been submitted to the
Commission;

(5) Beginning on the next page following the end of the argument
against the proposed measure, the complete text of the initiative
measure;

(6) If, in the opinion of legal counsel to the Commission, any existing
statutory provision or provisions would be affected by the measure,
the text of the specific statutory provision or provisions affected shall
be printed beginning on the next page following the end of the text of
the initiative measure. [Law governing 3 GCA §§ 17508-17510.]


32.     6 G.A.R. §21-14 is entitled "Mailing of Ballot Pamphlets." It provides:

Not less than thirty (30) days prior to the election in which an
initiative measure is to be presented to the voters, and earlier if the
ballot pamphlets are available before that date, the Director shall
cause to be mailed the following number of copies of the ballot
pamphlet to the following persons and places:

(a) One (1) copy to each voter registered as of the deadline for
eligibility to vote in the election in which the initiative measure is to
be submitted to the voters;

(b) One (1) copy to each village Commissioner;

(c) One (1) copy to each judge of the Superior Court; and

(d) One (1) copy to each Senator. [Law governing 3 GCA § 17511.]


33.     Two years ago, in a Guam Supreme Court decision specifically addressing the

administrative rules and regulations adopted by Guam Election Commission, <u>Wade v. Taitano</u>, 2002

Guam 16, the court wrote:

"[a]n agency does not have the authority to ignore its own rules." ...
Regulations have the same legal effect as statutes ... and, "[w]hen an
agency has the authority to adopt rules and does so, it must follow
them." ... Therefore, an agency's procedural rules "are binding upon
the agency which enacts them as well as upon the public." ...
"Regulations governing procedure are just as binding upon both the

agency which enacts them and the public, and the agency does not,
as a general rule, have the discretion to waive, suspend, or disregard,
in a particular case, a validly adopted rule so long as such rule
remains in force."

\*     \*     \*

Although the Initiative statutes, 3 GCA §§ 17101-09, do not provide
the GEC with a time frame to complete the verification process, the
statutes do allow the GEC to promulgate rules and regulations to
effectuate the election statutes. 3 GCA §§ 2103(d), 2104. In enacting
regulation 2108(c), the GEC was merely imposing upon itself a time
frame within which to complete a task. ... We do not find the GEC's
mere imposition of *when* to complete a statutory duty to be, in and of
itself, inherently inconsistent with the performance of that duty.
[Citations and footnotes omitted].

34.     An actual, justifiable controversy now exists over (1) the legal efficacy of any votes

cast for or against Proposal A at the general election to be held on November 2, 2004, and (2) the

legal efficacy of the results of the scheduled November 2, 2004 general election on Proposal A.

The controversy affects each and every single registered voter on Guam, as well as unregistered

Guam voters who would have registered to vote within the time allowed by law but for the

controversy. Attached hereto as Exhibit 3 are true and correct copies of newspaper articles printed

in the Pacific Daily News and the Marianas Variety as well as true and correct copies in written

form of reports broadcast on television by KUAM news, all of which were printed or broadcast on

and after October 7, 2004, the date the Attorney General's Office publicly disseminated its opinion

letter.

35.     Without a declaratory judgment by the courts on the legality of the Proposal A ballot

pamphlets mailed to the voters by the Election Commission, a fair election on Proposal A cannot be

held on November 2, 2004, as scheduled, and any result of such vote on Proposal A in the absence

of a declaratory judgment by the courts may not reflect the true will of the electorate.

36.     For the foregoing reasons, Plaintiffs request an immediate, pre-election declaratory

judgment from the court on the legality of the Proposal A ballot pamphlets mailed to the voters and

the legality of the scheduled November 2, 2004 election on Proposal A.

## COUNT II

### INJUNCTIVE RELIEF

37.     Plaintiffs refer to and incorporate paragraphs 1 through 36 of this complaint as

though fully set forth herein.

38.     Proposal A legally qualified for placement on the ballots the at the November 2,

2004 general election.

39.     The Proposal A ballot pamphlets mailed to the voters thirty (30) days before the

scheduled November 2, 2004 election on Proposal A are legally defective under applicable Guam

law and duly adopted administrative regulations.

40.     The right to vote is a fundamental right guaranteed by the First and Fourteenth

Amendments to the United States Constitution and by the Organic Act of Guam, § 1421(b).   The

First Amendment of the United States Constitution applies to Guam pursuant to 48 U.S.C. § 1421(b)(u).

41.     The right of Plaintiffs and the people of Guam to exercise the right of initiative is guaranteed by the Organic Act of Guam, §1422(a), 48 U.S.C.A. § 1422(a), as amended ("the People of Guam shall have the right of initiative and referendum, to be exercised under conditions and procedures specified in the laws of Guam").

42.     As a result of the legally defective ballot pamphlets, and as a result of the Attorney General's opinion letter and the mass public speculation it has caused, the results of the scheduled November 2, 2004 election on Proposal A will not be valid or binding under the Organic Act and other applicable laws of Guam or under the United States Constitution.

43.     There is a probability that Plaintiffs will succeed on the merits of this action; the possibility of immediate and irreparable injury exists; serious questions are raised; and the balance of hardships tips sharply in Plaintiffs' favor.

## COUNT III

### ORDER COMPELLING SPECIAL ELECTION

44.     Plaintiffs refer to and incorporate by reference paragraphs 1 through 43 of this complaint as though fully set forth herein.

45.     The Defendants have deprived Plaintiffs and the people of Guam of their fundamental, constitutional and organic right to vote.

46.     Under 3 G.C.A. §13103, the Governor has the power to call a special election on

Proposal A, and thereby protect Plaintiffs and the people of Guam's fundamental right to vote, but

he has refused to do so.

47.     Under 3 G.C.A. §17203, the Legislature has the power to call a special election on

Proposal A, and thereby protect Plaintiffs and the people of Guam's fundamental right to vote, but it

has refused to do so.

48.     Under 7 G.C.A. § 4104, both the Governor and the Legislature have the power to

apply directly to the Guam Supreme Court for declaratory relief under certain circumstances "where

it is a matter of great public interest and the normal process of law would cause undue delay", and

thereby protect Plaintiffs and the people of Guam's fundamental right to vote, but the Governor and

the Legislature have refused to do so.

49.     The Attorney General is the Chief Legal Officer of the Territory of Guam, with

standing and authority to institute legal proceedings to protect Plaintiffs and the people of Guam's

fundamental right to vote right to vote, but he has refused to do so.

50.     3 G.C.A. §14103 of the Guam Elections Code provides that "(e)very person charged

with the performance of any duty under the provisions of any law of this Territory relating to

elections, who, in his official capacity, knowingly acts in contravention or violation of any of the

provisions of such laws, is, unless a different classification is prescribed by this Title, guilty of a

misdemeanor." 3 G.C.A. §14102 of the elections code provides that "(e)very person who willfully

violates any of the provisions of laws of Guam relating to any election is, unless a different

classification is prescribed by this Title, guilty of a misdemeanor." Under Guam law, 9 G.C.A.

§80.34, a misdemeanor is punishable by imprisonment for up to one (1) year.

51.     Acting under color of territorial law, the Defendants have deprived Plaintiffs and the

people of Guam of their right to vote, which is a right and privilege secured by the Constitution of

the United States and the Organic Act of Guam. Pursuant to 42 U.S.C. §1983 and Guam law, the

Defendants are liable to Plaintiffs in this action at law and in equity for any all and appropriate

redress.

52.     Under the circumstances of this case, no remedy other than a special election on

Proposal A can (1) restore the right to vote to Plaintiffs and the people of Guam, and (2) guarantee

that Plaintiffs and the people of Guam will not be deprived of their right to vote in any future

general elections on Proposal A.

WHEREFORE, the Class Plaintiffs prays for relief as follow:

1.     An immediate, pre-election judicial declaration on (a) the legal efficacy of the

Proposal A ballot pamphlets mailed to the voters by the Directors and the Guam Election

Commission, and (b) an immediate, pre-election judicial declaration on whether the results of any

vote on Proposal A on November 2, 2004 will be invalid as a result of (i) the ballot pamphlets

mailed to the voters, and/or (ii) as a result of the mass public uncertainty caused by the Attorney

General's opinion.

2.     For a preliminary and permanent injunction (a) enjoining the scheduled November

2, 2004 vote on Proposal A, (b) compelling the Director and the Election Commission to remove

the Proposal A ballots from the polling places on November 2, 2004, and (c) enjoining the Director

and the Election Commission from tabulating any absentee votes cast on Proposal A.

3.      For an order compelling the Governor to call for a special election on Proposal A

pursuant to 3 G.C.A. §13103, or an order compelling the Legislature to call for a special election on

Proposal A pursuant to 3 G.C.A. §17203, or an order compelling the Election Commission to

schedule and hold a special election on Proposal A, to be held not later than sixty (60) days after the

date of the court's order, under the following procedure:

a.      That within twenty (20) days after the court's order, which will be forty (40)

days before the special election, the Election Commission and the Director must appear before the

court to affirmatively demonstrate their readiness, willingness, and ability to meet all Guam laws

and all election rules and regulations applicable to the people's right to initiative and special

elections, specifically with regard to the special election on Proposal A.

b.      That within twenty five (25) days after the court's order, which will be thirty

five (35) days prior to the special election, the Election Commission and the Director must appear

before the court to prove to the court's satisfaction that they have in fact complied with all Guam

laws and all election rules and regulations applicable to the people's right to initiative and special

elections, specifically with regard to the special election on Proposal A.

c.      That a further proceedings hearing be had in this court one (1) day after the

special election on Proposal A, at which hearing the Election Commission and the Director must

testify, under oath, about any irregularities or other events occurring during the election that may, in

their reasonable judgment, have interfered with a free and fair election on Proposal A.

    4.      For costs of suit;

    5.      For attorneys' fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988, or as

otherwise permitted by law or pursuant to the court's inherent powers;

    6.      For such other relief as the court deems just, necessary and proper.

DOOLEY ROBERTS & FOWLER LLP

Dated: October 25, 2004        By: _____

**THOMAS L. ROBERTS**
Attorneys for Plaintiffs Jay Merrill and
on his own behalf and on behalf of all other
similarly situated voters desirous of casting a
vote in favor of Proposal A at a fair and legal
election

F:\Documents\Thomas L Roberts (07.04)\C325 CFED\Pleadings\Superior Court (Class Action)\C325 - Complaint 10 25 2004.doc

An Act To Establish The

# GUAM CASINO
# GAMING CONTROL COMMISSION

EXHIBIT 1

Section 1.    Title 23 is added to the Guam Code Annotated to read          7

## ARTICLE 1—SHORT TITLE, STATEMENT OF LEGISLATIVE FINDINGS AND DEFINITIONS          7

Section 1001.    Short title          7

Section 1002    Statement of public policy          7

Section 1003.    Definitions          9

## ARTICLE 2—ESTABLISHMENT AND ORGANIZATION OF          16

Section 2001.    Guam Casino Gaming Control Commission; number of Commissioners; and their appointment          16

Section 2002.    Qualifications of Commissioners          16

Section 2003.    Terms of Commissioners; officers of the Commission; compensation of Commissioners; removal of Commissioners          16

Section 2004.    Organization and employees of the Commission          18

## ARTICLE 3—CONTROL AUTHORITY RESTRICTIONS          19

Section 3001.    Previous employment and individual assurance standards.          19

Section 3002.    Code of ethics to be promulgated          20

Section 3003.    Post-employment restrictions          21

## ARTICLE 4-COMMISSION DUTIES AND POWERS          22

Section 4001.    General duties and powers          22

Section 4002.    Commission powers regarding denials and sanctions          23

Section 4003.    Subpoenas, oaths          23

Section 4004.    Testimonial immunity          24

Section 4005.    Collection of fees, interest or penalties          24

Section 4006.    Emergency Rules          24

Section 4007.    Rule requiring exclusion of certain persons          25

2

Section 4009.   Exclusion or ejection of certain persons                25

Section 4010.   Penalties for gaming by prohibited persons              26

Section 4011.   Commission reports and recommendations; annual audit    26

Section 4012.   Meetings and quorum                                     26

Section 4013.   Minutes and records                                     27

Section 4014.   Appointment of peace officers                           28

Section 4015.   Specific duties of peace officers                       29

Section 4016.   Cooperation by licensees, registrants or applicants     29

Section 4017.   Inspection, seizure and warrants                        29

Section 4018.   Powers not enumerated                                   31

# ARTICLE 5—LICENSING                                                   31

Section 5001.   General provisions                                      31

Section 5002.   Statement of compliance                                 32

Section 5003.   Casino license; eligibility for                        34

Section 5004.   Approved hotel                                          36

Section 5005.   Casino license; applicant requirements                 37

Section 5006.   Additional requirements                                 38

Section 5007.   Casino license, Disqualification criteria for          41

Section 5008.   Investigation of applicants for casino licenses; order approving
                or denying license                                      42

Section 5009.   Renewal of casino licenses                             43

Section 5010.   Licensing of casino key employees                      43

Section 5011.   Licensing of casino employees                          45

Section 5012.   Registration of casino service employees               45

Section 5013.   Licensing and registration of casino service industries 46

Section 5014.   Registration of labor organizations                    47

Section 5015.   Approval and denial of registrations and licenses other than casino licenses. 47

3

# ARTICLE 6—CASINO OPERATIONS

|            |                                                                                     |    |
|------------|-------------------------------------------------------------------------------------|----|
| ARTICLE 6—CASINO OPERATIONS |                                                                | 48 |
| Section 6001. | Operation certificate                                                            | 48 |
| Section 6002. | Hours of operation                                                               | 48 |
| Section 6003. | Casino facility requirements                                                     | 49 |
| Section 6004. | Internal controls                                                                | 49 |
| Section 6005. | Games and gaming equipment                                                       | 49 |
| Section 6006. | Credit                                                                           | 52 |
| Section 6007. | Noncitizen patrons; proof of identity to establish accounts, multiple transactions | 55 |
| Section 6008. | Non-citizen patrons, proof of identity to redeem chips or markers                 | 56 |
| Section 6009. | Report of cash transactions                                                       | 56 |
| Section 6010. | Junkets and complimentary services                                               | 56 |
| Section 6011. | Alcoholic beverages in casino hotel facilities                                   | 59 |
| Section 6012. | Casino licensee, leases and contracts                                            | 59 |
| Section 6013. | Disposition of securities by corporate licensee                                  | 60 |
| Section 6013. | Casino employment                                                                | 61 |
| Section 6014. | Employment of bona fide residents of Guam required                               | 62 |

| TITLE 7—HEARINGS OF THE COMMISSION |                                                       | 62 |
|------------|--------------------------------------------------------------------------------------|----|
| Section 7001. | Conduct of hearings; rules of evidence; punishment of contempts; rehearing       | 62 |
| Section 7002. | Proceedings against licensees                                                     | 64 |
| Section 7003. | Emergency orders                                                                  | 65 |
| Section 7004. | Judicial review                                                                   | 65 |

| Article 8—Sanctions for Unlawful Acts |                                                    |    |
|------------|--------------------------------------------------------------------------------------|----|
| Section 8001. | Penalties for willful evasion of payment of license fees, other acts and omissions | 66 |
| Section 8002. | Unlicensed casino gaming unlawful; penalties                                       | 66 |

4

| Section 8003. | Swindling and cheating; penalties | 66 |
| Section 8004. | Use of certain devices in playing game, penalties | 67 |
| Section 8005. | Unlawful use of bogus chips or gaming billets, marked cards, dice, cheating devices, unlawful coins; penalty | 67 |
| Section 8006. | Cheating games and devices in a licensed casino; penalty | 68 |
| Section 8007. | Unlawful possession of device, equipment or other material illegally manufactured, distributed, sold or serviced | 68 |
| Section 8008. | Employment without license or registration; penalty | 68 |
| Section 8009. | Persons prohibited from accepting employment violation, penalty | 69 |
| Section 8010. | Unlawful entry by person whose name has been placed on list of excluded persons; penalty | 69 |
| Section 8011. | Gaming by certain persons prohibited; penalties; defenses | 69 |
| Section 8012. | Prohibited political contributions; penalty | 70 |
| Section 8013. | Authority of gaming licensee and agents to detain or question persons suspected of cheating; immunity from liability; posted notice required | 70 |
| Section 8014. | (a) Other offenses; general penalty | 70 |
| Section 8015. | Continuing offenses | 71 |
| Section 8016. | Exemption from certain provisions of Title 9 of the Guam Code Annotated | 71 |
| Section 8017. | Racketeer-influenced and corrupt organizations, Definitions of | 71 |
| Section 8018. | Prohibited activities | 72 |
| Section 8019. | Civil remedies | 73 |
| Section 8020. | Civil investigative demand | 74 |
| Section 8021. | Supplemental sanctions | 75 |

## ARTICLE 9--MISCELLANEOUS — 76

| Section 9001. | Declaration of Guam's Limited Exemption from Operation of Provisions of Section 1172 of Title 15 of the U. S. Code | 76 |
| Section 9002. | Legal shipment of gaming devices into Guam | 76 |
| Section 9003. | Severability and preemption | 77 |
| Section 9004. | Equal employment opportunity requirements | 77 |
| Section 9005. | Equal employment opportunity enforcement | 77 |

5

# ARTICLE 10-CONSERVATORSHIP

77

Section 10001.  Institution of conservatorship and appointment of conservators                77

Section 10002.  Instructions to, supervision of conservator                                   78

Section 10003.  Powers, authorities and duties of conservators                                78

Section 10004.  Compensation of conservators and others                                       80

Section 10005.  Assumption of outstanding debts                                               80

Section 10006.  Payment of net earnings during the period of the conservatorship              80

Section 10007.  Payments following a bulk sale                                                80

Section 10008.  Continuing jurisdiction of Commission                                         80

Section 10009.  Termination of a conservatorship                                              81

Section 10010.  Required reports                                                              81

Section 10011.  Review of actions of conservator                                             81

# ARTICLE 11—FEES AND TAXES

81

Section 11001.  Casino application and license fees                                           81

Section 11002.  Slot machine license fee                                                      82

Section 11003.  Fees for other than casino licenses                                           82

Section 11004.  Guam Casino Gaming Control Commission Fund                                     82

Section 11005.  Tax on gross revenues                                                         82

Section 11006.  Guam Casino Revenue Trust Fund                                                83

Section 11007.  Expenditure of the income of the Guam Casino Revenue Trust Fund.              84

Section 11008.  Disposition of second half of Guam Casino Revenue Tax                         84

Section 11009.  (a) Expenditure of the income of the Guam Casino Revenue Benefit Fund         84

Section 11010.  Payment of taxes                                                              85

Section 11011.  Determination of tax liability                                                85

Section 11012.  Penalties                                                                     86

SECTION 2.      APPROPRIATION OF FUNDS                                                        86

SECTION 3.      EFFECTIVE DATE OF ACT ADOPTED BY THIS INITIATIVE                              86

6

AN ACT TO ADD TITLE 23 TO THE GUAM CODE ANNOTATED TO ESTABLISH THE GUAM CASINO GAMING CONTROL COMMISSION TO OVERSEE AND DIRECT THE DEVELOPMENT AND OPERATION OF CASINO GAMING WITHIN GUAM AND TO RESERVE ONE-HALF OF THE TAX REVENUE DERIVED FROM CASINO GAMING IN A TRUST, THE INCOME OF WHICH SHALL BE DEDICATED TO MAKING LONG-TERM IMPROVEMENTS IN THE ISLAND'S INFRASTRUCTURE AND TO RESERVE ONE-HALF OF THE TAX REVENUE DERIVED FROM CASINO GAMING FOR EXPENDITURE ONLY TO SUPPORT WORTHY ENDEAVORS SPECIFICALLY IDENTIFIED BY THE PEOPLE THROUGH A QUADRENNIAL REFERENDUM; TO FIX THE DATE UPON WHICH THIS INITIATIVE SHALL BECOME LAW; AND TO MAKE AN INITIAL APPROPRIATION OF FUNDS FOR THE OPERATION OF THE GUAM CASINO GAMING CONTROL COMMISSION.

BE IT ENACTED BY THE PEOPLE OF THE TERRITORY OF GUAM:

Section 1. Title 23 is added to the Guam Code Annotated to read:

"TITLE 23—GUAM CASINO GAMING CONTROL COMMISSION"

Article 1—Short Title, Statement of Legislative Findings and Definitions

Section 1001. Short title. This Act shall be known and may be cited as the 'Guam Casino Gaming Control Commission Act.'

Section 1002. Statement of public policy. The people of Guam, the enactors of this legislation by initiative, hereby find and declare the following to be the public policy of Guam:

(a) The hospitality industry—consisting of tourist, resort and incipient convention activities—is a critical component of Guam's economic structure and, if properly developed, controlled and fostered, is capable of substantially contributing to the general welfare, health and prosperity of Guam and its inhabitants.

(b) By reason of its location, Guam is for Asia, and the south and western Pacific, a convenient and hospitable destination rich not only in the island's indigenous Chamorro heritage but also a wide range of the cultural and economic features of America.

(c) Guam has many competitors for visitors from abroad, however, and to maintain and enhance its standing as a destination of choice, it must be innovative and dynamic in encouraging the development of the sort of recreational activities that sophisticated travelers seek.

(d) One innovation that is alluring foreign visitors in great numbers from abroad to the United States, Australia, and the Philippines is casino gaming. Continental Airlines already provides twice weekly direct service through Guam from Japan to Cairns, Queensland, and hundreds of travelers transit Guam each week to visit not only the natural beauties of this competing Australian destination, but also to be entertained at the Reef Hotel Casino in Cairns. In the mainland of the United States 425 commercial casinos are operating in 11 states. According to an independent survey performed for the

American Gaming Association ("AGA"), 14,000 new jobs were created in the commercial casino industry in the US in 2000 and the industry as a whole generated $25 billion in gross gaming revenues, figures that do not include the 87 Native American gaming enterprises operating in 23 states and that generated more than $9.2 billion in gross gaming revenue in 2000.

(e) The AGA survey also noted that 370,000 employees in stateside casinos earned $10.9 billion in wages (including tips and benefits) and that the nearly $3.5 billion paid in taxes by the commercial casinos was responsible for construction of new roads, schools and hospitals, enhancement of local emergency services, development of parks and recreation areas, and other quality-of-life improvements.

(f) While casino gaming holds promise as a source of economic stimulation and enhanced revenues for the government, it is not to be viewed as a panacea for the prolonged economic recession Guam has experienced in conjunction with Japan's depressed financial status. Casino gaming can be, however, a hospitality attraction innovation that will induce not only more visitors to Guam from Japan but also help in the island's efforts to enlarge its visitor count from Korea, China and Taiwan.

(g) Through this initiative the people have given their stamp of approval to the establishment of a limited number of closely controlled and monitored casino gaming facilities in resort hotels. They have also made clear that, to the greatest extent possible, the Guam Casino Gaming Control Commission shall encourage not only the investment of outside capital in these projects, but also require that real opportunity for investment and employment in the casino gaming enterprises shall be provided for and insisted upon for the citizens of the United States born on Guam. Toward this end, strict citizenship and residency requirements are established for the Commissioners who shall establish the policies and rules of the Guam Casino Gaming Control Commission, it being the belief of the people that those who call Guam home know it best and are most likely to protect the island's people and institutions.

(h) The restriction of gaming to a limited number of hotels affording traditional visitor recreation activities is designed to assure that the existing family-oriented nature and tone of the island's hospitality industry be preserved, and that the casinos licensed pursuant to the provisions of this act are always offered and maintained as an integral element of such hospitality facilities, rather than as an industry unto itself.

(i) To assure the public's confidence and trust in the oversight exercised by the government vis a vis the hotel casino gaming enterprises, the regulatory provisions of this act are designed to impose strict regulation on persons, locations, practices and activities related to the operation of licensed gaming casino. In addition, licensure of a limited number of casino establishments, with the comprehensive law enforcement supervision attendant thereto, is further designed to contribute to the public confidence and trust in the efficacy and integrity of the regulatory process.

(j) Legalized casino gaming in Guam can attain and retain integrity, public confidence and trust, and remain compatible with the general public interest only under such a system of control and regulation as insures, so far as practicable, the exclusion from participation therein of persons with known criminal records, habits or associations, and the exclusion or removal from any positions of authority or responsibility within casino gaming operations of any persons known to be so deficient in business probity, either generally or with specific reference to gaming, as to create or enhance the dangers

8

of unsound, unfair or illegal practices, methods and activities in the conduct of gaming or the carrying on of the business and financial arrangements incidental thereto.

(k) Because the public has a vital interest in casino gaming in Guam and has, through this act, enlarged the opportunities on island for gaming for private gain, participation in casino gaming operations as a licensee or registrant under this act shall be deemed a revocable privilege conditioned upon the proper and continued qualification of the individual licensee or registrant and upon the discharge of the affirmative responsibility of each such licensee or registrant to provide to the regulatory authorities designated by this act any assistance and information necessary to assure that the policies declared by this act are achieved.

(l) Casino gaming operations are especially sensitive and in need of public control and supervision; therefore, it is vital to the interests of the people of this island to prevent entry, directly or indirectly, into such operations of persons who have pursued economic gains in an occupational manner or context which are in violation of the criminal or civil public policies of Guam or of another jurisdiction where they have engaged in the gaming industry. Accordingly, the regulatory and investigatory powers and duties of the Guam Casino Gaming Control Commission and other agencies of the government who shall participate in the enforcement of this act shall be exercised to the fullest extent consistent with law to avoid the entry of undesirable persons into casino gaming operations on Guam.

(m) Because the economic stability of casino gaming operations is in the public interest and competition should help foster such stability, the regulatory powers and duties conferred by this act shall include the power and duty to regulate, control and prevent economic concentration in the casino gaming operations to encourage and preserve competition.

Section 1003. Definitions. The following terms and words shall have the following definitions. In the construction of this Act, the defined words and terms shall be understood in their plain English meaning unless the context of the provision clearly requires a different construction.

(a) "Applicant" — Any person who on his or her own behalf or on behalf of another has applied for permission to engage in any act or activity which is regulated under the provisions of this act.

(b) "Application" — A written request for permission to engage in any act or activity that is regulated under the provisions of this act.

(c) "Attorney" — Any attorney licensed to practice law in Guam or any other jurisdiction, including an employee of a casino licensee. Any attorney not licensed to practice law in Guam and who is not an employee of the federal or a state government may act as an attorney before the Commission only in accordance with the laws of Guam pertaining to pro hac vice admission.

(d) "Authorized game" — Roulette, baccarat, blackjack, poker, craps, big six wheel, slot machines, mahjong, pachinko, minibaccarat, red dog, pai gow, and sic bo; any variations or composites of such games, provided that such variations or composites are found by the Commission suitable for use after an appropriate test or experimental period

9

under such terms and conditions as the Commission may deem appropriate; and any other game which is determined by the Commission to be compatible with the public interest and to be suitable for casino use after such appropriate test or experimental period as the Commission may deem appropriate. "Authorized game" includes gaming tournaments in which players compete against one another in one or more of the games authorized herein or by the Commission or in approved variations or composites thereof if the tournaments are authorized by the Commission.

(e) "Casino" or "casino room" or "licensed casino" — One or more locations or rooms in a casino hotel facility that have been approved by the Commission for the conduct of casino gaming in accordance with the provisions of this act.

(f) "Casino employee" — Any natural person employed in the operation of a licensed casino including, without limitation, boxmen, dealers or croupiers, floormen, machine mechanics, casino security employees, count room personnel, cage personnel, slot machine and slot booth personnel, collection personnel, casino surveillance personnel, and data processing personnel; or any other natural person whose employment duties predominantly involve the maintenance or operation of gaming activity or equipment and assets associated therewith or who, in the judgment of the Commission, is so regularly required to work in a restricted casino area that licensure as a casino employee is appropriate.

(g) "Casino key employee" — Any natural person employed in the operation of a licensed casino in a supervisory capacity or empowered to make discretionary decisions which regulate casino operations, including, without limitation, pit bosses, shift bosses, credit executives, casino cashier supervisors, casino facility managers and assistant managers, and managers or supervisors of casino security employees or any other employee so designated by the Casino Control Commission for reasons consistent with the policies of this act.

(h) "Casino license" — Any license issued pursuant to this act that authorizes the holder thereof to own, operate or manage a casino.

(i) "Casino security employee" — Any natural person employed by a casino licensee or its agent to provide physical security in a casino or restricted casino area. "Casino security employee" shall not include any person who provides physical security solely in any other part of the casino hotel.

(j) "Casino service employee" — Any natural person employed to perform services or duties in a casino restricted casino area but who is not included within the definition of casino employee, casino key employee, or casino security employee.

(k) "Casino Service Industry" — Any form of enterprise which provides casino licensees with goods or services regarding the establishment, development, promotion or maintenance of a casino or the casino gaming industry as a whole which the Commission determines by rule must be licensed.

(l) "Chairman," "Commissioner" or "member" — The chairman and any member of the Guam Casino Gaming Control Commission, respectively.

10

(m) "Complimentary service or item" — A service or item provided at no cost or at a reduced price. The furnishing of a complimentary service or item by a casino licensee shall be deemed to constitute the indirect payment for the service or item by the casino licensee, and shall be valued in an amount based upon the retail price normally charged by the casino licensee for the service or item. The value of a complimentary service or item not normally offered for sale by a casino licensee or provided by a third party on behalf of a casino licensee shall be the cost to the casino licensee of providing the service or item, as determined in accordance with the rules of the Commission.

(n) "Commission" — The Guam Casino Gaming Control Commission.

(o) "Conservator" — A fiduciary appointed pursuant to the Article 10 of this Act.

(p) "Conservatorship action" — An action brought pursuant to the Article 10 of this Act for the appointment of a conservator.

(q) "Contingent casino gaming license" — A casino gaming license that the Commission may reserve for a native Guamanian or a legal entity controlled by native Guamanians who the Commission finds qualified to hold a casino license but who, in order to induce outside investment or expertise to assist in the establishment of a casino hotel, request that issuance of the actual casino license be deferred for up to two (2) years or such additional time as the Commission may allow in order to obtain such outside investment or joint venture participation or expertise. The actual casino gaming license shall not be issued unless the source of the outside investment or expertise is a person or legal entity that the Commission determines is qualified to be licensed as a casino owner, operator or manager.

(r) "Creditor" — The holder of any claim, of whatever character, against a person, whether secured or unsecured, choate or inchoate, liquidated or unliquidated, absolute, fixed or contingent.

(s) "Debt" — Any legal liability or obligation, whether choate or inchoate, liquidated or unliquidated, absolute, fixed or contingent.

(t) "Encumbrance" — A mortgage, security interest, lien or charge of any nature in or upon property.

(u) "Equal employment opportunity" — Equality in opportunity for employment by any person licensed pursuant to the provisions of this act.

(v) "Equity security" — (a) Any voting stock of a corporation, or similar security; (b) any security convertible, with or without consideration, into such a security, or carrying any warrant or right to subscribe to or purchase such a security; (c) any such warrant or right; or (d) any security having a direct or indirect participation in the profits of the issuer.

11

(w) "Establishment" or "casino hotel" or "casino hotel facility" — A single building, or two or more buildings that are physically connected in a manner deemed appropriate by the Commission, containing an approved hotel and a casino.

(x) "Family" –Spouse or living companion, parents and children of a person who is subject to the licensing or certification provisions of this act.

(y) "Game" --Any banking or percentage game located within the casino played with cards, dice, tiles, dominoes, or any electronic, electrical, or mechanical device or machine for money, property, or any other thing of value.

(z) "Gaming" --The act of participating in a game for money, property, or any other thing of value.

(aa) "Gaming device" or "gaming equipment" --Any electronic, electrical, or mechanical contrivance or machine or other physical object used in connection with gaming or any game.

(bb) "Gross Revenue"--The total of all sums, including checks received by a casino licensee pursuant to Section 6006 of this act, whether collected or not, actually received by a casino licensee from gaming operations, less only the total of all sums paid out to patrons as a result of their success in gaming and a deduction for uncollectible gaming receivables not to exceed the lesser of (i) a reasonable provision for uncollectible patron checks received from gaming operations or (ii) four percent (4%) of the total of all sums including checks, whether collected or not, less the amount paid out as winnings to patrons. For the purposes of this section, any check which is invalid and unenforceable pursuant to Section 6006(f) shall be treated as cash received by the casino licensee from gaming operations.

(cc) "Hearing examiner" --A Commissioner or other person authorized by the Commission to conduct hearings.

(dd) "Holding company" --Any corporation, association, firm, partnership, trust or other form of business organization not a natural person which, directly or indirectly, owns, has the power or right to control, or has the power to vote any significant part of the outstanding voting securities of a corporation which holds or applies for a casino license. For the purpose of this section, in addition to any other reasonable meaning of the words used, an entity is a "holding company" if it indirectly has, holds or owns any such power, right or security through any interest in a subsidiary or successive subsidiaries, however many such subsidiaries may intervene between the holding company and the corporate licensee or applicant.

(ee) "Hotel" or "approved hotel" -- A single building, or two or more buildings which are physically connected in a manner deemed appropriate by the Commission and which are operated as one casino-hotel facility under the provisions of Section 5004 of this act.

(ff) "Institutional investor" --Any retirement fund administered by a public agency for the exclusive benefit of federal, state, or local public employees, including employees of the

12

government of Guam, any investment company registered under the Investment Company Act of 1940 (*15 U.S.C. § 80a-1* et seq.), any collective investment trust organized by banks under Part Nine of the Rules of the Comptroller of the Currency, any closed end investment trust, any chartered or licensed life insurance company or property and casualty insurance company, and banking or other chartered or licensed lending institution, and investment advisor registered under The Investment Advisors Act of 1940 (*15 U.S.C. § 80b-1* et seq.), any combination of the aforementioned entities and such other persons or entities as the Commission may determine for reasons consistent with the policies of this act.

(gg) "Intermediary company" — Any corporation, association, firm, partnership, trust or any other form of business organization other than a natural person which:

(1) Is a holding company with respect to a corporation which holds or applies for a casino license, and

(2) Is a subsidiary with respect to any holding company.

(hh) "Junket" — An arrangement the purpose of which is to induce any person, selected or approved for participation therein on the basis of his ability to satisfy a financial qualification obligation related to his ability or willingness to game or on any other basis related to his propensity to game, to come to a licensed casino hotel for the purpose of gaming and pursuant to which, and as consideration for which, any or all of the cost of transportation, food, lodging, and entertainment for said person is directly or indirectly paid by a casino licensee or employee or agent thereof.

(ii) "Junket enterprise" — Any person, other than the holder of a casino license, who employs or otherwise engages the services of a junket representative in connection with a junket to a licensed casino, regardless of whether or not those activities occur within Guam.

(jj) "Junket representative" — Any natural person who negotiates the terms of, or engages in the referral, procurement or selection of persons who may participate in any junket to a licensed casino, regardless of whether or not those activities occur within Guam.

(kk) "License" — Any license required by this act.

(ll) "License or Registration Fee" — Any money required by law to be paid for the issuance or renewal of a casino license, or any other license or registration required by this act.

(mm) "Licensed casino operation" — Any casino licensed pursuant to the provisions of this act.

(nn) "Licensee" — Any person who is licensed under any of the provisions of this act.

(oo) "Living companion" — A person with whom another person shares an intimate domestic relationship, but which has not been recognized under the law of Guam as a marriage or domestic partnership.

(pp) "Native Guamanian" — Any person born on Guam who by virtue of that birth is a citizen of the United States.

(qq) "Operation" — The conduct of gaming as herein defined.

(rr) "Operation certificate" — A certificate issued by the Commission that certifies that permits the operation of a casino that conforms to the requirements of this act and its applicable rules.

(ss) "Party" — The Commission, or any licensee, registrant, or applicant, or any person appearing of record for any licensee, registrant, or applicant in any proceeding before the Commission or in any proceeding for judicial review of any action, decision or order of the Commission.

(tt) "Person" — Any natural person as well as any corporation, association, operation, firm, partnership, trust or other form of business association.

(uu) "Principal employee" — Any employee who, by reason of remuneration or of a management, supervisory or policy-making position or such other criteria as may be established by the Commission by regulation, holds or exercises such authority as shall in the judgment of the Commission be sufficiently related to the operation of a licensee so as to require approval by the Commission in the protection of the public interest.

(vv) "Property" — Real property, tangible and intangible personal property, and rights, claims and franchises of every nature.

(ww) "Publicly traded corporation" — Any corporation or other legal entity, except a natural person, which:

(1) Has one or more classes of security registered pursuant to section 12 of the Securities Exchange Act of 1934, as amended *(15 U.S.C. § 78l)*, or

(2) Is an issuer subject to section 15(d) of the Securities Exchange Act of 1934, as amended *(15 U.S.C. § 78(o))*, or

(3) Has one or more classes of securities traded in any open market in any foreign jurisdiction or regulated pursuant to a statute of any foreign jurisdiction which the Commission determines to be substantially similar to either or both of the aforementioned statutes.

(xx) "Registration" — Any requirement other than one which requires a license as a prerequisite to conduct a particular business as specified by this act.

(yy) "Registrant" — Any person who is registered pursuant to the provisions of this act.

14

(zz) "Regulated complimentary service account" — An account maintained by a casino licensee on a regular basis which itemizes complimentary services and includes, without limitation, a listing of the cost of junket activities and any other service provided at no cost or reduced price.

(aaa) "Resident" — Any person who occupies a dwelling within Guam, has a present intent to remain within Guam for an indefinite time, and manifests the genuineness of that intent by establishing an ongoing physical presence within Guam together with indicia that his or her presence within Guam is something other than merely transitory in nature.

(bbb) "Respondent" — Any person against whom a complaint has been filed or a written request for information served.

(ccc) "Restricted Casino Areas" — The cashier's cage, the soft count room, the hard count room, the slot cage booths and runway areas, the interior of table game pits, the surveillance room and catwalk areas, the slot machine repair room and any other area specifically designated by the Commission as restricted.

(ddd) "Security" — Any instrument evidencing a direct or indirect beneficial ownership or creditor interest in a corporation, including but not limited to, stock, common and preferred; bonds; mortgages; debentures; security agreements; notes; warrants; options and rights.

(eee) "Slot machine" — Any mechanical, electrical or other device, contrivance or machine which, upon insertion of a coin, token or similar object therein, or upon payment of any consideration whatsoever, is available to play or operate, the play or operation of which, whether by reason of the skill of the operator or application of the element of chance, or both, may deliver or entitle the person playing or operating the machine to receive cash or tokens to be exchanged for cash, or to receive merchandise or any thing of value whatsoever, whether the payoff is made automatically from the machine or in any other manner whatsoever, except that the cash equivalent value of any merchandise or other thing of value shall not be included in the total of all sums paid out as winnings to patrons for purposes of determining gross revenues or be included in determining the payout percentage of any slot machine. The Commission shall promulgate rules defining "cash equivalent value" in order to assure fairness, uniformity and comparability of valuation of slot machine payoffs.

(fff) "State" — Any state of the United States, the District of Columbia, Puerto Rico, the U. S. Virgin Islands, American Samoa, the Northern Mariana Islands, and any state associated with the United States in a compact of free association.

(ggg) "Statement of compliance" — A statement by the Commission which may be issued to an applicant indicating satisfactory completion of a particular stage or stages of the license application process, and which states that unless there is a change of any material circumstance pertaining to such particular stage or stages of license application involved in the statement, such applicant has complied with requirements mandated by this act and by the Commission and is therefore approved for license qualification to the stage or stages for which the statement has been issued.

15

(hhh) "Subsidiary" (1) Any corporation, any significant part of whose outstanding equity securities are owned, subject to a power or right of control, or held with power to vote, by a holding company or an intermediary company; or

    (2) A significant interest in any firm, association, partnership, trust or other form of business organization, not a natural person, which is owned, subject to a power or right of control, or held with power to vote, by a holding company or an intermediary company.

(iii) "Transfer" — The sale and every other method, direct or indirect, of disposing of or parting with property or with an interest therein, or with the possession thereof, or of fixing a lien upon property or upon an interest therein, absolutely or conditionally, voluntarily or involuntarily, by or without judicial proceedings, as a conveyance, sale, payment, pledge, mortgage, lien, encumbrance, gift, security or otherwise. The retention of a security interest in property delivered to a corporation shall be deemed a transfer suffered by such corporation.

(jjj) "United States — When used in a geographical sense, Guam, every state of the United States, the District of Columbia, Puerto Rico, the U. S. Virgin Islands, American Samoa, the Northern Mariana Islands, and any state associated with the United States in a compact of free association.

### Article 2—Establishment and Organization of Guam Casino Gaming Control Commission

Section 2001. <u>Guam Casino Gaming Control Commission; number of Commissioners; and their appointment.</u> There is within the government of Guam an autonomous corporation known as the Guam Casino Gaming Control Commission. The Commission shall be directed by a by a board consisting of five (5) persons who are appointed by the Governor, subject to the advice and consent of the Legislature.

Section 2002. <u>Qualifications of Commissioners.</u> No person shall qualify as a Commissioner unless he or she is a citizen of the United States and has been resident of Guam for at least five (5) years immediately preceding his or her appointment by the Governor. In addition, no person holding any elective or appointed office in or employed by the federal or local government shall be eligible to be a Commissioner until at least two (2) years have elapsed since the person ceased to hold the elective or appointed office or be so employed. No more than three (3) Commissioners may be of the same sex. No person who has been convicted of a felony shall be eligible to be a Commissioner. One of the Commissioners shall be a certified public accountant, a certified fraud examiner or a certified government financial manager.

Section 2003. <u>Terms of Commissioners; officers of the Commission; compensation of Commissioners; removal of Commissioners.</u> (a) <u>Initial appointments.</u> From the first five (5) Commissioners appointed, the Governor shall appoint one person to a term of five (5) years, one person to a term of four (4) years, and three (3) persons to a term of three (3) years each. The Governor shall designate one person to be the Chairman of the Commission. The term of office of each Commissioner shall commence on the first day after his or her appointment has been confirmed by the Legislature and he

16

or she has taken her oath of office. A Commissioner shall continue to hold office until his or her successor is appointed and confirmed, provided, however, if a successor has not been appointed and confirmed by one hundred twenty (120) days after the expiration of the incumbent's term, the position shall be vacant.

(b) Subsequent appointments and term limits. After the initial appointments, each Commissioner shall be appointed for a term of five (5) years, provided, however, that no person shall serve for more than two (2) terms and this shall be regardless of the length of the term of a person's initial appointment.

(c) Filling an appointment caused by a vacancy. An appointment to fill a vacancy on the Commission shall be for the length of the unexpired term of the Commissioner who is replaced.

(d) Term of chairman and replacement of chairman. The Commissioner appointed by the Governor as chairman shall serve in such capacity throughout his or her term. Upon a vacancy in the office of chairman, the Governor may appoint a sitting Commissioner or a replacement Commissioner as chairman.

(e) Chairman chief executive officer. The chairman shall be the chief executive officer of the Commission.

(f) Subordinate officers of Commission. The Commissioners shall elect annually from their number a vice chairman, a treasurer and a secretary. The vice chairman shall be empowered to carry out all of the responsibilities of the chairman during the chairman's disqualification or inability to serve.

(g) Commission appointment a full-time occupation. Each Commissioner shall devote his or her full time to his or her duties of office and no Commissioner shall pursue or engage in any other business, occupation or other gainful employment so long as he or she is a Commissioner.

(h) Compensation and expenses of Commissioners. The Chairman of the Commission shall be paid a salary of one hundred thousand ($100,000) per year. Each of the other Commissioners shall be paid a salary of ninety-five thousand ($95,000) per year. In addition to his or her salary, each Commissioner shall be reimbursed for actual and necessary expenses incurred by him or her in the performance of his or her duties as a Commissioner.

(i) Removal of a Commissioner. A Commissioner may be removed from office for misconduct in office, willful neglect of duty, or other conduct evidencing unfitness or incompetence in his or her office. A proceeding for removal may be instituted by the Attorney General in the Superior Court upon the Attorney General's own motion or upon the motion of a majority of the Commissioners or upon the motion of the Public Auditor. Notwithstanding any other provision of law, any Commissioner or any employee of the Commission shall automatically forfeit his or her office or position upon his or her conviction of any felony.

17

Section 2004. <u>Organization and employees of the Commission.</u> (a) <u>Organizational structure.</u> The Commission may establish, and from time to time alter, the Commission's plan of organization and it may incur expenses within the limits of funds available to it.

(b) <u>Executive Secretary, appointment of; qualifications for appointment; compensation for.</u> The Commission shall appoint an executive secretary who shall serve at its pleasure and shall administer the affairs of the Commission in accordance with the policies established by the Commission. No person shall be appointed executive secretary unless he or she is a citizen of the United States, has been a resident of Guam for not less than five (5) years, is a certified public accountant, a certified fraud examiner or a certified government financial manager or has had at least five (5) years experience in law enforcement administration or in the administration of a state or tribal gaming control commission in the United States. The executive secretary shall be paid a salary of ninety thousand dollars ($90,000) per year.

(c) <u>Other Commission personnel.</u> (i) The Commission may employ such other personnel as it deems necessary. Due to the sensitive nature of the work to be performed by the Commission and the absolute need to assure the integrity of its operations at all times, all employees of the Commission shall be unclassified employees who serve at the pleasure of the Commission. The salary and benefits of the employees shall be set by the Commission, but to the extent consistent with sound management practices, the salaries and benefits established for the employees shall be similar to those of persons performing similar functions in other government agencies or in an equivalent state, territorial or tribal gaming commission. Chapter 10 of Title 4 of the Guam Code Annotated shall not apply to the Commission or its employees. The Commissioners and employees shall be permitted to participate in government of Guam sponsored retirement, health and life insurance programs.

(ii) <u>Attorney for Commission.</u> Notwithstanding the provisions of any other law to the contrary, the Commission may employ an attorney who shall represent the Commission in any proceeding to which it is a party, and who shall render legal advice to the Commission upon its request. No person shall be appointed attorney to the Commission unless he or she is a citizen of the United States, has been a resident of Guam for at least five (5) years, has been admitted to the bar of Guam for at least five (5) years. The Commission attorney shall be paid a salary of ninety thousand dollars ($90,000) per year. The Commission attorney shall devote his or her full time to his or her duties for the Commission and shall not pursue or engage in any other business, occupation or other gainful employment so long as he or she is attorney for the Commission.

(iii) <u>Contractual services authorized in support of Commission's activities.</u> The Commission may contract for the services of other professional, technical and operational personnel and consultants as may be necessary in the performance of its responsibilities under this act. Commissioners and employees of the Commission shall be enrolled in the Government of Guam Retirement Plan and be eligible to participate in the government-sponsored group health, life and accident programs.

18

# Article 3—Control Authority Restrictions

Section 3001.  <u>Previous employment and individual assurance standards.</u>  (a) <u>Restrictions on pre-employment.</u>  No person shall be appointed to or employed by the Commission if, during the three (3) years immediately preceding the appointment or employment, the person held any direct or indirect interest in, or any employment by, any person who is licensed as a casino licensee in Guam or has an application pending before the Commission for a casino license.  The bar of the preceding sentence shall not apply to a person who is to be employed in a clerical or custodial position.

(b) <u>Affirmation of no interest to be executed by Commissioners and employees; false affirmation constitutes a felony.</u>  Prior to appointment or employment, each Commissioner and each employee of the Commission, shall affirm under penalty of perjury that he or she possesses no interest in any business or organization licensed or regulated by the Commission.  Any person who gives a false affirmation shall be guilty of a felony of the third degree.

(c) <u>Financial disclosure requirement for Commissioners, executive secretary and attorney; penalty for false statement.</u>  On or before June 1 of each year, each Commissioner and every employee of the Commission, except clerical or custodial personnel, shall file with the Public Auditor of Guam a financial disclosure statement given under penalty of perjury.  The statement shall list all of the assets and liabilities, property and business interests, and sources of income of the individual and his or her spouse or living companion.  A person who gives a statement that is false in any material aspect shall be guilty of a felony of the third degree.

(d) <u>Continuing duty of Commissioners and all employees to appear and testify.</u>  It shall be the duty of each Commissioner and of every employee of the Commission, without exception, and every person who is bound by a contract with the Commission, to appear and testify upon matters directly related to the conduct of his or her office, position or employment before any court, grand jury or the Public Auditor.  Any public employee who fails or refuses to so appear and to so testify, after having been informed of his or her duty to appear and testify by the entity seeking such testimony shall be removed from his or her office, position or employment.  A person who is bound by a contract with the Commission who fails or refuses to so appear and to testify, after having been informed of his or her duty to appear and testify by the entity seeking such testimony, shall forfeit his or her contract.

(e) <u>Immunity from use of evidence after claim of privilege against self-incrimination; perjury for false swearing.</u>  If any Commissioner or employee of the Commission or a person bound to the Commission by a contract, after having been informed of his or her duty to appear and testify and after having claimed the privilege against self-incrimination, testifies before any court, grand jury or the Public Auditor, the testimony and evidence derived from such testimony shall not be used against the person in a subsequent criminal proceeding under the laws of Guam, provided that no Commissioner or employee of the Commission or a person bound to the Commission by a contract shall be exempt from prosecution or punishment for perjury or false swearing committed while so testifying.

19

(f) Removal or termination for commission of a felony. Any Commissioner or employee of the Commission or any person who is bound to the Commission by a contract who admits that he or she has committed a felony relating to his or her employment or touching the administration of his or her office or position or in the obtaining or execution of a contract with the Commission shall be removed from such office, position or employment or forfeit his or her contract with the Commission.

Section 3002. Code of ethics to be promulgated. (a) No later than October 1, 2003, the Commission shall promulgate, pursuant to the Administrative Adjudication Law, Chapter 9, Title 5, Guam Code Annotated, a code of ethics that is modeled upon the Code of Judicial Conduct of the American Bar Association.

(b) The code of ethics shall not be in derogation of the laws of Guam, except that the code may be more restrictive than any law of Guam. The code shall include, but not be limited to, provisions that:

(1) No Commissioner or employee or person bound to the Commission by a contract shall be permitted to game in any establishment licensed by the Commission, except in the course of his or her duties;

(2) No Commissioner or employee or person bound to the Commission by a contract shall act in his or her official capacity in any matter wherein he or she or his or her spouse or living companion has a direct or indirect personal financial interest that might reasonably be expected to impair the person's objectivity or independence of judgment;

(3) No Commissioner or employee or person bound to the Commission by a contract shall act in his or her official capacity in a matter concerning an applicant for licensure or a licensee who is the employer of a spouse, living companion, child, or parent of the Commissioner or employee or person bound to the Commission by a contract when the fact of the employment of such related person might reasonably be expected to impair the person's objectivity and independence of judgment;

(4) No spouse, living companion, child, or parent of a Commissioner or employee shall be employed in any capacity by an applicant for a casino license or a casino licensee, provided, however, that this prohibition shall not apply to a person who is employed in a clerical or custodial capacity;

(5) No Commissioner shall meet with any person, except for any other Commissioner or employee of the Commission or a person bound to the Commission by a contract, to discuss any issues involving any pending or proposed application or any matter whatsoever which may reasonably be expected to come before the Commission for determination unless the meeting or discussion takes place on the business premises of the Commission, provided, however, that Commissioners may meet to consider matters requiring the physical inspection of equipment or premises at the location of the equipment or premises;

20

(6)   A permanent log open to public inspection shall be maintained of the dates, times, places, attendees and subjects discussed pursuant to the meetings permitted in paragraph (5);

(7)   No Commissioner or employee or a person bound to the Commission by a contract shall have any interest, direct or indirect, in any applicant or in any person licensed or regulated by the Commission during his term of office, employment or contract or for such period thereafter as may be prescribed by this act;

(8)   Each Commissioner and employee, including the attorney for the Commission, shall devote his or her entire time and attention to his or her duties and shall not pursue any other business or occupation or other gainful employment, provided, however, clerical and custodial employees may engage in such other gainful employment so long as it shall not interfere with their duties to the Commission and, provided, further, that such employees make known to the Commission in writing the existence of such other gainful employment;

(9)   No Commissioner, employee or person bound to the Commission by a contract shall (a) use his or her position to interfere with or affect the result of an election or a nomination for any federal or local office; (b) directly or indirectly extort, coerce, attempt to extort or coerce, command or advise any person to pay, lend or contribute anything of value to a party, committee, organization, agency or person for political purposes; or (c) take part in any political campaign or the management thereof, provided, however, that nothing herein shall prohibit a person from voting as he or she chooses or from expressing his or her personal opinions on political subjects and candidates, nominees or elected officials.

Section 3003. Post-employment restrictions. (a) Two-year bar. No Commissioner or employee of the Commission or a person bound to the Commission by a contract shall hold any direct or indirect interest in, or be employed by, or represent in any capacity any applicant for or any person licensed or regulated by the Commission for a period of two (2) years following the date on which his or her term on or employment or contract with the Commission ends, provided, however, that this prohibition shall not apply to a person who has been employed in a clerical or custodial capacity.

(b) Exception for reduction in work. Notwithstanding the provisions of paragraph (a), if the employment of a Commission employee or the contract of a person who is bound to the Commission by a contract is terminated as a result of a reduction in the work of the Commission, the affected person may accept employment that would otherwise be prohibited provided that the Commission by its adoption of a written resolution waives the time bar. If the Commission refuses to give its approval, the Commission shall state in writing its basis for the denial.

(c) Bar not applicable in government representation. The bars in subparagraph (a) shall not apply to any person who appears before the Commission as a representative of the government of Guam or the federal government.

(d) Ban on representations by organizations. No partnership, firm or corporation in which a former Commissioner or employee has an interest, nor any partner, officer or

21

employee of any such partnership, firm or corporation, shall make any appearance or representation which is prohibited to the former Commissioner, employee or person that was bound to the Commission by a contract, provided, however, that this prohibition shall not apply to a person who has been employed in a clerical or custodial capacity.

(e) Liability for violations. (1) Violations by licensees. No applicant or person or organization licensed or regulated by the Commission shall employ or offer to employ, or provide, transfer or sell, or offer to provide, transfer or sell any interest, direct or indirect, in any business or activity licensed or registered by the Commission to any person restricted from such transactions by the provisions of this section. A violation of this section shall be a felony of the third degree. In addition, the Commission may impose such administrative penalties as may be further provided by law or regulation.

(2) Violations by former Commissioners, employees or persons bound to the Commission by contract. Any former Commissioner, employee or person bound to the Commission by contract who violates any provision of this section shall be guilty of a felony of the third degree. In addition, the Commission may impose such administrative penalties as may be further provided by law or regulation.

## Article 4 - Commission Duties and Powers

Section 4001. General duties and powers. The Commission shall have general responsibility for the implementation of this act, including, without limitation, the responsibility to:

(a) Hear and decide promptly and in reasonable order all license, regulation, registration, certification and permit applications and causes affecting the granting, suspension, revocation, or renewal thereof;

(b) Conduct all hearings pertaining to civil violations of this act or rules promulgated hereunder and conduct investigative hearings concerning the conduct of gaming and gaming operations as well as the development and well-being of the activities controlled by this act;

(c) Promulgate such rules as in its judgment may be necessary to fully implement this act;

(d) Collect all license, regulation and registration fees and taxes imposed by this act and the rules issued pursuant thereto;

(e) Levy and collect penalties for the violation of provisions of this act and the rules promulgated hereunder;

(f) Be present through its inspectors and agents at all times during the operation of any casino for the purpose of certifying the revenue thereof, receiving complaints from the public relating to the conduct of gaming operations, examining records of revenues and procedures, and conducting periodic reviews of operations and facilities for the purpose of evaluating the compliance with appropriate laws and rules of all persons licensed or regulated under this act;

22

Case 1:04-cv-00046    Document 1-2    Filed 10/26/2004    Page 1 of 30

(g) Refer, as appropriate, to the Public Auditor for investigation and to the Attorney General for investigation and prosecution, any evidence of a violation of this act or the rules issued pursuant thereto;

(h) Review and rule upon any complaint by a casino licensee regarding any investigation procedures by the Commission's staff which are unnecessarily disruptive of a casino's operation, which complaint shall not be established except upon the production of clear and convincing evidence establishing that the investigative procedures had no reasonable law enforcement purpose and that the procedures were so disruptive as to inhibit unreasonably the casino's operations;

(i) Exercise, through those employees that it designates as peace officers, such investigative powers as are granted by this act;

(j) Sue and be sued; and

(k) Maintain an Internet website containing at a minimum this act, the rules issued pursuant thereto and notice of its meetings and of proposed rules and of orders issued by the Commission.

Section 4002.  Commission powers regarding denials and sanctions.  The Commission shall assure, to the extent required by this act, that no license, approval, certificate, or permit shall be issued to nor held by, nor shall there be any material involvement, directly or indirectly, with a licensed casino's operation or ownership by unqualified or disqualified persons or persons whose operations are conducted in a manner not conforming with the provisions of this act. For purposes of this section, 'unqualified person' means any person who is found by the Commission to be unqualified pursuant to criteria set forth in Section 4007.  In enforcing the provisions of this act, the Commission shall have the power and authority to deny any application; limit or restrict any license, registration, certificate, permit or approval; suspend or revoke any license, registration, certificate, permit or approval; and, impose a penalty on any person licensed, regulated, registered, or previously approved for any cause deemed reasonable by the Commission pursuant to this act and the Commission's rules, except that no such denial, limitation, suspension or revocation shall be issued solely by reason of the fact that an applicant, registrant, or licensee holds an interest in or is associated with any licensed casino enterprise in any other jurisdiction.

Section 4003.  Subpoenas, oaths.  The Commission shall have the power and authority to issue subpoenas and to compel the attendance of witnesses at any place within Guam, to administer oaths and to require testimony under oath before the Commission in the course of any investigation or hearing conducted under this act.  The Commission may serve or cause to be served its process or notices in a manner provided for the service of process and notice in civil actions in accordance with the Guam Rules of Civil Procedure. The Commission shall have the authority to propound written interrogatories and the Commission may appoint hearing examiners, to whom may be delegated the power and authority to administer oaths, issue subpoenas, propound written interrogatories, and require testimony under oath pertaining to any aspect of any gaming activity and casino operations and ownership conducted pursuant to this act.

23

Section 4004. <u>Testimonial immunity.</u> The Commission may order any person to answer a question or questions or produce evidence of any kind and confer immunity as provided in this section, If, in the course of any investigation or hearing conducted under this act, a person refuses to answer a question or produce evidence on the ground that he or she will be exposed to criminal prosecution thereby, then in addition to any other remedies or sanctions provided for by this act, the Commission may, by a majority vote of the Commissioners and after the written approval of the Attorney General, issue an order to answer or to produce evidence with immunity. If, upon issuance of such an order, the person complies therewith, he or she shall be immune from having such responsive answer given by him or her or such responsive evidence produced by him or her, or evidence derived there from, used to expose him or her to criminal prosecution, except that such person may nevertheless be prosecuted for any perjury committed in such answer or in accordance with the order of the Commission. A person who refuses to respond despite a grant of immunity shall be held in contempt of the Commission and the matter shall then be referred to the Superior Court for a determination of the appropriate penalty, which in no case shall exceed twelve (12) months of incarceration at the Department of Corrections.

Section 4005. <u>Collection of fees, interest or penalties.</u> At any time within three (3) years after any amount of fees, interest, or penalties required to be paid pursuant to the provisions of this act shall become due and payable, the Commission may bring a civil action in the Superior Court or any other court of appropriate jurisdiction, in the name of the government of Guam, to collect the delinquent amount, together with penalties and interest. If the amount owed has been concealed from the Commission by fraud, the time to commence an action shall not run until the fraud has been or should have been discovered by the Commission. An action may be brought whether or not the person owing the amount is at such time an applicant, licensee or registrant pursuant to the provisions of this act. If such action is brought in Guam, a writ of attachment may be issued and no bond or affidavit shall be required prior to the issuance thereof. In all actions in Guam, the records of the Commission shall be prima facie evidence of the determination of the fee or tax or the amount of the delinquency.

Each debt that is due and payable as a result of fees, interest or penalties required to be collected pursuant to the provisions of this act or the rules promulgated hereunder, including any amount authorized as compensation of costs incurred because of the necessity of the appointment of a conservator, and each regulatory obligation imposed as a condition upon the issuance or renewal of a casino license which requires the licensee to maintain, as a fiduciary, a fund for a specific regulatory purpose, shall constitute a lien on the real property in Guam owned by or hereafter acquired by the applicant, licensee, or registrant owing such a debt or on whom such an obligation has been imposed.

Section 4006. <u>Emergency Rules.</u> (a) The Commission, in emergency circumstances, may summarily adopt, amend or repeal any regulation pursuant to the Administrative Adjudication Law.

(b) Notwithstanding any other provision of this act or the Administrative Adjudication Law to the contrary, the Commission, after notice provided in accordance with this subsection, may authorize the temporary or interim adoption, amendment or repeal of any rule concerning the conduct of gaming or the use or design of gaming

24

equipment, or the internal procedures and administrative and accounting controls of a licensee for a period not to exceed one (1) year for the purpose of determining whether such rules should be adopted on a permanent basis, Any temporary rulemaking authorized by this subsection shall be subject to such terms and conditions as the Commission may deem appropriate. Notice of any temporary rulemaking action taken by the Commission pursuant to this subsection shall be distributed to the news media of Guam and published on the Commission's Internet website at least seven days prior to the implementation of the temporary rules. Nothing herein shall be deemed to require the publication in a daily newspaper of the full text of any temporary rule adopted by the Commission or notice of any modification of any temporary rulemaking initiated in accordance with this subsection. The text of any temporary rule adopted by the Commission shall be posted in each casino affected by the temporary rulemaking.

Section 4007. Rule requiring exclusion of certain persons. (a) The Commission, by rule, shall provide for the establishment of a list of persons who are to be excluded or ejected from any licensed casino establishment. Such provisions shall define the standards for exclusion, and shall include standards relating to persons:

(1) Who are career or professional offenders as defined by rules of the Commission; or

(2) Whose presence in a licensed casino hotel would be inimical, in the opinion of the Commission, to the interest of Guam or of licensed gaming therein, or both.

(b) Race, color, creed, national origin or ancestry, citizenship, sex or religion shall not be a reason for placing the name of any person upon such list. Such list shall provide, however, that any alien unlawfully in Guam shall be excluded or ejected from any licensed casino regardless of whether the individual's name has been published on the Commission's list of excluded persons.

(c) The Commission may impose sanctions upon a licensed casino or individual licensee or registrant in accordance with the provisions of this act if such casino or individual licensee or registrant knowingly fails to exclude or eject from the premises of any licensed casino any person placed by the Commission on the list of persons to be excluded or ejected.

(d) Any list compiled by the Commission of persons to be excluded or ejected shall not be deemed an all-inclusive list, and licensed casino establishments shall have a duty to keep from their premises persons known to them to be within the classifications declared in paragraphs (1) and (2) of subsection (a) and the rules promulgated hereunder, or known to them to be persons whose presence in a licensed casino hotel would be inimical to the interest of Guam or of licensed gaming therein, or both, as defined in standards established by the Commission.*

Section 4009. Exclusion or ejection of certain persons. A casino licensee may exclude or eject from its casino hotel any person who is known to it to fall within the categories of excluded persons under Section 4007(a). Nothing in this section or in any other law of Guam shall limit the right of a casino licensee to exercise its common law right to exclude or eject from its casino hotel any person who

*The number "Section #008" has been omitted in error. Section 4009 follows on directly from Section 4007.

Case 1:04-cv-00046    Document 1-2    Filed 10/26/2004    Page 4 of 30

disrupts the operations of its premises, threatens the security of its premises or its occupants, or is disorderly or intoxicated.

Section 4010. <u>Penalties for gaming by prohibited persons.</u> (a) A person who is prohibited from gaming in a licensed casino by this act or any order of the Commission or a court of competent jurisdiction shall not collect, in any manner or proceeding, any winnings or recover any losses arising as a result of any prohibited gaming activity.

(b) For the purposes this act, any gaming activity in a licensed casino which results in a prohibited person obtaining any money or thing of value from, or being owed any money or thing of value by, the casino shall be considered, solely for purposes of this section, to be a fully executed gaming transaction.

(c) In addition to any other penalty provided by law, any money or thing or value which has been obtained by, or is owed to, any prohibited person by a licensed casino as a result of wagers made by a prohibited person shall be subject to forfeiture by order of the Commission, following notice to the prohibited person and an opportunity to be heard. If the Commission orders a forfeiture, one-half shall be deposited into the General Fund for appropriation by the Legislature to the Department of Health and Social Services and/or the Department of Mental Health to provide funds for compulsive gaming treatment and prevention programs and the remaining one-half shall be deposited into the Guam Casino Gaming Control Commission Fund established by Section 11004.

Section 4011. <u>Commission reports and recommendations; annual audit.</u> (a) The Commission shall carry on a continuous study of the operation and administration of casino gaming control laws which may be in effect in other jurisdictions, literature on this subject which may from time to time become available, federal laws which may affect the operation of casino gaming in Guam, and the reaction of Guam's residents to existing and potential features or dangers of casino gaming under this act. It shall seek to ascertain any defects in this act or in the rules and rules issued hereunder, formulating recommendations for changes in this act to prevent abuses thereof, guarding against the use of this act as a cloak for the carrying on of illegal gaming or other criminal activities, and insuring that this act and the rules and rules shall be in such form and be so administered as to serve the true purposes of this act. The Commission shall make to the Governor, the Legislature, the Public Auditor and the Attorney General an annual report of all revenues, expenses and disbursements, and shall include therein such recommendations for changes in this act as the Commission deems necessary or desirable. The Commission shall report immediately to the Governor and the Legislature any matters which in its judgment require immediate changes in the laws of Guam in order to prevent abuses and evasions of this act or of rules and rules promulgated hereunder, or to rectify undesirable conditions in connection with the operation and regulation of casino gaming.

(b) The Public Auditor shall audit the finances and operations of the Commission in accordance with the provisions of Chapter 19 of Title 1 of the Guam Code Annotated. The cost of any audit performed by or caused to be performed by the Public Auditor shall be borne by the Commission.

Section 4012. <u>Meetings and quorum.</u> (a) Meetings of the Commission shall be held at the call of the chairman or at the call of three Commissioners.

Case 1:04-cv-00046   Document 1-2   Filed 10/26/2004   Page 5 of 30

(b) The Commission shall be subject to the provisions of the Open Government Law set out at Chapter 8 of Title 5 of the Guam Code Annotated., provided, however, the Commission may hold executive sessions with the Public Auditor, the Attorney General, the Chief of the Guam Police Department, or federal law enforcement officials to review or discuss matters within the purview of the Commission which may pose a threat to public health, safety or welfare. Such Commission employees and consultants as the Commission deems necessary to be present may attend such meetings. All records of such meetings may be sealed for so long as the Commission deems necessary to protect the public health, safety or welfare, provided, however that the Governor, any Commissioner, or any member of the Legislature may petition the Superior Court to review in camera the records of such a meeting or meetings to determine whether the records should remain sealed or be made public. Upon appeal of the decision of the Superior Court in such a matter, the decision of the Superior Court shall be stayed pending the decision of the Supreme Court. Notice of such meetings shall be given as for any other meeting, except that the subject matter of the meeting need not be included in the notice.

(c) With the exception of a meeting called pursuant to paragraph (b), the Commission shall take all necessary steps to ensure that all interested persons are given adequate notice of Commission meetings, and the agenda of such meetings, through notice given to media regularly engaged in Guam in the dissemination of information and by publication of the information on the Commission's Internet website.

(d) A majority of the full Commission shall determine any action of the Commission.

Section 4013. Minutes and records. (a) The Commission shall keep a record of all proceedings held at all open meetings of the Commission. A verbatim transcript of those proceedings shall be prepared by the Commission upon the request of any Commissioner or upon the request of any other person and the payment by that person of the costs of preparation. A copy of a transcript shall be made available to any person upon request and payment of the costs of preparing the copy.

A true copy of the minutes of all open meetings of the Commission and a certified copy of any rule adopted by the Commission shall be forthwith delivered to the Governor, the Speaker of the Legislature, the Public Auditor and the Attorney General and published on the Commission's Internet website.

The record of any meeting held pursuant to Section 4012(b) shall be made public only upon a vote of a majority of the Commissioners or upon the order of the Superior Court.

(b) The Commission shall keep and maintain a list of all applicants for licenses and registrations together with a record of all actions taken with respect to such applicants, which file and record shall be open to public inspection; provided, however, that the foregoing information regarding any applicant whose license or registration has been denied, revoked, or not renewed shall be removed from such list after five years from the date of such action.

(c) The Commission shall maintain such other files and records as it may determine to be necessary and appropriate.

(d) Except as provided in subsection (h) of this section, all information and data required by the Commission to be furnished hereunder, or which may otherwise be obtained, relative to the internal controls imposed by this act or rules issued pursuant thereto relative to the earnings or revenue of any applicant, registrant, or licensee shall be kept confidential and shall not be revealed in whole or in part except in the course of the necessary administration of this act, or upon the lawful order of a court of competent jurisdiction, or, with the approval of the Attorney General, to a duly authorized law enforcement agency or the Public Auditor.

(e) All information and data pertaining to an applicant's criminal record, family, and background furnished to or obtained by the Commission from any source shall be kept confidential and shall be withheld in whole or in part, except that any information shall be released upon the lawful order of a court of competent jurisdiction or, with the approval of the Attorney General, to a duly authorized law enforcement agency or the Public Auditor.

(f) Files, records, reports and other information in the possession of the Department of Revenue and Taxation pertaining to licensees and that is not restricted as to its distribution by federal law shall be made available to the Commission as may be necessary to the effective administration of this act.

(g) The following information to be reported periodically to the Commission by a casino licensee shall not be considered confidential and shall be available for public inspection:

(1) A licensee's gross revenue from all authorized games;

(2) (a) The dollar amount of patron checks initially accepted by a licensee, (b) the dollar amount of patron checks deposited to the licensee's bank account, (c) the dollar amount of such checks initially dishonored by the bank and returned to the licensee as "uncollected," and (d) the dollar amount ultimately uncollected after all reasonable efforts;

(3) The amount of gross revenue tax actually paid;

(4) A list of the premises and the nature of improvements, costs thereof and the payees for all such improvements, which were required to be made by the casino owner as a condition of the granting of the casino license; and

(5) All quarterly and annual financial statements required to be submitted to the Commission.

(6) Nothing in this subsection shall be construed to limit access by the public to those forms and documents required to be filed pursuant to Article 11 of this act.

Section 4014. Appointment of peace officers. Pursuant to the power granted to the Commission by Section 4001(i), the Commissioners may appoint employees peace officers and as peace officers those employees shall have the power to: (a) promptly and in reasonable order investigate all applications, complaints made against persons licensed or regulated by this act or persons making an application for any benefit under this act, enforce the provisions of this act and all rules promulgated hereunder, and prosecute before the Commission all proceedings for violations of this act or any rules promulgated hereunder; and

28

(b) Provide the Commission with all information necessary for all action pertaining to licensing and for all proceedings involving enforcement of the provisions of this act or any rules promulgated hereunder.

Section 4015. Specific duties of peace officers. The Commission's peace officer employees shall: (a) Investigate the qualifications of each applicant before any license, certificate, or permit is issued to any person;

(b) Investigate the circumstances surrounding any act or transaction for which Commission approval is required;

(c) Investigate violations of this act and rules promulgated hereunder and refer to the Attorney General for prosecution all criminal violations of this act.;

(d) Conduct continuing reviews of casino operations through on-site observation and other reasonable means to assure compliance with this act and rules promulgated hereunder;

(e) Receive and take appropriate action on any referral from the Commission relating to any evidence of a violation of this act or the rules promulgated hereunder;

(f) Cooperate and exchange with appropriate law enforcement agencies both within and without the United States criminal history record information for use in considering applicants for any license or registration issued pursuant to the provisions of this act;

(g) Assist the Public Auditor in audits of casino operations at such times, under such circumstances, and to such extent as the Commission or Public Auditor shall determine, including reviews of accounting, administrative and financial records, and management control systems, procedures and records utilized by a casino licensee;

(h) Be entitled to request and receive information, materials and any other data from any licensee or registrant, or applicant for a license or registration under this act.

Section 4016. Cooperation by licensees, registrants or applicants. Each licensee or registrant, or applicant for a license or registration under this act shall cooperate with the Commission's peace officer employees and the Public Auditor in the performance of their duties.

Section 4017. Inspection, seizure and warrants. (a) The peace officer employees, upon approval of the Commission's Attorney, without notice and without warrant, shall have the authority to:

(1) Inspect and examine all premises wherein casino gaming is conducted; or gaming devices or equipment are manufactured, sold, distributed, or serviced; or wherein any records of such activities are prepared or maintained;

(2) Inspect all equipment and supplies in, about, upon or around such premises;

(3) Seize summarily and remove from such premises and impound any such equipment or supplies for the purposes of examination and inspection;

(4) Inspect, examine and audit all books, records, and documents pertaining to a casino licensee's operation;

29

(5) Seize, impound or assume physical control of any book, record, ledger, game, device, cash box and its contents, counting room or its equipment, or casino operations; and

(6) Inspect the person, and personal effects present in a casino facility licensed under this act, of any holder of a license or registration issued pursuant to this act while that person is present in a licensed casino facility.

(b) The provisions of subsection (a) shall in no way be deemed to limit warrantless inspections except in accordance with constitutional requirements.

(c) To effectuate further the purposes of this act, the peace officer employees may obtain administrative warrants for the inspection and seizure of any property possessed, controlled, bailed or otherwise held by any applicant, licensee, registrant, intermediary company, or holding company.

(d) Issuance and execution of warrants for administrative inspection shall be in accordance with the following:

(1) Any judge of the Superior Court or the Supreme Court may, upon proper oath or affirmation showing probable cause, issue warrants for the purpose of conducting administrative inspections authorized by this act or rules hereunder and seizures of property appropriate to such inspections. For the purposes of this section, "probable cause" means a valid public interest in the effective enforcement of the act or rules sufficient to justify administrative inspection of the area, premises, building or conveyance in the circumstances specified in the application for the warrant.

(2) A warrant shall issue only upon an affidavit of a person duly designated and having knowledge of the facts alleged, sworn to before the judge and establishing the grounds for issuing the warrant. If the judge is satisfied that grounds for the application exist or that there is probable cause to believe they exist, he or she shall issue a warrant identifying the area, premises, building, or conveyance to be inspected; the purpose of such inspection; and, where appropriate, the type of property to be inspected, if any. The warrant shall identify the item or types of property to be seized, if any. The warrant shall be directed to a person authorized to execute it. The warrant shall state the grounds for its issuance and the name of the person or persons whose affidavit has been taken in support thereof. It shall command the person to whom it is directed to inspect the area, premises, building, or conveyance identified for the purpose specified, and where appropriate, shall direct the seizure of the property specified. The warrant shall direct, except in emergent circumstances, that it be served during normal business hours of the licensee. It shall designate the judge to whom it shall be returned.

(3) A warrant issued pursuant to this section must be executed and returned within ten (10) days of its date. If property is seized pursuant to a warrant, the person executing the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken. The return of the warrant shall be made promptly and shall be accompanied by a written inventory of any property taken. The inventory shall be made in the presence of the person executing the warrant and of the person from whose possession or premises the property was taken, if they are present, or in the presence of at least one credible person other than the person executing the warrant. The clerk of the court, upon request, shall deliver a copy of the

30

inventory to the person from whom or from whose premises the property was taken and to the applicant for the warrant.

(4) The judge who has issued a warrant under this section shall attach to the warrant a copy of the return and all papers filed in connection therewith and shall cause them to be filed with the court which issued such warrant.

(e) The peace officer employees are authorized to make administrative inspections to check for compliance by any applicant, licensee, registrant, intermediary company or holding company with the provisions of this act or rules promulgated hereunder, and to investigate any violations thereof.

(f) This section shall not be construed to prevent entries and administrative inspections, including seizures of property, without a warrant:

(1) With the consent of the owner, operator or agent in charge of the controlled premises;

(2) In situations presenting imminent danger to health or safety;

(3) In situations involving inspection of conveyances where there is reasonable cause to believe that the mobility of the conveyance makes it impractical to obtain a warrant or in any other exceptional or emergent circumstance where time or opportunity to apply for a warrant is lacking;

(4) In accordance with the provisions of this act; or

(5) In all other situations where a warrant is not constitutionally required.

Section 4018. Powers not enumerated. The Commission may exercise any proper power or authority necessary to perform the duties assigned to it by law, and no specific enumeration of powers in this act shall be read to limit the authority of the Commission to administer this act.

## Article 5—Licensing

Section 5001. General provisions. (a) Limit on number of casino licenses. No more than ten (10) casino licenses shall be issued pursuant to this act and no license shall be issued except to operate a casino in an approved hotel.

(b) Affirmative responsibility of applicants and licensees. It shall be the affirmative responsibility of each applicant and licensee to establish by clear and convincing evidence the individual qualifications that are requisite for the obtaining of a license, and for a casino license the qualifications of each person who is required to be qualified under this act as well as the qualifications of the facility in which the casino is to be located.

(c) Any applicant, licensee, registrant, or any other person who must be qualified pursuant to this act shall provide all information required by this act and the rules issued pursuant thereto and satisfy all requests for information pertaining to qualification and in the form specified by the Commission. All applicants, registrants, and licensees shall waive liability as to the government of Guam, and its instrumentalities and agents, for any damages resulting from any disclosure or publication in any manner, other than a willfully unlawful disclosure or publication, of any material or information acquired during inquiries, investigations or hearings.

31

(d) All applicants, licensees, registrants, intermediary companies, and holding companies shall consent to inspections, searches and seizures and the supplying of individual photographs, handwriting and voice exemplars and eye scans as authorized by this act and rules promulgated hereunder.

(e) All applicants, licensees, registrants, and any other person who shall be qualified pursuant to this act shall have the continuing duty to provide any assistance or information required by the Commission, and to cooperate in any inquiry or investigation or hearing conducted by the Commission. If, upon issuance of a formal request to answer or produce information, evidence or testimony, an applicant, licensee, registrant, or any other person who is required to be qualified pursuant to this act refuses to comply, the application, license, registration or qualification of such person may be denied or revoked by the Commission.

(f) No applicant or licensee shall give or provide, offer to give or provide, directly or indirectly, any compensation or reward or any percentage or share of the money or property played or received through gaming, except as authorized by this act, in consideration for obtaining any license, authorization, permission or privilege to participate in any way in gaming operations.

(g) All licensees, registrants, and persons required to be qualified under this act, and all persons employed by a casino service industry licensed pursuant to this act, shall have a duty to inform the Commission of any action that they believe would constitute a violation of this act. No applicant, licensee or registrant shall discriminate against any person who supplies information to the Commission pursuant to this section.

(h) Any person who must be qualified pursuant to this act in order to hold the securities of a casino licensee or any holding or intermediary company of a casino licensee may apply for qualification status prior to the acquisition of any such securities.

(i) The Commission may establish by rule reasonable fees to pay for the cost of all investigations and proceedings necessitated in the processing of any application for any benefit under this act.

Section 5002. Statement of compliance. (a) (1) The Commission, in its discretion, may issue a statement of compliance to an applicant for any license or for qualification status under this act at any time the Commission is satisfied that the applicant has established by clear and convincing evidence that one or more particular eligibility criteria have been satisfied by an applicant. The applicant shall request the statement of compliance by filing a petition with the Commission. Before the Commission refers a petition for investigation, the Commission may require the applicant to establish to the satisfaction of the Commission that the applicant actually intends, if found qualified, to engage in the business or activity that would require the issuance of the license or the determination of qualification status.

(2) Any person who must be qualified pursuant to this act in order to hold the securities of a casino licensee or any holding or intermediary company of a casino licensee may request, prior to the acquisition of any such securities, a determination by the Commission that the person is qualified to hold such securities. Any request for the issuance of such a statement shall be initiated by the person filing a petition with the Commission in which the person shall be required to establish that there

32

is a reasonable likelihood that, if qualified, the person will obtain and hold the securities of a casino licensee or any holding or intermediary company thereof to such extent as to require the qualification of the person. If the Commission finds that this reasonable likelihood exists, and if the Commission is satisfied that the qualifications of the person have been established by clear and convincing evidence, the Commission, in its discretion, may issue a statement that the person is qualified to hold such securities. Any person who requests a statement pursuant to this paragraph shall be subject to the provisions of Section 5001 and shall pay for the costs of all investigations and proceedings in relation to the request unless the person provides to the Commission an agreement with one or more casino licensees which states that the licensee or licensees will pay those costs.

(b) Any statement of compliance shall specify:

(1) The particular eligibility criterion satisfied by the applicant or person;

(2) The date on which the Commission made its determination;

(3) The continuing obligation of the applicant or person to file any information required by the Commission as part of any application for a license or qualification status, including information related to the eligibility criterion for which the statement of compliance was issued; and

(4) The obligation of the applicant or person to reestablish its satisfaction of the eligibility criterion should there be a change in any material fact or circumstance that is relevant to the eligibility criterion for which the statement of compliance was issued.

(c) A statement of compliance certifying satisfaction of the requirements of Section 5005 with respect to a specific casino hotel proposal submitted by an eligible applicant may be accompanied by a written commitment from the Commission that a casino license shall be reserved for a period not to exceed two (2) years or within such additional time period as the Commission, upon a showing of good cause therefor, may establish and shall be issued to such eligible applicant with respect to such proposal provided that such applicant as of the date of the statement (1) complies in all respects with the provisions of this act, (2) qualifies for a casino license within a period not to exceed two (2) years of the date of such commitment or within such additional time period as the Commission may allow, and (3) complies with such other conditions as the Commission shall impose. The Commission may revoke such reservation at any time it finds that the applicant is disqualified from receiving or holding a casino license or has failed to comply with any conditions imposed by the Commission. Such reservation shall be automatically revoked if the applicant does not qualify for a casino license within the period of such commitment. No license other than a casino license shall be reserved by the Commission.

(d) In lieu of a statement of compliance, in the case of a native Guamanian or a legal entity controlled by native Guamanians, the Commission may issue a contingent casino gaming license as defined by Section 1003(q). The purpose of such contingent casino gaming license is to assure that native Guamanians shall be afforded a realistic opportunity to participate as investors, owners, operators or managers of casino hotels with the assistance of such outside investment or expertise as may be desirable to assure the success of the venture.

33

(e) Any statement of compliance or contingent casino gaming license issued pursuant to this section shall be withdrawn by the Commission if:

(1) The applicant or person otherwise fails to satisfy the standards for licensure or qualification;

(2) The applicant or person fails to comply with any condition imposed by the Commission; or

(3) The Commission finds just cause to revoke the statement of compliance for any other reason.

Section 5003. Casino license; eligibility for. (a) No casino shall operate unless all necessary licenses and approvals therefor have been obtained in accordance with law.

(b) Only the following persons shall be eligible to hold a casino license; and, unless otherwise determined by the Commission in accordance with subsection (c) of this section, each of the following persons shall be required to hold a casino license prior to the operation of a casino in the casino hotel for which the casino license has been applied:

(1) Any person who either owns an approved casino hotel or owns or has a contract to purchase or construct a casino hotel which in the judgment of the Commission can become an approved casino hotel within two (2) years or within such additional time as the Commission, upon a showing of good cause, may allow;

(2) Any person who, whether as lessor or lessee, either leases an approved casino hotel or leases or has an agreement to lease a casino hotel which in the judgment of the Commission can become an approved casino hotel within two (2) years or within such additional time period as the Commission, upon a showing of good cause, may allow;

(3) Any person who has a written agreement with a casino licensee or the holder of a contingent casino gaming license or with the holder of a statement of compliance that includes a reservation for a license for the complete management of a casino; and

(4) Any other person who has control over either an approved casino hotel or the land hereunder or the operation of a casino.

(c) Prior to the operation of a casino every agreement to lease an approved casino hotel or the land hereunder and every agreement to manage the casino shall be in writing and filed with the Commission. No such agreement shall be effective unless expressly approved by the Commission. The Commission may require that any such agreement include within its terms any provision reasonably necessary to best accomplish the policies of this act.

(d) The Commission may require that any person or persons who apply for a casino license organize into such form or forms of business association as the Commission shall deem necessary or desirable in the circumstances to carry out the policies of this act;

(e) As to agreements to lease an approved casino hotel or the land thereunder, unless it expressly and by formal vote for good cause determines otherwise, the

34

Commission shall require that the agreement include within its terms a buy-out provision conferring upon the casino licensee-lessee who controls the operation of the approved casino hotel the absolute right to purchase for an expressly set forth fixed sum the entire interest of the lessor or any person associated with the lessor in the approved casino hotel or the land thereunder in the event that said lessor or said person associated with the lessor is found by the Commission to be unsuitable to be associated with a casino enterprise;

(f) The Commission shall not permit an agreement for the leasing of an approved casino hotel or the land thereunder to provide for the payment of an interest, percentage or share of money derived from casino gaming activity or of revenues or profits of the casino unless the party receiving payment of such interest, percentage or share is a party to the approved lease agreement, each party to the lease agreement holds either a casino license or casino service industry license and unless the agreement conforms in other respects to the provisions of paragraph (d) above;

(g) As to agreements for the management of a casino, the Commission shall require that each party thereto hold a casino license, that the party thereto who is to manage the casino gaming operations own at least ten percent (10%) of all outstanding equity securities of any casino licensee or of any eligible applicant for a casino license if the said licensee or applicant is a corporation and the ownership of an equivalent interest in any casino licensee or in any eligible applicant for a casino license if the same is not a corporation, and that such an agreement be for the complete management of all casino space in the casino hotel, provide for the sole and unrestricted power to direct the casino gaming operations of the casino hotel which is the subject of the agreement, and be for such a term as to assure reasonable continuity, stability and independence in the management of the casino gaming operations;

(h) The Commission may permit an agreement for the management of a casino to provide for the payment to the managing party of an interest, percentage or share of money derived from gaming at all authorized games or derived from casino gaming activity or of revenues or profits of casino gaming operations; and

(i) As to agreements to lease an approved casino hotel or the land there under, agreements to jointly own an approved casino hotel or the land there under and agreements for the management of casino gaming operations, the Commission shall require that each party thereto, except for the government of Guam or any political subdivision or any agency or instrumentality thereof, shall be jointly and severally liable for all acts, omissions and violations of this act by any party thereto regardless of actual knowledge of such act, omission or violation and notwithstanding any provision in such agreement to the contrary.

(j) No corporation shall be eligible to apply for a casino license unless:

(1) The corporation is incorporated in Guam, although such corporation may be a wholly or partially owned subsidiary of a corporation that is organized pursuant to the laws of another state of the United States or of a foreign country;

(2) The corporation maintains an office of the corporation in the casino hotel licensed or to be licensed;

(3) The corporation complies with all the requirements of the laws of the Guam pertaining to corporations;

35

(4) The corporation maintains a ledger in the principal office of the corporation in Guam which shall at all times reflect the current ownership of every class of security issued by the corporation and shall be available for inspection by the Commission at all reasonable times without notice;

(5) The corporation maintains all operating accounts required by the Commission in a bank or banks in Guam;

(6) The corporation states in its articles of incorporation that a purpose for which it is organized to conduct casino gaming and further includes in the articles all provisions required by this act, the rules issued pursuant thereto or by order of the Commission;

(7) The corporation, if it is not a publicly traded corporation, files with the Commission such adopted corporate charter provisions as may be necessary to establish the right of prior approval by the Commission with regard to transfers of securities, shares, and other interests in the applicant corporation; and, if it is a publicly traded corporation, provides in its corporate charter that any securities of such corporation are held subject to the condition that if a holder thereof is found to be disqualified by the Commission pursuant to the provisions of this act, such holder shall dispose of his interest in the corporation;

(8) The corporation, if it is not a publicly traded corporation, establishes to the satisfaction of the Commission that appropriate charter provisions create the absolute right of such non-publicly traded corporations and companies to repurchase at the market price or the purchase price, whichever is the lesser, any security, share or other interest in the corporation in the event that the Commission disapproves a transfer in accordance with the provisions of this act;

(9) Any publicly traded holding, intermediary, or subsidiary company of the corporation, whether the corporation is publicly traded or not, contains in its corporate charter the same provisions required under paragraph (7) for a publicly traded corporation to be eligible to apply for a casino license; and

(10) Any non-publicly traded holding, intermediary or subsidiary company of the corporation, whether the corporation is publicly traded or not, establishes to the satisfaction of the Commission that its charter provisions are the same as those required under paragraphs (7) and (8) for a non-publicly traded corporation to be eligible to apply for a casino license. The provisions of this subsection shall apply with the same force and effect with regard to casino license applications and casino licensees that have a legal existence that is other than corporate to the extent to which it is appropriate.

(k) No person shall be issued or be the holder of more than two casino licenses. For the purposes of this subsection a person shall be considered the holder of a casino license if such license is held by any holding, intermediary or subsidiary company thereof, or by any officer, director, casino key employee or principal employee of such person, or of any holding, intermediary or subsidiary company thereof.

Section 5004. Approved hotel. (a) For the purposes of this act an approved hotel is a single building or two or more buildings which are physically connected in a manner deemed appropriate by the Commission and which is operated as one casino-hotel facility under a license granted by the Commission. An approved hotel must have not less than the number of rooms specified hereafter used for providing guests or visitors overnight accommodations. In no event shall the only access to an approved hotel be through a

36

casino. In addition, an approved hotel must have a twenty-four (24) hour public food service facility capable of seating not fewer than sixty (60) persons, recreation facilities, including a swimming pool and a children's enclosed recreation area that is available to guests from 10 a.m. until 6 p.m. daily and that is supervised by qualified hotel personnel.

(b) The following classes of approved hotels are established and must conform to the following space standards:

| Class | Required Guest Rooms | Required Casino Area |
|-------|---------------------|---------------------|
| A | Not less than 100 | Not more than 25,000 square feet |
| AA | Not less than 300 | Not more than 50,000 square feet |
| AAA | Not less than 500 | Not more than 75,000 square feet |
| AAAA | Not less than 700 | Not more than 100,000 square feet |

(c) Once a hotel is initially approved, the Commission may permit it to change its category, providing that the hotel complies with the space standards of the class to which it wishes to move and such other conditions that the Commission may determine are reasonably necessary to protect the island's people, its economy and its ecological environment.

(d) The Commission may permit an approved hotel to deviate from its space requirements for a reasonable time if the Commission finds that such deviation is warranted in order that the approved hotel can be rehabilitated, renovated or altered.

(e) The Commission shall not impose any unreasonable criteria or requirements regarding the contents of the approved hotel in addition to the criteria and requirements expressly specified in this act, provided, however, that the Commission shall be authorized to require each casino licensee to establish and maintain an approved hotel which is in all respects a facility of good quality which will help develop and improve Guam's international reputation as a resort, tourist and convention destination.

Section 5005. Casino license; applicant requirements. Any applicant for a casino license must produce information, documentation and assurances that establish to the satisfaction of the Commission that:

(a) The financial background and resources and the financial stability, integrity and responsibility of the applicant, including but not limited to bank references, business and personal income and disbursement schedules, tax returns and other reports filed with governmental agencies, and business and personal accounting and check records and ledgers. In addition, each applicant, in writing, shall authorize the Commission to examine all bank accounts and records as the Commission deems necessary;

(b) The integrity of all financial backers, investors, mortgagees, bondholders, and holders of indentures, notes or other evidences of indebtedness, either in effect or proposed, which bears any relation to the casino proposal submitted by the applicant or applicants; provided, however, that this section shall not apply to banking or other licensed lending institutions and institutional investors. Any such banking or licensed lending institution or institutional investor, however, shall produce for the Commission

upon request any document or information that bears any relation to the casino proposal submitted by the applicant or applicants. The integrity of financial sources shall be judged upon the same standards as the applicant. In addition, the applicant shall produce whatever information, documentation or assurances as may be required to establish by clear and convincing evidence the adequacy of financial resources both as to the completion of the casino proposal and the operation of the casino;

(c) The applicant's good character, honesty and integrity. Such information shall include, without limitation, information pertaining to family, habits, character, reputation, criminal and arrest record, business activities, financial affairs, and business, professional and personal associates, covering at least the ten (10) years immediately preceding the filing of the application. Each applicant shall notify the Commission of any civil judgments obtained against any applicant pertaining to antitrust or security regulation laws of the federal government, of Guam or of any state or any other jurisdiction, province or country. In addition, each applicant shall produce letters of reference from law enforcement agencies having jurisdiction in the applicant's place of residence and principal place of business, which letters of reference shall indicate that such law enforcement agencies do not have any pertinent information concerning the applicant, or if such law enforcement agency does have information pertaining to the applicant, shall specify what the information is. If the applicant has conducted gaming operations in a jurisdiction which permits such activity, the applicant shall produce letters of reference from the gaming or casino enforcement or control agency which shall specify the experiences of such agency with the applicant, his or her associates, and his or her gaming operation; provided, however, that if no such letters are received within six (6) months of the request therefor, the applicant may submit a statement under oath that he is or was during the period such activities were conducted in good standing with such gaming or casino enforcement or control agency.

(d) The applicant has sufficient business ability and casino experience as to establish the likelihood of creation and maintenance of a successful, efficient casino operation. The applicant shall produce the names of all proposed casino key employees as they become known and a description of their respective or proposed responsibilities, and a full description of security systems and management controls proposed for the casino and related facilities.

(e) Subject to the Commission's powers under Section 5004(e), the suitability of the hotel casino and related facilities to its proposed location. Each applicant shall submit an impact statement which shall include, without limitation, architectural and site plans which establish that the proposed facilities comply in all respects with the requirements of this act and the requirements of zoning and planning laws and regulations of Guam; a market impact study which analyzes the adequacy of the patron market and the effect of the proposal on such market and on the existing casino facilities licensed under this act; and an analysis of the effect of the proposal on the overall economic and competitive conditions of Guam.

Section 5006.   Additional requirements.   (a) In addition to other information required by this act, a corporation applying for a casino license shall provide the following information:

(1) The organization, financial structure and nature of all businesses operated by the corporation; the names and personal employment and criminal histories,

38

if any, of all officers, directors and principal employees of the corporation; the names of all holding, intermediary and subsidiary companies of the corporation; and the organization, financial structure and nature of all businesses operated by such of its holding, intermediary and subsidiary companies as the Commission may require, including names and personal employment and criminal histories, if any, of such officers, directors and principal employees of such corporations and companies as the Commission may require;

(2) The rights and privileges acquired by the holders of different classes of authorized securities of such corporations and companies as the Commission may require, including the names, addresses and amounts held by all holders of such securities;

(3) The terms upon which securities have been or are to be offered;

(4) The terms and conditions of all outstanding loans, mortgages, trust deeds, pledges or any other indebtedness or security devices utilized by the corporation;

(5) The extent of the equity security holding in the corporation of all officers, directors and underwriters, and their remuneration in the form of salary, wages, fees or otherwise;

(6) Names of persons other than directors and officers who occupy positions specified by the Commission or whose compensation exceeds an amount determined by the Commission, and the amount of their compensation;

(7) A description of all bonus and profit-sharing arrangements;

(8) Copies of all management and service contracts; and

(9) A listing of stock options existing or to be created.

(b) If a corporation applying for a casino license is, or if a corporation holding a casino license is to become, a subsidiary, each holding company and each intermediary company with respect thereto must, as a condition of the said subsidiary acquiring or retaining such license, as the case may be:

(1) Qualify to do business in Guam; and

(2) If it is a corporation, register with the Commission and furnish the Commission with all the information the Commission may require; or

(3) If it is not a corporation, register with the Commission and furnish the Commission with such information as the Commission may require.

(c) No corporation shall be eligible to hold a casino license unless each officer; each director; each person who directly or indirectly holds any beneficial interest or ownership of the securities issued by the corporation; any person who in the opinion of the Commission has the ability to control the corporation or elect a majority of the board of directors of that corporation, other than a banking or other licensed lending institution which makes a loan or holds a mortgage or other lien acquired in the ordinary course of business; each principal employee; and any lender, underwriter, agent, employee of the corporation, or other person whom the Commission may consider appropriate for approval or qualification would, but for residence, individually be qualified for approval as a casino key employee pursuant to the provisions of this act.

39

(d) No corporation which is a subsidiary shall be eligible to receive or hold a casino license unless each holding and intermediary company with respect thereto:

(1) If it is a corporation, shall comply with the provisions of subsection (c) of this section as if said holding or intermediary company were itself applying for a casino license; provided, however, that the Commission may waive compliance with the provisions of subsection (c) hereof on the part of a publicly-traded corporation which is a holding company as to any officer, director, lender, underwriter, agent or employee thereof, or person directly or indirectly holding a beneficial interest or ownership of the securities of such corporation, where the Commission is satisfied that such officer, director, lender, underwriter, agent or employee is not significantly involved in the activities of the corporate licensee, and in the case of security holders, does not have the ability to control the publicly-traded corporation or elect one or more directors thereof; or

(2) If it is not a corporation, shall comply with the provisions of subsection (e) of this section as if said company were itself applying for a casino license.

(e) Any noncorporate applicant for a casino license shall provide the information required in subsection (a) of this section in such form as may be required by the Commission. No such applicant shall be eligible to hold a casino license unless each person who directly or indirectly holds any beneficial interest or ownership in the applicant, or who in the opinion of the Commission has the ability to control the applicant, or whom the Commission may consider appropriate for approval or qualification, would, but for residence, individually be qualified for approval as a casino key employee pursuant to the provisions of this act.

(f) Notwithstanding the provisions of subsections (c) and (d) of this section, and in the absence of a finding by the Commission that the institutional investor may be found unqualified, an institutional investor holding either (1) under 10% of the equity securities of a casino licensee's holding or intermediary companies, or (2) debt securities of a casino licensee's holding or intermediary companies, or another subsidiary company of a casino licensee's holding or intermediary companies which is related in any way to the financing of the casino licensee, where the securities represent a percentage of the outstanding debt of the company not exceeding 20%, or a percentage of any issue of the outstanding debt of the company not exceeding 50%, may be granted a waiver of qualification if such securities are those of a publicly traded corporation and its holdings of such securities were purchased for investment purposes only and upon request by the Commission it files with the Commission a certified statement to the effect that it has no intention of influencing or affecting the affairs of the issuer, the casino licensee or its holding or intermediary companies; provided, however, that it shall be permitted to vote on matters put to the vote of the outstanding security holders. The Commission may grant a waiver of qualification to an institutional investor holding a higher percentage of such securities upon a showing of good cause and if the conditions specified above are met. Any institutional investor granted a waiver under this subsection which subsequently determines to influence or affect the affairs of the issuer shall provide not less than one (1) month's notice of such intent and shall file with the Commission an application for qualification before taking any action that may influence or affect the affairs of the issuer; provided, however, that it shall be permitted to vote on matters put to the vote of the outstanding security holders. If an institutional investor changes its investment intent, or if the Commission finds reasonable cause to believe that the institutional investor may be found unqualified, no action other than divestiture shall be taken by such investor with

40

respect to its security holdings until there has been compliance with the provisions of this act, including the execution of a trust agreement. The casino licensee and its relevant holding, intermediary or subsidiary company shall immediately notify the Commission of any information about, or actions of, an institutional investor holding its equity or debt securities, where such information or action may impact upon the eligibility of such institutional investor for a waiver pursuant to this subsection.

(g) If at any time the Commission finds that an institutional investor holding any security of a holding or intermediary company of a casino licensee, or, where relevant, of another subsidiary company of a holding or intermediary company of a casino licensee which is related in any way to the financing of the casino licensee, fails to comply with the terms of subsection (f) of this section, or if at any time the Commission finds that, by reason of the extent or nature of its holdings, an institutional investor is in a position to exercise such a substantial-impact upon the controlling interests of a licensee that qualification of the institutional investor is necessary to protect the public interest, the Commission may, in accordance with the applicable provisions this act, take any necessary action to protect the public interest, including requiring such an institutional investor to be qualified pursuant to the provisions of this act.

Section 5007. Casino license, Disqualification criteria for. The Commission shall deny a casino license to any applicant who is disqualified on the basis of any of the following criteria:

(a) Failure of the applicant to prove by clear and convincing evidence that the applicant is qualified in accordance with the provisions of this act;

(b) Failure of the applicant to provide information, documentation and assurances required by the act or requested by the Commission, or failure of the applicant to reveal any fact material to qualification, or the supplying of information which is untrue or misleading as to a material fact pertaining to the qualification criteria;

(c) The conviction of the applicant, or of any person required to be qualified under this act as a condition of a casino license, of any:

(1) Offense in any jurisdiction, the punishment for which would be imprisonment of more than one year; or

(2) Offense under the law of any jurisdiction which indicates that licensure of the applicant would be inimical to the policy of this act and to casino operations; provided, however, that the automatic disqualification provisions of this subsection shall not apply with regard to any conviction which occurred more than ten (10) years immediately preceding application for licensure and which the applicant demonstrates by clear and convincing evidence does not justify automatic disqualification pursuant to this subsection or any conviction which has been the subject of a judicial order of expungement or sealing or pardon by the chief executive of the jurisdiction in which the conviction was had;

(d) Current prosecution or pending charges in any jurisdiction of the applicant or of any person who is required to be qualified under this act as a condition of a casino license, for any of the offenses enumerated in subsection (c) of this section; provided, however, that at the request of the applicant or the person charged, the Commission shall defer decision upon such application during the pendency of such charge;

41

(e) The pursuit by the applicant or any person who is required to be qualified under this act as a condition of a casino license of economic gain in an occupational manner or context which is in violation of the laws of Guam, if such pursuit creates a reasonable belief that the participation of such person in casino operations would be inimical to the policies of this act or to legalized gaming in Guam. For purposes of this section, occupational manner or context shall be defined as the systematic planning, administration, management, or execution of an activity for financial gain;

(f) The identification of the applicant or any person who is required to be qualified under this act as a condition of a casino license as a career offender or a member of or participant in a career offender cartel or an associate of a career offender or career offender cartel in such a manner which creates a reasonable belief that the association is of such a nature as to be inimical to the policy of this act and to gaming operations. For purposes of this section, career offender shall be defined as any person whose behavior is pursued in an occupational manner or context for the purpose of economic gain, utilizing such methods as are deemed criminal violations of the public policy of Guam or the federal government. A career offender cartel shall be defined as any group of persons who operate together as career offenders;

(g) The engaging in or attempt to engage in by the applicant or any person who is required to be qualified under this act as a condition of a casino license of any act or acts which would constitute any offense under subsection (c) of this section, even if such conduct has not been or may not be prosecuted under the laws of Guam or any other jurisdiction or has been prosecuted under the criminal laws of Guam or any other jurisdiction and such prosecution has been terminated in a manner other than with a conviction; and

(h) Contumacious defiance by the applicant or any person who is required to be qualified under this act of any legislative investigatory body or other official investigatory body of Guam or any state, territory, commonwealth, district or freely associated state of the United States or of the United States when such body is engaged in the investigation of crimes relating to gaming, official corruption, or organized crime activity.

Section 5008. Investigation of applicants for casino licenses; order approving or denying license. (a) Upon the filing of an application for a casino license and such supplemental information as the Commission may require, the Commission shall cause an investigation to be made into the qualification of the applicant, and the Commission shall conduct a hearing thereon concerning the qualification of the applicant in accordance with its rules. The Commission shall not approve any casino license for any person except after a public hearing for which appropriate public notice has been given.

(b) After such investigation and hearing, the Commission may either deny the application or grant a casino license to an applicant whom it determines to be qualified to hold such license.

(c) The Commission shall have the authority to deny any application pursuant to the provisions of this act. When an application is denied, the Commission shall prepare and file an order denying such application with the general reasons therefor, and if requested by the applicant, shall further prepare and file a statement of the reasons for the denial, including a specific findings of facts.

42

(d) After an application is submitted to the Commission, final action of the Commission shall be taken within three (3) months of the completion of all hearings and investigations and the receipt of all information required by the Commission.

(e) If satisfied that an applicant is qualified to receive a casino license, and upon tender of all license fees and taxes as required by law and rules of the Commission, and such bonds as the Commission may require for the faithful performance of all requirements imposed by law or rules, the Commission shall issue a casino license for the term of one (1) year or a casino reservation or a contingent casino gaming license for such term as is appropriate under this act.

(f) The Commission shall fix the amount of the bond or bonds to be required under this section in such amounts as it may deem appropriate by rules of uniform application. The bonds so furnished may be applied by the Commission to the payment of any unpaid liability of the licensee under this act. The bond shall be furnished in cash or negotiable securities, by a surety bond guaranteed by a satisfactory guarantor, or by an irrevocable letter of credit issued by a banking institution of Guam acceptable to the Commission. If furnished in cash or negotiable securities, the principal shall be placed without restriction at the disposal of the Commission, but any income shall inure to the benefit of the licensee.

Section 5009. Renewal of casino licenses. (a) Subject to the power of the Commission to deny, revoke, or suspend licenses, any casino license in force shall be renewed by the Commission for the next succeeding license period upon proper application for renewal and payment of license fees and taxes as required by law and the rules of the Commission. The license period for a renewed casino license shall be up to one year for each of the first two renewal periods succeeding the initial issuance of a casino license. Thereafter the renewal periods shall be up to (4) four years each, but the Commission may reopen licensing hearings at any time. In addition, the Commission shall reopen licensing hearings at any time at the request of the Public Auditor or the Attorney General.

(b) The application for renewal shall be filed with the Commission not less than three (3) months prior to the expiration of the current license, and all license fees and taxes required by law shall be paid to the Commission on or before the date of expiration of the current license.

Section 5010. Licensing of casino key employees. (a) No person may be employed as a casino key-employee unless he or she is the holder of a valid casino key employee license issued by the Commission.

(b) Each applicant for a casino key employee license, must produce prior to the issuance of the license information, documentation and assurances that establish to the Commission's satisfaction:

(1) The applicant's financial stability, integrity and responsibility, including but not limited to bank references, business and personal income and disbursements schedules, tax returns and other reports filed with governmental agencies, and business and personal accounting and check records and ledgers. In addition, each applicant shall authorize the Commission in writing to exam all bank accounts and records as may be deemed necessary by the Commission.

43

(2) The applicant's good character, honesty and integrity. Such information shall include, without limitation, data pertaining to family, habits, character, reputation, criminal and arrest record, business activities, financial affairs, and business, professional and personal associates, covering at least the ten (10) years immediately preceding the filing of the application. Each applicant shall notify the Commission of any civil judgments obtained against such applicant pertaining to antitrust or security regulation laws of the federal government, of Guam or of any other jurisdiction. In addition, each applicant shall, upon request of the Commission or the division, produce letters of reference from law enforcement agencies having jurisdiction in the applicant's place of residence and principal place of business, which letters of reference shall indicate that such law enforcement agencies do not have any pertinent information concerning the applicant, or if such law enforcement agency does have information pertaining to the applicant, shall specify what that information is. If the applicant has been associated with gaming or casino operations in any capacity, position or employment in a jurisdiction which permits such activity, the applicant shall, upon request of the Commission, produce letters of reference from the gaming or casino enforcement or control agency, which shall specify the experience of such agency with the applicant, his associates and his participation in the gaming operations of that jurisdiction; provided, however, that if no such letters are received from the appropriate law enforcement agencies within six (6) months of the applicant's request therefor, the applicant may submit a statement under oath that he is or was during the period such activities were conducted in good standing with such gaming or casino enforcement or control agency.

(c) Each applicant shall be a resident of the Guam prior to the issuance of a casino key employee license; provided, however, that upon petition by the holder of a casino license, the Commission may waive this residency requirement for any applicant whose particular position will require him to be employed outside Guam.

(d) The Commission shall deny a casino key employee license to any applicant who is disqualified on the basis of the criteria contained in Section 5007(c) of this act, provided, however, that the Commission may waive the disqualification pursuant to Section 5007(c)(2).

(e) Upon petition by the holder of a casino license, the Commission may issue a temporary license to an applicant for a casino key employee license, provided that:

(1) The applicant for the casino key employee license has filed a complete application as required by the Commission;

(2) The completed form of the Commission's casino key employee license application has been in the possession of the Commission for at least fifteen (15) days; and

(3) The petition for a temporary casino key employee license certifies, and the Commission finds, that an existing casino key employee position of the petitioner is vacant or will become vacant within two (2) months of the date of the petition and that the issuance of a temporary key employee license is necessary to fill the said vacancy on an emergency basis to continue the efficient operation of the casino, and that such circumstances are extraordinary and not designed to circumvent the normal licensing procedures of this act,

44

(f) In the event that an applicant for a casino key employee license is the holder of a valid casino employee license, and if the provisions of paragraphs (e)(1) and (2) of this subsection are satisfied, the Commission may issue a temporary casino key employee license upon petition by the holder of a casino license, if the Commission finds the issuance of a casino key employee license will be delayed by necessary investigations and the said temporary casino key employee license is necessary for the operation of the casino.

(g) Unless otherwise terminated pursuant to this act, any temporary casino key employee license issued pursuant to this section shall expire one (1) year from the date of its issuance.

Section 5011. <u>Licensing of casino employees.</u> (a) No person may commence employment as a casino employee unless he is the holder of a valid casino employee license.

(b) Any applicant for a casino employee license must, prior to the issuance of any such license, produce sufficient information, documentation and assurances to meet the qualification criteria.

(c) The Commission may require that all applicants for casino employee licenses be residents of Guam for a period not to exceed six (6) months immediately prior to the issuance of such license, but application may be made prior to the expiration of the required period of residency. The Commission may waive the required residency period for an applicant upon a showing that the residency period would cause undue hardship upon the casino licensee which intends to employ said applicant, or upon a showing of other good cause.

(d) The Commission shall deny a casino employee license to any applicant who is disqualified on the basis of the criteria contained in Section 5007(c) of this act, provided, however, that the Commission may waive the disqualification pursuant to Section 5007(c)(2).

(e) For the purposes of this section, casino security employees shall be considered casino employees and must, in addition to any requirements under other laws, be licensed in accordance with the provisions of this act.

(f) Upon petition by the holder of a casino license, a temporary license may be issued by the Commission to an applicant for a casino employee license on the same basis as it may issue a temporary license to a casino key employee.

(g) Unless sooner terminated by order of the Commission, a temporary license shall expire one (1) year from the date of its issuance.

Section 5012. <u>Registration of casino service employees.</u> (a) No person may be employed as a casino service employee unless the person has been registered with the Commission, which registration shall be in accordance with subsection (f) of this section.

(b) Any applicant for casino service employee registration shall produce such information as the Commission may require. The Commission shall deny a casino employee license to any applicant who is disqualified on the basis of the criteria contained in Section 5007(c) of this act, provided, however, that the Commission may waive the disqualification pursuant to Section 5007(c)(2).

45

(c) The Commission may require that all applicants for casino service employee registration be residents of Guam for a period not to exceed three (3) months immediately prior to such registration, but application may be made prior to the expiration of the required period of residency. The Commission shall waive the required residency period for an applicant upon a showing that the residency period would cause undue hardship upon the casino licensee which intends to employ said applicant, or upon a showing of other good cause.

(d) Upon petition by the holder of a casino license, a temporary casino service employee registration shall be granted to each applicant for such registration named therein, provided that the petition certifies that each such applicant has filed a completed application for casino service employee registration as required by the Commission.

Section 5013. <u>Licensing and registration of casino service industries.</u> (a) (1) All casino service industries offering goods or services which directly relate to casino or gaming activity, including gaming equipment, suppliers, repairers and independent testing laboratories, schools teaching gaming and either playing or dealing techniques, and casino security services, shall be licensed in accordance with the provisions of this act prior to conducting any business whatsoever with a casino applicant or licensee, its employees or agents, and in the case of a school, prior to enrollment of any students or offering of any courses to the public whether for compensation or not; provided, however, that upon a showing of good cause by a casino applicant or licensee for each business transaction, the Commission may permit an applicant for a casino service industry license to conduct business transactions with such casino applicant or licensee prior to the licensure of that service industry applicant under this subsection.

(2) In addition to the requirements of paragraph (1) of this subsection, any casino service industry intending to manufacture, sell, distribute, test or repair slot machines within Guam shall be licensed in accordance with the provisions of this act prior to engaging in any such activities; provided, however, that upon a showing of good cause by a casino applicant or licensee for each business transaction, the Commission may permit an applicant for a casino service industry license to conduct business transactions with the casino applicant or licensee prior to the licensure of that service industry applicant under this subsection; and provided further, however, that upon a showing of good cause by an applicant required to be licensed as a casino service industry pursuant to this paragraph, the Commission may permit the service industry applicant to initiate the manufacture of slot machines or engage in the sale, distribution, testing or repair of slot machines with any person other than a casino applicant or licensee, its employees or agents, prior to the licensure of that service industry applicant under this subsection.

(b) Each casino service industry in subsection (a) of this section, as well as its owners; management and supervisory personnel; and principal employees if such principal employees have responsibility for services to a casino licensee, must qualify under the standards, except residency, established for qualification of a casino key employee.

(c) The Commission may require by rule that casino service industries not included in subsection (a) of this section shall be licensed in accordance with rules of the Commission if the Commission determines that such licensure is necessary to protect the public and the gaming industry. The Commission may exempt any person or field of commerce from the licensing requirements of this subsection if the person or field of

46

commerce demonstrates (1) that it is regulated by a public agency or that it will provide goods or services in insubstantial or insignificant amounts or quantities, and (2) that licensing is not deemed necessary in order to protect the public interest or to accomplish the policies established by this act. Upon granting an exemption or at any time thereafter, the Commission may limit or place such restrictions thereupon as it may deem necessary in the public interest, and shall require the exempted person to cooperate with the Commission and, upon request, to provide information in the same manner as required of a licensed casino service industry; provided, however, that no exemption shall be granted unless the applicant agrees in writing to comply with the equal employment opportunity provisions of this act.

(d) No casino service industry license shall be issued pursuant to subsection (a) or subsection (c) of this section to any person unless that person shall provide proof of valid business registration with the Department of Revenue and Taxation.

Section 5014. Registration of labor organizations. (a) Each labor organization, union or affiliate seeking to represent employees who are employed in a casino hotel or casino by a casino licensee shall register with the Commission annually, and shall disclose such information to the Commission as the Commission may require, provided, however, that no labor organization, union, or affiliate shall be required to furnish such information to the extent such information is included in a report filed by any labor organization, union, or affiliate with the Secretary of Labor pursuant to 29 U.S.C. 431 et seq. or 1001 et seq. if a copy of such report, or of the portion thereof containing such information, is furnished to the Commission pursuant to the aforesaid federal provisions. The Commission may in its discretion exempt any labor organization, union, or affiliate from the registration requirements of this subsection where the Commission finds that such organization, union or affiliate is not the certified bargaining representative of any employee who is employed in a casino hotel or casino by a casino licensee, is not involved actively, directly or substantially in the control or direction of the representation of any such employee, and is not seeking to do so.

(b) Neither a labor organization, union or affiliate nor its officers and agents not otherwise individually licensed or registered under this act and employed by a casino licensee may hold any financial interest whatsoever in the casino hotel, casino, or casino licensee whose employees they represent.

(c) Any person, including any labor organization, union or affiliate, who shall violate, aid and abet the violation, or conspire or attempt to violate this section is guilty of a felony of the third degree.

(d) The Commission may maintain a civil action and proceed in a summary manner, without posting bond, against any person, including any labor organization, union or affiliate, to compel compliance with this section, or to prevent any violations, the aiding and abetting thereof, or any attempt or conspiracy to violate this section.

Section 5015. Approval and denial of registrations and licenses other than casino licenses. (a) Upon the filing of an application for any license or registration required by this act, other than a casino license, and after submission of such information as the Commission may require, the Commission may conduct such investigation and hearing into the qualification of the applicant as may be necessary to determine qualification for such license or registration.

47

(b) The Commission shall have the authority to grant or deny any application pursuant to the provisions of this act. When an application is denied, the Commission shall prepare and file its order denying such application with the general reasons therefor, and if requested by the applicant, shall further prepare and file a statement of the reasons for the denial, including the specific findings of fact.

(c) When the Commission grants an application, the Commission may limit or place such restrictions thereupon as it may deem necessary in the public interest. Casino service employee registration shall, upon issuance, remain in effect for the duration authorized by the Commission unless revoked, suspended, limited, or otherwise restricted by the Commission.

## Article 6—Casino Operations

Section 6001. Operation certificate. (a) Notwithstanding the issuance of a license therefor, no casino may be opened or remain open to the public, and no gaming, except for test purposes, may be conducted therein, unless and until a valid operation certificate has been issued to the casino licensee by the Commission. Such certificate shall be issued by the Commission upon a finding that a casino complies in all respects with the requirements of this act and rules promulgated hereunder, that the casino licensee has implemented necessary management controls and security precautions for the efficient operation of the casino and that casino personnel are licensed for the performance of their respective responsibilities, and that the casino is prepared in all respects to receive and entertain the public.

(b) The operation certificate shall include an itemized list by category and number of the authorized games permitted in the particular casino establishment.

(c) A casino licensee shall, in accordance with the Commission's rules, file any changes in the number of authorized games to be played in its casino and any changes in the configuration of the casino with the Commission.

(d) An operation certificate shall remain in force and effect unless altered in accordance with subsection (c) of this section, or revoked, suspended, limited, or otherwise altered by the Commission in accordance with this act.

(e) It shall be an express condition of continued operation under this act that a casino licensee shall maintain all books, records, and documents pertaining to the licensee's operations, including its approved hotel in a manner and location approved by the Commission. All such books, records and documents shall be immediately available for inspection during all hours of operation in accordance with the rules of the Commission and shall be maintained for such period of time as the Commission shall require.

Section 6002. Hours of operation. (a) The Commission shall establish by rule uniform hours during which a casino may operate.

(b) A casino licensee shall file with the Commission a schedule of its hours of operation that is no greater than that authorized by the rule. If the casino licensee proposes any change in its scheduled hours, it shall notify the Commission in writing prior to making such change.

48

Section 6003. Casino facility requirements, (a) Each casino licensee shall arrange the facilities of its casino in such a manner as to promote optimum security for the casino and its patrons and shall comply in all respects with rules of the Commission pertaining thereto.

(b) Each casino hotel shall include:

(1) A closed circuit television system according to specifications approved by the Commission, with access on the licensed premises to the system or its signal provided to the Commission, in accordance with rules\s pertaining thereto;

(2) Design specifications that insure that visibility in a casino is not obstructed in any way that might interfere with the ability of the Commission to supervise casino operations.

Section 6004. Internal controls. (a) Each casino licensee shall submit to the Commission a description of its system of internal procedures and administrative and accounting controls for gaming operations and a description of any changes made after the initial submission. Such submission shall be made at least one (1) month before such operations are to commence or at least one (1) month before any change in those procedures or controls is to take effect, unless otherwise directed by the Commission.

(b) The Commission shall review each submission of the casino licensee and shall determine whether it conforms to the requirements of this act and to the Commission's rules and whether the system submitted provides adequate and effective controls for the operations of the particular casino hotel submitting it. If the Commission finds any insufficiencies, it shall specify them in writing to the casino licensee, who shall make appropriate alterations. When the Commission determines a submission to be adequate in all respects, it shall notify the casino licensee of that fact. Except as otherwise provided in subsection (a), no casino licensee shall commence or alter gaming operations until such system of controls is approved by the Commission.

Section 6005. Games and gaming equipment. (a) This act shall not be construed to permit any gaming except the conduct of authorized games in a casino room in accordance with this act and the Commission's rules. The Commission shall have exclusive discretion to determine the types of games to be played in a casino.

(b) Gaming equipment shall not be possessed, maintained or exhibited by any person on the premises of a casino hotel except in a casino room or in restricted casino areas used for the inspection, repair or storage of such equipment and specifically designated for that purpose by the casino licensee with the approval of the Commission. Gaming equipment which supports the conduct of gaming in a casino but does not permit or require patron access, such as computers, may be possessed and maintained by a casino licensee in restricted casino areas specifically designated for that purpose by the casino licensee with the approval of the Commission. No gaming equipment shall be possessed, maintained, exhibited, brought into or removed from a casino room unless such equipment is necessary to the conduct of an authorized game, has permanently affixed, imprinted, impressed or engraved thereon an identification number or symbol authorized by the Commission, is under the exclusive control of a casino licensee or his employees, and is brought into or removed from the casino room or following 24-hour prior notice given to an authorized agent of the Commission. Notwithstanding the foregoing, a person may, with the prior approval of the Commission and under such terms and conditions as may be required by the Commission, possess, maintain or exhibit

49

gaming equipment in any other area of the casino hotel, provided such equipment is not used for gaming purposes.

(c) Each casino hotel shall contain a count room and such other secure facilities as may be required by the Commission for the counting and storage of cash, coins, tokens and checks received in the conduct of gaming and for the inspection, counting and storage of dice, cards, chips and other representatives of value. All drop boxes and other devices wherein cash, coins, or tokens are deposited at the gaming tables or in slot machines, and all areas wherein such boxes and devices are kept while in use, shall be equipped with two locking devices, one key to which shall be under the exclusive control of the Commission and the other under the exclusive control of the casino licensee, and said drop boxes and other devices shall not be brought into or removed from a casino room or locked or unlocked, except at such times, in such places, and according to such procedures as the Commission may require.

(d) All chips used in gaming shall be of such size and uniform color by denomination as the Commission shall require.

(e) All gaming shall be conducted according to rules promulgated by the Commission. All wagers and pay-offs of winning wagers shall be made according to rules promulgated by the Commission, which shall establish such limitations as may be necessary to assure the vitality of casino operations and fair odds to patrons. Each slot machine shall have a minimum payout of 83%.

(f) Each casino licensee shall make available in printed form to any patron upon request the complete text of the rules of the Commission regarding games and the conduct of gaming, pay-offs of winning wagers, an approximation of the odds of winning for each wager, and such other advice to the player as the Commission shall require. Each casino licensee shall prominently post within a casino room such information about gaming rules, pay-offs of winning wagers, the odds of winning for each wager, and such other advice to the player as the Commission shall require.

(g) Each gaming table shall be equipped with a sign indicating the permissible minimum and maximum wagers pertaining thereto. It shall be unlawful for a casino licensee to require any wager to be greater than the stated minimum or less than the stated maximum; provided, however, that any wager actually made by a patron and not rejected by a casino licensee prior to the commencement of play shall be treated as a valid wager.

(h)(1) No slot machine shall be used to conduct gaming unless it is identical in all electrical, mechanical and other aspects to a model thereof which has been specifically tested and licensed for use by the Commission. The Commission, in its discretion, and for the purpose of expediting the approval process, may refer testing to any testing laboratory licensed by the Commission to perform such service as a casino service industry. The commission shall establish such technical standards for licensure of slot machines, including mechanical and electrical reliability, security against tampering, the comprehensibility of wagering, and noise and light levels, as it may deem necessary to protect the player from fraud or deception and to insure the integrity of gaming. The denominations of such machines shall be set by the licensee; the licensee shall simultaneously notify the commission of the settings.

(2) The Commission shall, by regulation, determine the permissible number and density of slot machines in a licensed casino so as to:

(A) promote optimum security for casino operations;

50

(B) avoid deception or frequent distraction to players at gaming tables;

(C) promote the comfort of patrons;

(D) create and maintain a gracious playing environment in the casino; and

(E) encourage and preserve competition in casino operations by assuring that a variety of gaming opportunities is offered to the public.

Any rule promulgated by the Commission which determines the permissible number and density of slot machines in a licensed casino shall provide that all casino floor space shall be included in any calculation of the permissible number and density of slot machines in a licensed casino.

(i) It shall be unlawful for any person to exchange or redeem chips for anything whatsoever, except for currency, negotiable personal checks, negotiable counter checks, other chips, coupons or complimentary vouchers distributed by the casino licensee, or, if authorized by the rules of the Commission, a valid charge to a credit or debit card account. A casino licensee shall, upon the request of any person, redeem that licensee's gaming chips surrendered by that person in any amount over $100 with a check drawn upon the licensee's account at any banking institution in this Guam and made payable to that person.

(j) It shall be unlawful for any casino licensee or its agents or employees to employ, contract with, or use any shill or barker to induce any person to enter a casino or play at any game or for any purpose whatsoever.

(k) It shall be unlawful for a dealer in any authorized game in which cards are dealt to deal cards by hand or other than from a device specifically designed for that purpose, unless otherwise permitted by the rules of the Commission.

(l) It shall be unlawful for any casino key employee or any person who is required to hold a casino key employee license as a condition of employment or qualification to wager in any casino in Guam, or any casino employee, other than a junket representative, bartender, waiter, waitress, or other casino employee who, in the judgment of the commission, is not directly involved with the conduct of gaming operations, to wager in a casino in the casino hotel in which the employee is employed or in any other casino in Guam that is owned or operated by the same casino licensee.

(m) (1) It shall be unlawful for any casino key employee, boxman, floorman, or any other casino employee who shall serve in a supervisory position to solicit or accept, and for any other casino employee to solicit, any tip or gratuity from any player or patron at the casino hotel where he or she is employed.

(2) A dealer may accept tips or gratuities from a patron at the table at which such dealer is conducting play, subject to the provisions of this subsection. All such tips or gratuities shall be immediately deposited in a lockbox reserved for that purpose, accounted for, and placed in a pool for distribution pro rata among the dealers, with the distribution based upon the number of hours each dealer has worked, except that the Commission may permit a separate pool to be established for dealers in the game of poker, or may permit tips or gratuities to be retained by individual dealers in the game of poker.

51

Section 6006. Credit. (a) Except as otherwise provided in this section, no casino licensee or any person licensed under this act, and no person acting on behalf of or under any arrangement with a casino licensee or other person licensed under this act, shall:

(1) Cash any check, make any loan, or otherwise provide or allow to any person any credit or advance of anything of value or which represents value to enable any person to take part in gaming as a player; or

(2) Release or discharge any debt, either in whole or in part, or make any loan which represents any losses incurred by any player in gaming, without maintaining a written record thereof in accordance with the rules of the Commission.

(b) No casino licensee or any person licensed under this act, and no person acting on behalf of or under any arrangement with a casino licensee or other person licensed under this act, may accept a check, other than a recognized traveler's check or other cash equivalent from any person to enable such person to take part in gaming or simulcast wagering activity as a player, or may give cash or cash equivalents in exchange for such check unless:

(1) The check is made payable to the casino licensee;

(2) The check is dated, but not postdated; and

(3) The check is presented to the cashier or the cashier's representative at a location in the casino approved by the Commission and is exchanged for cash or slot tokens which total an amount equal to the amount for which the check is drawn, or the check is presented to the cashier's representative at a gaming table in exchange for chips which total an amount equal to the amount for which the check is drawn.

Nothing in this subsection shall be deemed to preclude the establishment of an account by any person with a casino licensee by a deposit of cash, recognized traveler's check or other cash equivalent, or a check which meets the requirements of subsection (g), or to preclude the withdrawal, either in whole or in part, of any amount contained in such account.

(c) When a casino licensee or other person licensed under this act, or any person acting on behalf of or under any arrangement with a casino licensee or other person licensed under this act, cashes a check in conformity with the requirements of subsection (b), the casino licensee shall cause the deposit of such check in a bank for collection or payment, or shall require an attorney or casino key employee with no incompatible functions to present such check to the drawer's bank for payment, within (1) seven (7) calendar days of the date of the transaction for a check in an amount of $1,000.00 or less; (2) fourteen (14) calendar days of the date of the transaction for a check in an amount greater than $1,000.00 but less than or equal to $5,000.00; or (3) (45) calendar days of the date of the transaction for a check in an amount greater than $5,000.00. Notwithstanding the foregoing, the drawer of the check may redeem the check by exchanging cash, cash equivalents, chips, or a check which meets the requirements of subsection (g) in an amount equal to the amount for which the check is drawn; or he may redeem the check in part by exchanging cash, cash equivalents, chips, or a check which meets the requirements of subsection (g) and another check which meets the requirements of subsection (b) for the difference between the original check and the cash, cash equivalents, chips, or check tendered; or he may issue one check which meets the requirements of subsection (b) of this section in an amount sufficient to redeem two or more checks drawn to the order of the casino licensee. If there has been a partial

52

redemption or a consolidation in conformity with the provisions of this subsection, the newly issued check shall be delivered to a bank for collection or payment or presented to the drawer's bank for payment by an attorney or casino key employee with no incompatible functions within the period herein specified. No casino licensee or any person licensed under this act, and no person acting on behalf of or under any arrangement with a casino licensee or other person licensed under this act, shall accept any check or series of checks in redemption or consolidation of another check or checks in accordance with this subsection for the purpose of avoiding or delaying the deposit of a check in a bank for collection or payment or the presentment of the check to the drawer's bank within the time prescribed by this subsection.

In computing a time prescribed by this subsection, the last day of the period shall be included unless it is a Saturday, Sunday, or a Guam or federal holiday, in which event the time period shall run until the next business day.

(d) No casino licensee or any other person licensed under this act, or any other person acting on behalf of or under any arrangement with a casino licensee or other person licensed under this act, shall transfer, convey, or give, with or without consideration, a check cashed in conformity with the requirements of this section to any person other than:

(1) The drawer of the check upon redemption or consolidation in accordance with subsection (c) of this section;

(2) A bank for collection or payment of the check;

(3) A purchaser of the casino license as approved by the commission; or

(4) An attorney or casino key employee with no incompatible functions for presentment to the drawer's bank.

The limitation on transferability of checks imposed herein shall apply to checks returned by any bank to the casino licensee without full and final payment.

(e) No person other than one licensed as a casino key employee or as a casino employee may engage in efforts to collect upon checks that have been returned by banks without full and final payment, except that an attorney representing a casino licensee may bring action for such collection.

(f) Notwithstanding the provisions of any law to the contrary, checks cashed in conformity with the requirements of this act shall be valid instruments, enforceable at law in the courts of Guam. Any check cashed, transferred, conveyed or given in violation of this act shall be invalid and unenforceable for the purposes of collection but shall be included in the calculation of gross revenue.

(g) Notwithstanding the provisions of subsection (b) to the contrary, a casino licensee may accept a check from a person to enable the person to take part in gaming as a player, may give cash or cash equivalents in exchange for such a check, or may accept a check in redemption or partial redemption of a check issued in accordance with subsection (b), provided that:

(1) (A) The check is drawn by a casino licensee upon an account established in accordance with the provisions of subsection (b) or is drawn by a casino licensee as payment for winnings from an authorized game or simulcast wagers;

Case 1:04-cv-00046    Document 1-3    Filed 10/26/2004    Page 2 of 30

(B) The check is issued by a banking institution which is chartered in a country other than the United States on its account at a Guam chartered, federally chartered or state-chartered bank and is made payable to "cash," "bearer," a casino licensee, or the person presenting the check;

(C) The check is issued by a banking institution which is chartered in the United States on its account at another federally chartered, Guam chartered or state-chartered bank and is made payable to "cash," "bearer," a casino licensee, or the person presenting the check;

(D) The check is issued by an annuity jackpot trust as payment for winnings from an annuity jackpot; or

(E) The check is issued by an affiliate of a casino licensee that holds a gaming license in any jurisdiction;

(2) The check is identifiable in a manner approved by the Commission as a check issued for a purpose listed in paragraph (1) of this subsection;

(3) The check is dated, but not postdated;

(4) The check is presented to the cashier or the cashier's representative by the original payee and its validity is verified by the drawer in the case of a check drawn pursuant to subparagraph (a) of paragraph (1) of this subsection, or the check is verified in accordance with rules promulgated by the commission.

No casino licensee shall issue a check for the purpose of making a loan or otherwise providing or allowing any advance or credit to a person to enable the person to take part in gaming as a player.

(h)(1) Notwithstanding the provisions of subsection (b) and subsection (c) to the contrary, a casino licensee, at a location outside the casino, may accept a personal check or checks from a person for up to $1,500 in exchange for cash or cash equivalents, and may, at such locations within the casino as may be permitted by the Commission, accept a personal check or checks for up to $1,500 in exchange for cash, cash equivalents, tokens, chips, or plaques to enable the person to take part in gaming, provided that:

(A) The check is drawn on the patron's bank or brokerage cash management account;

(B) The check is for a specific amount;

(C) The check is made payable to the casino licensee;

(D) The check is dated but not post-dated;

(E) The patron's identity is established by examination of one of the following: valid credit card, driver's license, passport, or other form of identification credential which contains, at a minimum, the patron's signature and photograph;

(F) The check is restrictively endorsed "For Deposit Only" to the casino licensee's bank account and deposited on the next banking day following the date of the transaction; and

(G) The total amount of personal checks accepted by any one licensee pursuant to this subsection that are outstanding at any time, including the current check being submitted, does not exceed $1,500.

54

(2) Nothing in paragraph (1) of this subsection shall be construed to limit the authority of a casino licensee to accept, and exchange for cash or cash equivalents other than tokens, chips, or plaques, a check from a patron that is not offered or exchanged in order to enable the patron or anyone else to take part in gaming, provided that:

(A) The patron so certifies;

(B) The casino licensee has no reason to believe that the cash or cash equivalents will be used to enable the patron or anyone else to take part in gaming;

(C) The check is not accepted or exchanged in the casino; and

(D) The casino licensee maintains full documentation of the transaction in accordance with regulations established by the Commission.

(i) Checks cashed pursuant to the provisions of paragraph (1) of subsection (h) of this section which are subsequently uncollectible may not be deducted from the total of all sums received in calculating gross revenue.

(j) Notwithstanding the provisions of paragraph (4) of subsection (b) to the contrary, a casino licensee may, prior to the completion of the verifications that are otherwise required by the rules of the Commission for a casino licensee to issue credit, accept a check from a person to enable such person to take part in gaming or may give cash or cash equivalents in exchange for such check, provided that:

(1) The casino licensee records in the credit file of the person:

(A) The efforts that were made to complete the required verifications and the reasons why the verifications could not be completed; and

(B) A description of the criteria that were relied upon in determining to issue credit to the person prior to the completion of the required verifications;

(2) The check otherwise complies with the requirements of subsection (b) and is processed by the casino licensee in accordance with all other provisions of this section and the regulations of the commission; and

(3) Any check accepted by a casino licensee pursuant to the provisions of this subsection:

(A) is clearly marked as such in a manner approved by the Commission; and

(B) may not be deducted from the total of all sums received in calculating gross revenue, even if such check should subsequently prove uncollectible or the casino licensee completes all of the required verifications prior to its deposit or presentment.

Section 6007. Noncitizen patrons; proof of identity to establish accounts, multiple transactions. No casino licensee or any person licensed under this act, and no person acting on behalf of or under any arrangement with a casino licensee or other person licensed under this act, shall, in a single transaction during a gaming day, accept cash from a person offered for the purposes of establishing an account, when the amount offered totals ten thousand dollars ($10,000) or more, unless the person presents proof of his identity and passport identification number if he is not a United States citizen. Multiple currency transactions shall be treated as a single transaction if the casino licensee or any person licensed under this act has knowledge that the transactions are by or on behalf of one person and result in either cash in or cash out totalling more than ten

55

thousand dollars ($10,000) during a gaming day.

Section 6008. Non-citizen patrons, proof of identity to redeem chips or markers. No casino licensee or any person licensed under this act, and no person acting on behalf of or under any arrangement with a casino licensee or other person licensed this act, shall, in a single transaction during a gaming day, redeem for cash or credit any chips or markers in an amount of ten thousand dollars ($10,000) or more or exchange chips for cash in an amount of ten thousand dollars ($10,000) or more, from any one person, unless the person seeking to redeem the chips or markers presents proof of his identity and passport identification number if he is not a United States citizen. Multiple currency transactions shall be treated as a single transaction if the casino licensee or any person licensed under this act has knowledge that the transactions are by or on behalf of one person and result in either cash in or cash out totalling more than ten thousand dollars ($10,000) during a gaming day.

Section 6009. Report of cash transactions. Casino licensees, persons licensed under this act and persons acting on behalf of or under any arrangement with casino licensees or other persons licensed under this act who accept cash or redeem chips or markers totalling ten thousand dollars ($10,000) or more in a gaming day for which identification is required pursuant to Sections 6007 and 6008, shall at least once every thirty (30) days report the identities and passport numbers of the persons offering the cash, chips or markers, to the Commission.

Section 6010. Junkets and complimentary services. (a) No junkets may be organized or permitted except in accordance with the provisions of this act. No person may act as a junket representative or junket enterprise except in accordance with this section.

(b) A junket representative employed by a casino licensee, an applicant for a casino license or an affiliate of a casino licensee shall be licensed as a casino employee in accordance with the provisions of this act, provided, however, that said licensee need not be a resident of Guam. Any person who holds a current and valid casino employee license may act as a junket representative while employed by a casino licensee or an affiliate. No casino licensee or applicant for a casino license may employ or otherwise engage a junket representative who is not so licensed.

(c) Junket enterprises which, and junket representatives not employed by a casino licensee or an applicant for a casino license or by a junket enterprise who, are engaged in activities governed by this section shall be subject to the licensing provisions prescribed for casino service industries and such other provisions of this act as the Commission may determine by rule. Such of the owners, management and supervisory personnel, and other principal employees of a junket enterprise as the Commission may consider appropriate for qualification shall qualify under the standards, except for residency, established for qualification of a casino key employee.

(d) Prior to the issuance of any license required by this section, an applicant for licensure shall submit to the jurisdiction of Guam and shall demonstrate to the satisfaction of the Commission that he or she is amenable to service of process within Guam. Failure to establish or maintain compliance with the requirements of this subsection shall constitute sufficient cause for the denial, suspension or revocation of any

license issued pursuant to this section.

(e) Upon petition by the holder of a casino license, an applicant for junket representative licensure may be issued a temporary license by the Commission upon such conditions as the Commission may prescribe by rule.

(f) Every agreement concerning junkets entered into by a casino licensee and a junket representative or junket enterprise shall be deemed to include a provision for its termination without liability on the part of the casino licensee, if the Commission orders the termination upon the suspension, limitation, conditioning, denial or revocation of the licensure of the junket representative or junket enterprise. Failure to expressly include such a condition in the agreement shall not constitute a defense in any action brought to terminate the agreement.

(g) A casino licensee shall be responsible for the conduct of any junket representative or junket enterprise associated with it and for the terms and conditions of any junket engaged in on its premises, regardless of the fact that the junket may involve persons not employed by such a casino licensee.

(h) A casino licensee shall be responsible for any violation or deviation from the terms of a junket. Notwithstanding any other provisions of this act, the Commission may, after hearings in accordance with this act, order restitution to junket participants, assess penalties for such violations or deviations, prohibit future junkets by the casino licensee, junket enterprise or junket representative, and order such further relief as it deems appropriate.

(i) The Commission shall prescribe methods, procedures and forms for the delivery and retention of information concerning the conduct of junkets by casino licensees.

(j) Each casino licensee, junket representative or junket enterprise shall, in accordance with the rules of the Commission, file a report with the Commission with respect to each list of junket patrons or potential junket patrons purchased directly or indirectly by the casino licensee, junket representative or enterprise.

(k) The Commission shall have the authority to determine, either by regulation, or upon petition by the holder of a casino license, that a type of arrangement otherwise included within the definition of "junket" shall not require compliance with any or all of the requirements of this section. In granting exemptions, the Commission shall consider such factors as the nature, volume and significance of the particular type of arrangement, and whether the exemption would be consistent with the public policies established by this act. In applying the provisions of this subsection, the Commission may condition, limit, or restrict any exemption as the Commission may deem appropriate.

(l) No junket enterprise or junket representative or person acting as a junket representative may:

(1) Engage in efforts to collect upon checks that have been returned by banks without full and final payment;

(2) Exercise approval authority with regard to the authorization or issuance of credit pursuant;

(3) Act on behalf of or under any arrangement with a casino licensee or a

57

gaming patron with regard to the redemption, consolidation, or substitution of the gaming patron's checks awaiting deposit;

(4) Individually receive or retain any fee from a patron for the privilege of participating in a junket;

(5) Pay for any services, including transportation, or other items of value provided to, or for the benefit of, any patron participating in a junket.

(m) No casino licensee shall offer or provide any complimentary services, gifts, cash or other items of value to any person unless:

(1) The complimentary item consists of room, food, beverage or entertainment expenses provided directly to the patron and his or her guests by the licensee or indirectly to the patron and his or her guests on behalf of a licensee by a third party; or

(2) The complimentary consists of documented transportation expenses provided directly to the patron and his or her guests by the licensee or indirectly to the patron and his or her guests on behalf of a licensee by a third party, provided that the licensee ensures that a patron's and his or her guests' documented transportation expenses are paid for or reimbursed only once; or

(3) The complimentary item consists of coins, tokens, cash or other complimentary items or services provided through a bus coupon or other complimentary distribution program approved by the Commission.

Notwithstanding the foregoing, a casino licensee may offer and provide complimentary cash or noncash gifts which are not otherwise included in paragraphs (1) through (3) of this subsection to any person, provided that any such gifts in excess of two thousand dollars ($2,000) per trip, or such greater amount as the Commission may establish by rule, are supported by documentation regarding the reason the gift was provided to the patron and his or her guests, including where applicable, a patron's player rating, which documentation shall be maintained by the casino licensee. For the purposes of this paragraph, all gifts presented to a patron and the patron's guests directly by the licensee or indirectly on behalf of the licensee by a third party within any five (5) day period shall be considered to have been made during a single trip. In the case of cash gifts, the Commission shall establish by rule the total amount of such gifts that a licensee may provide to a patron each year.

Each casino licensee shall maintain a regulated complimentary service account for those complimentaries which are permitted pursuant to this section, and shall submit a quarterly report to the Commission based upon such account and covering all complimentary services offered or engaged in by the licensee during the immediately preceding quarter. Such reports shall include identification of the regulated complimentary services and their respective costs, the number of persons by category of service who received the same, and such other information as the Commission may require.

(n) As used in this subsection, "person" means any officer or employee of the government of Guam who is subject to financial disclosure by law or executive order and any other officer or employee of the government of Guam who has responsibility for matters affecting casino activity; the Governor; any member of the Legislature or full-time member of the Judiciary; any full-time professional employee of the Office of the Governor, or the Legislature; Commissioners and employees of the Commission; the head

of a principal department; the assistant or deputy heads of a principal department, including all assistant and deputy commissioners; the head of any division of a principal department; and any member of the governing body of any autonomous corporation or instrumentality of the government of Guam.

No casino applicant or licensee shall provide directly or indirectly to any person identified in this subsection any complimentary service or discount which is other than such service or discount that is offered to members of the general public in like circumstance.

Section 6011. Alcoholic beverages in casino hotel facilities. Any casino shall be subject to the provisions of Chapter 3 of Title 11 of the Guam Code Annotated with respect to the use of alcoholic beverages on its premises and the Alcoholic Beverage Control Board and its Administrator shall coordinate the licensing of a casino with the Commission.

Section 6012. Casino licensee, leases and contracts. (a)(1) Unless otherwise provided in this subsection, no agreement which provides for the payment, however defined, of any direct or indirect interest, percentage or share of any money or property wagered at a casino or derived from casino gaming activity shall be lawful.

(2) Agreements which provide only for the payment of a fixed sum which is in no way affected by the amount of any such money, property, revenues, profits or earnings shall not be subject to the provisions of this subsection; and receipts, rentals or charges for real property, personal property or services shall not lose their character as payments of a fixed sum because of contract, lease, or license provisions for adjustments in charges, rentals or fees on account of changes in taxes or assessments, cost-of-living index escalations, expansion or improvement of facilities, or changes in services supplied.

(3) Agreements between a casino licensee and its employees which provide for casino employee or casino key employee profit sharing and which are in writing and have been filed with the Commission shall be lawful and effective only if expressly approved by the Commission.

(4) Agreements to lease an approved casino hotel or the land thereunder and agreements for the complete management of all casino gaming operations in a casino hotel shall not be subject to the provisions of this subsection but shall rather be subject to the appropriate provisions of Section 5002.

(5) Agreements which provide for percentage charges between the casino licensee and a holding company or intermediary company of the casino licensee shall be in writing and filed with the Commission but shall not be subject to the provisions of this subsection.

(b) Each casino applicant or licensee shall maintain, in accordance with the rules of the Commission, a record of each written or unwritten agreement regarding the realty, construction, maintenance, or business of a proposed or existing casino hotel or related facility. The foregoing obligation shall apply regardless of whether the casino applicant or licensee is a party to the agreement. Any such agreement may be reviewed by the Commission on the basis of the reasonableness of its terms, including the terms of compensation, and of the qualifications of the owners, officers, employees, and directors of any enterprise

Case 1:04-cv-00046   Document 1-3   Filed 10/26/2004   Page 8 of 30

involved in the agreement. If the Commission disapproves such an agreement or the owners, officers, employees, or directors of any enterprise involved therein, the Commission may require its termination.

Every agreement required to be maintained, and every related agreement the performance of which is dependent upon the performance of any such agreement, shall be deemed to include a provision to the effect that, if the Commission shall require termination of an agreement pursuant to this subsection, such termination shall occur without liability on the part of the casino applicant or licensee or any qualified party to the agreement or any related agreement. Failure expressly to include such a provision in the agreement shall not constitute a defense in any action brought to terminate the agreement. If the agreement is not submitted to the Commission in accordance with its rules, or the disapproved agreement is not terminated, the Commission may pursue any remedy or combination of remedies provided in this act.

(c) Nothing in this act shall be deemed to permit the transfer of any license, or any interest in any license, or any certificate of compliance or any commitment or reservation without the consent of the Commission being first obtained.

Section 6013.* Disposition of securities by corporate licensee. (a) The sale, assignment, transfer, pledge or other disposition of any security issued by a corporation which holds a casino license is conditional and shall be ineffective unless approved by the Commission.

(b) Every security issued by a corporation which holds a casino license shall bear, on both sides of the certificate evidencing such security, a statement of the restrictions imposed by this section, except that in the case of a publicly traded corporation incorporated prior to the effective date of this act, a statement of restriction shall be necessary only insofar as certificates are issued by such corporation after the effective date of this act.

(c) The Director of Revenue and Taxation shall not accept for filing any articles of incorporation of any corporation which includes as a stated purpose the conduct of casino gaming, or any amendment which adds such purpose to articles of incorporation already filed, unless such articles or amendments have been approved by the Commission and a certified copy of such approval is annexed thereto upon presentation for filing.

(d) If at any time the Commission finds that an individual owner or holder of any security of a corporate licensee or of a holding or intermediary company with respect thereto is not qualified under this act, and if as a result the corporate licensee is no longer qualified to continue as a casino licensee in Guam, the Commission, pursuant to the provisions of this act, shall take any necessary action to protect the public interest, including the suspension or revocation of the casino license of the corporation; provided, however, that if the holding or intermediary company is a publicly traded corporation and the Commission finds disqualified any holder of any security thereof who is required to be qualified under this act, and the Commission also finds that: (1) the holding or intermediary company has complied with the provisions of this act; (2) the holding or intermediary company has made a good faith effort, including the prosecution of all legal remedies, to comply with any order of the Commission requiring the divestiture of the security interest held by the disqualified holder; and (3) such disqualified holder does not have the ability to control the corporate licensee or any holding or intermediary company with respect thereto, or to elect one or more members of the board of directors of such corporation or company, the Commission shall not take action against the casino licensee or the

*The number "Section 6013" has been duplicated in error.

Case 1:04-cv-00046    Document 1-3    Filed 10/26/2004    Page 9 of 30

holding or intermediary company with respect to the continued ownership of the security interest by the disqualified holder. For purposes of this act, a security holder shall be presumed to have the ability to control a publicly traded corporation, or to elect one or more members of its board of directors, if such holder owns or beneficially holds five percent (5%) or more of the equity securities of such corporation, unless such presumption of control or ability to elect is rebutted by clear and convincing evidence.

(e) Commencing on the date the Commission serves notice upon a corporation of the determination of disqualification under subsection (d) of this section, it shall be unlawful for the named individual:

(1) To receive any dividends or interest upon any such securities;

(2) To exercise, directly or through any trustee or nominee, any right conferred by such securities; or

(3) To receive any remuneration in any form from the corporate licensee for services rendered or otherwise.

(f) After a nonpublicly traded corporation has been issued a casino license pursuant to the provisions of this act, but prior to the issuance or transfer of any security to any person required to be but not yet qualified in accordance with the provisions of this act, such corporation shall file a report of its proposed action with the Commission, and shall request the approval of the Commission for the transaction. If the Commission shall deny the request, the corporation shall not issue or transfer such security. After a publicly traded corporation has been issued a casino license, such corporation shall file a report quarterly with the Commission, which report shall list all owners and holders of any security issued by such corporate casino licensee.

(g) Each corporation which has been issued a casino license shall file a report of any change of its corporate officers or members of its board of directors with the Commission. No officer or director shall be entitled to exercise any powers of the office to which he was so elected or appointed until qualified by the Commission.

Section 6013.* Casino employment. (a) A casino licensee shall not appoint or employ in a position requiring a casino key employee license, a casino employee license, or a casino service employee registration any person not possessing a current and valid license or registration permitting such appointment or employment.

(b) A casino licensee shall, within 24 hours of receipt of written or electronically transmitted notice thereof, terminate the appointment or employment of any person whose license or registration has been denied, revoked or has expired. A casino licensee shall comply in all respects with any order of the Commission imposing limitations or restrictions upon the terms of employment or appointment in the course of any investigation or hearing.

(c) An applicant for or a holder of a casino key employee license or a casino employee license whose application is denied or whose licensure is revoked, as the case may be, shall not, in addition to any restrictions imposed by the regulations of the Commission on a reapplication for licensure, be employed by a casino licensee in a position that does not require a license until two (2) years have elapsed from the date of the denial or revocation, except that the Commission may permit such employment upon good cause shown.

*The number "Section 6013" has been duplicated in error.

61

Section 6014. _Employment of bona fide residents of Guam required,_ (a) By the end of the third year of the opening of the first casino hotel facility in Guam, ninety percent (90%) of all persons employed to work in any and all casino hotels and the local office of casino service industries licensed to do business in Guam shall be bona fide residents of Guam. In the years prior to the end of the third year, the casino licensees and casino service industries licensed to do business in Guam shall employ bona fide residents of Guam in the following percentages in accordance with the timetable stated: at least sixty-five percent (65%) by the end of the first year of the opening of the first casino hotel facility; and at least seventy-five percent (75%) by the end of the second year of the opening of the first casino hotel facility. For purposes of this section, a bona fide resident of Guam is a native Guamanian or a person who has been domiciled lawfully in Guam for one (1) year.

(b) The primary obligation for carrying out the bona fide resident employment requirement rests with the casino licensees who shall submit quarterly reports to the Commission showing the degree of compliance achieved. The Commission may waive the bona fide resident employment requirement only upon a showing by a casino licensee or a casino service industry entity that despite diligent efforts to locate qualified, bona fide residents through the Guam Department of Labor and by a company's own recruitment efforts, the required percentages of bona fide resident employment could not be achieved.

(c) The Commission may establish and impose a fines on casino licensees and casino service industry entities that does not comply with the bona fide resident employment requirement.

(d) If the Commission determines that a casino licensee casino service industry entity has failed to demonstrate compliance with the bona fide resident employment requirement, the casino licensee or casino service entity shall be granted three (3) months to achieve compliance before a fine is imposed.

(e) In the case of continued non-compliance, the Commission may suspend the license of a casino or a casino service industry entity.

(f) A violation of the bona fide resident employment requirement shall be a civil violation subject to the penalties established by the Commission and may be enforced by an action in the Superior Court.

## Title 7—Hearings of the Commission

Section 7001. _Conduct of hearings; rules of evidence; punishment of contempts; rehearing._ (a) At all hearings of contested cases the Commission may hear the case directly or permit the Chairman to designate any Commissioner or a qualified hearing officer to conduct the hearing.

(b) The proceedings at the hearing shall be recorded or transcribed.

(c) Oral evidence shall be taken only upon oath or affirmation.

(d) Each party to a hearing shall have the right to call and examine witnesses; to introduce exhibits relevant to the issues of the case, including the transcript of testimony

Case 1:04-cv-00046     Document 1-3     Filed 10/26/2004     Page 11 of 30

at any investigative hearing conducted by or on behalf of the Commission; to cross-examine opposing witnesses in any matters relevant to the issue of the case; to impeach any witness, regardless of which party called him or her to testify; and to offer rebuttal evidence.

(e) If an applicant, licensee, registrant or person who shall be qualified pursuant to this act is a party and if such party shall not testify in his or her own behalf, he or she may be called and examined as if under cross-examination.

(f) The hearing shall not be conducted according to rules relating to the admissibility of evidence in courts of law. Any relevant evidence may be admitted and shall be sufficient in itself to support a finding if it is the sort of evidence upon which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in a civil action.

(g) The parties or their counsel may, by written stipulation, agree that certain specified evidence may be admitted, although such evidence may be otherwise subject to objection.

(h) The Commission or hearing officer may take official notice of any generally accepted information or technical or scientific matter in the field of gaming and of any other fact that may be judicially noticed by the courts of Guam. The parties shall be informed of any information, matters or facts so noticed and shall be given a reasonable opportunity, on request, to refute such information, matters or facts by evidence or by written or oral presentation of authorities, the manner of such refutation to be determined by the Commission or hearing officer. The Commission or hearing office has the discretion, before rendering a decision, to permit the filing of amended or supplemental pleadings and shall notify all parties thereof and provide a reasonable opportunity for objections thereto.

(i) If any person in proceedings before the Commission or a hearing officer disobeys or resists any lawful order, refuses to respond to a subpoena, refuses to take the oath or affirmation as a witness or thereafter refuses to be examined, or is guilty of misconduct at the hearing or so near the place thereof as to obstruct the proceeding, the person may be punished for contempt in accordance with the Rules of Court if the Commission or hearing officer certifies the facts underlying the contumacious behavior to the Superior Court. Thereafter, the courts shall have jurisdiction in the matter, and the same proceeding shall be had, the same penalties may be imposed, and the person charged may purge himself or herself of the contempt in the same way as in the case of a person who has committed contempt in the trial of a civil action before the Superior Court.

(j) The Commission, upon motion therefor made within ten (10) days after the service of the decision and order, may order a rehearing before the Commission upon such terms and conditions as it may deem just and proper when the Commission finds cause to believe that the decision and order should be reconsidered in view of the legal, policy or factual matters advanced by the moving party or raised by the Commission on its own motion.

(k) Upon motion made within a reasonable time, but in no event later than one (1) year from the service of the decision and order, the Commission may relieve a party from the decision and order upon a showing that there is additional evidence which is material and necessary and which would be reasonably likely to change the decision of the

Case 1:04-cv-00046    Document 1-3    Filed 10/26/2004    Page 12 of 30

Commission, and that sufficient reason existed for failure to present such evidence at the hearing or on a motion for reconsideration. The motion shall be supported by an affidavit of the moving party or his or her counsel showing with particularity the materiality and necessity of the additional evidence and the reason why it was not presented at the hearing or on a motion for reconsideration. Upon rehearing, rebuttal evidence to the additional evidence shall be admitted. After rehearing, the Commission may modify its decision and order as the additional evidence may warrant.

(l) A motion for relief from a decision and order which is based on any ground other than the presentation of newly discovered evidence shall be governed as to both timeliness and sufficiency by the rules of the Commission, which shall be modeled, to the extent practical, upon the rules then governing similar motions before the courts of Guam.

Section 7002. <u>Proceedings against licensees.</u> (a) Any proceeding against a licensee or registrant shall be brought on by written complaint, which shall include a statement setting forth in ordinary and concise language the charges and the acts or omissions supporting such charges.

(b) Upon the filing of the complaint the Commission shall serve a copy upon the licensee or registrant either personally or by certified mail to the address on file with the Commission.

(c) Within twenty (20) days after service upon of the complaint, the licensee or registrant may file with the Commission a responsive pleading which may:

(1) Request a hearing;

(2) Admit the accusation in whole or in part;

(3) Present new matters or explanations by way of defense; or

(4) State any legal objections to the complaint.

(d) The licensee or registrant shall be entitled to a hearing on the merits if a responsive pleading has been filed within the time allowed by subsection (c), and any such notice shall be deemed a specific denial of all parts of the complaint not expressly admitted. Failure to timely file a responsive pleading or to appear at the hearing shall constitute an admission of all matters and facts contained in the complaint and a waiver of the licensee's or registrant's right to a hearing, but the Commission, in its discretion, may nevertheless order a hearing. All affirmative defenses shall be specifically stated, and unless objection is taken as provided in paragraph (4) of subsection (c) of this section, all objections to the form of the complaint shall be deemed waived.

(e) The Commission shall determine the time and place of the hearing as soon as is reasonably practical after receiving the licensee's or registrant's responsive pleading. The Commission shall deliver or send by certified mail a notice to all parties at least ten (10) days prior to the hearing. Unless the licensee or registrant consents, the hearing shall not be held prior to the expiration time within which the licensee or registrant is entitled to file a responsive pleading.

(f) Prior to a hearing before the Commission, and during a hearing upon reasonable cause shown, the Commission shall issue subpoenas and subpoenas duces tecum at the

64

request of a licensee, a registrant, or the Commission's attorney.

Section 7003. Emergency orders. Notwithstanding any provisions of this article, the Commission may issue an emergency order for the suspension, limitation of conditioning of any operation certificate or any license, other than a casino license, or any registration, or may issue an emergency order requiring the licensed casino to keep an individual from the premises of such licensed casino or not to pay such individual any remuneration for services or any profits, income or accruals on his or her investment in such casino, in the following manner;

(a) An emergency order shall be issued only when the Commission finds that:

(1) A licensee or registrant has been charged with the violation of a federal or Guam criminal law, or

(2) Such action is necessary to prevent a violation of a Guam or federal criminal law, or

(3) Such action is immediately necessary for the preservation of the public peace, health, safety, morals, good order and general welfare or to preserve the public policies declared by this act.

(b) An emergency order shall set forth the grounds upon which it is issued, including the statement of facts constituting the alleged emergency necessitating such action.

(c) The emergency order shall be effective immediately upon issuance and service upon the licensee, registrant, or resident agent of the licensee. The emergency order may suspend, limit, condition or take other action in relation to the approval of one or more individuals who were required to be approved in any operation, without necessarily affecting any other individuals or the licensed casino establishment. The emergency order shall remain in effect until further order of the Commission or final disposition of the case.

(d) Within five (5) days after issuance of an emergency order, the Commission shall cause a complaint to be filed and served upon the person or entity affected by the order.

(e) Thereafter, the person or entity against whom the emergency order has been issued and served shall be entitled to a hearing before the Commission in accordance with the provisions of this article.

Section 7004. Judicial review. (a) Any person aggrieved by a final decision or order of the Commission made after hearing or rehearing by the Commission, whether or not a petition for hearing was filed, may obtain judicial review thereof by appeal to the Superior Court in accordance with the Rules of Court.

(b) Filing of an appeal shall not stay enforcement of the decision or order of the Commission unless the stay is obtained from the court upon application in accordance with the Rules of Court or from the Commission upon such terms and conditions as it deems proper.

(c) The reviewing court may affirm the decision and order of the Commission, may remand the case for further proceedings, or may reverse the decision if the substantive

65

rights of the petitioner have been prejudiced because the decision is:

(1) In violation of constitutional provisions;

(2) In excess of the statutory authority and jurisdiction of the Commission; or

(3) Arbitrary or capricious or otherwise not in accordance with law.

(d) In order to protect the public interest and the regulatory authority of the Commission, any action by the Commission under this article shall not be subject to the injunctive authority of the Superior Court prior to the exhaustion of the administrative procedures herein specified, unless it appears evident to the court, by clear and convincing evidence, that a manifest denial of justice would result from the refusal to enjoin the contemplated action of the Commission.

## Article 8—Sanctions for Unlawful Acts

Section 8001. _Penalties for willful evasion of payment of license fees, other acts and omissions._ Any person who willfully fails to report, pay or truthfully account for and pay over any license fee or tax imposed by the provisions of this act, or willfully attempts in any manner to evade or defeat any such license fee, tax, or payment thereof is guilty of a misdemeanor and subject to the penalties therefor, except that the amount of a fine may be up to ten thousand dollars ($10,000), and in the case of a person other than a natural person, the amount of a fine may be up to fifty thousand dollars ($50,000) and shall in addition be liable for a penalty of three times the amount of the license fee or tax evaded and not paid, collected or paid over, which penalty shall be assessed by the Commission and collected in accordance with the provisions of this act.

Section 8002. _Unlicensed casino gaming unlawful; penalties._

(a) Any person who violates the provisions of Sections 5001 or 5003 or of Article 6, or permits any gaming, slot machine or device to be conducted, operated, dealt or carried on in any casino by a person other than a person licensed for such purposes pursuant to this act is guilty of a misdemeanor.

(b) Any licensee who places games or slot machines into play or displays such games or slot machines in a casino without the authority of the Commission to do so is guilty of a misdemeanor.

(c) Any person who operates, carries on or exposes for play any gaming, gaming device or slot machine after his license has expired and prior to the actual renewal thereof is guilty of a misdemeanor.

(d) Upon conviction of any of the offenses specified in subsections (a), (b) and (c), the penalties provided for a misdemeanor may be imposed, except that the amount of a fine may be up to ten thousand dollars ($10,000), and in the case of a person other than a natural person, the amount of a fine may be up to fifty thousand dollars ($50,000).

Section 8003. _Swindling and cheating; penalties._ (a) Except as provided in subsection (b), any person who by any trick or sleight of hand, or by a fraud or fraudulent scheme, or the use of marked cards or rigged or loaded dice or device, for himself or for another wins or attempts to win money or property or a representative of either or reduces a losing wager or attempts to reduce a losing wager in connection with casino gaming or

66

simulcast wagering is guilty of a misdemeanor and subject to the penalties therefor, except that the amount of a fine may be up to ten thousand dollars ($10,000), and in the case of a person other than a natural person, the amount of a fine may be up to fifty thousand dollars ($50,000).

(b) Any person who by any trick or sleight of hand, or by fraud or fraudulent scheme, or the use of marked cards or rigged or loaded dice or device, for himself or for another wins or attempts to win money or property or a representative of either or reduces a losing wager or attempts to reduce a losing wager in connection with casino gaming is guilty of a petty misdemeanor and is subject to not more than thirty (30) days imprisonment and a fine of not more than one thousand dollars ($1,000) of both if the value of such money or property or representative of either is one hundred dollars ($100) or less.

Section 8004. Use of certain devices in playing game, penalties. A person commits a petty misdemeanor if, in playing a game in a licensed casino, the person uses, or assists another in the use of, an electronic, electrical or mechanical device which is designed, constructed, or programmed specifically for use in obtaining an advantage at playing any game in a licensed casino. In addition to any other penalty imposed by the court upon the person, the device used by any person in violation of this section shall be seized and delivered to the Commission. Each casino licensee shall post notice of this prohibition and the penalties of this section in a manner determined by the Commission.

Section 8005. Unlawful use of bogus chips or gaming billets, marked cards, dice, cheating devices, unlawful coins; penalty. (a) It shall be unlawful for any person gaming in any licensed casino to:

(1) Knowingly to use bogus or counterfeit chips or gaming billets, or to knowingly substitute and use in any such game cards or dice that have been marked, loaded or rigged; or

(2) Knowingly to use or possess any cheating device with intent to cheat or defraud.

(b) It shall be unlawful for any person, playing or using any slot machine in a licensed casino to:

(1) Knowingly use other than a lawful coin or legal tender of the United States, or to use coin not of the same denomination as the coin intended to be used in such slot machine, except that in the playing of any slot machine or similar gaming device, it shall be lawful for any person to use gaming billets, tokens or similar objects therein which are approved by the Commission; or

(2) Use any cheating or thieving device, including but not limited to tools, drills, wires, coins or tokens attached to strings or wires, or electronic or magnetic devices, to facilitate the alignment of any winning combination or removing from any slot machine any money or other contents thereof.

(c) It shall be unlawful for any person to knowingly possess or use while on the premises of a licensed casino, any cheating or thieving device, including but not limited to tools, wires, drills, coins attached to strings or wires or electronic or magnetic devices to facilitate removing from any slot machine any money or contents thereof, except that a duly authorized employee of a licensed casino may possess and use any of the foregoing only in

67

furtherance of his or her employment in the casino.

(d) It shall be unlawful for any person knowingly to possess or use while on the premises of any licensed casino any key or device designed for the purpose of or suitable for opening or entering any slot machine or similar gaming device or drop box, except that a duly authorized employee of a licensed casino or of the Commission may possess and use any of the foregoing only in furtherance of his or her employment.

(e) Any person who violates this section is guilty of a misdemeanor and subject to the penalties therefor, except that the amount of a fine may be up to ten thousand dollars ($10,000), and in the case of a person other than a natural person, the amount of a fine may be up to fifty thousand dollars ($50,000). In addition, to any other penalty imposed by the court upon the person, the device used by any person in violation of this section shall be seized and delivered to the Commission.

Section 8006. Cheating games and devices in a licensed casino; penalty. (a) It shall be unlawful to:

(1) Knowingly to conduct, carry on, operate, deal or allow to be conducted, carried on, operated or dealt any cheating or thieving game or device; or

(2) Knowingly to deal, conduct, carry on, operate or expose for play any game or games played with cards, dice or any mechanical device, or any combination of games or devices, which have in any manner been marked or rigged, or placed in a condition, or operated in a manner, the result of which tends to deceive the public or tends to alter the normal random selection of characteristics or the normal chance of the game which could determine or alter the result of the game.

(b) It shall be unlawful knowingly to use or possess any marked cards, loaded dice, plugged or rigged machines or devices.

(c) Any person who violates this section is guilty of a misdemeanor and subject to the penalties therefor, except that the amount of a fine may be up to ten thousand dollars ($10,000), and in the case of a person other than a natural person, the amount of a fine may be up to fifty thousand dollars ($50,000). In addition, to any other penalty imposed by the court upon the person, the device used by any person in violation of this section shall be seized and delivered to the Commission.

Section 8007. Unlawful possession of device, equipment or other material illegally manufactured, distributed, sold or serviced. Any person who possesses any device, equipment or material which he or she knows has been manufactured, distributed, sold, rigged or serviced in violation of the provisions of this act is guilty of a crime of a misdemeanor and subject to the penalties therefor, except that the amount of a fine may be up to ten thousand dollars ($10,000), and in the case of a person other than a natural person, the amount of a fine may be up to fifty thousand dollars ($50,000). In addition, to any other penalty imposed by the court upon the person, the device used by any person in violation of this section shall be seized and delivered to the Commission.

Section 8008. Employment without license or registration; penalty. (a) Any person who, without obtaining the requisite license or registration as provided in this act, works or is employed in a position whose duties would require licensing or registration under the provisions of this act is guilty of a misdemeanor and subject to the penalties therefor, except that the amount of a fine may be up to ten thousand dollars ($10,000), and

in the case of a person other than a natural person, the amount of a fine may be up to fifty thousand dollars ($50,000).

(b) Any person who employs or continues to employ an individual not duly licensed or registered under the provisions of this act in a position whose duties require a license or registration under the provisions of this act is guilty of a misdemeanor and subject to the penalties therefor, except that the amount of a fine may be up to ten thousand dollars ($10,000), and in the case of a person other than a natural person, the amount of a fine may be up to fifty thousand dollars ($50,000).

(c) Any person violating the provisions of Section 6005(e) shall be guilty of a felony of the third degree and shall be punished as provided therefore, except that a fine of not more than twenty-five thousand dollars ($25,000) may be imposed in the case of an individual and in the case of a person other than a natural person, a fine of not more than one hundred thousand dollars ($100,000) may be imposed. Any licensee permitting or allowing such a violation shall also be punishable under this subsection, in addition to any other sanctions the Commission may impose.

Section 8009. <u>Persons prohibited from accepting employment violation, penalty.</u> (a) No applicant or person or organization licensed by or registered with the Commission knowingly shall employ or offer to employ any person who is prohibited by the provisions of this act from accepting such employment.

(b) An applicant or person or organization who violates the provisions of this section is guilty of a misdemeanor and shall be subject to not more than one (1) year of imprisonment or a fine of not more than ten thousand dollars ($10,000) or both and in the case of a person other than a natural person, to a fine of not more than fifty thousand dollars ($50,000).

Section 8010. <u>Unlawful entry by person whose name has been placed on list of excluded persons; penalty.</u> Any person whose name is on the list of persons promulgated by the Commission pursuant to Section 4007 who knowingly enters the premises of a licensed casino is guilty of a petty misdemeanor, except that any person who has been convicted of this offense three times is guilty of a misdemeanor for each subsequent offense.

Section 8011. <u>Gaming by certain persons prohibited; penalties; defenses.</u> (a) No person under the age of twenty-one (21) shall enter, or game in, a licensed casino; provided, however, that such a person may enter a casino by way of passage to another room, and provided further, however, that any such person who is licensed or registered under the provisions of this act may enter a casino in the regular course of the person's permitted activities.

(b) Any licensee or employee of a casino who allows a person under the age of twenty-one (21) to remain in or game in a casino is guilty of a petty misdemeanor; except that the establishment of all of the following facts by a licensee or employee allowing any such underage person to remain shall constitute a defense to any prosecution therefor:

(1) That the underage person falsely represented in writing that he or she was at or over the excludable age;
(2) That the appearance of the underage person was such that an ordinary prudent person would believe him or her to be at or over the age excludable age; and

69

(3) That the admission was made in good faith, relying upon such written representation and appearance, and in the reasonable belief that the underage person was actually at or over the excludable age.

Section 8012. Prohibited political contributions; penalty. Any person who makes or causes to be made a political contribution prohibited by the provisions of this act is guilty of a crime of a misdemeanor and is and subject to the penalty therefor, except that the amount of a fine may be up to ten thousand dollars ($10,000), and in the case of a person other than a natural person, the amount of a fine may be up to fifty thousand dollars ($50,000).

Section 8013. Authority of gaming licensee and agents to detain or question persons suspected of cheating; immunity from liability; posted notice required. (a) Any licensee or its officers, employees or agents may question any individual in the casino who is reasonably suspected of violating any of the provisions of Sections 8003, 8004, 8005, 8006 and 8007. No licensee or its officers, employees or agents shall be criminally or civilly liable by reason of any such questioning.

(b) Any licensee or its officers, employees or agents who shall have probable cause for believing there has been a violation of in the casino of Sections 8003, 8004, 8005, 8006 and 8007 by any person may refuse to permit such person to continue gaming or may take such person into custody and detain him or her in the establishment in a reasonable manner for a reasonable length of time, for the purpose of notifying law enforcement or Commission authorities. Such refusal or taking into custody and detention shall not render such licensee or its officers, employees or agents criminally or civilly liable for false arrest, false imprisonment, slander or unlawful detention, unless such refusal or such taking into custody or detention is unreasonable under all of the circumstances.

(c) No licensee or the officers, employees or agents of such licensee shall be entitled to any immunity from civil or criminal liability provided in this section unless there is displayed in a conspicuous manner in the casino a notice in bold face type clearly legible and in substantially this form:

"Any gaming licensee or officer, employee or agent thereof who has probable cause for believing that any person is violating any of the provisions of the Casino Control Act prohibiting cheating or swindling in gaming may detain such person in the establishment for the purpose of notifying a police officer or Casino Control Commission."

Section 8014. (a) Other offenses; general penalty. Notwithstanding any other law, any person who violates any provision of this act the penalty for which is not specifically fixed in this act is guilty of a misdemeanor and subject to imprisonment of not more than one (1) year and a fine of not more than Ten Thousand Dollars ($10,000).

(b) The maximum penalty for felonies as designated under this act, unless otherwise stated, is a term of imprisonment of five (5) years and a fine of Twenty-Five Thousand Dollars ($25,000) in the case of a natural person and a fine of One Hundred Thousand Dollars ($100,000) for other than natural persons.

70

(c) Notwithstanding any other law, and whether specifically stated in this act or not, the offenses set forth in this act and the penalties assessed therefore shall be and are in addition to any other offenses and penalties which may be charged and imposed pursuant to any other applicable criminal provision of the Guam Code Annotated.

Section 8015. Continuing offenses. (a) A violation of any of the provisions of this act which is an offense of a continuing nature shall be deemed to be a separate offense on each day that it occurs. Nothing herein shall be deemed to preclude the commission of multiple violations within a day of those provisions of this act which establish offenses consisting of separate and distinct acts.

(b) Any person who aids, abets, counsels, commands, induces, procures or causes another to violate a provision of this act is punishable as a principal and subject to all sanctions and penalties, both civil and criminal, provided by this act.

Section 8016. Exemption from certain provisions of Title 9 of the Guam Code Annotated. The provisions of Sections 64.10, 64.20, 64.21, 64.22 and 64.22A of Title 9 of the Guam Code Annotated shall not apply to any person who, as a licensee operating pursuant to the provisions of this act, or as a player in any game authorized pursuant to the provisions of this act, engages in gaming as authorized herein.

Section 8017. Racketeer-influenced and corrupt organizations, Definitions of. For purposes of this act:

(a) "Racketeering activity" means (1) any act or threat involving murder, kidnapping, gaming, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under Guam law and punishable by imprisonment for more than 1 year; (2) any act which is indictable under any of the following provisions of Title 18, United States Code: section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471 through 509 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gaming information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful fund payments), section 1955 (relating to the prohibition of illegal gaming businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2421-2424 (relating to white slave traffic); (3) any act which is indictable under Title 29, *United States Code, section 186* (relating to restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds); or (4) any offense involving bankruptcy fraud, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States.

71

(b) "Person" includes any individual or entity holding or capable of holding a legal or beneficial interest in property.

(c) "Enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not as a legal entity.

(d) "Pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this act and the last of which occurred within ten (10) years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

(e) "Unlawful debt" means a debt (1) which was incurred or contracted in gaming activity which was in violation of the law of Guam, the United States, a state or political subdivision thereof; or (2) which is unenforceable under Guam, state or federal law in whole or in part as to principal or interest because of the laws relating to usury; or (3) which was incurred in connection with the business of gaming in violation of the law of Guam, the United States, a state or political subdivision thereof; or (4) which was incurred in connection with the business of lending money or a thing of value at a rate usurious under Guam, state or federal law, where the usurious rate is at least twice the enforceable rate.

(f) "Documentary material" includes any book, paper, document, record, recording, or other material.

Section 8018. Prohibited activities. (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 8015(b) to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in or the activities of which affect casino gaming operations or ancillary industries which do business with any casino licensee. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer or of assisting another to do so, shall not be unlawful under this subsection, provided that the sum total of the securities of the issuer held by the purchaser, the members of his or her family, and his or her or their accomplices in any pattern of racketeering activity or in the collection of an unlawful debt does not amount in the aggregate to one percent (1%) of the outstanding securities of any one class, or does not, either in law or in fact, empower the holders thereof to elect one or more directors of the issuer.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, casino gaming operations or ancillary industries which do business with any casino licensee.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, casino gaming operations or ancillary industries which do business with any casino licensee, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

72

racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

(e) Any person who violates any provision of this section shall be fined not more than two hundred thousand dollars ($250,000) or imprisoned not more than ten years (10) or both and shall forfeit to the government of Guam (1) any interest he has acquired or maintained in violation of this section and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of this section.

(f) In any action brought by the Attorney General under this section, the Superior Court shall have jurisdiction to enter such restraining orders or prohibitions, or to take such other actions, including, but not limited to, the acceptance of satisfactory performance bonds, in connection with any property or other interest subject to forfeiture under this section, as it shall deem proper.

(g) Upon conviction of a person under this section, the court shall authorize the Attorney General to seize all property or other interest declared forfeited under this section upon such terms and conditions as the court shall deem proper. If a property right or other interest is not exercisable or transferable for value by the government of Guam, it shall expire and shall not revert to the convicted person.

Section 8019.  Civil remedies.  (a) The Superior Court shall have jurisdiction to prevent and restrain violations of Section 8018 by issuing appropriate orders, including, but not limited to, ordering any person to divest himself or herself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect casino gaming operations or ancillary industries which do business with any casino licensee; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

(b) The Attorney General may institute proceedings in Superior Court for violations of Section 8018. In any action brought under this section, the court shall proceed as soon as practicable to the hearing and determination thereof. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

(c) Any person injured in his or her business or property by reason of a violation of Section 8018 may sue therefor in any appropriate court and shall recover threefold any damages he or she or it sustains and the cost of the suit, including a reasonable attorney's fee.

(d) A final judgment or decree rendered in favor of the people of Guam in any criminal proceeding brought under this act shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding brought by the Attorney General.

Section 8020.  Civil investigative demand.  (a) Whenever the Attorney General has reason to believe that any person or enterprise may be in possession, custody, or control

Case 1:04-cv-00046    Document 1-3    Filed 10/26/2004    Page 22 of 30

pf any documentary materials relevant to an investigation under this act, the Attorney General, shall prior to the institution of a civil or criminal proceeding thereon, issue in writing, and cause to be served upon such person, a civil investigative demand requiring such person to produce such material for examination.

(b) Each such demand shall:

(1) State the nature of the conduct constituting the alleged violation that is under investigation and the provision of law applicable thereto;

(2) Describe the class or classes of documentary material to be produced thereunder with such specificity and certainty as to permit such material to be fairly identified;

(3) Prescribe a return-date which will provide a reasonable period of time within which the material so demanded may be assembled and made available for inspection and copying or reproduction; and

(4) Identify the custodian to whom such material shall be made available.

(c) No such demand shall:

(1) Contain any requirement which would be held to be unreasonable if contained in a subpoena duces tecum issued in aid of a grand jury investigation; or

(2) Require the production of any documentary evidence which would be otherwise privileged from disclosure if demanded by a subpoena duces tecum issued in aid of a grand jury investigation.

(d) Service of any such demand or any petition filed under this section may be made upon a person by:

(1) Delivering a duly executed copy thereof to any partner, executive officer, managing agent, or general agent thereof, or to any agent thereof authorized by appointment or by law to receive service of process on behalf of such person, or upon any individual person;

(2) Delivering a duly executed copy thereof to the principal office or place of business of the person to be served; or

(3) Depositing such copy in the United States mail, by registered or certified mail duly, addressed to such person at its principal office or place of business.

(e) A verified return by the individual serving any such demand or petition setting forth the manner of such service shall be prima facie proof of such service. In the case of service by registered or certified mail, such return shall be accompanied by the post office's return receipt of delivery of such demand.

(f) Any person upon whom any demand issued under this section has been duly served shall make such material available for inspection and copying or reproduction to the Attorney General at the principal place of business of such person, or at such other place as the Attorney General and such person thereafter may agree and prescribe in writing, on the return date specified in such demand or on such later date as the Attorney General may prescribe in writing. Upon written agreement between such person and the Attorney General, copies may be substituted for all or any part of such original materials. The Attorney General may cause the preparation of such copies of documentary material

74

as may be required for official use by the Attorney General. While in the possession of the Attorney General, no material so produced shall be available for examination, without the consent of the person who produced such material, by any individual other than the Attorney General or his duly appointed representatives. Under such reasonable terms and conditions as the Attorney General shall prescribe, documentary material while in his or her possession shall be available for examination by the person who produced such material or any duly authorized representatives of such person.

(g) Upon completion of:

(1) The review and investigation for which any documentary material was produced under this section, and

(2) Any case or proceeding arising from such investigation, the Attorney General shall return to the person who produced such material all such material other than copies thereof made by the Attorney General pursuant to this section, provided that is has not passed into the control of any court or grand jury through the introduction thereof into the record of such case or proceeding.

(h) When any documentary material has been produced by any person under this section for use in any racketeering investigation, and no such case or proceeding arising therefrom has been instituted within a reasonable time after completion of the examination and analysis of all evidence assembled in the course of such investigation, such person shall be entitled, upon written demand made upon the Attorney General, to the return of all documentary material other than copies thereof made pursuant to this section so produced by such person.

(i) Whenever any person fails to comply with any civil investigative demand duly served upon him, her or it under this section or whenever satisfactory copying or reproduction of any such material cannot be done and such person refuses to surrender such material, the Attorney General may file in the Superior Court a petition for an order of such court for the enforcement of this section.

(j) The provisions of this section shall not apply to any situation covered by the provisions of Section 4017, and shall in no way limit the Commission's authority under that section.

Section 8021. Supplemental sanctions. In addition to any penalty, fine or term of imprisonment authorized by law, the Commission, after appropriate hearings and factual determinations, shall have the authority to impose the following sanctions upon any person licensed or registered pursuant to this act:

(1) Revoke the license or registration of any person for the conviction of any criminal offense under this act or for the Commission of any other offense or violation of this act which would disqualify such person from holding his, her or its license or registration;

(2) Revoke the license or registration of any person for willfully and knowingly violating an order of the Commission directed to such person;

(3) Suspend the license or registration of any person pending hearing and determination, in any case in which license or registration revocation could result;

(4) Suspend the operation certificate of any casino licensee for violation of any provisions of this act or rules promulgated hereunder relating to the operation of its

75

casino, including games, internal and accountancy controls and security;

(5) Assess such civil penalties as may be necessary to punish misconduct and to deter future violations, which penalties may not exceed twenty-five thousand dollars ($25,000) in the case of any individual licensee or registrant, except that in the case of a casino licensee the penalty may not exceed one hundred thousand dollars ($100,000);

(6) Order restitution of any money or property unlawfully obtained or retained by a licensee or registrant;

(7) Enter a cease and desist order which specifies the conduct which is to be discontinued, altered or implemented by the licensee or registrant;

(8) Issue letters of reprimand or censure, which letters shall be made a permanent part of the file of each licensee or registrant so sanctioned and which may be considered by the Commission upon the licensee's application for renewal or a different license or registration; or

(9) Impose any or all of the foregoing sanctions in combination with each other.

## Article 9--Miscellaneous

Section 9001. _Declaration of Guam's Limited Exemption from Operation of Provisions of Section 1172 of Title 15 of the U. S. Code._ Pursuant to Section 2 of an Act of Congress of the United States entitled "An act to prohibit transportation of gaming devices in interstate and foreign commerce," approved January 2, 1951, being chapter 1194, 64 Stat. 1134, and codified at Sections 1171-1177 of Title 15 of the U. S. Code, the people of Guam, acting directly through the initiative process authorized to them by the Congress through its enactment of Section 1422a(a) of Title 48 of the U. S. Code and implemented for them by the Legislature through its enactment of Chapter 17 of Title 3 of the Guam Code Annotate, do hereby, in accordance with and in compliance with the provisions of section 2 of said Act of Congress, declare and proclaim that section 2 of that Act of Congress shall not apply to any gaming device in Guam where the transportation of such a device is specifically authorized by and done in compliance with the provisions of this act, any other applicable statute of Guam, and any regulations promulgated pursuant thereto, and that any such gaming device transported in compliance with Guam law and regulations shall be exempt from the provisions of that Act of Congress.

Section 9002. _Legal shipment of gaming devices into Guam._ All shipments into Guam of gaming devices, including slot machines, the registering, recording and labeling of which has been duly had by the manufacturer or dealer thereof in accordance with sections 3 and 4 of an Act of Congress of the United States entitled "An act to prohibit transportation of gaming devices in interstate and foreign commerce," approved January 2, 1951, being chapter 1194, 64 Stat. 1134, and codified at Sections 1171-1177 of Title 15 of the U. S. Code, shall be deemed legal shipments thereof into Guam.

Section 9003. _Severability and preemption._ (a) If any part of this act or the application thereof to any person or circumstances shall be held to be invalid, such holding

shall not affect, impair or invalidate the remainder of this act or the application of such remaining portion of the act to any other person or circumstances. The holding of invalidity shall apply only to the portion directly involved in such holding or to the persons or circumstances therein involved.

(b) If any provision of this act is inconsistent with, in conflict with, or contrary to any other provision of law, such provision of this act shall prevail over such other provision and such other provision shall be deemed to be amended, superseded or repealed to the extent of such inconsistency or conflict. The Commission shall have exclusive jurisdiction over all matters delegated to it or within the scope of its powers under the provisions of this act.

Section 9004. <u>Equal employment opportunity requirements.</u> The Commission shall not issue a license to any applicant, including a casino service industry, who has not agreed to afford equal employment opportunity to bona fide residents of Guam.

Section 9005. <u>Equal employment opportunity enforcement.</u> In addition to and without limitation of other powers that it may have by law, the Commission shall have the following powers to:

(a) Investigate and determine the percentage of population of bona fide residents of Guam employed in any casino or casino service industry in Guam;

(b) Establish and promulgate by rule such percentage guidelines in determining the adequacy of equal employment opportunity being afforded bona fide residents of Guam by the casino and casino service industry in Guam;

(c) Impose such sanctions as may be necessary to accomplish the equal employment opportunities for the bona fide residents of Guam in the casino and casino service industry in Guam;

(d) Refer to the Attorney General instances or circumstances which may constitute violations of law;

(e) Enforce in a court of law violations of the equal employment opportunity requirements of this act or to assist in any enforcement proceeding initiated by an aggrieved person who claims a violation of his or her equal employment opportunity right; and

(f) Require a licensee to designate an equal employment opportunity officer to enforce the provisions of Section 9004 and any rules promulgated pursuant thereto.

### Article 10-Conservatorship

Section 10001. <u>Institution of conservatorship and appointment of conservators.</u> (a) Notwithstanding any other provision of this act, (1) upon the revocation of a casino license, (2) upon, in the discretion of the Commission, the suspension of a casino license or operation certificate for a period of in excess of four (4) months, or (3) upon the failure or refusal to renew a casino license, and notwithstanding the pendency of any appeal therefrom, the Commission may appoint and constitute a conservator to, among other

77

things, take over and into his or her possession and control all the property and business of the licensee relating to the casino and the approved hotel; provided, however, that this subsection shall not apply in any instance in which the casino in the casino hotel facility for which the casino license had been issued, in fact, has not been in operation and open to the public, and provided further that no person shall be appointed as conservator unless the Commission is satisfied that he or she is individually qualified according to the standard applicable to casino key employees, except that casino experience shall not be necessary for qualification.

(b) The Commission may proceed in a conservatorship action in a summary manner or otherwise and shall have the power to appoint and remove one or more conservators and to enjoin the former or suspended licensee from exercising any of its privileges and franchises, from collecting or receiving any debts and from paying out, selling, assigning or transferring any of its property to other than a conservator, except as the Commission may otherwise order. The Commission shall have such further powers as shall be appropriate for the fulfillment of the purposes of this act.

(c) Every conservator, before assuming his or her duties, shall execute and file a bond for the faithful performance of his or her duties payable to the Commission with such surety or sureties and in such form as the Commission shall approve and in such amount as the Commission shall prescribe.

(d) When more than one conservator is appointed pursuant to this section, the provisions of this article applicable to one conservator shall be applicable to all; the debts and property of the former or suspended licensee may be collected and received by any of them; and the powers and rights conferred upon them shall be exercised by a majority of them.

(e) The Commission shall require that the former or suspended licensee purchase liability insurance, in an amount determined by the Commission, to protect a conservator from liability for any acts or omissions of the conservator occurring during the duration of the conservatorship which are reasonably related to, and within the scope of, the conservator's duties.

Section 10002. Instructions to, supervision of conservator. Upon the appointment of a conservator, the Commission shall provide the conservator with written instructions which enumerate the specific powers and duties conferred by the Commission on the conservator with respect to the conservatorship. A conservator shall be under the direct supervision of the Commission and shall exercise only those powers and perform only those duties expressly conferred on the conservator by the Commission. The Commission, at any time after a conservatorship is established, may modify the powers of the conservator by providing the conservator with a new set of written instructions.

Section 10003. Powers, authorities and duties of conservators. (a) Upon his appointment, the conservator shall become vested with the title of all the property of the former or suspended licensee relating to the casino and the approved hotel, subject to any and all valid liens, claims, and encumbrances. The conservator shall have the duty to conserve and preserve the assets so acquired to the end that such assets shall continue to be operated on a sound and businesslike basis.

78

(b) Subject to the direct supervision of the Commission and pursuant to the written instructions of the Commission and any other order the Commission may deem appropriate, a conservator shall have power to:

(1) Take into his possession all the property of the former or suspended licensee relating to the casino and the approved hotel, including its books, records and papers;

(2) Institute and defend actions by or on behalf of the former or suspended licensee;

(3) Settle or compromise with any debtor or creditor of the former or suspended licensee, including any taxing authority;

(4) Continue the business of the former or suspended licensee and to that end enter into contracts, borrow money and pledge, mortgage or otherwise encumber the property of the former or suspended licensee as security for the repayment of the conservator's loans; provided, however, that such power shall be subject to any provisions and restrictions in any existing credit documents;

(5) Hire, fire and discipline employees;

(6) Review all outstanding agreements to which the former or suspended licensee is a party that fall within the purview of the Commission's regulatory powers and advise the Commission as to which, if any, of such agreements should be the subject of scrutiny, examination or investigation by the commission; and

(7) Do all further acts as shall best fulfill the purposes of the Casino Control Act.

(c) Except during the pendency of a suspension or during the pendency of any appeal from any action or event which precipitated the conservatorship or in instances in which the Commission finds that the interests of justice so require, the conservator, subject to the prior approval of and in accordance with such terms and conditions as may be prescribed by the Commission, and after appropriate prior consultation with the former licensee as to the reasonableness of such terms and conditions, shall endeavor to and be authorized to sell, assign, convey or otherwise dispose of in bulk, subject to any and all valid liens, claims, and encumbrances, all the property of a former licensee relating to the casino and the approved hotel only upon prior written notice to all creditors and other parties in interest and only to such persons who shall be eligible to apply for and shall qualify as a casino licensee in accordance with the provisions of this act. Prior to any such sale, the former licensee shall be granted, upon request, a summary review by the commission of such proposed sale. No casino license privilege or entitlement shall be conveyed by any sale made by the conservator.

(d) The Commission may direct that the conservator, for an indefinite period of time, retain the property and continue the business of the former or suspended licensee relating to the casino and the approved hotel. During such period of time or any period of operation by the conservator, he or she shall pay when due, without in any way being personally liable, all secured obligations and shall not be immune from foreclosure or other legal proceedings to collect the secured debt, nor with respect thereto shall such conservator have any legal rights, claims, or defenses other than those which would have been available to the former or suspended licensee.

(e) A conservator shall cooperate fully with any investigation or inquiry conducted by the Commission during the conservatorship or after the termination of the conservatorship.

Section 10004. <u>Compensation of conservators and others.</u> Upon the appointment of a conservator, the Commission shall establish a reasonable rate of compensation for the services, costs and expenses of the conservator. The Commission shall also designate the party or parties responsible for the payment of compensation to the conservator and shall direct that the responsible party or parties guarantee payment in such manner as the Commission shall deem appropriate. The rate of compensation payable to the attorney for the conservator, the appraiser, the auctioneer, the accountant and such other persons as the Commission may appoint in connection with the conservatorship shall be established by the Commission at the time of appointment. All requests for payment by the conservator and other persons appointed by the Commission in connection with the conservatorship shall be subject to the approval of the Commission, and the Commission shall reduce any fee which it deems excessive. Fees payable to the conservator and expenses incurred in the course of the conservatorship shall have priority for payment over all other debts or obligations of the former or suspended licensee, including debts or obligations secured by the former or suspended licensee's property.

Section 10005. <u>Assumption of outstanding debts.</u> Incidental to any sale, assignment, conveyance or other disposition in bulk of all property of the former licensee relating to the casino and the approved hotel, the Commission, in its discretion, may require that the purchaser thereof assume in a form and substance acceptable to the Commission all of the outstanding debts of the former licensee that arose from or were based upon the operation of either or both the casino or the approved hotel.

Section 10006. <u>Payment of net earnings during the period of the conservatorship.</u> No payment of net earnings during the period of the conservatorship may be made by the conservator without the prior approval of the Commission, which, in its discretion, may direct that all or any part of same be paid either to the suspended or former licensee or to the Commission; provided, however, that the former or suspended licensee shall be entitled to a fair rate of return out of net earnings, if any, during the period of the conservatorship on the property retained by the conservator, taking into consideration that which amounts to a fair rate of return in the casino industry or the hotel industry, as the case may be.

Section 10007. <u>Payments following a bulk sale.</u> Following any sale, assignment, conveyance or other disposition in bulk of all the property subject to the conservatorship, the net proceeds therefrom, if any, after payment of all obligations owing to the government of Guam and any political subdivision thereof and of those allowances set forth in Section 10004, shall be paid by the conservator to the former or suspended licensee.

Section 10008. <u>Continuing jurisdiction of Commission.</u> A conservator shall at all times be subject to the provisions of this act and such rules, limitations, restrictions, terms and conditions as the Commission may from time to time prescribe. Except as may be otherwise provided, during the period of any conservatorship the casino operation in the form of the conservatorship shall be deemed to be a licensed casino operation and any

80

reference in this act to any obligations or responsibilities incumbent upon a casino licensee or those persons dealing with, affiliated with, having an interest in, or employed by a casino licensee shall be deemed to apply to the said casino operation.

Section 10009. <u>Termination of a conservatorship.</u> (a) The Commission shall direct the termination of any conservatorship when the conservator has, with the prior approval of the Commission, consummated the sale, assignment, conveyance or other disposition in bulk of all the property of the former licensee relating to the casino and the approved hotel.

(b) The Commission may direct the termination of any conservatorship when it determines that for any reason the cause for which the action was instituted no longer exists.

(c) Upon the termination of the conservatorship and with the approval of the Commission, the conservator shall take such steps as may be necessary in order to effect an orderly transfer of the property of the former or suspended licensee.

(d) The sale, assignment, transfer, pledge or other disposition of the securities issued by a former or suspended licensee during the pendency of a conservatorship shall neither divest, have the effect of divesting, nor otherwise affect the powers conferred upon a conservator.

Section 10010. <u>Required reports.</u> A conservator shall file with the Commission such reports with regard to the administration of the conservatorship in such form and at such intervals as the Commission shall prescribe. Such reports shall be available for examination and inspection by any creditor or party in interest and, in addition, the Commission may direct that copies of any such reports be mailed to such creditors or other parties in interest as it may designate and that summaries of any such reports be published in on the Commission's Internet website.

Section 10011. <u>Review of actions of conservator.</u> A creditor or party in interest aggrieved by any alleged breach of a fiduciary obligation of a conservator in the discharge of his duties shall be entitled, upon request, to a review thereof in accordance with rules to be promulgated by the Commission.

### Article 11—Fees and Taxes

Section 11001. <u>Casino application and license fees.</u> The Commission shall establish by rule fees for the application, issuance and renewal of any casino license. The initial application fee, which must be paid at the time that the Commission receives an application from any person for any casino license and which shall be nonrefundable, shall be not less than two hundred thousand dollars ($200,000). The issuance fee for an initial casino license, which must be paid at or before the time that the casino license is issued, shall be not less than three hundred thousand dollars ($300,000). The renewal fee shall be based upon the cost of maintaining control and regulatory activities contemplated by this act and shall be not less than one hundred thousand dollars ($100,000) for a one-year casino license and three hundred thousand dollars ($300,000) for a four-year casino license. For administrative convenience, the Commission may issue a casino license for only that portion of a year between the effective date and the next July 30 and prorate the sum required to be paid by the licensee for the initial license.

81

Section 11002. Slot machine license fee. (a) In addition to any other tax or fee imposed by this act, the Commission shall impose by rule on every slot machine maintained for use or in use in any licensed casino in Guam an annual license fee of not less than five hundred dollars ($500).

(b) The slot machine license fee shall be imposed as of the first day of July of each year with regard to all slot machines maintained for use or in use on that date, and on a pro rata basis thereafter during the year with regard to all slot machines maintained for use or placed in use after July 1.

Section 11003. Fees for other than casino licenses. The Commission, by rule, shall establish fees for the investigation and consideration of applications for the issuance and renewal of registrations and licenses other than casino licenses, which fees shall be payable by the applicant, licensee or registrant.

Section 11004. Guam Casino Gaming Control Commission Fund. (a) There is hereby created and established the Guam Casino Gaming Control Commission Fund, into which shall be deposited all money collected or received by the Commission from any source, except the receipts derived from the tax on gross revenues established by Section 11005.

(b) The Commission shall use the fund exclusively for the lawful operating expenses of the Commission.

(c) The Commission shall maintain a uniform system of accounting consistent with the government auditing standards established by the Comptroller General of the United State.

(d) The Commission shall publish annually within four (4) months after the end of its fiscal year a comprehensive report on its administration of the affairs of the Commission.

Section 11005. Tax on gross revenues. (a) There is hereby imposed on gross revenues as defined by Section 1003(bb) as annual tax, known as the Guam Casino Revenue Tax, as follows:

(1) Nine percent (9%) during the first two years of a casino's operation;

(2) Ten percent (10%) during the casino's third and fourth years of operation; and

(3) Eleven percent (11%) for each succeeding year.

(b) The tax on gross revenue shall not be reduced when or if the casino is sold or transferred to a new licensee or owner.

(c) Gross revenues from casino gaming shall not be subject to the gross receipts tax established pursuant to Chapter 26 of Title 11 of the Guam Code Annotated. However, gross revenues from any casino or casino-hotel revenues that are not subject to the gross revenue tax imposed by this section are subject to the gross receipts tax.

(d) The Director of Revenue and Taxation, with cooperation from the Commission,

shall collect the gross revenues tax. The Director of Revenue and Taxation and the Commission shall collaborate in the preparation of rules necessary to implement and enforce the tax and the Commission, with the concurrence of the Director, shall promulgate the rules pursuant to the provisions of the Administrative Adjudication Law.

Section 11006. <u>Guam Casino Revenue Trust Fund.</u> (a) There is hereby established a Guam Casino Revenue Trust Fund into which shall be deposited one-half (1/2) of all money derived from the tax imposed pursuant to Section 11005.

(b) The purpose of the fund is to establish an inviolable reservoir of capital, the income from which shall be dedicated to the improvement of the health, safety, education and quality of life of the people of Guam.

(c) The Commissioners shall be the trustees of the fund and have a fiduciary relationship to the people of Guam with regard to their management of the fund.

(d) The Commissioners, as trustees, shall discharge their duties with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. The Commissioners, as trustees, shall diversify the investments of the fund so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

(e) Any Commissioner who knowingly violates his or her fiduciary responsibility shall be removed from the Commission by the Governor and may be personally liable to the fund to the extent of the losses incurred by the fund. The Attorney General shall enforce the provisions of this subsection to hold a Commissioner personally liable. A Commissioner who the Governor seeks to remove under this subsection shall be entitled to notice of the charges against him or her and a hearing before an impartial hearing officer and shall not be removed unless his or her violation of his or her fiduciary responsibility is established by clear and convincing evidence. A Commissioner may appeal an order of removal to the Superior Court.

(f) The fund shall not be subject to appropriation for any purpose by the legislature and the Commissioners, as trustees, shall not permit the corpus of the fund to be invaded for any purpose whatsoever.

(g) The Commissioners, as trustees, may invest the corpus of the fund in the same type of investments as are permitted to the trustees of the Government of Guam Retirement Fund pursuant to Sections 8143 through 8159 of Title 4 of the Guam Code Annotated.

(h) Within four (4) months after the close of the Commission's fiscal year, the Commissioners, as trustees, shall transfer all of the prior year's earnings of the fund to the Director of Administration for deposit in the General Fund. At the same time, the Commissioners shall notify the Governor and the Legislature of the sum transferred to the General Fund.

Section 11007. Expenditure of the income of the Guam Casino Revenue Trust

83

Fund. Money from the Guam Casino Revenue Trust Fund deposited to the General Fund shall be appropriated by the Legislature exclusively for making long-term improvements in the island's infrastructure. For purposes of this section, infrastructure means roads, power, water and sanitary systems, public buildings, including hospitals and public health centers, schools and post secondary educational facilities, libraries, police, fire and correctional facilities, and sports, parks and recreational facilities. None of the money shall be appropriated for personnel costs.

Section 11008. Disposition of second half of Guam Casino Revenue Tax. (a) There is hereby established a Guam Casino Revenue Benefits Fund into which shall be deposited one half (1/2) of all money derived from the tax imposed pursuant to Section 11005.

(b) The purpose of the fund is to provide an annual source of revenue for the support of worthy endeavors specifically identified by the people through a quadrennial referendum.

(c) Within four (4) months after the close of the Commission's fiscal year, the Director of Administration shall transfer one-half of the prior year's receipts from the Guam Casino Revenue Tax and any interest earned thereon into the General Fund. The Director shall notify the Governor and the Legislature of the sum transferred to the General Fund.

Section 11009. (a) Expenditure of the income of the Guam Casino Revenue Benefit Fund. Money from the Guam Casino Revenue Benefit Fund deposited to the General Fund shall be appropriated by the Legislature exclusively for the following purposes:

(1) Ten percent (10%) shall to the Mayors' Council of Guam for village improvements;

(2) Twenty percent (20%) to the Department of Education for books and other instructional materials and supplies to be utilized by the students in the public and nonpublic elementary, middle and high schools;

(3) Ten percent (10%) to organizations registered with the Department of Revenue and Taxation as nonprofit organizations pursuant to Section 501(c)(3) of the Internal Revenue Code and which have as a primary purpose of their existence the preservation and development of the myriad cultures which call Guam home;

(4) Ten percent (10%) for public safety purposes, which shall include the activities of the Guam Police Department, the Guam Fire Department, the Customs and Quarantine Agency, the conservation division of the Department of Agriculture, and the Marshals Office of the Supreme and Superior Courts;

(5) Fifteen percent (15%) to the Departments of Public Health and the Mental Health and Substance Abuse for health care for the indigent;

(6) Fifteen percent (15%) to the Departments of Labor and Public

84

Health and Social Services for job training programs for the indigent;

(7)   Ten percent (10%) to government and nonprofit agencies that assist victims of domestic, child, spousal and elderly abuse; and

(8)   Ten percent (10%) for programs that are designed to combat injuriously addictive habits;

(b) In conjunction with each election for Governor, the Guam Election Commission shall conduct a referendum election to permit the people to express their preference as to how the money transferred to the General Fund pursuant to this section shall be apportioned. Any government of Guam agency or any organization registered with the Department of Revenue and Taxation as a nonprofit organization pursuant to Section 501(c)(3) of the Internal Revenue Code and which has as a primary purpose of its existence the preservation and development of a unique cultural heritage shall be granted a place on the referendum ballot if the advocates thereof submit to the Guam Election Commission a timely petition bearing the valid signatures of one thousand (1,000) of qualified registered voters.

(c) The Guam Election Commission shall submit the final tally of the referendum to the Legislature and commencing with the next ensuing fiscal year, the Legislature shall apportion the money transferred to it by this section among the eight (8) organizations or for the purposes receiving the highest number of votes. The apportionment shall be in direct ratio to the percentage of vote obtained by each of the organizations or purposes.

Section 11010. Payment of taxes. (a) The tax imposed by Section 11005 shall be due and payable to the Director of Revenue and Taxation within thirty (30) calendar days following the last day of each previous month and shall be based upon gross revenues derived during the previous month. A licensee shall file its first return and shall report gross revenues from the time it commenced operations and ending on the last day of the first month in which it has conducted business pursuant to a license issued by the Commission. The taxpayer shall file with the Commission each month an information copy of the filed return.

(b) Any other law to the contrary notwithstanding, any business conducted by any person holding a license pursuant to this act shall, in addition to all other taxes imposed by this act, file a corporate or individual income tax return, as appropriate, and pay the taxes thereon to the Director of Revenue and Taxation. The taxpayer shall file with the Commission each month an information copy of the filed return.

Section 11011. Determination of tax liability. The Director of Revenue and Taxation may or cause to be performed audits of the books and records of a casino licensee, at such times and intervals as he or she deems appropriate, for the purpose of determining the sufficiency of tax payments. If a return or deposit required by this act is not filed or paid, or if a return or deposit when filed or paid is determined to be incorrect or insufficient with or without an audit, the amount of tax or deposit due shall be determined by the Director of Revenue and Taxation. Notice of such determination shall be given to the licensee liable for the payment of the tax or deposit. Such determination

85

shall finally and irrevocably fix the tax unless the person against whom it is assessed, within thirty (30) days after receiving notice of such determination, shall apply to the Director of Revenue and Taxation for a hearing, or unless the Director on his or her own motion shall redetermine the tax. After such hearing the Director shall give notice of his or her determination to the person against whom the tax is assessed. The power granted to the Director by this section shall not preclude the Commission or the Public Auditor from conducting such audits as they are permitted to perform pursuant to this act.

Section 11012. Penalties. (a) Any licensee who shall fail to file his, her or its return when due or to pay any tax or deposit when the same becomes due, as herein provided, shall be subject to a penalty at the rate of five percent (5%) per month or any fraction thereof, but shall not exceed twenty-five percent (25%) in the aggregate.

(b) If the Director determines that the failure to comply with any provision of this article was excusable under the circumstances, the Director may remit such part or all of the penalty as shall be appropriate under such circumstances.

(c) Any person failing to file a return, failing to pay the tax or deposit, or filing or causing to be filed, or making or causing to be made, or giving or causing to be given any return, certificate, affidavit, representation, information, testimony or statement required or authorized by this act, or rules or regulations adopted hereunder which is willfully false, or failing to keep any records required by this act or rules of the Commission, shall, in addition to any other penalties herein or elsewhere prescribed, be guilty of a crime of a felony of the second degree and subject to the penalties therefor, except that the amount of a fine may be up to Two Hundred Fifty Thousand Dollars ($250,000).

(d) If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to fifty percent (50%) of the underpayment."

Section 2. Appropriation of funds. There is appropriated from the General Fund to the Guam Casino Gaming Control Commission Fund five hundred thousand dollars ($500,000) to be expended by the Commission for initial set-up and administration of the Commission. Within two (2) months after a quorum of Commissioners have taken office, they shall submit a proposed budget for the remainder of the fiscal year in which they have taken office and for the next ensuing fiscal year. Until such time as the Commission's receipts from fees and licenses is sufficient to sustain its operations, the Legislature shall appropriate such funds as are reasonable and necessary to sustain the Commission in attaining the purposes of this act.

Section 3. Effective date of act adopted by this initiative. This act shall take effect April 1, 2003.

Douglas B. Moylan
Attorney General



Robert M. Weinberg
Assistant Attorney General
Civil Division

**CONFIRMATION**

## Office of the Attorney General

October 7, 2004

**Mr. Gerald A. Taitano**
Executive Director
Guam Election Commission
P.O. Box BG
Hagåtña, Guam 96910

### RE: GUAM CASINO GAMING CONTROL COMMISSION ACT

Dear Mr. Taitano:

This Office has received a complaint regarding the manner in which the Government has implemented the Election Code of Guam pertaining to the Guam Casino Gaming Control Commission Act Initiative (Proposal A).

Upon preliminary review of the complaint, this Office is seriously concerned that there are material errors and omissions which have occurred that will prevent Proposal A from being legally presented to the voters on November 2, 2004 (General Election), and that will prevent Proposal A from withstanding a legal challenge that may be brought before, and will most certainly be brought after, the election. This Office believes that the will of the voters and citizens of Guam to determine the merits of Proposal A on November 2, 2004 may have been thwarted.

From the complaint, and our preliminary analysis and review, we understand the following facts:

1.  the pamphlet (brochure) attached and identified as Exhibit A was mailed out by the Commission on or by October 3, 2004;

Guam Judicial Center, Suite 2-206E • 120 West O'Brien Drive • Hagåtña, Guam 96910 • USA
(671) 475-3324 • (671) 472-2493 (Fax) • www.guamattorneygeneral.com • law@mail.justice.gov.gu

**EXHIBIT 2**

2.  according to press reports, notably, yesterday's *Marianas Variety Guam Edition*, p. 5, many people on island have not even received the pamphlet or brochure;

3.  three (3) signatures of voters were submitted with the argument in opposition to Proposal A, but only one name appears on the pamphlet, contrary to 3 G.C.A. § 17506;

4.  the pamphlet was presumably mailed to the categories of persons identified in 3 G.C.A. § 17511; *and*

5.  the actual Proposal was not included as part of the pamphlet identified as Exhibit A herein, otherwise mailed to the categories of persons identified in 3 G.C.A. § 17511.

If you believe our facts to be in error, please advise me immediately. According to 6 G.A.R. § 2114, the Commission must mail out a properly formatted pamphlet at least thirty (30) days before the election. In this case at least four (4) material defects appear to exist on the face of the pamphlet, which pamphlet provides notice to the public and is required by law. *See* 3 G.C.A. § 17509. The deficiencies include:

1.  there is no Guam Casino Gaming Control Commission Act in the pamphlet, *see* 3 G.C.A. § 17509(a)(1) (requiring that the ballot pamphlets *"shall contain ... [a] complete copy of any measure to be submitted to the voters by ... Initiative or referendum petition"*);

2.  there is no analysis by the Commission as required by 3 G.C.A. § 17507 and § 17509(d) in the pamphlet;

3.  the "analysis" that is provided does not appear to be authored or acknowledged by legal counsel for the Commission as required by 2 G.A.R. § 2111; *and*

4.  the pamphlet lacks the three (3) signatures of voters who submitted the opposition to Proposal A. *See* 3 G.C.A. § 17506.

Most glaringly, with respect to the analysis of the measure required by 3 G.C.A. § 17507, there is no *"impartial analysis of the measure showing the effect of the measure on the existing law and the operation of the measure."* Legal challenges to this election due to the Guam Election Commission's failure to comply with the Code and its own administrative regulations are inevitable, and were foreseeable, as is the likely result in a court of law. The thirty (30) day window required by 6 G.A.R. § 2114 closed on October 3, 2004, and the material

Page 3
Mr. Gerald A. Taitano
October 7, 2004

defects can probably not be rectified to meet the needs of this particular election. However, there may be procedures available for setting another election date, but that may require the Governor or Legislature to call a special election.

It is imperative that we meet with the Attorney General no later than the close of business on Monday, October 11, 2004 in order to discuss this situation and the possible alternatives. Please feel free to contact me if you have any questions. The Attorney General's executive secretary, Ms. Joyce Siguenza, will be contacting you to arrange a convenient time to meet with our Office. Thanking you in advance, I am

Sincerely,

Robert M. Weinberg
Assistant Attorney General

Attachments (3)
cc:    Cesar Cabot, Esq.

GENERAL ELECTION 2004

Voters Information Pamphlet

Prepared by:

Guam Election Commission
P.O. Box BG
Hagatna, Guam 96932

414 West Soledad Avenue
Guam Capital Investment
Corporation, Inc.
Suite 200, 2nd Floor
Hagatna, Guam
(671) 477-8991 thru 4

Guam Election Commission
P.O. Box BG
Hagatna, Guam 96932

## An Objective and Independent View of Proposal A

By David A. Tydingco, Executive Director, Guam Election Commission

## PROPOSAL A INITIATIVE MEASURE

This initiative measure proposes to establish the Guam Casino Gaming Control Commission Act.

### The Guam Casino Gaming Control Commission Act

This Act shall (1) allow for certain licensed casino gambling activities in approved Guam hotels; (2) create a Guam Casino Gaming Control Commission which (3) defines the gambling activities allowed, (4) promulgates rules and regulations regarding licensed gamblers, (5) enforces said guidelines, and (6) provides for civil and criminal penalties for violations of these provisions; and (7) provide a mechanism by which the commission shall (a) central register of gambling licenses, (b) conduct hearings under the proposed Act, (c) collect licensing and registration fees imposed by the proposed Act, and (d) enact rules and regulations necessary in carrying out the Act.

In summary, this initiative allows for certain licensed casino gambling activities in approved Guam hotels.

The initiative creates a 5-member Guam Casino Gaming

Control Commission which controls the gambling activities allowed.

The initiative promulgates rules and regulations regarding licensed gambling.

The initiative enforces said guidelines, and provides for civil and criminal penalties for violations of these provisions.

Finally, the initiative provides a mechanism by which the commission shall control the issuance of gambling licenses, conduct hearings under the proposed Act, collect licensing and registration fees imposed by the proposed Act, and enact rules and regulations necessary in carrying out the Act.

The Ballot Format for the Initiative Question is as follows:

### INITIATIVE MEASURE

SHALL PROPOSAL A, AN INITIATIVE TO ESTABLISH THE GUAM CASINO GAMING CONTROL COMMISSION ACT, BE ADOPTED BY THE VOTERS OF GUAM?

VOTE "YES" OR "NO"

[ ] YES

[ ] NO



EXHIBIT A

## A Proponent's View of Proposal A
### By Greg Schulte
Citizens for Economic Diversity

Passage of Proposal A will legalize controlled hotel casino gaming by enacting the Guam Casino Gaming Control Commission Act. A maximum of 15 casino licenses will be issued, on a competitive basis, to hotels that contain a minimum of 250 rooms. In total, it is expected only a few would be granted licenses. The purpose of the Act is to provide an additional layer of entertainment for visitors, enhance Guam's visitor industry, and generate revenue and employment for the people of Guam.

Passage of Proposal A will stimulate the creation of thousands of new jobs by building Guam's most prestigious source of income — tourism. Surveys of Japanese visitors show that casinos are among their top four requested new attractions. Casino gaming has created more than $2.5 billion in wages and benefits for residents of American Samoa and will generate tax revenues of approximately $20 million annually over the next five years on Guam. Controlled casino gaming will attract investments and make Guam a world-class visitor destination.

Passage of Proposal A will establish a self-funded commission, of five members to oversee and direct the development and operation of Guam's casino hotels. The

the Governor and confirmed by the legislature to a staggered terms; no Governor can appoint all the Commissioners. At least three of the five Commissioners must be women, one must be a Certified Public Accountant, and another must have law enforcement experience. The regulations governing the Commission will be as comprehensive as in any Jurisdiction in the United States. The Commission will receive confidential police, legal and financial securities, former FBI experts confirm the Act has the controls necessary to keep Guam's casinos crime free.

Passage of Proposal A will create a substantial new tax revenue that will be paid for by Guam's visitors. Revenue for the Commission will grow from 5% to 11% over four years, generating approximately $20 million annually for Guam. Thousands of new jobs will be created to staff the casinos. Wages will be 10-15% higher than regular visitor industry wages. Fifty percent of gaming tax revenue will be spent on health care, education, public safety, cultural heritage, and the Mayor's Council; the other fifty percent will be held in trust by its Gaming Commission, to be spent on improving Guam's roads, water system, schools, and the hospital.

only gets 3% tax while casinos keep 95% of revenue. Some states charge 35% tax. It's a bad deal; only casinos profit. Money spent in casinos is taken away from all other local businesses. Most tourists add they will vacation elsewhere if casinos come to Guam. Our local interest have spent against.

...gambling, addictions... threaten our ability to function and increase military spending...

Prop A will hurt Guam's income and diverse... When Guam had casino gaming machines, children were neglected while parents gambled away earnings. Loan sharks, stressed out... Residents but savings, prostitution, organized crime, prostitution, bankruptcy, and drug/alcohol abuse ALL increased. GPD studies that 47% of Guam residents know someone with a gambling problem. Social costs average $10,360 annually per problem gambler. Casinos will greatly increase the social costs, which we cannot control or afford now.

Prop A is a bad law that creates more government. Gambling will be "controlled" by 5 politically appointed Commissioners who can serve 10 years, paid $100,000 each plus unlimited expenses, and decide how fees and taxes are collected and spent. The Commis-

[column 4 / right block]

can keep all licensing fees and gets 97% of the profit/income to "invest". Most licenses will be spent on the Commission. Prop A creates a new Govt Guam agency with broad powers and little accountability... It increases employees, travel and commissions will be required. $600,000,000 of your money's spent just to don't. The Governor is changed for ten years. Government is not capable of effectively controlling gambling.

The profits/benefits are also subject to the public interest operated in the casino applied/operated expenditure. We want increases the client tax burden. Increases control/now being loosened. Gambling hasn't worked for the public. (A bet cannot help itself said they want even because Prop A allows/15 casinos in most hotels... is the plan for Guam. Prop A based on one sided evidence. U.S. casino experts say Guam would earn only a fraction of GPED planning. Prop A admits its estimates/sphere. Prop A voters are "unpredictable." Don't be fooled by their numbers.

Prop A is a bad for Guam. Casinos benefit few at the expense of everyone else. And we risk damaging the visitor industry we all worked so hard to build. Our economy is slowly recovering. Don't gamble our future on an unknown industry that benefits few, promises overnight riches and undue social risks everything we have earned.

Be smart ... not misled. Keep Guam Good. Vote NO on Prop A.

[column 3 lower / byline block]

## An Opponent's View of Proposal A
Proposal A
### By Joaquin C. Arriola, Jr., Esq.
Committee Opposing Prop A
Luana Sin Casino

Proposal A will hurt our economy. Under Prop A, Guam

Case 1:04-cv-00048  Document 1-4  Filed 10/26/2004  Page 10 of 20



# AG's Office says GEC not running clean campaign for Prop "A"

**by Ken Wetmore, KUAM News**
**Thursday, October 07, 2004**

You've watched, read, and heard advertisements opposing and supporting Proposal "A". The casino gaming initiative is one of the most talked about and debated issues for voters this November, but will Prop "A" make it on the General Election ballot? The Guam Attorney General's Office threw a curveball at the Guam Election Commission today, citing deficiencies in voter information pamphlets that were recently mailed to registered voters.

In a letter to GEC executive director Gerry Taitano assistant attorney general Robert Weinberg wrote after reviewing complaints from concerned citizens, the AG's Office believes there are material errors and omissions that will prevent Proposal "A" from being put to voters on November 2. The assistant AG cited four specific deficiencies with the voter information pamphlet that by law the GEC must mail to all registered voters.

Namely, the deficiencies cited are:

1. There is no Guam Casino Gaming Control Commission Act in the pamphlet. By law the GEC must mail the complete act along with the pamphlet to voters.
2. There is no analysis by the Commission in the pamphlet.
3. The "analysis" that is provided does not appear to be authored or acknowledged by legal counsel for the Commission as required by law.
4. The pamphlet lacks the three signatures of voters who submitted the opposition to Proposal "A", also required by public law.

"We're really just rather dismayed...that the Election Commission has sent this out," expressed Weinberg. "Under the law and under Election Commission's own rules and regulations they have to be done within 30 days of the election; this has to be sent within 30 days of the election."

Weinberg also said while he's open to suggestions from the GEC, he doesn't believe the problems can be fixed so Prop "A" can be voted upon on the General Election ballot for Decision 2004. "Even if it went forward and the Guam Election Commission said it's too late and we want to go forward with it, the problem is that someone could come in afterwards, either a Prop 'A' proponent or a Prop 'A' opponent and could come in, depending on how it goes, and challenge the law because it was not properly passed by the voters," he stated.

GEC executive director Taitano says he doesn't believe a challenge would succeed. "If you take a look at the precedent - the precedents that have been set in

EXHIBIT 3

past initiatives - we've followed the same format we've done the same procedures," he said confidently.

While the AG's Office maintains the pamphlet is insufficient to properly educate Guam's voters, Taitano says he believes Guam's voters are sophisticated and both sides of Prop "A" have done a good job of educating the public about the voter initiative. Taitano admits the law does require the mailing out of the entire proposal, but points out it is 80 pages long and the Guam Legislature did not give him the budget he requested. "If I as the executive director submit a budget to the Guam Legislature and the Legislature sees fit to exclude those items, then to me it's either a concession that I don't have to send out an 80-page document to every voter on this island, because it's not cost effective," Taitano said.

Speaking of expenses, Taitano says the ballots for the November 2 General Election have already been printed. He explained, "We printed 60,000 ballots, a tremendous expense, and we are not going to throw away those ballots because of you know because of some concerns that haven't been adjudicated. We are proceeding with this election - we are on schedule."

Taitano says he is handing the matter over to the GEC's legal counsel to handle. The AG's Office has asked for a meeting with the GEC no later than this coming Monday.

As far as how the main supporters and detractors of Proposal "A" reacted to the AG's Office's announcement, Citizens for Economic Diversity spokesperson Jay Merrill was not surprisingly crestfallen, but at the same time, optimistic. "Initially we were disappointed, but we contacted the Guam Election [Commission] and they said that they're fully confident that they followed the spirit of the law and they were confident that the election was going to proceed, so we were heartened by that," he said.

Merrill says there's much international interest in the outcome of the election and if Prop "A" fails for technical reasons it isn't going to reflect well on the community. He did say however, that his opposition on Prop "A", Communities Opposing Prop "A" has expressed a desire to join together with CFED in a lawsuit if necessary to ensure Prop "A" is on the General Election ballot.

Likewise, KUAM News spoke with COPA legal counsel Attorney Jay Arriola. "We want an election, we want this vote to go forward. We are confident that we will soundly defeat Prop "A" and we want the people to decide that, however, if the Guam Election Commission can't control an election an election its further evidence of the inability of our government to control certain things such as gaming by the same token however the need for this information is crucial," he said.

Arriola says he agrees with the Guam Attorney General that there are deficiencies with the voter information pamphlet but says he believes it may be possible to correct the deficiencies in time for Prop "A" to remain on the ballot.

Copyright © 2000-2004 by Pacific Telestations, Inc.

# Pacific Daily News

© 2004 Gannett Publications, Inc.

NO. 251 HAGÅTÑA, GUAM, OCTOBER 8, 2004

HAFA ADAI, IT'S FRIDAY

A Gannett Newspaper

guampdn.com

75¢ en Guam

guam
PDN
.com
• Daily News

ON
THE
AIR

Get the
best news
you by the
Daily News

FM 95.5

News Monday
Friday at:
and 9:30 a.m
and 12:55 p.m
5:30 p.m.

91.9 FM

News Monday
Friday at:
and 8:30 a.m
5:30 p.m.

terrine

fiesta, learn
French cui-
in make at

▲ See
story,
Page 34

ulation
n 29
age 18

# Prop A vote hits snag

**By Steve Limtiaco**
*Pacific Daily News*
*slimtiaco@guampdn.com*

Lawmakers or the governor might have to call a special election to decide the casino-gaming issue, according to the attorney general's office, because the Guam Election Commission appears to have made several mistakes in the informational pamphlets that were mailed to voters last week.

Among other things, the Election Commission did not mail a complete copy of the 80-page casino proposal to registered voters, as required by Guam law, according to the attorney general's office.

The decision to send voters a single-page pamphlet appears to have been made unilaterally by commission Executive Director Gerald Taitano, who said he did not ask lawmakers for the money needed to mail the full 80-page document to voters — a potential cost of more than $100,000, according to the commission's legal counsel.

Taitano yesterday afternoon told the Pacific Daily News that the entire casino text was not included in the

▲ See **Vote**, Page 4

Election 2004



INSIDE

## Honorary fire chief salutes



**Wish granted:** Xavier Fernandez-Reyes salutes Antonio B. Won Pat International Airport Authority Fire Chief Pedro Lizama after the 6-year-old was made the honorary airport fire chief yesterday. The youngster was having his wish granted though the Make-A-Wish Foundation.
*Masako Watanabe/Pacific Daily News/mwatanabe@guampdn.com*

▲ See story, Page 2

# Gas prices head skyward again

**By Katie Worth**
*Pacific Daily News*
*kworth@guampdn.com*

Just when residents thought gasoline prices had finally taken a turn for the better, the island has been hit with another increase.

If you happened to go to the pumps yesterday, you probably noticed that Mobil stations were once again charging $2.46 a gallon, after a brief reprieve at $2.41.

Yesterday, an official at Shell Guam Inc. announced the company was going to follow suit as of midnight last night. And although an official at South Pacific Petroleum Corp., which runs the 76 stations, couldn't say whether its prices also would rise, historically the three main gas retailers have moved prices in near synchronization.

All three companies lowered their prices to $2.41 a

▲ Gas prices leapt to $2.46 a gallon, after a brief reprieve to $2.41. Mobil Oil's gas prices had risen by yesterday morning, and Shell planned to raise its prices last night.

▲ See **Gas**, Page 4



THE COST OF GUAM'S GASOLINE

Fuel brands as of yesterday:
Fuel brands: ■ 76; ■ Shell; ■ Mobil
* Expected to have risen as of last night

REGULAR     PREMIUM     DIESEL

$2.41 $2.41 $2.46    $2.51 $2.51 $2.56    $2.49 $2.47

National prices as of yesterday:

NATIONAL AVERAGE
Regular: $1.94
Premium: $2.14
Diesel: $2.00

HIGHEST Hawaii
Regular: $2.35
Premium: $2.54
Diesel: $2.31

LOWEST South Carolina
Regular: $1.82
Premium: $2.08
Diesel: $1.86

Source: AAA Web site, www.aaa.com
CM Cross/Pacific Daily News/croos@guampdn.com

## Bookmobile set to roll

The bookmobile starts rolling on Monday, thanks to a public-private partnership between the Guam Public Library System, the first lady's office, Matson Navigation Co. and South Pacific Petroleum Corp. Until repairs began months ago, the bookmobile had been idle for years at the main Hagåtña library branch because of broken air conditioning, a leaking roof and lack of library personnel. The mobile library will bring books to readers in the villages.

INSIDE



REGISTER YOUR
DUB

Enter Everyday
by: DUB
[Download X Now]
[HOME]

GUAMCELL
www.guamcell.com

guampdn.com Pacific Daily News, Friday, October 8, 2004

# Vote: Special election may need to be held

▲ Continued from Page 1

pamphlet because lawmakers did not fund it. Later in the afternoon, he acknowledged that he did not ask lawmakers for the money needed to print and mail an 80-page pamphlet, nor did he intend to ask for it.

Taitano said he ruled out the possibility of mailing an 80-page casino proposal to voters because of the potential cost to the government.

Taitano said he did not ask the commission board to vote on the final version of the pamphlet or to approve his decision to leave the complete text out of the pamphlet.

Vice Speaker Frank Aguon Jr., the Legislature's budget chairman, yesterday said the Election Commission asked for only $25,000 in connection with the casino initiative. The governor last month transferred that amount to the commission so the single-page pamphlets could be mailed. Aguon said the $100,000 was not mentioned by the commission in its budget request.

It is too late to correct the alleged pamphlet flaws in time for the Nov. 2 General Election, according to the attorney general's office, because Guam law requires pamphlets to be mailed to registered voters at least 30 days before the question is put before voters.

Election Commission attorney Cesar Cabot yesterday said the commission disagrees with some of the statements made by the attorney general's office but acknowledged that the text of the proposal was intentionally omitted from the pamphlet because of the cost. Leaving it out was an administrative decision made by Taitano, and not by the commission board, Cabot said.

He said as far as the commission is concerned, the casino question still is on the General Election ballot, "until or unless a court of law tells us otherwise."

Jay Merrill, a consultant for Citizens for Economic Diversity, which

## WHAT'S AT ISSUE

Here's what the attorney general's office says is wrong with the Proposal A pamphlet:

**Pamphlet**

▲ **The claim:** There is no Guam Casino Gaming Control Commission Act in the pamphlet.

▲ **What Guam law says:** "The Ballot pamphlets shall contain: (a) A complete copy of any measure submitted to the voters by: (1) The Legislature, (2) Initiative or referendum petition. (b) A copy of the specific statutory provision, if any, proposed to be affected." In addition, government regulations state that "the complete text of the initiative measure" must be printed-in the ballot pamphlet, immediately after the argument against the measure, followed by the text of any existing laws that would be affected.

**Analysis**

▲ **The claim:** There is no analysis by the commission as required by law.

▲ **The claim:** The "analysis" that is provided does not appear to be authored or acknowledged by legal counsel for the commission, as required by the government's Administrative Rules and Regulations.

(According to Assistant Attorney General Robert Weinberg, the text in the pamphlet does not appear to meet the minimum requirements of the law.)

▲ **What Guam law says:** "Whenever any measure qualifies for a place on the ballot, the Election Commission shall prepare an impartial analysis of the measure showing the effect of the measure on the existing law and the operation of the measure." The analysis shall be printed in the ballot pamphlet between the ballot title and the arguments for and against the measure. The length of the analysis shall not exceed five hundred (500) words, except with the approval of the Election Commission.

**Legal counsel**

▲ **The claim:** The "analysis" that is provided does not appear to be authored or acknowledged by legal counsel for the commission, as required by the government's Administrative Rules and Regulations.

▲ **What the regulations say:** "Legal counsel for the commission shall, not less than 45 days prior to the election at which an initiative measure is to be submitted to the voters, prepare an analysis of the measure, not to exceed 500 words in length. The analysis shall be impartial and shall show the effect of the measure on existing law and the operation of the measure."

**Signatures**

▲ **The claim:** The pamphlet lacks the three signatures of voters who submitted the opposition to Proposal A. Three signatures of voters were submitted, but only one name appears on the pamphlet, contrary to law.

**What Guam law says:** "No more than three signatures shall appear with any argument printed in the ballot pamphlet. In case any argument is signed by more than three persons the signature of the first three shall be printed."

*Pacific Daily News*

wrote Proposal A, said it is premature to comment until the attorney general meets with the Election Commission to discuss the issues.

"Obviously, we're distressed at the prospect of having this election delayed or postponed for a long period of time. It's going to create a tremendous disappointment amongst our followers," Merrill said. "We've got 20,000 signatures from folks that say they support what we're doing. It's just amazing that the democratic process could be interrupted this way."

Attorney Jay Arriola, a spokesman for Communities Opposing Prop A, said the group believes the election should be held, but only if the law is followed and voters are given the opportunity to read the casino proposal before they vote on it. He called the commission's alleged failure "inexcusable."

"This is basic rules and procedures that they wrote, that they are all intimately familiar with, and that

they were warned they should comply with. I know, because we warned them," Arriola said. "I've never heard of a senator voting on a bill that he didn't read. Likewise, the public should not necessarily vote on an initiative that they haven't read."

The attorney general's office became involved in the issue after it received a complaint about the commission's actions, according to a letter sent to the commission yesterday by Assistant Attorney General Robert Weinberg.

Weinberg said he cannot comment on who filed the complaint, saying it was lodged by "a concerned citizen."

Arriola said COPA did not lodge the complaint. "But it really doesn't matter who did," he said. "Everybody has received this ballot pamphlet. It is woefully inadequate, and something's got to be done. And we certainly appreciate the attorney general's efforts to enforce the law."

The commission's failure to fol-

low Guam law and its own regulations could result in a legal challenge to the casino election, Weinberg said.

"This office believes that the will of the voters and citizens of Guam to determine the merits of Proposal A on November 2, 2004, may have been thwarted," Weinberg wrote.

His letter calls for the commission to meet with the attorney general by Monday in order to address the concerns.

Election Commission attorney Cabot said, "At this juncture, we respectfully do not agree with all of the issues and concerns that are raised by the attorney general. We will look into them very seriously and then we will get back to him."

One of the allegations states that the impartial analysis that was printed on the pamphlet might not have been written by the commission's legal counsel, as required by law. Cabot said he did write that analysis at the time the proposal was first submitted

to the Election Commission, so signatures could be gathered.

Cabot called the requirement to print the entire text of the proposal in the pamphlet an "unfunded mandate."

"The code does indicate that a complete copy of the measure is to be submitted to the voters. But here we're talking about 50,000 mailers, containing an initiative measure that is 80 pages in length," Cabot said. "So in order for us to fulfill the letter of the law, it would have cost over $100,000."

When told that Taitano did not request the amount needed to mail an 80-page pamphlet to voters, Cabot said, "I can't speak to that. I'm not aware of what we asked for or didn't ask for in the budget. All that I know is this initiative measure was approved for placement on the ballot back in 2002. So this was an expense that had been expected and anticipated. It's obvious that we can only implement and carry out the rules that have the proper level of funding."

The Election Commission already has printed the General Election ballots, with the casino initiative on the first page. The commission plans to program its electronic voting machines this weekend to ask the casino question, Taitano said.

According to Pacific Daily News files, holding a special election would cost about $200,000. If new pamphlets are needed, it would add another $100,000 to the price tag, not including the $25,000 that already was spent on the possibly flawed pamphlets.

Aguon said if it is determined that the casino question cannot be decided during the Nov. 2 General Election, then lawmakers need to fund a special election, as a last resort, despite the additional cost.

"It's not a question of whether we can afford it," Aguon said. "I think the people's desire, by virtue of the (Prop A) initiative, should be self-explanatory."

# Gas: Prior weeks' lower prices called blip in radar

▲ Continued from Page 1

few weeks ago, with the gasoline representatives saying refined oil prices from Singapore had dropped slightly and they were hoping it was the start of a trend.

But Shell Guam President Phil Stalker said it was merely a blip in the radar. Yesterday, the price of crude oil reached a new all-time high of $52 a barrel.

This is not good news for 34-year-old James Louis, who has the misfortune of living in Mexico and working in Harmon.

"I don't like the prices going up, because my place is too far, and I already spend $30-some a week on gas," Louis said.

He said he's even considering moving up to a central village because driving back and forth to Merizo every day is just too costly.

Nursing student Jeanette Manibusan, 24, of Yigo didn't even know the prices had risen until she stopped to put $11 worth of gasoline in her boyfriend's truck at the East Hagåtña Mobil station yesterday afternoon.

"Holy cow!" she yelped. "I think



**Gulp:** University of Guam nursing student Jeanette Manibusan, 24, of Yigo keeps her eye on the price gauge of a Mobil gas station gas pump yesterday as she fills up her boyfriend's Toyota 4x4 pickup in East Hagåtña.

*Ric A. Eusebio/Pacific Daily News/reusebio@guampdn.com*

it's kind of ridiculous. Considering I'm still a student and I'm not working, yes, it's a problem."

Even before the latest jump, she said, she and her boyfriend had begun

changing their driving habits in order to save money. Since the beginning of the semester, she said, they have been riding in a carpool rather than taking two cars each day. She said

she drops him off at work and then goes to school and the hospital for classes each morning, and then picks him up at the end of the day.

Though the gasoline prices appear to be heading upward again, she said she may have to accept it and pay more, because she's not sure what more she can do to cut costs.

"Of course it's going to be a problem, but what can you do?" she said. "I don't really have a choice — I have to go to school and to the hospital. I can't just not go because of the gas prices."

## All-time high

International fuel prices have been soaring to new pinnacles in recent days. Last week, the cost of a barrel of oil reached its all-time high of $50. Then, on Tuesday the prices reached a new high of $51. In turn, that record was shattered yesterday, when the price of a barrel reached $52.

Guam's gasoline companies have said the prices here are even higher than they are on the U.S. mainland because they buy their gasoline through Singapore, which has a great demand from China and other Asian countries. All three com-

panies receive their fuel from a single Singapore refinery, and fuel prices at most Guam gasoline stations have historically mirrored each other within a matter of days.

Both Shell's Stalker and South Pacific's President Brian Suhr said recent years' increase in gasoline prices haven't exactly been good for their businesses either.

"These kinds of prices are not good for us, either," Stalker said. "I'm not asking for sympathy here. I mean we're a big gas company, but it's certainly not good for our business. And your guess is as good as mine when it's going down again."

Suhr said South Pacific's sales indicate that people are becoming more conservative in their gasoline expenditures as prices go up.

"I believe people are more conscious about their gasoline usage and where they drive, and are cutting down on their usage to some extent. We have definitely seen a flat demand, at least for our company, but we haven't seen any sharp decline."

Several calls to Mobil Oil Guam's public affairs manager Cecile Bamba Suda were not returned yesterday.

**Guam PDN.com**
Pacific Daily News

**GUAM's** *complete* **SOURCE**

guampdn.com

**H**ow are you learning about Prop A?

Personal research, including Web sites ............ 11.1%

Through community forums ............ 3.0%

**Total votes: 135**

## Local news

### $5M grant to reduce substance abuse

Gov. Felix Camacho announced that the government of Guam will receive nearly $5 million over a five-year period through a federal grant to reduce and prevent substance abuse on Guam. The grant comes from the U.S. Substance Abuse and Mental Health Services Administration and will support Guam's implementation of the Strategic Prevention Framework State Incentive Grant, which aims to build a solid foundation for substance abuse and mental health services.

### Arbor Day poster winners announced

Nine students from the island's public and private schools were named winners this week in the 2004 Arbor Day poster contest. This year's Guam Arbor Day theme is "Plant a Tree, Protect a Reef." The winners of the kindergarten and third-grade category are Chris Bensan of St. Anthony School, first place; Timmy Quidachay of D.L.

# Kayakers' fam

By Gene Park
*Pacific Daily News*
*epark@guampdn.com*

This coming All Souls' Day, Janeyrose Cruz will remember her lost beloved brother. It's a day when many island residents will spend the day visiting graves and attending Mass on the Catholic holiday.

But there is no grave site for her brother, John Aguon, who is among the three men who remain missing after their kayaks were overcome by turbulent waves tossed by Tropical Storm Tingting in June.

Cruz can only presume that the watery grave of Piti Bay, which she and her family still visit often, is her brother's resting place. That's why Aguon's family and the families of the other men gathered yesterday at the beach site to remember their lost loved ones 100 days after the tragedy.

"With All Souls' Day coming up, we don't have a grave site to go to," Cruz said. "I guess the only place we can come is here."

On June 29, five men — Aguon, Mike Bautista, Roland Jose, Keith Brian Mendiola and Ed Uson — were last seen preparing pontoons for Guam Seawalker Tours, who employed some of the men. For reasons that remain unknown, the five men went out in three kayaks and were pounded by huge surf.

The bodies of Jose and Uson



Masako Watanabe/Pacific Daily New

**Prayer service:** Holly Lee, mother of [...] as she holds five sticks of incense wh [...] Bay Marine Preserve yesterday. Jose [...] of Guam Seawalker Tours were over [...] June 29, the day after Tropical Storm [...] Friends and family held a prayer serv [...] 100 days since the tragedy.

have been recovered. Rescue officials suspended recovery efforts of the other three on July 9.

It's during moments when Cruz finds herself alone — a long drive or getting ready for bed — that she thinks about her brother.

"We're still grieving," Cruz said. "We don't have a body. We can only

presu [...]
ing to [...]

Th [...]
came [...]
moth [...]
yeste [...]

"I [...]
not b [...]
saw [...]

# Make-A-Wish brings



By Natalie J. Qu [...]
*Pacific Daily New*
*nquinata@guampd [...]*

Six-year-old X [...] Reyes walked a littl [...] in his blue firefight [...] form yesterday with [...] bashful smile that [...] couldn't hide.

The Make-A-Wis [...] dation granted Xavie [...] ple wish of being a f [...] yesterday at the Anti [...] Won Pat Internation [...]

guampdn.com Pacific Daily News, Friday, October 8, 2004

*Our View*

# What you must know

## Be informed of all of the effects that legalized gaming will have on Guam

**W**henever a change is proposed that will have wide-reaching and long-lasting impact on a community, it is critical that those making the decision look beyond just the possible benefits. Decision-makers also must give equal consideration to the potential negative affects, and look at all areas that can and will be affected.

On Wednesday, a report prepared by the Spectrum Gaming Group, a gaming consultant business for some members of the Guam Hotel and Restaurant Association, was made public. The report said that legalizing casino gaming on Guam, by the passage of Proposition A in the General Election, could mean as many as 2,085 new jobs, and as much as $20.52 million a year in taxes to the government of Guam. It also said that gaming would draw more visitors to our island and result in increased capital investment.

But the report also noted that some businesses would suffer as a result of legalized gaming, particularly those that can't spend money on-growth and improving their appearance. This could result in business failures and many lost jobs, though the report didn't quantify those effects.

It also predicted that local residents would spend about $15.3 million a year in the casinos. But that also, very likely, translates into $15.3 million that is currently spent in our economy in various other areas that won't be spent in those sectors should Proposition A be passed. It's not as if residents will suddenly have additional money to spend; they will spend money they normally spend elsewhere. Likewise, some of the money tourists currently spend in other areas will very likely be spent on gambling.

And this doesn't take into account the social ramifications, such as those that have arisen in other communities that have legalized casinos: increased crime rates, higher suicide rates, more gambling addicts; a further increase in bankruptcies, and a potential stifling in other economic investment and development.

Before you make up your mind on how to vote on Proposition A, you need to know more than just some of the economic benefits — you must know the full story and ALL the possible and potential effects that legalized gambling would have on the social and economic fabric of our community. There's a lot more to this than simple dollars and cents.

### Pacific Daily News

Published daily at 244 Archbishop FL. Flores St.
Hagåtña, Guam USA 96910
Mailing Address P.O. Box DN
Hagåtña, Guam 96932

A Gannett Newspaper

LEE P. WEBBER / Publisher
RINDRALY GILES LIMTIACO / Executive Editor
DUANE M. GEORGE / Editorial Editor



*Cartoon speech bubbles:* "WE RELIED ON SUSPICIOUS DOCUMENTS, WE TRUSTED UNRELIABLE SOURCES, WE IGNORED THE SKEPTICS, WE RUSHED AHEAD WITHOUT ASKING THE HARD QUESTIONS." "YOU GOT A PROBLEM WITH THAT?"

ED STEIN '04
ROCKY MTN.
NEWS-NRS

# Singer soothes soul jarred by video illustrating child abuse

**N**othing twists my stomach and pulls at my heartstrings more than the sight of abused and neglected children. As a father, I can't comprehend why any parent or guardian could brutally attack a child or deprive him or her of the necessities of life including food, shelter and love.

Through a visual presentation at a benefit concert at the Marriott on Saturday, I was reminded once again that these atrocities are a growing problem in the Philippines.

Philippine flutist Jong Cuenco, rapper KC Montero and singer Jaya, were on island to encourage support for Bantay Bata 163 (watching over children), together with the program's director, Tina Monzon-Palma.

According to the project's Web site of the same name, Bantay Bata 163 is committed to uplifting the rights of Filipino children. The undertaking is an important task of ABS-CBN Foundation Inc., the nonprofit arm of the Philippine media company.

The Web site describes the project as "the only media-based intervention program that provides a holistic approach in the rescue and rehabilitation of abused children," through its mission "to create and provide a safe, nurturing and loving environment where children can develop and realize their full potential and become productive-members of society."

Support for Bantay Bata 163 is also gained through televised stories of children with serious medical cases brought on by abuse, neglect or impoverished conditions. Sponsors are then encouraged to step forward and pay for the kids' medical expenses. Groups and individuals from Guam have helped the organization

### What's the Norm?



**Norman Analista**

I pray for Bantay Bata 163's success and the many children and families ...

throughout the years.

The video I saw powerfully illustrated how serious the child abuse and neglect problem is in the Third-World country. Images of crippled and skinny kids spawned massive sighs of pity from hundreds of concert-goers, including myself. It made me so miserable to see children beaten black and blue and malnourished from neglect.

Thankfully, however, my sentiments were transformed from disgust for these victims' perpetrators to hope for the children after seeing how Bantay Bata 163 had rescued them in their hour of need.

Without detracting from the profound purpose of the concert, however, I also wanted to comment on Jaya's classy performance, which managed to lift my spirits after the depressing media presentation.

Ever since I picked up the Filipina singer's self-titled 1996 CD and heard her song "Dahil Tanging Ikaw" (Because You're the Only One), I became hooked on her soulful vocal expressions.

Jaya's tones are deep and sweet. And if you close your eyes and allow her melodies

to flow through your auditory senses, it will create goose bumps and filter to your core and warm it.

The singer's lyrics are about love and life. Even though I'm not fluent in Tagalog, I'm still able to decipher her messages through the passion in her voice. Jaya's distinctive sound emanates sophistication and depth without straining or overperforming.

She performed a medley which included one of my favorite songs, "Laging Naro'n ka" (You're Always There). And several times the singer shared the spotlight with audience members. I was so impressed that the Pinays Jaya picked memorized the lyrics to his Tagalog songs and performed them so well.

The soul diva also showed her skills as a jokester. The crowd roared with laughter when Jaya said she didn't like to travel with her comedienne mother, who insists on having a pillow for her Santo Niño statue wherever she goes.

Jaya eventually ended the show with funky disco hits including "Best of My Love" by The Emotions and "September" by Earth Wind & Fire, musical grooves I also enjoy. This was one of the best shows I've ever been to and I commend the concert organizers for their outstanding efforts.

I pray for Bantay Bata 163's success and the many children and families whose lives have been duly transformed by it. In my eyes, the program is definitely heaven-sent and worthy of community support. I'm already looking forward to the next benefit concert.

*Norman Analista, 29, is a former news anchorman and a second-generation Filipino. Write him at analista@vzpacifica.net.*

# Upcoming Sunday Forum topics

The Pacific Daily News invites readers to join us in discussing some of the hot topics in the news.

▲ Sunday: What should consumers know to best protect themselves against identity theft?

If you have some insight on this topic and wish to share your viewpoint, or if you just want to join the discussion, we want to hear from you. Call 477-9711, ext. 415, fax 477-3079, or send e-mail to voice@guampdn.com

# *Marianas Variety*

### Local & Regional Newspaper

Vol. 01 No. 06
©2004 Marianas Variety

**Friday • October 8, 2004**

www.mvariety.com
Serving the Marianas for 32 Years

**50¢**

# Pamphlet flaws may stall casino poll

By Trina A. San Agustin
*Variety News Staff*

THE proposed casino initiative may not find itself in the Nov. 2 ballot unless defects in the voters' information pamphlets distributed by the Guam Election Commission are rectified, the Attorney General's Office warned yesterday.

Assistant Attorney General Robert Weinberg is seeking a meeting with GEC to discuss potential legal flaws on the casino information packets.

"It is very likely this (problem) will stop Proposal A from being on the ballot," Weinberg told Variety.

In a letter to GEC executive director Gerald Taitano, Weinberg said AGO has received a complaint on the commission's procedures related to the Guam Gaming Control Commission Act initiative, also known as Proposal A.

"Upon preliminary review of the complaint," Weinberg wrote, "this office is seriously concerned that there are material errors and omissions which have occurred that will prevent Proposal A from being legally presented to the voters on Nov. 2 general elections and that will prevent Proposal A from withstanding a legal challenge that may be brought before and will most certainly be brought after the election."

Reacting to a Variety report in its Wednesday issue, AGO also noted that many people on island have not even received the brochure.

"A special election would require an appropriation by the legislature and I think that is where the legislature's role would come in," said Sen. Ben Pangelinan (D-Barrigada).

"The governor can call a special election but it is the legisla-



*Douglas Moylan*

-ture that would have to appro-
**Continued on page 2**

## Health care experts gather for medical symposium

By Mar-Vic Cagurangan
*Variety News Staff*

SCIENTISTS and health care experts from neighboring islands and Asian countries gather here today for the First Micronesian Medical Symposium which opens tonight at the Guam Marriott Resort.

The forum, hosted by the Guam Memorial Hospital Authority and cosponsored by the Guam Medical Society, is intended to provide medical education and training, foster shared health care dialogue and promote professional and regional health care alliances, GMH administrator Bill McMillan said.

McMillan expects about 200 delegates to participate in the three-day forum billed "Alliances For Quality Care," where 20 guest speakers will present new medical research and treatment advances in the region.

There are experts from the mainland who will bring medical breakthroughs that will benefit patients in the region, he added.

McMillan said physicians and nurses would receive up to 20 Continuing Medical Education credits upon completion of the symposium.

"The nice thing about this is that since it is being held here travel is not an issue. It is affordable to our local professionals. Our doctors and nurses are required to attend continuing education and the symposium will

**Continued on page 2**

# US panel begins study on radiation exposure on Guam

By Mar-Vic Cagurangan
*Variety News Staff*

THE Washington-based Board of Radiation Effects Research Committee has began doing a research on the possible radiation exposure that Guam residents might have suffered as a result of the federal government's nuclear tests in Marshall Islands 50 years ago, according to the Pacific Association for Radiation Survivors.

PARS president Robert Celestial has received an e-mail from BRER director Dr. Isaf

Al-Nabulsi who was inquiring about the sources of milk and the residents' dairy consumption level during the period when the nuclear weapons were being tested in the Pacific.

Dr. Chris Perez, an officer of PARS, recalled that back in the 1950s, commercial milk was either not affordable or not locally available so the people on island were relying on goats and cows for their milk supply.

Cows and goats could be feeding on plants in environments where radioactive materials

might have fallen. Toxic elements that might have entered these animals' system could have been passed on to humans, Perez explained.

"The fact that the BRER committee is doing this research indicates that they are convinced that Guam may be a fallout area," Perez said.

Celestial said the result of BRER's study would help the panel determine Guam's possible inclusion into the Radiation Exposure Compensation Program as a "downwinder" or

"fallout" site.

The U.S. Congress has so far approved Guam's inclusion into the program as a "washdown" area after taking into account the fact that nuclear-testing ships had anchored and cleaned in Guam's Apra Harbor for several months.

Celestial and Perez noted the huge number of cancer patients on Guam, purportedly as a result of possible radiation exposure.

"Unfortunately, we have no
**Continued on page 2**



## Inside:

Guam super salesman honored ............ p.5

Marshall teachers ............ p.10

## Pamphlet...

Continued from page 1

priate the funds for one," he added.

The speaker of the legislature said cost estimates in the past have a $100,000 price tag to hold a special election

Weinberg pointed out four "material defects in the pamphlet.

First, there is no Guam Casino Gaming Control Commission in the pamphlet in violation of law which requires that the ballot pamphlets "contain a complete copy of any measure to be submitted by voters — by initiative or referendum petition."

Second, the analysis in the pamphlet that was sent out via mail does not appear to be authored or acknowledged by GEC legal counsel, additionally the GEC analysis is not provided, which is also required by law.

The AGO contends the pamphlet is lacking three signatures of voters who submitted the op-

position to the proposal. The GEC is required by law to mail out the informative pamphlets to all registered voters exactly 30 days before the Nov. 2 election.

Weinberg told Taitano that the 30-day window closed on Oct. 3 and the material defects can probably not be rectified to meet the needs of the general election.

"However, there may be procedures available for setting another election date, but that may require the governor or the legislature to call a special election," according to yesterday's letter.

The AGO feels that the material errors and omissions in the pamphlet will prevent the proposal from being legally presented to voters on Nov. 2. Weinberg also stated that it would prevent the proposal from withstanding a legal challenge either before or after the general election as of press time the AGO requested meeting had not been scheduled.

## Health...

Continued from page 1

give them an opportunity to do it here at home." McMillan said.

The symposium will also provide health care profes-



*Bill McMillan*

sionals with training on areas that deal with bio-terrorism, conflict resolution in health care, prevention and treatment

of depression, suicide, diabetes, pediatric toxicology, and vascular disease, and up-to-date information on pain management and hormone replacement therapy for women.

Health care experts will also assess the nursing shortage in the region.

"We hope to be able to establish this as annual symposium. We expect to see our colleagues from our neighboring islands. This will give everybody a chance to weave a network and to update their knowledge," he added.

Expected to attend the symposium from the region are health care professionals from the Northern Marianas, Palau and Yap among others.

The symposium opens at 6 p.m. tonight and ends at 5 p.m. Sunday.

## US Panel...

Continued from page 1

scientific data to establish that one's cancer was a result of radiation exposure or caused by other agents. You can't tell the difference," Perez said.

Not easy

Celestial said it's not easy to get accurate statistics on cancer-related deaths on Guam because some of the cancer victims, who were on island 50 years ago, had moved to other states where they might have passed away.

"What we want to find out is whether the BRER committee can determine sufficient radiation fallout here to recommend to Congress that Guam be included as a downwinder status," he added.

who were exchanging warnings that radiation were drifting toward these islands.

"What I would like to know is if there was any scientific criteria to determine that a jurisdiction falls under the downwinder status," Perez said.

Perez and Celestial noted that Hawaii and Utah had been included in radiation compensation program as downwinder sites without Congress requiring them to submit any scientific proof of their claims.

"It seems like a political decision. I believe that the states and counties with voting representatives in Congress succeeded in their pushing for their claims because their representation was

## US raises security alert in Green Zone

**BAGHDAD, Iraq (AP)** — U.S. authorities raised the security alert in the heavily guarded Green Zone after an improvised bomb was found in front of a restaurant there, officials said Thursday. Twenty Iraqis were arrested in the north in operations against those suspected of planting bombs against U.S. and Iraqi targets.

Elsewhere, one American soldier was killed and two others were wounded when a bomb exploded late Wednesday near their convoy outside the insurgent stronghold Fallujah. Four U.S. Marines and three Iraqi soldiers were reported injured in an operation to crush insurgents south of Baghdad.

About 240 detainees, meanwhile, were released from U.S. and Iraqi custody Thursday, the U.S. military said. It was the fourth round of releases under a joint U.S.-Iraqi review process set up Aug. 21 following the prisoner abuse scandal at Abu Ghraib prison.

The publication in April of photographs showing naked, terrified Iraqi prisoners being abused and humiliated by grinning American guards at Abu Ghraib caused outrage here and internationally.

None of those freed Thursday were so-called high-value detainees, who are processed separately from the 1,700 "security detainees" held at the Abu Ghraib facility near Baghdad and Camp Bucca in southern Iraq, said Lt. Col. Barry Johnson, a military spokesman.

The warning to Americans and Iraqi officials in the Green Zone followed the discovery Tuesday of an explosive device at the Green Zone Cafe, a popular hangout for Westerners living and working in the compound — which houses major U.S. and Iraqi government offices. A U.S. military ordnance detachment safely disarmed it, U.S. officials said.

A loud explosion shook the Green Zone on Thursday afternoon and smoke was seen rising from inside the compound. The U.S. military had no immediate information on the incident. Insurgents regularly fire at the compound.

Americans living and working in the zone were warned to avoid non-essential movements, travel in groups and avoid specific areas.

Although movements in and out of the Green Zone are restricted, about 10,000 Iraqis live inside the 4-square-mile district, located along the western side of the Tigris river.

In Mosul, the U.S. military said American and Iraqi forces detained 20 people in operations in northern Iraq and foiled a road-side bombing Wednesday in the city of Tal Afar, scene of intense fighting last month between U.S. soldiers and insurgents.

A U.S. demolition team defused a homemade bomb found beneath an Iraqi police car, the U.S. command said. Eight people were arrested in raids in Tal Afar, and Iraqi National Guard troops seized two grain sacks full of dynamite, two-way radios used to detonate roadside bombs and other materials, U.S. authorities said.

Twelve other people were arrested in a series of raids in Mosul, the U.S. command said.

Homemade bombs, including those rigged in cars and trucks, have become an increasing threat to multinational and Iraqi forces because insurgents find them safer than other forms of attack that can draw devastating American return fire. In September, 29 Iraqi and multinational troops were killed by car bombs, according to the U.S. command, which did not break down the figure by nationality.

On Wednesday, a suicide car bomber slammed into an Iraqi military checkpoint northwest of Baghdad, killing 16 Iraqis and wounding about 30. Iraqi officials said. The attack occurred near an Iraqi National Guard camp near Abah, 160 miles northeast of Baghdad on the main highway to Syria. According to the U.S. military, the camp came under fire, and a few minutes later a vehicle sped to a nearby National Guard checkpoint and exploded.

U.S. and Iraqi forces are trying to restore enough control so that national elections can be held in January. The election is considered a vital step toward building Iraqi democracy. President Bush and Prime Minister Ayad Allawi insist the elections will take place

throughout the country, despite warnings by some U.S. military officials that elections in some areas may not be possible.

As part of the new security push, more than 3,000 U.S. and Iraqi forces are trying to clear an insurgent stronghold in a string of towns and villages just south of Baghdad, notorious for kidnappings and ambushes.

A statement by the U.S. command Thursday said 17 suspected insurgents were captured the day before in two joint raids by U.S and Iraqi troops around Haswah and Iskandariyah, both about 30 miles south of Baghdad.

Since the operation began Tuesday, four U.S. Marine, three Iraqi National Guard members and three civilians have been injured, U.S. officials said. Raids since Tuesday have yielded 18 500-pound bombs, 197 rocket propelled grenades, dozens of mortar shells and military supplies, the command said.

As military operations continue, the Iraqi government is reported close to an agreement with followers of Muqtada al-Sadr to end weeks of fighting in his stronghold of Sadr City, a teeming Shiite slum in northeastern Baghdad.

Allawi told reporters Wednesday that a committee was being formed to discuss what is termed an "initiative to end the conflict. Kareem al-Bakhati, a pro-al-Sadr tribal elder, said the framework agreement calls for al-Sadr's militiamen to turn in their weapons in exchange for cash payments and immunity from prosecution for most of them.

Iraqi police would take over security responsibilities in Sadr City and American forces would enter the district only with the approval of Iraqi authorities, he said.

Some al-Sadr aides expressed reservations about some of the conditions, and the fiery cleric, whose Mahdi Army launched bloody uprisings in April and August, has frequently zigzagged in negotiations. A senior al-Sadr follower, speaking on condition of anonymity, said his aide rejected the proposal because it did not include a halt to arrests, the release of prisoners or an end to house raids.

"While compensation is one way of assuaging the pain caused by the nuclear test, Perez said the advocates' primary goal "is to get proven test identifiable bombs before us."

nated during those years, resulting in fallout across the Pacific.

Last week, PARS organized a forum at University of Guam to provide information on the Radiation Exposure Compen-

Center to conduct a study on Guam's possible radiation exposure.

"From there, we can determine whether Guam's risk for cancer increased as a result of

# Pacific Daily News

©2004 Guam Publications, Inc.

A Gannett Newspaper

VOL. 35 NO. 252  HAGÅTÑA, GUAM, OCTOBER 9, 2004

HAFA ADAI IT'S SATURDAY

guampdn.com

75¢ on Guam

GuamPDN.com

**Spirited athlete**

Yigo resident Hiroko Evans, who enjoys Judo, admires the pure and nice spirit of sports.

▲ See Sports, Page 40

**Warriors win**

The St. Paul Christian School Warriors cashed on top of the Tagaison in the regular season of the IIAAG Girls' Volleyball League. Coach Garrido is disappointed that his team won't be participating in the Far East tournament next month.

▲ See Sports, Page 40



**Inside**

▲ Nobel Peace Prize awarded to environmentalist Page 10

# Residents split on Prop A

## Officials to discuss possible vote delay on Monday

**By Oyaol Ngirairikl**
*Pacific Daily News*
*ongirairikl@guampdn.com*

Tour bus driver Tony Portka said he wants to wait.

Resident Rose David is ready to decide next month.

"Cab driver Albert Eata is unsure of what the government should do, but knows how he's going to vote "No" on Proposition A, when island residents get to vote on it.

▲ THE BOTTOM LINE
Residents have a range of opinions about the possible delay on the Proposition A vote.

Currently, some island residents still expect to vote on Proposition A on Nov. 2. But concerns about the information provided to residents about Proposition A, which would allow regulated casino gaming in as many as 10 large Guam hotels, may delay the vote.

On Monday, the attorney general's office and the Election Commission is expected to meet and address some concerns, which may move the vote on Proposition A by months to years.

Two days ago, the attorney general's office said lawmakers may have to call a special election to decide the casino-gaming issue because of several mistakes in the informational pamphlets that were mailed to voters

last week.

Among other things, the Guam Election Commission did not mail a complete copy of the 80-page casino proposal to registered voters, as required by Guam law, which may have cost more than $100,000, the commission's legal council has stated.

Instead, the Election Commission sent out single-page pamphlets that provides a summary of the proposal.

▲ See Gaming, Page 4

# Mueller pleads not guilty

**By Theresa Merto**
*Pacific Daily News*
*tmerto@guampdn.com*

A man accused of receiving obscene, sexual visual depictions of minors pleaded not guilty to charges yesterday in the District Court of Guam and was released despite an objection from the government.

Stephen Remy Mueller appeared in District Court before Judge Joaquin Manibusan for an initial appearance and arraignment hearing. A federal grand jury on Wednesday handed down the indictment against Mueller accusing him of receiving digital images over the Internet in May of minors engaging in sexually explicit conduct. He was charged with receipt of child pornography and possession of obscene visual representations, the indictment said.

The assistant U.S. attorney handling the case has said federal officials received a tip that the visual images were seen on Mueller's computer. A search warrant was executed and a forensics expert was able to access the images by looking at the

▲ See Case, Page 4

▲ THE BOTTOM LINE
A man indicted on child pornography charges pleaded not guilty yesterday in the District Court of Guam.

**Hearing:** Stephen Remy Mueller, who has been accused of receiving and possessing child pornography through the Internet, leaves the U.S. District Court of Guam after his initial appearance yesterday.



Masako Watanabe/Pacific Daily News: mwatanabe@guampdn.com



**THE QUEST TO QUIT**

## Quitting is such a drag

After smoking for 20 years, Duane George is trying to quit. In a weekly column, the editorial editor at the Pacific Daily News will write about his efforts to kick the habit.

▲ See story, Page 20

## Officials eye gas pricing

With the rising cost of gasoline on Guam, Attorney General Douglas Moylan and Vice Speaker Frank Aguon Jr. will meet next week to discuss possible funding sources for an anti-trust attorney. The attorney would serve as a watchdog over the pricing of gasoline at the pump, but appropriation was not made for the AG office's fiscal 2005 budget.

▲ See story, Page 8



AD tones

DOWNLOAD YOUR DUB RINGTONE TODAY!

GUAMCELL
www.guamcell.com



guampdn.com · Pacific Daily News, Saturday, October 9, 2004

# Gaming: Some ready for Nov. 2 vote



▲ Continued from Page 1

which Portka and other residents said does not provide adequate information about the proposal.

"Eighty-two pages ... and they fit it into one page," the Guam Sanko Transportation bus driver said, adding that he personally doesn't gamble but is willing to consider "controlled casino gambling" proposed by Proposition A.

"But I haven't even seen (the proposal) and I'm sure there are things in it that people have to be aware of before they can make a decision that's good for the entire island," Portka said.

Local businessman Prakash Hemlani, who manages the family-owned Rocky Mountain Chocolate Factory in Tamuning's Guam Premiere Outlets, said he thinks more information should be provided in the form of the proposition itself but also in public discussions and debates.

"Really, the information in the pamphlets that the supporters of casino gambling and the group against it are passing out are basically general advocates and provide no depth on the issue," Hemlani said.

"We need to have the two sides come out and debate their sides so that we can see the best and the worst of the issue and make educated decisions when the time comes to vote."

The store manager said he personally is in favor of finding other means to speed up the nearly decade-long economic slump that the island has been in, and while casino-gambling may bring in some additional money, there is much that needs to be discussed.

Hemlani, who also deals in real estate, said the ice cream shop stands to lose money if residents and tourists decide to spend their money at the casinos. But he anticipates that real estate business will pick up if Proposition A is approved.

"I'm kind of yes and no

**Caption:** Masako Watanabe/Pacific Daily News/mwatanabe@guampdn.com

**Wait on vote':** Tony Portka, 28, a bus driver for Guam Sanko Transportation, said he thinks voting on Proposition A should be postponed.

when it comes to casino gambling, ... and I would like to see more information to help me make my decision. I think we should hold off on voting," Hemlani said.

David agrees that casino gambling has been an issue of public debate for decades on Guam and the residents are "smart enough to know the good and the bad" about casino gambling and are more than ready to vote on Nov. 2, whether they receive summary pamphlets or the entire proposal from the Election Commission.

"Right now, I think everyone can say its going to bring more money to the island. They're just worried its also going to bring crime and a lot of 'bad habits,'" David said. "But there's already crime' and you already have people spending their hard-earned money on other things and failing to pay their rent.

"Really, what it comes

> "We need to have the two sides come out and debate their sides ..."
>
> **Prakash Hemlani**
> businessman

down to is personal discipline and if people decide to go for broke then that's up to them," the Tamuning resident said, who will vote "Yes" on Proposition A.

David said many people on Guam already gamble when they play Bingo, fight roosters or fly off island to areas that do have casinos.

"I know a lot of people who go to Las Vegas so they can sit in front of a slot machine," David said.

"Face it, it's a recreational thing and it'll provide additional entertainment for the island."

According to a recently released Spectrum Gaming Group report, casinos would add as many as 2,085 jobs to the local economy, with 1,388 of those employees working directly for casinos.

The casinos could take in as much as $106.7 million a year, the report states, including $15.3 million from

local residents.

The report projects that more than 41,000 local residents and more than 480,000 tourists would visit casinos each year, with local residents gambling as many as nine times per year.

These revenue projections are based on the assumption that the island will have 1.6 million visitors — a figure that is about 300,000 more than Guam's current record for visitor arrivals.

A group against Proposition A, Communities Opposing Prop A, also announced that it will bring an expert on the gaming industry, University of Nevada Las Vegas professor William N. Thompson, to Guam later this month to talk about the economic impact of casino gaming on Guam.

Cab driver Eats, 33, said all the studies and all the debates won't sway his vote.

"I don't gamble," Eats stated simply. "I don't have to read a proposal or hear how much money the supporters think its going to bring in. I don't like gambling and so I'm going to vote 'No.'"

## TO LEARN MORE

### PROPOSITION A

▲ To learn more about Proposition A, call Citizens for Economic Diversity at 647-CFED (2333) or visit its Web site, www.guamgaming.com.

### OPPOSITION

▲ To learn more about Communities Opposing Prop A, call 472-COPA (2672) or visit its Web site at www.copaguam.com.

## WHAT'S AT ISSUE

Here's what allegedly is wrong with the Proposal A pamphlet, according to the attorney general's office:

**Pamphlet**

▲ The claim: There is no Guam Casino Gaming Control Commission Act in the Pamphlet.

▲ What Guam law says about that: "The Ballot pamphlets shall contain: (a) A complete copy of any measure submitted to the voters by: (1) The Legislature. (2) Initiative or referendum petition. (b) A copy of the specific statutory provision, if any, proposed to be affected." In addition, government regulations state that "the complete text of the initiative measure" must be printed in the ballot pamphlet, immediately after the argument against the measure, followed by the text of any existing laws that would be affected.

**Analysis**

▲ The claim: There is no analysis by the commission as required by law. (According to Assistant Attorney General Robert Weinberg, the text in the pamphlet does not appear to meet the minimum requirements of the law).

▲ What Guam law says about that: "Whenever any measure qualifies for a place on the ballot, the Election

Commission shall prepare an impartial analysis of the measure showing the effect of the measure on the existing law and the operation of the measure. The analysis shall be printed in the ballot pamphlet between the ballot title and the arguments for and against the measure. The length of the analysis shall not exceed five hundred (500) words, except with the approval of the Election Commission."

**Legal counsel**

▲ The claim: The "analysis" that is provided does not appear to be authored or acknowledged by legal counsel for the commission, as required by the government's Administrative Rules and Regulations.

▲ What the regulations say about that: "Legal counsel for the commission shall, not less than 45 days prior to the election at which an initiative measure is to be submitted to the voters, prepare an analysis of the measure, not to exceed 500 words in length. The analysis shall be impartial and shall show the editor of the measure on an existing law and the operation of the measure."

**Signatures**

▲ The claim: The pamphlet lacks the three signatures of voters who submitted the opposition to Proposal A. Three signatures of voters were submitted, but only one name appears on the pamphlet, contrary to law.

▲ What Guam law says about that: "No more than three signatures shall appear with any argument printed in the ballot pamphlet, in case any argument is signed by more than three persons the signature of the first three shall be printed."

· Pacific Daily News

---

# Case: Arguments heard over suspect's flight risk

▲ Continued from Page 1

computer's hard drive.

During the hearing yesterday, Mueller was represented by attorney Howard Trapp, while Assistant U.S. Attorney Karon Johnson represented the government.

Manibusan advised Mueller of his rights, including his right to retain counsel of his choice and the right to not make any statement. After the judge asked Mueller a series of questions including whether he has received a copy of the indictment and whether he understands the nature of the charges, Trapp entered a "not guilty" plea on behalf of his client.

The issue of whether Mueller

## WHAT'S NEXT

▲ The jury selection and trial for Stephen Remy Mueller is scheduled for 9:30 a.m. Nov. 30 in the District Court of Guam. The pre-trial conference is scheduled for Nov. 12.

should be released pending trial was then argued.

Johnson brought a copy of a report from the Bureau of Prisons that contained a survey of 54 inmates who were charged with child pornography. Forty-three of the 54 inmates admitted to at one point physically sexually abusing children. Johnson said citing the report,

Based on the report, Johnson asked the judge yesterday that a psychological profile be conducted on Mueller to determine whether he is a danger to the community.

"The government opposes his release at this time," Johnson said.

Trapp, however, said the government has no authority to have Mueller evaluated, adding that he will advise his client not to talk to anyone about the case.

"He has the right to remain silent," Trapp said. "We certainly object to any psychological evaluation."

He said there is no such appearance in the case against Mueller that he had sexual contact with minors. Trapp said his client is charged with

able to following instructions, adding that Mueller has been cooperative with the probation office, federal marshals and the court itself.

"If he was going to take off, he would have done it by now," Trapp said.

"My client is very, very worried about this," Trapp said referring the case before the court, adding that Mueller has never been in trouble with the law before.

"He should be released pending trial," Trapp said.

In response, Johnson said she opposes his release because he is no longer employed and has no ties to Guam, and she has reason to believe he may be a flight risk, adding that he may be provoked

community. Following his indictment, Mueller — who was working for a company contracted to Andersen Air Force Base — was denied access to the base.

Manibusan said that although the defendant has lost his job, that doesn't mean he will become a flight risk, nor does it mean he poses a threat. Mueller was released pending trial.

"If the trial date has been scheduled for Nov. 30. The pre-trial conference is scheduled for Nov. 12.

As part of his release, Mueller cannot have any contact with minors. Manibusan said if this condition or any of the conditions are violated his pre-trial release will be revoked.

Case 1:04-cv-00046-x   Document 1   Filed 11/26/20   Page 2 of 11



Member

Local news editor: David V. Crisostomo, 477-9711, ext. 414
Assistant local news editor:
nor Dumat-ol Daleno, 477-9711, ext. 417
Gene Park, 477-9711, ext. 412
News tip hot line: Call 475-NEWS
e-mail: news@guampdn.com

# LOCAL



## Should Prop A be postponed until the next general election?

No          47.8%

Total votes: 203

## Local news

### Power outages in Sinajana, Pago Bay

The Guam Power Authority has scheduled the following power outages today.

▲ In Sinajana from 8:30 a.m. to 2:30 p.m., affecting Herman Avenida de León, parts of Calle Angel Flores St., North Gado and parts of South Gado and others in the area.

▲ In Pago Bay from 9 a.m. to 3 p.m., affecting the Pago Bay Bridge location, Pago Bay Estates, San Agustin residence, Cliff Side Tai, and others in the area. There will also be 30-minute power interruptions at 9 a.m. and 3 p.m. affecting the intersection of Route 4 and Guam Veterans Highway, Manibusan and Quinguia residential areas, and Harper Valley Kennel location.

### GTA cable upgrade to affect services

Guam Telephone Authority crews will upgrade cable facilities from 7 a.m. today on Route 16, next to McDonald's Restaurant, affecting Fort Juan Muna to Taitano Road and surrounding areas. Full restoration of phone services is expected by midnight tonight. GTA crews also started upgrading cable facilities in Inarajan yesterday, affecting the former Papa Niyoc Store, Pale Duenas St., toward the Ija Subdivision and surrounding areas, with full restoration expected at 6 a.m. today. People who are still experiencing phone service problems should call 611.

### Naval base front gate to be closed

The Commander, U.S. Naval Forces Marianas has announced in a statement that the Naval Base Guam front gate will close at 10 p.m. tonight to allow workers to re-install concrete barriers. Motorists with authorized access to the base are advised to use the X-Ray detour gate, the front gate. The front gate will reopen at 4 a.m. tomorrow.

*Pacific Daily News*

### Clearing the record

We care about accuracy. If you would like to clear the record, call the Pacific Daily News at 477-9711, ext. 414.

---

# Renaming ceremony held

By Natalie J. Quinata
*Pacific Daily News*
nquinata@guampdn.com

After two years of hard work, the family of the late Honorary Brig. Gen. Tomas R. Santos yesterday dedicated the Guam Army National Guard Readiness Center to their late father and grandfather.

The Brigadier General Tomas R. Santos Army National Guard Readiness Center is home to Guam's largest infantry unit, which is at least 500 soldiers of the 1st Battalion 294 INF (LIGHT), said Cpt. Romeo Delfin of the Guam Army National Guard.

The building is the first of four phases of readiness centers that house administrative offices which ensure that Guam's units are continuously ready for deployment in the case of a military emergency.

Patricia Sison, Tomas Santos' eldest daughter, spoke proudly of her father and his accomplishments at yesterday's renaming ceremony.

Born in 1909, Tomas R. Santos enlisted in the Guam militia in 1925, at the age of 14. He was then appointed and commissioned as an officer in 1934 and served as a commanding officer of the 1st Battalion Reserves.

After his service in the military, Santos continued on to serve as a senator in the 5th, 8th, and 11th Guam Legislatures, in addition to being a teacher and later a principal.

His achievements include such titles as honorary brigadier general of the Guam National Guard and the first Chamorro Postmaster for the island.

"Our dad is a great man. He achieved a lot of things for the people of Guam," Sison said proudly of her father.

To ensure that reservists are ready for deployment, the readiness center makes sure that all paperwork for reservist personnel are finalized, such as making sure that the soldiers' list with aid instruments are up to date.

"We make sure that we're always ready to go to war," Delfin said.

The construction of the Tomas



Photos by Ric A. Eusebio/Pacific Daily News/reusebio@guampdn.com

**Unveiling:** From the left: former Gov. Paul Calvo; Gov. Felix Camacho; Honorary Brig. Gen. Tomas R. Santos' daughter, Julie S. Blas; and Santos' grandchildren, Rachel Lee R. Santos and Derrick Santos, unveil a plaque at a Army National Guard Readiness Center ceremony yesterday.

▲ Family members and prominent local officials honored Honorary Brig. Gen. Tomas R. Santos in a renaming ceremony of the Guam Army National Guard Readiness Center.

R. Santos Readiness center was a milestone in the history of the Guam Army National Guard because it is the first modernized facility for the island's National Guard.

In April, the Guam Army National Guard broke ground on Phase III of the Guard's Readiness Center. The $6.97 million facility is scheduled to be completed in July 2005.

It will be a one-story complex at about 26,000 square feet. The facility will be the new home of the 105th Troop Command, the 1224th Engineer Detachment and the 294th Military Intelligence Detachment.



**Resolution:** Speaker Ben Pangelinan, left, stands beside the sister of Guam National Guard honorary Brig. Gen. Tomas R. Santos, Patricia Santos Sison, right, after having received a resolution in honor of Santos during a ceremony held at the Army National Guard Readiness Center in Barrigada yesterday.

---

# Vice-mayoral results go to trial today

By Steve Limtiaco
*Pacific Daily News*
slimtiaco@guampdn.com

A trial is scheduled this morning in the Superior Court of Guam to determine whether the results of the Tamuning vice mayoral election should be counted a third time.

That race was a tie between Republicans Joshua Mafnas and Louise Rivera, at 459 votes each. But a recount ordered by the Guam Election Commission showed a 12-vote discrepancy in the election-night results.

Rivera had 455 votes and Mafnas had 451, according to the recount, and the commission certified Rivera as the next vice mayor of Tamuning.

Mafnas sued Rivera in the Superior Court of Guam and has asked the court to intervene and count the ballots again, arguing that there was human error and that some ballots might have been improperly discarded because of alleged crossover voting.

Mafnas also is challenging the practice of certifying the winning candidate in a single-party primary as the winner of that office, as was done with Rivera.

Presiding Judge Alberto Lam-

### WHAT'S NEXT

▲ The trial to determine whether the results of the Tamuning vice-mayoral election should be recounted will start at 9 a.m. today in the Superior Court of Guam.

orena decided to allow the Guam Election Commission to participate as a party in the case, despite the objections of Mafnas' attorney, Jay Arriola.

Arriola, during a hearing earlier this month, argued that Rivera and her attorney can represent the interests of the election commission in the case, but the commission argued that it needs to be able to speak for itself.

The commission's decision to

participate in the legal battle between Mafnas and Rivera might come at an extra cost to taxpayers.

The commission's legal counsel — Cabot Law Offices — currently is paid a minimum of $3,200 per month for its services, to include the first 17 hours of work it puts in per month.

Any work beyond that 17 hours will be billed at $175 per hour, said Commission Executive Director Gerald Taitano, based on a contract the law firm has had since October 2002.

Lamorena earlier this month said he plans to take all day today, if necessary, to conduct the trial.

Arriola yesterday said he believes it will take "at least a day" to discuss the issue in court.

# LOCAL

**Local news editor:** David V. Crisostomo, 477-9711, ext. 4T...
**Assistant local news editors:**
Gaynor Dumat-ol Daleno, 477-9711, ext. 417
Gene Park, 477-9711, ext. 412
**News tip hot line:** Call 475-NEWS
e-mail: news@guampdn.com

guampdn.com PACIFIC SUNDAY NEWS, October 10, 2004






**GuamPDN.com**
Pacific Daily News
GUAM'S SOURCE

Have you read Prop A in its entirety?

No **81.7%**

as of 8 p.m. Oct. 9

## Local news

### Nursing Education Week scheduled

Nursing Education Week, focusing on oncology, will be held tomorrow through Friday, presented at no charge as a public service by the Cancer Center of Guam.

The Cancer Center of Guam has announced, in association with Guam Memorial Hospital, that registered nurse Charlene Chyz, will hold a seminar for all interested nurses in the theory, practice and practical of chemotherapy administration, in addition to other seminars. A certificate of proficiency of chemotherapy administration will be given to participants upon course completion. Four hours of CE credit will also be given. Call the GMH Continuing Education Department at 647-2349 for more information.

*Pacific Sunday News*

### Columbus Day What's open, what's not Monday, Oct. 11

Post office branches and federal government offices: closed.

Banks: closed.

Pacific Daily News: open.

### Clearing the record

We care about accuracy. If you would like to clear the record, call the Pacific Daily News at 477-9711, ext. 414.

▲ Patricia Santos Sison is the daughter of Guam National Guard honorary Brig. Gen. Tomas R. Santos. Other information was published in a caption that ran on page 2 of the Oct. 9 edition of the Pacific...

# Independence celebrated

**By Oyaol Ngirairikl**
*Pacific Sunday News*
ongirairikl@guampdn.com

Ten years ago, the people of the Palauan islands regained control of their island and their destiny after more than a century of foreign governance — and that is cause for celebration.

Rae Aiko De Soto said it's the "celebration of freedom and independence" gained a decade ago that pulled her and hundreds of other Palauans whom have made Guam their home to the 10th anniversary celebration of the Republic of Palau's independence.

Gov. Felix Camacho and Rear Adm. Arthur J. Johnson, commander of the U.S. Naval Forces Marianas, joined in the festivities, greeting Palau President Tommy Remengesau Jr. and about 500 people at Ypao Beach Park yesterday. The celebration also attracted political candidates from both Palau and Guam.

The day-long celebration started with the presentation of the U.S., Guam and Palau flags, followed by a colorful march of flags representing the island-nation's 16 states. The celebration also featured cultural dances and food.

De Soto, like many Palauans living on Guam, was born and raised here, but said she stays true to her Palauan heritage.

"I celebrate (Palau's independence) because I'm Palauan in my heart and in my blood," De Soto said. "To me, Palau's independence means we have the freedom to control our own destiny," she said.

Like many other Pacific islands, Palau's first contact with the Western world was through European whalers and missionaries.

According to the Palau Visitor's Bureau Web site, foreign governance of Palau began when Pope Leo XIII asserted Spain's rights over the Caroline Islands in 1885. In 1899, Spain sold the Carolines to Germany, which established an organized program to exploit the islands' natural resources, such as phosphate in Angaur the southernmost island of the Palau archipelago.

Following Germany's defeat in World War I, the islands were formally passed to the Japanese, which established systems of education

and government. Then after World War II, Palau, Guam and other islands in the Micronesian region became United Nations Trust Territories under U.S. administration.

After many years of talks about a post-trust status for Palau, the U.S. Congress in 1986 approved a Compact of Free Association agreed to by U.S. and Palauan negotiators.

Palau law, however, required that 75 percent of Palauan voters approve the Compact. It took eight referendums and a constitutional amendment decreasing the 75 percent requirement to a simple majority to pass the compact.

On Nov. 9, 1993, 68 percent of Palauan voters approved the compact. On Oct. 1, 1994, U.S. President Clinton proclaimed Palau's status as an independent nation in free association with the United States.

Under the compact, the U.S. remains responsible for Palau's defense for 50 years. The U.S. must approve the entry into Palauan territory of any foreign military, may establish military bases there, and is permitted to operate nuclear-capable warships there.

In return, Palau receives financial assistance from the U.S. and is eligible to participate in some 40 federal programs for 15 years after independence. Also, Palauans can live and work in the U.S. mainland and its territories.

There are more than 2,000 Palauans who have built lives on Guam, according to the 2000 Census.

Nina Kilad was born in Palau but came to Guam in 1969 to attend school. After graduating from George Washington High School, she went on to nursing school at the University of Hawaii, eventually returning to Guam and starting a life here.

"At the time, the educational opportunities were not available in Palau. That's the main reason I came to Guam," Kilad said. "Leaving home gave me the opportunity to learn how to be self-reliant, to re-



**Commemoration:** Zita Villanueva, 20, of Latte Heights, right, serves food yesterday at the 1... anniversary celebration of the Republic of Palau's independence. A celebration was held yesterday at Ypao Beach Park in Tumon, where hundreds gathered to commemorate the day in which Palau gained its independence.

*Ric A. Eusebio/Pacific Sunday News/reusebio@guampdn...*

## ON THE NET

▲ For more photos of the celebration, visit www.guampdn.com


...spect other people's experiences, backgrounds, and become... nomically self-sufficient."

Kilad drew a parallel between personal growth and Palau's growth as a country, whose independence fairly young compared to other nations, including the U.S.

"I think as a young nation we're doing pretty well, the education system has improved a lot since I was a child, for example," Kilad... "That's not to say we don't have a lot of work to do, we still need to... a way to become economically viable so that we're not so reliant on the U.S. for funding. But right now I think we're doing good."

# Symposium picks up with presentation

**By Natalie J. Quinata**
*Pacific Sunday News*
nquinata@guampdn.com

Diabetes, a widespread health problem on Guam, was among one of the topics discussed during yesterday's 1st Micronesian Medical Symposium.

With Guam's abnormally high rate of diabetes on Guam, Dr. Stephen Hsu, a Harvard-trained and Singapore-based molecular geneticist, hopes to begin a study that focuses particularly on the genetics of diabetes particular...

Hsu, who describes himself as a

"gene hunter,'" said that he would like to organize with local officials to hunt down the diabetes gene.

"I call it modern molecular medicine," said Hsu as he explained how he hopes his career in genetics will impact modern medicine.

Hsu, along with other medical and health-care professionals gave presentations yesterday at the 1st Micronesian Medical Symposium at the Guam Marriott Resort, which concludes today.

The goal of the symposium is to bring health-care professionals from around the Micronesian region... the idea of forming an alliance

among the region.

Dr. Nathaniel Berg, secretary of the Guam Medical Society, said that the best part of the symposium was the fact that it focuses not just on Guam, but on the region.

As a health-care provider who has practiced in other islands in the region, Berg said he was excited that a symposium of this caliber has finally been done, and also said that he hopes to make it an annual event.

Glynis Almonte, the executive director of the Guam Nurses Association, said that the symposium covers a range of topics from the latest technologies in medical care to...

ment to the public policies that affect health care in the region.

Other participants, like R... Rama, attended the symposium simply to be more informed about... profession.

Rama, a nurse for Inarajan... mentary School, said, "This is... new knowledge and more this... learn."

With all of the technological advancements and research being done, Lourdes Sicnoza, a local... macist said health-care profession... als "have to learn the most it... tant and recent development in the field..."



# GEC, AG's Office meet over Prop "A" pamphlet

**by Marissa Eusebio, KUAM News**
**Monday, October 11, 2004**

Officials from the Guam Election Commission and the Attorney General's Office met this morning to discuss concerns about deficiencies in the voter information pamphlet on the casino gaming initiative, which the AG's Office claims may prevent the vote on Prop "A" from taking place in the November 2 General Election. GEC legal counsel Cesar Cabot told KUAM News the issue boils down to a lack of funding.

In order for the GEC to have distributed an 82-page mailer, it would have cost more than $150,000. Cabot says that until they receive the funding needed to comply with the law, the issue will continue to go unresolved.

In the meantime, Attorney General Douglas Moylan says after reviewing the facts and applying the law, because the GEC failed to provide the full mailer, regardless of the cost, the General Election question on the ballot will be ineffective for purposes of passing the initiative. Moylan described it as a fatal defect on a wasted notice, adding that insufficient funding is not an excuse in the law for not providing adequate due process to the public.

However, Moylan says that the two groups will continue to work together to come up with alternatives. Their next meeting is slated for October 21.

**Copyright © 2000-2004 by Pacific Telestations, Inc.**

# Copa slams casino economic study

By Gerardo R. Partido
*Variety News Staff*

MEMBERS of the anti-casino group Communities Opposing Proposal A have slammed an economic impact study on gaming commissioned by the island's hotel sector.

According to Copa chairwoman Jackie Marati, the study commissioned by the Guam Hotel and Restaurant Association promotes gambling and was performed by a gambling consulting firm which stands to make more money if Prop A is passed.

"This is a study that promotes gambling. The consultant who prepared the study helps casinos get started. They prepared the Prop A summary used by Citizens For Economic Diversity. How 'independent' is that?" Marati, charged.

The study, conducted by Michael J. Pollock, managing director of Spectrum Gaming LLC, concluded that gaming could add as much as 1,388 direct jobs leading to a total increase in employment of as many as 2,085 jobs, with a total annual payroll of about $42.7 million.

In addition, the study said the government of Guam could realize up to $20.52 million in additional tax revenues from gaming taxes, gross receipts taxes, and personal income taxes.

The Spectrum Gaming Group is an international gaming consultancy specializing in services to casino developers and regulatory agencies.

But Marati said the Spectrum study failed to answer where the Prop A jobs would be coming from and what the new sources of revenue would be.

"It does not tell us whether Prop A is good or bad for Guam now, that is the question," Marati said.

Copa is bringing in its own expert, Dr. Bill Thompson from the University of Nevada-Las Vegas, to discuss the effects of casinos on Guam.

"We are finalizing a calendar which will allow all voters to benefit from his perspective, and giving them the opportunity to ask the challenging questions we need to ask," Marati said.

Thompson has consulted for the congressional national gambling impact study commission as well as numerous casino groups throughout the U.S. and various local governments both within the United States and overseas.

In light of the "fluctuating" figures presented by CFED, Marati said her group decided to call on Thompson's expertise to confirm what the true impact of casino gambling will be for Guam.

Marati also criticized the $2,500 cost of securing a copy of the Spectrum study.

"We thought they were rolling out an education program for all the people. And now we have to fork over $2,500 for a copy of the report? Why won't the really big businesses come out and admit they funded a $38,000 63-page report?" Marati asked.

Marati also reiterated her challenge for CFED to agree to a public debate and forum. CFED earlier decided to pull out of a public forum on Proposal A, charging that casino proponents would not get a fair shake from the forum.

"We the voters need more than press conferences and $2,500 reports to inform us. Let's bring the debate to the voters to allow them to decide," Marati said.



*Copa chairwoman Jackie Marati said the study commissioned by the Guam Hotel and Restaurant Association was performed by a firm which stands to make more money if Prop A is passed.*
— Photo by Gerardo R. Partido

## AGO probing agencies hiring private lawyers

By Mar-Vic Cagurangan
*Variety News Staff*

THE Attorney General's office has expanded its investigation into private legal service con- spend.

Asked if AGO was preparing possible court actions against the agencies, Moylan replied, "We will make that decision once we

## Camacho urged to address Prop A crisis

By Trina A San Agustin
*Variety News Staff*

VICE Speaker Frank Aguon Jr. (D-Yona) has urged Gov. Felix P. Camacho to use his transfer authority to provide the Guam Election Commission with funds for the printing of a corrected version of the voters, information, pamphlet for the Casino Gaming Initiative.

"The recent news of the lack of funds for the printing of the Proposition A initiative by the GEC for general distribution as part of their responsibility to the community, may directly impact the ability of our people to vote on the initiative this upcoming general election," Aguon said in a letter to the governor.

Aguon, chairman of the legislative committee on budgeting and appropriations, also expressed concern that GEC may be running out of time. The elections commission need sufficient time to distribute the new information materials to voters. The casino plebiscite will be held simultaneously with the general elections on Nov. 2.

The vice speaker thus urged the governor to expedite the release of funds for printing in order for the voters to get enough



*Felix P. Camacho*

time to review the pamphlets.

"An informed electorate would make the right decision and best decision for our island," he added.

Senate erred in rejecting $213M

# FORUM
## Our Opinion

OPINION

## The report that nails Saddam

**By David Brooks**

SADDAM Hussein saw his life as an unfolding epic narrative, with retreats and advances, but always the same ending. He would go down in history as the glorious Arab leader, as the Saladin of his day. One thousand years from now, schoolchildren would look back and marvel at the life of The Struggler, the great leader whose life was one of incessant strife, but who restored the greatness of the Arab nation.

They would look back and see the man who lived by his saying: "We will never lower our heads as long as we live, even if we have to destroy everybody." Charles Duelfer opened his report on Iraqi weapons of mass destruction with those words. For a humiliated people, Saddam would restore pride by any means.

Saddam knew the tools he would need to reshape history and establish his glory: weapons of mass destruction. These weapons had what Duelfer and his team called a "totemic" importance to him. With these weapons, Saddam had defeated the evil Persians. With these weapons he had crushed his internal opponents. With these weapons he would deter what he called the "Zionist octopus" in both Israel and America.

But in the 1990's, the world was arrayed against him to deprive him of these weapons. So Saddam, the clever one, The Struggler, undertook a tactical retreat. He would destroy the weapons while preserving his capacities to make them later. He would foil the inspectors and divide the international community. He would induce it to end the sanctions it had imposed to pen him in. Then, when the sanctions were lifted, he would reconstitute his weapons and emerge greater and mightier than before.

The world lacked what Saddam had: the long perspective. Saddam understood that what others see as defeat or a setback can really be a glorious victory if it is seen in the context of the longer epic.

Saddam worked patiently to undermine the sanctions. He stored the corpses of babies in great piles, and then unveiled them all at once in great processions to illustrate the great humanitarian horrors of the sanctions.

Saddam personally made up a list of officials at the U.N. in France, in Russia and elsewhere who would be bribed. He sent out his oil ministers to curry favor with China, France, Turkey and Russia. He established illicit trading relations with Ukraine, Syria, North Korea and other nations to rebuild his arsenal.

It was all working. He acquired about $11 billion through illicit trading. He used the oil-for-food billions to build palaces. His oil minister was treated as a "rock star," as the report put it, at international events, so slick was the lust to trade with Iraq.

France, Russia, China and other nations lobbied to lift sanctions. Saddam was, as the Duelfer report noted, "palpably close" to ending sanctions.

With sanctions weakening and money flowing, he rebuilt his strength. He contacted W.M.D. scientists in Russia, Belarus, Bulgaria and elsewhere to enhance his technical knowledge base. He increased the funds for his nuclear scientists. He increased his military-industrial complex's budget 40-fold between 1996 and 2002. He increased the number of technical research projects to 3,200 from 40. As Duelfer reports, "Prohibited goods and weapons were being shipped into Iraq with virtually no problem."

And that is where Duelfer's story ends. Duelfer makes clear on the very first page of his report that it is a story. It is a mistake

Continued on page 11

## Marianas Variety

Serving the Mariana Islands for 32 years
Published Monday to Friday by Younis Art Studio, Inc.

P.O. Box 231, Saipan MP 96950-0231 .
Tel. (670) 234-6341 /7578/9797/9272
Fax: (670) 234-9271
E-mail: mvariety@vzpacifica.net
URL: www.mvariety.com

215 Rojas Street, Suite 101,
Hagatna Guam 96913
Tel. (671) 969-1924/4678
Fax: (671) 969-3207
E-mail: admin@mvguam.com

© 2004, Marianas Variety All Rights Reserved





### Gerry R. Partido
### Island Stir

## Prop A conspiracy theories

THE conspiracy theories have begun.

Shortly after the attorney general's office announced that the voting on Proposal A may have to be postponed, rumors started flying thick and fast about the party of parties who prodded AGO to look into the defects of the casino information pamphlets distributed by the Guam Election Commission.

In a letter to GEC executive director Gerald Taitano, AGO said it received a complaint on the commission's procedures related to Proposal A that could prompt a legal challenge and derail the Prop A poll this November.

AGO, however, did not identify who the complainant was. Pro-casino people say the anti-Prop A people are behind this while the antis, of course, say it's the other way around.

The conspiracy theories revolve around the theme of either the anti- or pro-casino group, depending on which part of the fence the theorist sits on, lagging behind in surveys and needing more time to educate and sway the voting public to its side.

Although GEC and AGO have already set a meeting to thresh out the flaws in the Prop A pamphlet, both acknowledge that it is too late to correct the errors because the law requires the pamphlets to be mailed 30 days before election day. That "window of opportunity" has already lapsed.

This now makes for an interesting scenario. Even if the voting for Prop A goes through this November, the final result would be open to challenge because of the perceived defects in the procedures followed by GEC.

The contest could never end and Prop A may never be resolved with finality, as either party can challenge the results of the election due to the technicalities raised by AGO.

The only recourse may be to call a special election for Proposal A at a later date. But this would mean additional costs and a separate appropriation from the legislature. Cost estimates based from past special elections peg the price of a special election at $100,000 minimum.

The special election scenario has also prompted one of the more intriguing of the Prop A conspiracy theories. Some people are saying that a special election would favor the pro-casino camp for the following reasons:

• The general election is not limited to Prop A and as such would not receive the full attention of the voting public;

• Any general election ballot with the Prop A section left blank could translate to a "no" vote on Prop A; and

• A special election would enable voters to focus on the casino issue, attracting more people to vote on the proposal, and lessening the chances for spoiled ballots.

But Jay Merrill, a consultant with CFED, has stated that the pro-casino group wants the issue to be decided in the November polls. According to Merrill, surveys have been positive for the pro-casino group and there is no reason for them to want any postponement of the Prop A voting.

Copa also wants to go through with the November Prop A vote, saying that the surveys favor the anti-casino group.

In fact, both CFED and Copa, ironically enough, may join forces and launch an unprecedented lawsuit to force the holding of the Prop A vote on November.

Meanwhile, GEC's Gerald Taitano has been put on the spot because of the commission's handling of the Prop A voter education requirement.

The legislature can't be blamed for not appropriating money to address the pamphlet defects because Taitano didn't ask for it.

According to the legislature, GEC only asked for $25,000 to fund the casino initiative voting, not the $100,000 which could have financed the other Prop A voter education requirements.

To be fair, the GEC head was only doing what he thought was best because printing and mailing the required 80-page casino proposal in full would have been costly and impractical.

In any case, we only have three weeks before the general elections and the following days should prove quite interesting as we await the final decision on Prop A.



# Pacific Daily News

04 Guam Publications, Inc.

0. 255 HAGÅTÑA, GUAM, OCTOBER 12, 2004

**HAFA ADAI, IT'S TUESDAY**

A Gannett Newspaper

guampdn.com

75¢ on Guam




# Prop A vote not binding

## AG: Error with pamphlets may jeopardize election



▲ While Proposal A can stay on the Nov. 2 ballot, the outcome of the casino initiative might not be enforceable because of problems with an informational pamphlet that was mailed to voters.

**By Steve Limtiaco**
*Pacific Daily News*
slimtiaco@guampdn.com

Residents can head to the polls Nov. 2 to decide whether to legalize casino gaming on Guam, but the outcome of that election might not be enforceable because of problems with an informational pamphlet that was mailed to voters by the Guam Election Commission, Attorney General Douglas Moylan said yesterday.

While several potential problems in the pamphlet were identified by the attorney general's office last week, the biggest problem is that the complete text of the 80-page initiative was not included in the pamphlet, as required by Guam law, Moylan said.

The election can move forward as planned because it will not cost anything extra to do so, but if casino gaming is approved by voters, that law cannot be enforced, Moylan said.

Moylan met with Election Commission legal counsel Cesar Cabot and commission employees yesterday morning, but the concerns about the pamphlet are unresolved,

▲ See **Casino**, Page 4

## Two women hurt in collision yesterday



Masako Watanabe/Pacific Daily News/newatanabe@guampdn.com

**Route 15:** Guam Police Department officers stand next to two cars involved in a collision on Route 15 yesterday afternoon. Two women were transported to Guam Memorial Hospital after the accident and were in stable condition as of yesterday evening.

▲ See **story**, Page 5

## Baby needs foster home



If your home can accommodate the needs of a sick baby, consider being a foster child for the little boy. The Child Protective Services has custody of the 3-month-old, who needs to transition from a hospital environment to home care. The boy is a survivor. He was not even expected to live beyond birth, because he was born with only a brain stem, with the rest of his brain undeveloped. But the baby has since gained weight and is now around 8 pounds. The agency has checked with all its current foster care homes, and none is able to take him right now.

## 'Superman' dies at 52



Actor Christopher Reeve, the star of the "Superman" movies who became even more famous as an advocate for the disabled after he was paralyzed in 1995, died Sunday. He was 52. Reeve fell into a coma Saturday after going into cardiac arrest while at his New York home, his publicist, Wesley Combs, told The Associated Press.

## Judge orders recount of ballots

▲ A Superior Court of Guam judge has ordered that ballots in the Tamuning vice-mayoral race be counted a third time.

**By Steve Limtiaco**
*Pacific Daily News*
slimtiaco@guampdn.com

Discrepancies surfaced during last month's recount of ballots for the Tamuning vice-mayoral race, and Presiding Judge Alberto Lamorena yesterday said he is not satisfied with the explanations for disappearing votes.

Lamorena has ordered that those ballots be counted a third time, but this time by court employees and not by the Guam Election Commission.

The Tamuning vice-mayoral race was initially a tie between Republicans Joshua Mafnas and Louise Rivera, at 459 votes each. A recount ordered by the

▲ See **Ballots**, Page 4



  2004  **20TH ANNIVERSARY SALE-A-BRATION**
Total Savings of up to $4,000 SEE PAGE 11

guampdn.com Pacific Daily News, Tuesday, October 12, 2004

# Casino: GEC board to meet next Thursday

▲ Continued from Page 1

Moylan said. The attorney general's office became involved in the issue after receiving a complaint about the pamphlets from an unnamed person.

"We have to advise the commission on whether or not the error that occurred has jeopardized the Nov. 2 election," Moylan said. "Our position is that it has jeopardized it, and the law, if it is passed, will not be enforceable."

Dededo resident Johnny Camacho, 42, yesterday said he never received an informational pamphlet in the mail, but said the vote should be held anyway. He said he supports casino gaming because it will be good for the island.

"I think it should go on," he said.

Erwin Samelo, 35, of Santa Rita, who also did not receive an informational pamphlet, said the vote should not happen.

"I think they should postpone it first, so everyone will understand the process for casino gambling," he said.

Election Commission attorney Cabot said the commission did not include the complete text in the pamphlet because it did not have enough money in its budget to pay for it.

Cabot said it would cost as much as $165,000 to comply with that law, which is about a third of the commission's budget.

"There's no money, and nobody seems to have a solution for that problem. As much as the GEC wants to comply with the law, ... we just don't have the money and the funds to do so."

Cabot said he will report the attorney general's concerns to the Election Commission board so it can decide what to do.

The board is scheduled to meet next Thursday but could meet sooner if the board members decide, Cabot said.

"As far as we're concerned, we carried out the letter of the law to the best that we could, based upon our funding," Cabot said. "When we went to the government for funding, we asked for $850,000. They chopped it down to half."

Masako Watanabe/Pacific Daily News/mwatanabe@guampdn.com

**Registration:** Guam Election Commission program coordinator David Chargualaf Jr., right, checks the voter registration status for Conchita Nelson, 48, and her husband, Carl Nelson, 45, of Dededo. As voters get ready to vote on Nov. 2, the attorney general's office is leaving it up to the commission whether to include the casino question, Proposal A, on the ballot.

## PAMPHLET PROBLEMS

Here's what the attorney general's office says is wrong with the Proposal A pamphlet:

**Pamphlet**

▲ The claim: There is no Guam Casino Gaming Control Commission Act in the pamphlet.

▲ What Guam law says: "The Ballot pamphlets shall contain: (a) A complete copy of any measure submitted to the voters by: (1) The Legislature. (2) Initiative or referendum petition. (b) A copy of the specific statutory provision, if any, proposed to be affected." In addition, government regulations state that "the complete text of the initiative measure" must be printed in the ballot pamphlet, immediately after the argument against the measure, followed by the text of any existing laws that would be affected.

**Analysis**

▲ The claim: There is no analysis by the commission as required by law. (According to Assistant Attorney General Robert Weinberg, the text in the pamphlet does not appear to meet the minimum requirements of the law).

▲ What Guam law says: "Whenever any measure qualifies for a place on the ballot, the Election Commission shall prepare an impartial analysis of the measure showing the effect of the measure on the existing law and the operation of the measure. The analysis shall be printed in the ballot pamphlet between the ballot title and the arguments for and against the measure. The length of the analysis shall not exceed five hundred (500) words, except with the approval of the Election Commission."

**Legal counsel**

▲ The claim: The "analysis" that is provided does not appear to be authored or acknowledged by legal counsel for the commission, as required by the government's Administrative Rules and Regulations.

▲ What the regulations say: "Legal counsel for the commission shall, not less than 45 days prior to the election at which an initiative measure is to be submitted to the voters, prepare an analysis of the measure, not to exceed 500 words in length. The analysis shall be impartial and shall show the effect of the measure on existing law and the operation of the measure."

**Signatures**

▲ The claim: The pamphlet lacks the three signatures of voters who submitted the opposition to Proposal A. Three signatures of voters were submitted, but only one name appears on the pamphlet, contrary to law.

▲ What Guam law says: "No more than three signatures shall appear with any argument printed in the ballot pamphlet. In case any argument is signed by more than three persons the signature of the first three shall be printed."

*Pacific Daily News*

But Election Commission Executive Director Gerald Taitano told the Pacific Daily News last week that he never intended to send the complete text to voters and did not ask lawmakers for the money to do so.

The commission's budget request, submitted to lawmakers in May, appears to support that. According to that document, the commission asked lawmakers for $22,000 for postage and $2,500 to produce informational pamphlets and other related documents.

Moylan said money is not the issue because Guam law is clear about the requirements for voter notification. He said a recent count decision that delayed the election for the Retirement Fund board of trustees reinforces the importance of meeting the minimum requirements.

Cabot said he disagrees with the other concerns raised by the attorney general's office, which include the source and form of the pamphlet's impartial summary and whether or not more names should have been listed on the argument against Proposal A.

Moylan said his office and election commission officials also discussed yesterday the possibility of getting the law changed to avoid similar problems in the future and find the most efficient and effective way to educate voters about initiatives.

"They're talking in general terms about having the election commission publish it in the newspaper, versus having these pamphlets sent out," Moylan said.

The problem with the pamphlet cannot be fixed in time for the General Election, Moylan said, because the law requires that voters receive their pamphlets at least 30 days before the election.

The sponsors of the initiative have met the requirement to put their initiative to a vote, but it now is a question of when that should happen, Moylan said.

"Our interest is to ensure that the laws that are passed are valid and that government money isn't wasted on defective laws," he said.

## WHAT'S AT ISSUE

The main problem in the informational pamphlets mailed to voters earlier this month is the absence of the 80-page casino initiative, since Guam law requires the entire text be included in the pamphlet, according to the attorney general. The commission's fiscal 2005 budget request indicates that the commission did not ask lawmakers for enough money to send the complete casino text to voters.

Here is what the Guam Election Commission asked lawmakers for during budget hearings this past May, specifically related to the casino gaming initiative:

▲ $22,000 for postage to bulk-mail 60,000 informational pamphlets for the Guam Casino Gaming Control Commission Act

▲ $14,380 for separate ballot stock for the casino gaming initiative (note: the commission has since decided to print the initiative question on the same ballot as the nonpartisan races, eliminating the need for separate paper)

▲ $2,500 to print "sample ballots, official forms and instructional material such as voter-information pamphlet, ballots, etc."

What is needed to include the complete text of the initiative in the informational pamphlet that is supposed to be mailed to voters:

▲ $145,000 for printing

▲ As much as $20,000 for postage, according to election commission legal counsel Cesar Cabot.

What the commission received in September:

▲ A $25,000 transfer from Gov. Felix Camacho, to pay the cost of printing and mailing a single-page pamphlet.

*Guam Election Commission's fiscal 2005 budget request to the Legislature, dated May 21, 2004; and election commission legal counsel Cesar Cabot*

# Ballots: Court employees to conduct recount of votes

▲ Continued from Page 1

Election Commission showed a 12-vote discrepancy in the election-night results. According to the recount, Rivera had 455 votes and Mafnas had 451, and the commission certified Rivera as the winner.

Mafnas sued Rivera and asked the court to intervene and count the ballots again. A trial for the case was held last Saturday.

Lamorena yesterday said he found no evidence of fraud or misconduct in the election process, but said he is not satisfied with court testimony on the reason for discrepancies in the recount. Specifically, he said he is not satisfied with testimony about the 12-vote discrepancy.

"This is pretty much everything we asked for," said Mafnas' attorney, Jay Arriola, who added that there is no harm in conducting another recount.

He said he is pleased that the court will be counting the ballots instead of the election commission.

Mafnas

Rivera

Rivera attorney Michael Berman said he would have preferred to avoid a recount, but said Lamorena was being careful.

"I think it's a fair-minded result," Berman said of Lamorena's decision.

Lamorena did not grant Mafnas' request that all votes for him be credited, even if they were written in the Democratic or Independent columns.

The court will count only the votes that were cast in the Republican column, Lamorena ruled.

The court also will re-examine all ballots that had been rejected or invalidated by the Election Commission to determine whether they are valid or not, Lamorena ruled.

Lamorena ordered that the ballots for the Tamuning precincts be delivered to his courtroom by 10 a.m. today so the results of the vice-mayoral race can be re-examined by the clerk of the court and five deputy clerks. Representatives for Mafnas, Rivera and the Election Commission can witness the process, he said.

The process the court will use to recount the ballots will be explained at 11 a.m. in his courtroom, Lamorena said.

## WHAT'S NEXT

▲ The Guam Election Commission is scheduled to deliver Tamuning primary election ballots to the Superior Court of Guam by 10 a.m. today so the results of the Tamuning vice-mayoral race can be counted a third time.

# Marianas Variety
The Local & Regional Newspaper

Vol. 01 No. 08 | Tuesday • October 12, 2004 | www.mvariety.com | Serving the Marianas for 32 Years | 50¢

©2004 Marianas Variety

# Guam judiciary bill passes Congress

By Gerardo R. Partido
*Variety News Staff*

GUAM moved closer to having a third branch of government yesterday with the U.S. Senate's passing of H.R. 2400, the Guam judicial reform bill.

This legislation, introduced by Rep. Madeleine Z. Bordallo (D-Guam) last year, amends the Organic Act of Guam to establish the judiciary as the third, co-equal and independent branch of the government of Guam.

The legislation also clarifies that the Supreme Court of Guam shall have appellate and administrative authority over all inferior courts in Guam, thereby effectively establishing a unified local judiciary.

Congress' passing of the bill is seen as a significant step forward for the independence and autonomy of the judicial branch of Guam.

In an interview, Speaker Vicente Pangelinan described the congressional action as very significant and historic.

"This creates a co-equal branch of government. This is important because having an independent judiciary is one of the pillars of a democratic form of government," he said.

The Speaker, who has been a long-time champion of the Guam Supreme Court, said judiciary reform is something that he has been working on ever since he got into the legislature.

"We were the ones who contested a Republican-passed bill in the legislature that stripped the authority of the Supreme Court. We won that case with Atty. Mike Phillips. That case upheld the Judicial Council and the Supreme Court's authority over all the courts of Guam. But this would still have been subject to change in local law. Now that HR 2400 is passed, there is no longer any danger of changing the structure of the courts through local law," the Speaker said.

**Significant landmark**

Bordallo, in a press statement from Washington, described the passage of the Guam judicial reform bill as a significant landmark in the development of self-governance on Guam.

"Once President Bush signs this legislation into law, Guam will have a truly co-equal and independent third branch of government," Bordallo said.

Continued on page 2

**WORLD UPSIDE DOWN.** *Enjoying their weekend away from school, girls hang from a monkey bar in Ypao Beach Park Sunday.*
Photo By Mar-Vic Cagurangan

## FAA approves Palau Micronesia flights to Guam

By Gemma Q. Casas
*Variety News Staff*

THE U.S. Federal Aviation Administration has approved Palau Micronesia Air's application to serve the Guam-Palau route on a regular basis, making it the first locally-owned airline in the Pacific Region to be granted such privilege.

PMA founder and president Alan Seid said the test inaugural flight between Palau and Guam was made on Sept. 21 and the airline is now serving the route regularly.

Seid admitted the airline's passenger load at this time is still low.

But he remains optimistic the trend will change once PMA has signed "interline" agreements with international airlines that bring tourists from Japan and Korea to Guam.

"We're very happy to have been able to inaugurate our flights to Guam.... It's a very significant milestone that we have been able to achieve—obtaining the rights from the U.S. Department of Transportation, the approval of the Transportation Security Administration, the U.S. immigration and the FAA (Fed-

Continued on page 2

**Inside:**

LOCAL
Brown tree snake bill passes US Senate p. 4

CNMI
Bill to authorize telecoms to increase prices p. 6

WORLD
Iran, Russia nearing nuclear [illegible] p. 17

# GEC racing against time on Prop A

By Trina A San Agustin
*Variety News Staff*

WITH barely three weeks before the Nov. 2 elections, the Guam Election Commission is racing against time.

Attorney General Doug Moylan said Prop A might eventually have to be voted on in a special election.

The voting public heads to the polls in three weeks to cast their votes on the controversial Proposal A initiative, the results will be ineffective if voters decide to allow casino gaming on island.

"If the government fails to provide adequate notice to the voters of the way the initiative is supposed to look then the election cannot go forward on Nov. 2," said Attorney General Doug Moylan. "The window closed on Oct. 3 and anything that Guam Election Commission does right now wouldn't cure the problem. So they are going to have to do another election basically."

Yesterday officials of the AGO and the GEC met one on one to discuss legal technicalities on GEC's Voters Information Pamphlet for Proposal A.

Moylan said the GEC representatives will bring the information and options back to the commission on Oct. 21. "However, we stand by our position that they have defective notices that were sent out and can't be fixed before the Nov. 2 election," he added.

Moylan however, ruled out court action to correct the situation. "We are going to permit them to go forward but because the $500,000 required by the government we are

Continued on page 2

# CFED brings casino gaming expert to Guam



*Fredric Gushin, founder of the Spectrum Gaming Group, said that gaming will spawn ancillary industries that support casino operations.*
Photo by Gerardo R. Partido

By Gerardo R. Partido
*Variety News Staff*

RENOWNED gaming expert and attorney-at-law Fredric Gushin will be on island until Friday this week for consultation with interested parties on Proposal A.

Gushin is the principal of Spectrum Gaming Group, an international gaming consultancy which provides advice and counsel to both the casino industry and governmental regulatory agencies.

According to the pro-casino group Citizens For Economic Diversity, Gushin has independently reviewed Proposal A in its entirety and wrote the summary of the act which is freely available from the CFED office or from its website www.guamgaming.com <http://www.guam-gaming.com/>

CFED said Gushin's famil-

iarity with the gaming act, along with his expert knowledge of the industry as a whole, puts him in a position to answer any questions regarding Proposal A.

CFED added that Gushin is available for questions on how Guam's proposed gaming commissioners will be chosen or about the provisions of the Guam Casino Revenue Trust Fend, both of which are included in Proposal A.

Gushin has already been to Guam before and during his first visit, he indicated that the proposed gaming initiative is sound and will provide a viable means of developing the gaming industry on Guam.

He pointed out that every gaming jurisdiction is different and it would not be wise to blindly copy what Nevada or what Atlantic City has done. Gushin also said that Guam

can learn from the principles of gaming operating in those areas but has to develop its own gaming policies tailored to the local markets and the local situation.

He added that proper and effective regulation will be the catalyst by which investors will decide on whether to put money in a Guam gaming industry.

"The Gaming Control Commission mandated by the initiative must be transparent in issuing licenses and have controls in place against money laundering. The bottomline is that gaming and regulation go hand in hand. Effective regulation has always been and will continue to be the catalyst for gaming development," the consultant stressed in an earlier press conference held at the Palace hotel.

## GEC...

Continued from page 1

looking at our position. This election will be ineffective in the purpose of passing Proposal A because of the defect in the notice requirement," Moylan told Variety.

The chief executive legal officer said the election commission's position on this is that they know there is a flaw in it (informative pamphlets).

"Their excuse is that they didn't have enough money to do it. Our position is money is irrelevant for purposes of the due process notice required," he added.

Moylan confirms that the initiative is on the non-partisan ballot, but the only question that remains is whether or not it will be effective for purposes of passing Proposal A.

Moylan said the Citizens For Economic Diversity has validly provided the right information and details to have this question put before the voters.

"The voters have the right to have this question heard. How-

ever, because of the election commission's failure to follow the notice requirement, it will be ineffective for purposes of validly passing that initiative into law," he said.

The GEC and the AGO are exploring available options to address the situation.

One option is the holding of a special election on the casino proposal. However, this option requires a long process. Gov. Felix P. Camacho must first call for a special election and from there, the legislature will appropriate funds for that exercise.

Among the defects discovered by the AGO were listed, there is no Guam Casino Gaming Control Commission in the pamphlet while Guam law requires the ballot pamphlets "shall contain a complete copy of any measure to be submitted by voters ... by initiative or referendum petition."

The analysis in the pamphlet that was sent does not bear the acknowledgement of the GEC legal counsel, as required by law.

## FAA...

Continued from page 1

eral Aviation Administration) to fly to Guam," Seid told Variety in an interview.

"This is a milestone in Micronesia's aviation history. This is the first time that a locally founded airline has ever been able to achieve that. It means that we've been reviewed, looked upon and we meet the standards to become an international carrier," he added.

PMA currently uses for its flights a Boeing 737-300 plane it leased from the New Zealand-based Airwork.

Aside from Guam, the airline also regularly flies twice a week to Manila.

The Republic of Palau just celebrated its 10th founding anniversary. Many of its workers are from the Philippines, thus, the Palau-Manila direct fly is considered by many as a relief.

Seid said their main target market from Guam right now are Palauans going to Guam

and vice versa.

But he said they are working on interline agreements with some airlines to bring tourists to Palau.

"...we're also targeting interline agreements so we can bring Koreans and Japanese tourists to Guam from Japan Airlines and Korean Airlines then connect to Palau," the airline president said.

### Capitalization

Seid said PMA is currently operating on a $10 million initial capital.

The majority of it came from the governments of Palau, Yap and Pohnpei.

"We have a mixture of investors. We have Palau National Development Bank, $1 million. We have Palauan companies. We have Yap state government. We have Yap companies. We have Pohnpei state government. So those are the major shareholders," Seid said.

From the public, PMA managed to raise $6.5 million when it issued initial

public offerings in Palau.

"We have IPO under Palau law now so we're operating that now. How much have we raised (so far)? Probably around $6.5 million. It's a $100 per share," Seid said.

He said the airline will not sell the IPO in the CNMI or Guam because they have not registered that in the U.S.

"We haven't pursued that under the U.S. and so we're not raising money in the CNMI and Guam," he said.

There are also a few foreign investors who chipped in to the regional airline's capitalization need.

The airline also invited the CNMI government to join its business venture for $500,000.

But the local government refused the invitation citing concerns on the profitability of the project.

The cash-strapped government could hardly even raise money for its bills to various private and public vendors.

## Guam...

Continued from page 1

"The success realized today builds on the work of my predecessor, Congressman Robert Underwood, who began his effort in Congress. The united approach taken by Guam's leaders on this issue also helped to ensure final passage of H.R. 2400 in the House and Senate," she added.

For his part, Supreme Court director for planning and policy Dan Tydingco said the court is pleased that Bordallo was able to bring Guam's judiciary agenda to the attention of Congress.

He added that the congressional action will firmly establish the judiciary as an entrenched third branch of gov-

ernment with no more room for politics and manipulation of the court's operations.

H.R. 2400 was first reported by the House resources committee on July 14, and later passed the House of Representatives on Sept. 13, before it was sent to the Senate for consideration.

The Senate energy and natural resources committee's subcommittee on public lands and forests, which has jurisdiction over the territories, held a hearing on H.R. 2400 on Sept. 29, 2004.

At that hearing, Bordallo appeared before the subcommittee with Lt. Gov. Kaleo S. Moylan to urge passage, and enter into the record, statements in support of the legislation from leaders in Guam.

Bush approval seen

The congressional action is expected to be approved by President Bush because Scott Cameron, deputy assistant secretary for performance and management at the U.S. Department of the Interior, also testified at the hearing that the Bush administration does not object the legislation.

According to Bordallo, moving the Guam judicial reform bill through the legislative process in Congress was made possible by the broad support it received from all sectors of the Guam community.

Favorable consideration in the Senate was aided by a letter of support from Gov. Felix P. Camacho as well as by several meetings Bordallo, Moylan and Chief Justice F. Philip

Carbullido held with key Senate staff.

Moreover, the enactment of local law, authored by Sen. F. Randall Cunliffe, chairman of the Guam Legislature's committee on judiciary, helped clarify the island's judicial structure and highlighted the need for passage of the legislation in the U.S. Congress.

Pangelinan and other Guam legislators also expressed their support for H.R. 2400 through a legislative resolution presented to Congress. The Judicial Council of Guam and the Guam Bar Association also sent a resolution to Congress urging passage of the bill.

The language of H.R. 2400 is based on previous legislation introduced by former Rep. Robert Underwood in the 105th,

106th, and 107th Congresses.

Bordallo commended the leadership of chairman Rep. Richard W. Pombo (R-California) and ranking member Rep. Nick J. Rahall, II (D-West Virginia) of the House resources committee for moving the legislation through the House.

She also noted the "instrumental" work of Rep. Jeff Flake (R-Arizona), the leading Republican co-sponsor and the help of Sens. Pete Domenici (R-New Mexico), Jeff Bingaman (D-New Mexico), Larry E. Craig (R-Idaho), and Ron Wyden (D-Oregon), for expediting the bill in the Senate.

H.R. 2400 will now be sent to the White House for action by the President, who is expected to sign the bill into law in the coming weeks.

guampdn.com Pacific Daily News, Wednesday, October 13, 2004


Member



What should the Guam Election Commission do with the casino question Proposal A?

Hold a special election after Nov. 2 **17.4%**



**Total votes: 201**

## Local news

### PUC to decide on 10% water rate hike

The Public Utilities Commission will decide on the Guam Waterworks Authority's proposed water rate increase at its meeting at 6 p.m. tomorrow on the second floor of the GCIC building. The proposed increase of 10 percent is part of gradual increases over the next three years to pay for an anticipated bond debt. Proceeds of the bond will be used to pay for federally required improvements to the island's water and wastewater systems. Paul Kemp, the agency's compliance officer, said the increase also will strengthen GWA's position on the bond market and will allow the agency to save money in the upcoming years for when it will eventually have to begin repaying about $11.5 million annually.

### Nursing education week ongoing



# LO

# Hard

**By Oyaol Ngirairikl**
*Pacific Daily News*
ongirairikl@guampdn.com

In the past several months, Mark Peredo felt compelled to walk instead of ride mass transit buses.

Mark and Meriam Peredo are just two of thousands of people on Guam who have disabilities and are protected by federal laws against discrimination.

The Americans with Disabilities Act was enacted to protect the rights of people with disabilities.

"Historically, society has tended to isolate and segregate individuals with disabilities; and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem, ... in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services," the law states.

But Mark Peredo said, many times, the grumbles and the discriminating remarks about his wife's disability and the accommodations required to assist her come from people who also ride the public bus with them.

Peredo said living with his and his wife's disability is difficult enough without the added stress of "disrespectful comments" by other residents.

Peredo said his wife Meriam, 42, contracted polio when she was a child and

Ric A. Eu

**Disabl**
bus ope
left, rem
helps hi

hadn't re
ment for
ing into a
able to w
ity was li

In the
Meriam
walk has
she can't
feet from
the bathr
ing on to
support.

Union: Edu

# Pro-casino group weighs its options on Prop A poll

By Gerardo R. Partido
*Variety News Staff*

EXPRESSING disappointment with the recent developments in the Proposal A vote, the pro-casino group Citizens For Economic Diversity yesterday said it is carefully weighing its options before deciding on a course of action.

The possibility that the casino initiative may not be resolved to everyone's satisfaction surfaced after the Attorney General's Office issued a warning that defects in the voter information pamphlets distributed by the Guam Election Commission may make the vote on the casino initiative this November subject to challenge.

Jay Merrill, a consultant

with CFED, said his organization is very disappointed with the developments in the casino initiative.

"We're now in a no-win situation because if the election is postponed, people may blame us. We're damned if we do, damned if we don't," Merrill said in an interview.

"The AG has made it very clear that even if we were to win in the general election, the result could be questioned. And even if we had a special election, the AG's action now puts a cloud over the whole thing," he added.

AG Douglas Moylan on Monday said Prop A might eventually have to be voted upon in a special election because of the mistakes com-

mitted by GEC.

"We stand by our position that they (GEC) have defective notices that were sent out and can't be fixed before the Nov. 2 election," Moylan said.

While the AG won't stop the casino initiative from being decided in the Nov. 2 polls, Moylan said GEC's failure to follow the election notice requirement properly will render ineffective any decision made on Proposal A during the general election.

"We haven't decided entirely what to do next. We're exploring different options now and what can be done. But our objective is clear. And that is to provide as free and as unfettered an election as possible for the people of Guam to decide," Merrill said.

A special election for Proposal A would require action from the governor and an additional appropriation from the legislature.

While not saying whether CFED is in favor of a special election, Merrill said that as of now, any result on the Prop A vote this November "will not be representative of anything."

"Some of our supporters may be discouraged and not vote anymore during the general election, thinking that their votes won't do any good anyway. Even the undecided may decide to vote against Prop A, not necessarily because they're against casino gaming, but because they may perceive the whole process to be flawed due to GEC's mis-


*Jay Merrill*

takes," Merrill lamented.

"So there's just no way we can get a fair shake out of this whole thing," he added.

# Babauta signs law enforcing child support payments

By Ulysses Torres Sabuco
*Variety News Staff*

SAIPAN — Governor Juan N. Babauta signed into law a measure that addresses the "blatant abuse and disregard" of all Commonwealth court child support orders.

Advocates hailed it as a landmark action citing how enforcement difficulties in child support orders in the CNMI have been eased.

In signing House Bill 14-122 yesterday as Public Law 14-34, the Governor authorized the withholding of in-

come to enforce support orders, and "all missed support payments" become automatic judgments for withholding income.

The new law also provides for mandatory medical support for a child.

"(The new law) provides a practicable and comprehensive scheme to improve the enforcement of support orders issued by (Commonwealth) courts as well as support orders issued in the United States, its territories and possessions,"

Babauta told presiding officers in his transmittal letter yesterday.

"This is a more effective way of enforcing child support orders," Babauta separately said before signing the bill into law.

Specifically, the law ensures that individuals required by a court order to "pay support," including child support, medical support or maintenance of a spouse" must make payments in a timely manner. This is through "direct payments" or an "income withholding order" issued by the court.

The new law also created the CNMI Support Disbursement Unit within the Treasury. The unit ensures funds received from enforcement of an income-withholding order are deposited in a "special and separate" account.

It will be disbursed directly to the individual or family to whom support is owed.

Lucy Blanco Maratita, a child support advocate, helped draft the bill along with Angela Bennett.

It was introduced by Reps. Benjamin Seman (R-Saipan)

and Norman Palacios (Covenant-Tinian).

"This is a bold step. We have been talking about this for many years and this will end (difficulties) of children and custodial parents," Maratita said yesterday.

She says many court orders for child support are currently "blatantly disregarded." There are an estimated 900 child support court orders.

"This makes child support payments more consistent and on time. This is a big step," she added.

# GVB markets Guam as a diving paradise

By Gerardo R. Partido
*Variety News Staff*

THE Guam Visitors Bureau has sent a delegation to the Diving Equipment and Marketing Association 2004 Show in Houston, Texas from Oct. 13-16.

The show is a "trade-only"

special interest fair for professionals in the diving industry. This will be the eighth year that GVB is sending a delegation to market Guam as a diving destination.

The two-person marketing team consists of GVB marketing manager Pilar Laguana and

GVB senior marketing officer Gina Kono.

The GVB team will conduct a "Dive Guam in Magnificent Micronesia" seminar on Oct. 14 featuring Jim Pinson as guest speaker. Pinson will present Guam as having one of the world's rarest diving sites where

relics from two separate world wars are found one atop the other underwater.

The shipwrecks SMS Cormoran and Tokai Maru have already been shown in the Discovery Channel TV program series "Deep Sea Detectives" with Pinson as a co-host of the episode.

Exhibitors and buyers at the Dema Show are wholesale manufacturers of dive equipment, retailers, dive shop owners and travel industry professionals.

GVB will promote Guam as having one of the richest ocean regions in the world, with clear, warm, blue water, more than 800 species of tropical fish, nearly 400 corals, countless invertebrates, shipwrecks, and reefs, making it one of the finest and most diverse dive destinations in the world.

GVB will also promote Guam's full range of accommodations for any budget, with dive shops that are well-stocked and offer every level of instructor training.

ing. Reef appreciation courses can also be found at many major dive shops with beach and boat dives taking place daily.

Guam's Blue Hole is one of the region's special novelty dives as divers drift through a huge shaft in the inner wall and emerge over 100 feet down along a wall in the clear open sea.

Guam has over 90 dive sites that are visited regularly by its active dive community. Dive packages for Guam can be found through many local dive shops and tour operators. GVB is encouraging people visiting other Micronesian dive destinations to stop off in Guam for some unique diving experiences.

Guam also has daily "spinner" dolphin tours, snorkeling tours, an undersea observatory, and a huge walk-through aquarium as well as many water and ocean-related activities.

People visiting GVB's Dive Guam Web site can get a free Dive Guam Brochure, a Dive

Case 1:03-cv-00048    Document 1-1    Filed 10/06/2005    Page 6 of 10

# Pacific Daily News

©2004 Guam Publications, Inc.

A Gannett Newspaper

VOL. 35 NO. 257 HAGÅTÑA, GUAM, OCTOBER 14, 2004

**HAFA ADAI, IT'S THURSDAY**

guampdn.com

75¢ on Guam

**Guam PDN.com**
Pacific Daily News

Don't forget to...

religious beliefs influence your vote on Election Day?

Read more on Page 2.

**Pacific Daily News ON THE AIR**

Get the latest news brought to you by the Pacific Daily News on

**KStereo FM 95.5**

Listen to live news Monday through Friday at:
▲ 7:30, 8:30 and 9:30 a.m.
▲ 11:30 a.m. and 12:30 p.m.
▲ 4:30 and 5:30 p.m.

on **Joy 92, 91.9 FM**

Listen to live news Monday through Friday at:
▲ 6:30, 7:30 and 8:30 a.m.
▲ 4:30 and 5:30 p.m.

**Synergize**

Synergy Studio works body and mind with Tae Bo, pilates, power yoga and dance classes.

# Sides spar on Prop A



**Ballot:** University of Guam student Gemma Doculan, 18, of Yigo casts her mock ballot on Proposal A after a forum at the University of Guam yesterday. Of the 75 who voted, 54 said no to Proposal A and 21 said yes, according to the university.

Masako Watanabe/Pacific Daily News /mwatanabe@guampdn.com

## UOG gaming forum ends with mock vote

**By Steve Limtiaco**
*Pacific Daily News*
slimtiaco@guampdn.com

People with fundamental moral or religious objections to gambling should vote against Proposal A, gaming consultant Frederic Gushin told University of Guam students yesterday afternoon.

But legalizing casinos in Guam hotels will create jobs and provide long-term economic benefit for the island and the region, he said.

"Casinos have been and will be, here, an economic catalyst for capital — getting money to improve the hotels, expand the hotels, expand the base of tourism, clearly create jobs. Forty-eight states out of 50 can't be wrong," he said.

Gushin was part of a three-person pro-casino panel that participated in a casino gaming forum, sponsored by the student life office, early yesterday afternoon at the University of Guam student center. Also on that panel were Citizens for Economic

▲ See **Prop A:** Page 4

**KATIE'S POINT**
▲ Casino proponents and opponents of casino gambling raised arguments for their respective positions at a forum at the University of Guam, where a majority of students who voted in a mock election said no to Proposal A.

## Clinic crowding shifts cost to ER

**By Katie Worth**
*Pacific Daily News*

tried to go to Public Health clinics, but have been turned

creative ways to get prompt care.

# Tropical Storm Tokage passes

**By Katie Worth**
*Pacific Daily News*
kworth@guampdn.com

The island spent much of the day yesterday under a flash-flood warning because of heavy rains associated with Tropical Storm Tokage, which passed about 30 miles north of Ritidian Point early yesterday morning.

Though the storm didn't cause much hardship as it passed, meteorologists are warning residents to keep an eye on the weather because there's an ugly mass of clouds on the horizon, and it appears to be waxing storm-like.

Tokage, which means lizard in Japanese, passed through the Rota channel around 5 a.m. yesterday, causing a tropical storm warning for Rota, Tinian and Saipan, but not for Guam. As of 7 last night, Tokage was about 230 miles west northwest of Guam and moving

▲ See **Storm.** Page 4

**REGION POINT**
▲ Tropical Storm Tokage passed the Mariana Islands yesterday without causing much problem, but another formation may develop into a storm and may be heading our way.

## Delicious decadence

Get your sweet tooth ready for the seventh annual Pastries in Paradise this Saturday. In today's Mas Pika, we provide some helpful tips on how to prepare for this decadent event.

# Prop A: Economic benefits vs. social impact



Election 2004

▲ Continued from Page 1

### Special election

### Tinian comparison

# Hospital: Reform law complicates care

▲ Continued from Page 1

## BY THE NUMBERS

# Storm: Another one likely

▲ Continued from Page 1

Gaynor Dumat-ol Daleno,
Gene Park, 477-9711, ext. 412
News tip hot lines: Call 475-NEWS
e-mail: news@guampdn.com

# ●LOCAL



GuamPDN.com
Pacific Daily News
GUAM'S complete SOURCE

**Will your personal religious beliefs influence your vote on Prop A?**

| No | 69.2% |
|---|---|

as of 8 p.m. Oct. 14

guampdn.com

## Local news

### Search continues for missing fisherman

Guam Fire Department rescue officials and the Navy helicopter squadron last night were searching for a man off the waters of Ipan, Talofofo. Around 6:09 p.m., the Guam Fire Department received a report of a missing person in the waters behind Jeff's Pirates Cove, said GFD spokeswoman Firefighter Phyllis Blas. Blas said four fishermen went out, but only three returned. "Of the three, nobody was hurt or injured," Blas said last night. "But one is not accounted for. They are searching for him now." Five department rescue units, including 1, 2 and 3 and Medic 7, responded to the scene. Two Navy HC-5 helicopters were also called to assist with the search. The island's waters have claimed 16 lives this year. Last year, six people drowned in the island's waters.

### AG: Child support checks on the way

The attorney general's Child Support Enforcement Division announced that all incoming child support payments are being processed daily, and all child support checks are in the process of being mailed to custodial parents. Attorney General Douglas Moylan recently contracted Covansys Corp., which provides support services to child support offices, and slight delays have occurred due to transition issues. If you do not receive your checks on time, call Briget Rodriguez or Diane Blas at 475-3360.

### FSM election delayed until Wednesday

The Consulate General of the Federated States of Micronesia has announced that the FSM special election for Chuuk State has been postponed until Wednesday, from 7 a.m. to 8 p.m. at Ypao Beach Park's main pavilion in Tumon. Call 646-9154/5/6.

*Pacific Daily News*

### Clearing the record

We care about accuracy. If you would like to clear the record, call the Pacific Daily News at 477-9711, ext. 111.

# GEC warned on pamphlet

**By Steve Limtiaco**
*Pacific Daily News*
slimtiaco@guampdn.com

The Guam Election Commission was told by its attorney several months ago that mailing incomplete informational pamphlets for the casino initiative might be a problem, but the commission mailed single-page pamphlets to voters despite that concern.

The decision to omit the 80-page text of the casino initiative from the pamphlets means the law was not followed, so the results of the Nov. 2 vote on Proposal A will not be enforceable, Attorney General Douglas Moylan said this week.

One possible solution is to delay the vote and hold a special election for the casino initiative, which is something that can be ordered by the governor or by lawmakers.

Jay Merrill, a consultant for the group that introduced Prop A, this week said a special election is required unless there are government assurances that the Nov. 2 election for the casino initiative will count.

Merrill yesterday said it is unclear where that assurance would come from, although the Election Commission would be a good source.

"It would make sense to have the government come up with a solution to their own problem, and we're doing everything we can to let them know that we'll be willing to work with the government, as long as they can give us some assurance that the election is going to be determined



**Moylan**

fair," he said. "It's a completely confused situation. We're not the ones that did anything to begin with. We are the aggrieved party, but so is (Communities Opposing Prop A). People have to have an opportunity to vote, where their vote actually means something."

## Special election unlikely

Speaker Ben Pangelinan, D-Barrigada, yesterday said he opposes a special election.

Gov. Felix Camacho will not interfere in the electoral process, his spokeswoman, Erica Perez, said, and he supports holding the election on Nov. 2 as planned.

"For the proponents of Prop A to ask for a special election is tantamount to giving them a second chance," Pangelinan said. "The matter of whether or not it being on the ballot is valid is not for the attorney general to decide, it's for the courts to decide. Until such time that that is decided, I feel the casino initiative will be valid."

Pangelinan, who is up for re-election, speculated that casino supporters doubt whether the casino initiative can make it through a General Election.

"They're probably feeling that it's not to their advantage (to go through a General Election)," because of the Santos Amendment.

The Santos Amendment makes it more difficult for initiatives to pass



Election 2004

during a General Election because it counts blank ballots and invalid ballots as votes against the initiative.

Merrill said the casino initiative has not even had a first chance, let alone a second. He said the Santos Amendment will not be a factor in the General Election because he believes the casino issue is important enough for voters to fill out their ballots.

The Election Commission's board is scheduled to meet next Wednesday at 4 p.m., but it cannot call a special election, commission legal counsel Cesar Cabot said yesterday. Guam law states that only the governor or lawmakers can call a special election, he said.

"There's already a mandate that we carry out the initiative election," he said.



**Camacho**



**Pangelinan**

The attorney general has "very strong opinions on the matter, and that's his prerogative, but it's not the court of law," Cabot said. "We have no choice, we have to press on unless a court of law instructs us otherwise."

Cabot several months ago tried to address the pamphlet issue.

Cabot on July 29 sent a letter to commission Executive Director Gerald Taitano, regarding the informational pamphlets for the casino initiative.

"I am concerned because if we are to follow the letter of the law, 17509(a) requires a 'complete copy' of the text of the measure to be mailed to all registered voters," Cabot's letter states. "As you know, the gaming initiative is rather volu-

▶ BIG POINT

▲ Election officials were aware of the potential problem for the Proposal A vote months ago, and scheduling a new election for the casino initiative appears unlikely, according to the legislative speaker and the governor's office.

minous and over 60 pages long. I am concerned that the amount of funding that the GEC is presently requesting from the Legislature may not be sufficient to follow the strict requirement of the law."

Cabot's letter states that it may be appropriate to let lawmakers know about the strict requirements of the initiative law and perhaps urge them to change the law to avoid a mass-mailing.

There is no record of the commission staff responding to that concern. Taitano is off-island, in Nebraska, to oversee the programming of the vote-counting machines for the General Election.

Any request to change the election law would have been channeled through Vice Speaker Frank Aguon Jr.'s committee on government operations, but Aguon yesterday said the Election Commission did not request any changes to the initiative process.

When asked whether the Election Commission asked lawmakers to change the initiative process, Cabot said it did not pursue any changes for the upcoming election, but has raised the issue with lawmakers in the past.

"We have had discussions with prior legislatures and they have not resolved it in any direct action," Cabot said. He said technology officers more efficient ways of getting the information to voters, as opposed to using traditional mail.



## Secretary of the Navy visits Guam

**Arrival:** Secretary of the Navy Gordon R. England, right, is welcomed to Guam by Rear Adm. Arthur Johnson, commander, U.S. Naval Forces Marianas, left; and Gov. Felix Camacho, center, after arriving at Andersen Air Force Base yesterday. England is meeting with commanding officers and sailors of Navy commands on island. England also has been invited to attend the U.S. Navy's 229th Birthday Ball and the commissioning of the U.S. Coast Guard Cutter Sequoia today.

Photo courtesy of U.S. Naval Forces Marianas Public Affairs

Pacific Daily News, Friday, October 15, 2004

Member

Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Drive
Tamuning, Guam 96913
Telephone: (671) 646-1222
Facsimile: (671) 646-1223

FILED
SUPERIOR COURT
OF GUAM

2004 OCT 25 PM 4: 02

CLERK OF COURT

BY:_ _ _ _ _ _

Attorneys for Plaintiffs Jay Merrill on his own behalf and on behalf of all
other similarly situated voters desirous of casting a vote in favor of Proposal A
at a fair and legal election



RECEIVED
OCT 2 6 2004
10:38 am
ATTORNEY GENERAL'S OFFICE

## IN THE SUPERIOR COURT

## OF GUAM

| | |
|---|---|
| JAY MERRILL, on his own behalf and on behalf of all other similarly situated voters desirous of casting a vote in favor of Proposal A at a fair and legal election,<br><br>      Plaintiffs,<br><br>    vs.<br><br>THE GUAM ELECTION COMMISSION; GERALD A. TAITANO, in his individual capacity and in his capacity as the Executive Director of THE GUAM ELECTION COMMISSION, I MINA' BENTE SIETE NA LIHESLATURAN GUAHAN (The 27th Guam Legislature); FELIX P. CAMACHO, in his official capacity as the GOVERNOR OF GUAM.<br><br>      Defendants. | CIVIL CASE NO. CV 1111-04<br><br>*EX-PARTE* NOTICE OF MOTION AND MOTION AND MEMORANDUM IN SUPPORT OF PRE-ELECTION (1) INJUNCTIVE RELIEF AND (2) DECLARATORY RELIEF |

## EX PARTE NOTICE OF MOTION AND MOTION FOR PRE-ELECTION DECLARATORY AND INJUNCTIVE RELIEF

Please take notice that on the 28th day of October, 2004, at the hour of 2:00 p.m., before the

Honorable Katherine A. Maraman, Judge of the Superior Court of Guam, Plaintiffs will move this

court, and by this notice of motion do herby move *ex parte*, for pre-election (1) injunctive relief and

(2) declaratory relief.

Plaintiffs' motion for a special election does not legally need to be heard on its merits before the November 2, 2004 election. But, the event the court grants Plaintiffs' motion for pre-election declaratory and injunctive relief, the interests of the parties and the interests of the public require that the hearing on the motion for a special election be heard as expeditiously as possible. Therefore, at the hearing on Plaintiffs' motion for declaratory and injunctive relief, Plaintiffs will also request, and hereby do request, that the court set a reasonably expedited hearing date on the motion for a special election and a reasonably expedited briefing schedule.

This ex parte motion is based on the October 25, 2004 complaint on file on this case, the supporting memorandum immediately following, and the October 18, 2004 complaint and supporting memorandum and all other documents on file CV1103-04, all of which are incorporated herein and made a part hereof by this reference.

DOOLEY ROBERTS & FOWLER LLP

Dated: <u>October 25, 2004</u>

By: _____

**THOMAS L. ROBERTS**
Attorneys for Plaintiffs Jay Merrill
on his own behalf and on behalf of all
other similarly situated voters desirous
of casting a vote in favor of Proposal A
at a fair and legal election

## MEMORANDUM IN SUPPORT OF EX PARTE MOTION FOR PRE-ELECTION DECLARATORY RELIEF AND PRELIMINARY AND PERMANENT INJUNCTION

A.  <u>Pre-Election Declaratory Relief</u>.  Plaintiffs move for an immediate, pre-election declaratory judgment on (a) the legal efficacy of the Proposal A ballot pamphlets mailed to the voters by the Directors and the Guam Election Commission, and (b) whether the results of any vote on Proposal A on November 2, 2004 will be invalid as a result of (i) the ballot pamphlets mailed to the voters, and/or (ii) the mass public uncertainty caused by the Attorney General's opinion.  Under Rule 57 of the Guam Rules of Civil Procedure, the existence of alternative or cumulative or narrower remedies "does not preclude a judgment for declaratory relief in cases where it is appropriate."  Additionally, "(t)he court may order a speedy hearing of an action for a declaratory judgment and may advance it on the calendar", and Plaintiffs so request.

The undisputed facts and law supporting Plaintiffs' request for a pre-election declaratory judgment are set forth in the October 18, 2004 complaint and supporting memorandum, which are incorporated herein and made a part hereof by this reference.

The applicable facts are set forth in the complaint.  These facts are not disputable.  No one can dispute, and no one has even attempted to dispute, that the Guam Election Commission and its Director did not follow the relevant statutes and regulations in putting Proposal A on the ballot for the November 2, 2004 election.  Specifically, the actual text of Proposition A was not mailed to the voters, as required by Guam law.  The Director himself has freely and publicly admitted this undeniable fact, and he will freely and publicly admit this fact through his attorneys

at the hearing on this motion. The Attorney General's Office and the Attorney General himself have announced to the public that their votes for or against Proposal A on November 2, 2004 will be meaningless, as will the results of any such election. Voters cannot be expected to intelligently vote on a law the government has failed to provide to them. The Attorney General's Office has identified no less than four other statutes or rules that were also violated by the Director and the Election Commission, as explained in Exhibit 2 to the complaint in this case.

The applicable law is also set forth in the complaint as well as in this supporting memorandum. First, it is legally undisputed that legal challenges to elections known in advance to be procedurally flawed must be brought before the election. Post-election procedural challenges are barred.[1]

---

[1] Lewis v. Cayetano, 823 P.2d 738, 72 Haw. 499, 503-504 (1992) ("efficient use of public resources demand that we not allow persons to gamble on the outcome of the election contest then challenge it when dissatisfied with the results, especially when the same challenge could have been made before the public is put through the time and expense of the entire election process."); Soules v. Kauaians for Nukolii Campaign Committee, 849 F.2d 1176, 1180-1181 (9th Cir. 1988) ("the courts have been wary lest the granting of post-election relief encourage sandbagging on the part of wily plaintiffs ... if aggrieved parties, without adequate explanation, do not come forward before the election, they will be barred from the equitable relief of overturning the results of the election."); Fairness & Accountability in Ins. Reform v. Greene, 886 P.2d 1338, 180 Ariz. 582, 587 (1994) ("the procedures 'leading up to an election cannot be questioned' after the vote but 'must be challenged before the election is held.'"); Tilson v. Mofford, 737 P.2d 1367, 1369-1370, 153 Ariz. 468, 470-471 (1987) ("the courts do have the duty of ensuring that the constitutional and statutory provisions protecting the electoral process (i.e., the manner in which an election is held) are not violated ... the procedures leading up to an election cannot be questioned after the people have voted, but instead the procedures must be challenged before the election is held."); Kerby v. Griffin, 62 P.2d 1131, 48 Ariz. 434, 444-446 (1936) ("to hold a court of equity could not intervene to prevent an election being held, when every constitutional and statutory provision setting forth what must be done before holding a legal election had been violated, would result in an absurdity.") Bell v. Eagerton, 2002 Ala. LEXIS 116, 7-8 (Ala. 2002) ("The rights and interests of the electorate are better promoted by a decision in advance, advising the commissioners of their want of power, and restraining them from proceeding with a meaningless and useless election."); Miami Dolphins, Ltd. v. Metropolitan Dade County, 394 So. 2d 981, 986 (Fla. 1981) (courts must "preclude or forestall possible expenditure of substantial sums of public monies in the doing of what could be a vain and useless thing.").

Second, it is undisputed that because the Director and the Guam Election Commission failed to follow the law and their own regulations, the election is illegal and the results invalid, just as the Attorney General's Office has already opined. Wade v. Taitano, 2002 Guam 16. Two years ago, in Wade, the Guam Supreme Court expressly warned the Guam Election Commission and the Director that if they fail to follow the law and their own regulation, their actions are void.[2] It does not appear that they were listening.

On the motion for pre-election declaratory relief, there is really nothing to dispute. The law is clear. The facts are clear. The required relief is clear. The court's duty is clear.

B.    Pre-Election Preliminary and Permanent Injunction. Plaintiffs also move for a preliminary and permanent injunction pursuant to Rule 65 of the Guam Rules of Civil Procedure. Rule 65 provides that "(b)efore or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application," and Plaintiffs so request.

For the reasons stated in the supporting memorandum filed in CV1103-04, which is incorporated herein and made a part hereof by this reference, and for the reasons stated below, the court should enter an order (1) enjoining the scheduled November 2, 2004 vote on Proposal

---

[2] "We begin our analysis by outlining two fundamental principles in statutory and regulatory constructions. The first principle is that "[a]n agency does not have the authority to ignore its own rules." ... Regulations have the same legal effect as statutes ... and, "[w]hen an agency has the authority to adopt rules and does so, it must follow them." ... Therefore, an agency's procedural rules "are binding upon the agency which enacts them as well as upon the public." ... "Regulations governing procedure are just as binding upon both the agency which enacts them and the public, and the agency does not, as a general rule, have the discretion to waive, suspend, or disregard, in a particular case, a validly adopted rule so long as such rule remains in force." Wade v. Taitano, 2002 Guam 16 at ¶¶ 7-8 (citations omitted).

A, (2) compelling the Director and the Election Commission to remove the Proposal A ballots from the polling places on November 2, 2004, and (3) enjoining the Director and the Election Commission from tabulating any mailed or other ballots on Proposal A.

The same cases cited above require the court to grant Plaintiffs' requested injunctive relief. When an election is procedurally flawed, the courts must step in before the election and stop it.[3]

As first suggested in the supporting memorandum in CV1103-04, and as has now been publicly stated by one of Proposal A's most vocal opponents, the November 2, 2004 election on Proposal A is now a mere "straw poll". But "straw polls" are not permitted on initiatives under Guam law. How is the court supposed to rule that the election is legally flawed, yet order that a "straw poll" be held on the initiative anyway? The answer to this question is pretty easy. It is an even easier answer when one considers that the electorate has not been given a copy of the actual law they are supposed to be voting on, the Guam Casino Gaming Control Commission Act, Proposal A. The Act is lengthy and it creates an entire autonomous agency of the Government of Guam. Under these circumstances, the vast majority of the electorate would not know what they were actually voting on. The "straw poll" would merely be a "yes" or "no" vote on the idea of

---

[3] Miami Dolphins, Ltd. v. Metropolitan Dade County, supra ("courts must preclude or forestall possible expenditure of substantial sums of public monies in the doing of what could be a vain and useless thing."); Bell v. Eagerton, *supra* (courts must enjoin election officials in advance, "restraining them from proceeding with a meaningless and useless election."); Lewis v. Cayetano, supra (courts must "prevent use of a ballot not in conformity with the law and to compel officials to prepare and distribute proper ballots.").

gambling itself. But the "idea of gambling" is obviously not what we are supposed to be voting on in the election.

The only legitimate or disputed issue in this case is whether the court should order a special election, which is discussed below.

For now, the court must grant the motion for an order shortening time and set a pre-election hearing on Plaintiffs' motion for a declaratory judgment and injunctive relief. At the hearing, the court must enter a pre-election declaratory judgment that the election on Proposal A is void. Then, the court must enter a pre-election preliminary and permanent injunction (1) enjoining the scheduled November 2, 2004 vote on Proposal A, (2) compelling the Director and the Election Commission to remove the Proposal A ballots from the polling places on November 2, 2004, and (3) enjoining the Director and the Election Commission from tabulating any mailed or other ballots on Proposal A.

DOOLEY ROBERTS & FOWLER LLP

Dated: October 25, 2004

By: _____

**THOMAS L. ROBERTS**
Attorneys for Plaintiffs Jay Merrill on his own
behalf and on behalf of all other similarly situated
voters desirous of casting a vote in favor of
Proposal A at a fair and legal election

Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Drive
Tamuning, Guam 96913
Telephone:     (671) 646-1222
Facsimile:      (671) 646-1223

Attorneys for Plaintiffs Jay Merrill on his own behalf and on behalf of all
other similarly situated voters desirous of casting a vote in favor of Proposal A
at a fair and legal election

## IN THE SUPERIOR COURT

## OF GUAM

| | |
|---|---|
| JAY MERRILL, on his own behalf and on behalf of all other similarly situated voters desirous of casting a vote in favor of Proposal A at a fair and legal election,<br><br>Plaintiffs,<br><br>vs.<br><br>THE GUAM ELECTION COMMISSION; GERALD A. TAITANO, in his individual capacity and in his capacity as the Executive Director of THE GUAM ELECTION COMMISSION, I MINA' BENTE SIETE NA LIHESLATURAN GUAHAN (The 27th Guam Legislature); FELIX P. CAMACHO, in his official capacity as the GOVERNOR OF GUAM.<br><br>Defendants. | CIVIL CASE NO. CV 1111-04<br><br>*EX PARTE* NOTICE OF MOTION AND MOTION AND MEMORANDUM IN SUPPORT OF PRE-ELECTION (1) INJUNCTIVE RELIEF AND (2) DECLARATORY RELIEF |

## EX PARTE NOTICE OF MOTION AND MOTION FOR PRE-ELECTION DECLARATORY AND INJUNCTIVE RELIEF

Please take notice that on the 28th day of October, 2004, at the hour of 2:00 p.m., before the

Honorable Katherine A. Maraman, Judge of the Superior Court of Guam, Plaintiffs will move this

court, and by this notice of motion do herby move *ex parte*, for pre-election (1) injunctive relief and

(2) declaratory relief.

Plaintiffs' motion for a special election does not legally need to be heard on its merits before the November 2, 2004 election. But, the event the court grants Plaintiffs' motion for pre-election declaratory and injunctive relief, the interests of the parties and the interests of the public require that the hearing on the motion for a special election be heard as expeditiously as possible. Therefore, at the hearing on Plaintiffs' motion for declaratory and injunctive relief, Plaintiffs will also request, and hereby do request, that the court set a reasonably expedited hearing date on the motion for a special election and a reasonably expedited briefing schedule.

This ex parte motion is based on the October 25, 2004 complaint on file on this case, the supporting memorandum immediately following, and the October 18, 2004 complaint and supporting memorandum and all other documents on file CV1103-04, all of which are incorporated herein and made a part hereof by this reference.

DOOLEY ROBERTS & FOWLER LLP

Dated: October 25, 2004          By: _____

**THOMAS L. ROBERTS**
Attorneys for Plaintiffs Jay Merrill
on his own behalf and on behalf of all
other similarly situated voters desirous
of casting a vote in favor of Proposal A
at a fair and legal election

## MEMORANDUM IN SUPPORT OF EX PARTE MOTION FOR
## PRE-ELECTION DECLARATORY RELIEF
## AND PRELIMINARY AND PERMANENT INJUNCTION

A. <u>Pre-Election Declaratory Relief</u>. Plaintiffs move for an immediate, pre-election declaratory judgment on (a) the legal efficacy of the Proposal A ballot pamphlets mailed to the voters by the Directors and the Guam Election Commission, and (b) whether the results of any vote on Proposal A on November 2, 2004 will be invalid as a result of (i) the ballot pamphlets mailed to the voters, and/or (ii) the mass public uncertainty caused by the Attorney General's opinion. Under Rule 57 of the Guam Rules of Civil Procedure, the existence of alternative or cumulative or narrower remedies "does not preclude a judgment for declaratory relief in cases where it is appropriate." Additionally, "(t)he court may order a speedy hearing of an action for a declaratory judgment and may advance it on the calendar", and Plaintiffs so request.

The undisputed facts and law supporting Plaintiffs' request for a pre-election declaratory judgment are set forth in the October 18, 2004 complaint and supporting memorandum, which are incorporated herein and made a part hereof by this reference.

The applicable facts are set forth in the complaint. These facts are not disputable. No one can dispute, and no one has even attempted to dispute, that the Guam Election Commission and its Director did not follow the relevant statutes and regulations in putting Proposal A on the ballot for the November 2, 2004 election. Specifically, the actual text of Proposition A was not mailed to the voters, as required by Guam law. The Director himself has freely and publicly admitted this undeniable fact, and he will freely and publicly admit this fact through his attorneys

at the hearing on this motion. The Attorney General's Office and the Attorney General himself

have announced to the public that their votes for or against Proposal A on November 2, 2004 will

be meaningless, as will the results of any such election. Voters cannot be expected to

intelligently vote on a law the government has failed to provide to them. The Attorney General's

Office has identified no less than four other statutes or rules that were also violated by the

Director and the Election Commission, as explained in Exhibit 2 to the complaint in this case.

The applicable law is also set forth in the complaint as well as in this supporting

memorandum. First, it is legally undisputed that legal challenges to elections known in advance

to be procedurally flawed must be brought before the election. Post-election procedural

challenges are barred.[1]

---

[1] Lewis v. Cayetano, 823 P.2d 738, 72 Haw. 499, 503-504 (1992) ("efficient use of public resources demand that we not allow persons to gamble on the outcome of the election contest then challenge it when dissatisfied with the results, especially when the same challenge could have been made before the public is put through the time and expense of the entire election process."); Soules v. Kauaians for Nukolii Campaign Committee, 849 F.2d 1176, 1180-1181 (9th Cir. 1988) ("the courts have been wary lest the granting of post-election relief encourage sandbagging on the part of wily plaintiffs ... if aggrieved parties, without adequate explanation, do not come forward before the election, they will be barred from the equitable relief of overturning the results of the election."); Fairness & Accountability in Ins. Reform v. Greene, 886 P.2d 1338, 180 Ariz. 582, 587 (1994) ("the procedures 'leading up to an election cannot be questioned' after the vote but 'must be challenged before the election is held.'"); Tilson v. Mofford, 737 P.2d 1367, 1369-1370, 153 Ariz. 468, 470-471 (1987) ("the courts do have the duty of ensuring that the constitutional and statutory provisions protecting the electoral process (i.e., the manner in which an election is held) are not violated ... the procedures leading up to an election cannot be questioned after the people have voted, but instead the procedures must be challenged before the election is held."); Kerby v. Griffin, 62 P.2d 1131, 48 Ariz. 434, 444-446 (1936) ("to hold a court of equity could not intervene to prevent an election being held, when every constitutional and statutory provision setting forth what must be done before holding a legal election had been violated, would result in an absurdity.") Bell v. Eagerton, 2002 Ala. LEXIS 116, 7-8 (Ala. 2002) ("The rights and interests of the electorate are better promoted by a decision in advance, advising the commissioners of their want of power, and restraining them from proceeding with a meaningless and useless election."); Miami Dolphins, Ltd. v. Metropolitan Dade County, 394 So. 2d 981, 986 (Fla. 1981) (courts must "preclude or forestall possible expenditure of substantial sums of public monies in the doing of what could be a vain and useless thing.").

Second, it is undisputed that because the Director and the Guam Election Commission failed to follow the law and their own regulations, the election is illegal and the results invalid, just as the Attorney General's Office has already opined. Wade v. Taitano, 2002 Guam 16. Two years ago, in Wade, the Guam Supreme Court expressly warned the Guam Election Commission and the Director that if they fail to follow the law and their own regulation, their actions are void.[2] It does not appear that they were listening.

On the motion for pre-election declaratory relief, there is really nothing to dispute. The law is clear. The facts are clear. The required relief is clear. The court's duty is clear.

    B.    Pre-Election Preliminary and Permanent Injunction.  Plaintiffs also move for a preliminary and permanent injunction pursuant to Rule 65 of the Guam Rules of Civil Procedure. Rule 65 provides that "(b)efore or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application," and Plaintiffs so request.

For the reasons stated in the supporting memorandum filed in CV1103-04, which is incorporated herein and made a part hereof by this reference, and for the reasons stated below, the court should enter an order (1) enjoining the scheduled November 2, 2004 vote on Proposal

---

[2] "We begin our analysis by outlining two fundamental principles in statutory and regulatory constructions. The first principle is that "[a]n agency does not have the authority to ignore its own rules." ... Regulations have the same legal effect as statutes ... and, "[w]hen an agency has the authority to adopt rules and does so, it must follow them." ... Therefore, an agency's procedural rules "are binding upon the agency which enacts them as well as upon the public." ... "Regulations governing procedure are just as binding upon both the agency which enacts them and the public, and the agency does not, as a general rule, have the discretion to waive, suspend, or disregard, in a particular case, a validly adopted rule so long as such rule remains in force." Wade v. Taitano, 2002 Guam 16 at ¶¶ 7-8 (citations omitted).

A, (2) compelling the Director and the Election Commission to remove the Proposal A ballots

from the polling places on November 2, 2004, and (3) enjoining the Director and the Election

Commission from tabulating any mailed or other ballots on Proposal A.

The same cases cited above require the court to grant Plaintiffs' requested injunctive

relief. When an election is procedurally flawed, the courts must step in before the election and

stop it.[3]

As first suggested in the supporting memorandum in CV1103-04, and as has now been

publicly stated by one of Proposal A's most vocal opponents, the November 2, 2004 election on

Proposal A is now a mere "straw poll". But "straw polls" are not permitted on initiatives under

Guam law. How is the court supposed to rule that the election is legally flawed, yet order that a

"straw poll" be held on the initiative anyway? The answer to this question is pretty easy. It is an

even easier answer when one considers that the electorate has not been given a copy of the actual

law they are supposed to be voting on, the Guam Casino Gaming Control Commission Act,

Proposal A. The Act is lengthy and it creates an entire autonomous agency of the Government of

Guam. Under these circumstances, the vast majority of the electorate would not know what they

were actually voting on. The "straw poll" would merely be a "yes" or "no" vote on the idea of

---

[3] Miami Dolphins, Ltd. v. Metropolitan Dade County, supra ("courts must preclude or forestall possible expenditure of substantial sums of public monies in the doing of what could be a vain and useless thing."); Bell v. Eagerton, *supra* (courts must enjoin election officials in advance, "restraining them from proceeding with a meaningless and useless election."); Lewis v. Cayetano, supra (courts must "prevent use of a ballot not in conformity with the law and to compel officials to prepare and distribute proper ballots.").

gambling itself. But the "idea of gambling" is obviously not what we are supposed to be voting on in the election.

The only legitimate or disputed issue in this case is whether the court should order a special election, which is discussed below.

For now, the court must grant the motion for an order shortening time and set a pre-election hearing on Plaintiffs' motion for a declaratory judgment and injunctive relief. At the hearing, the court must enter a pre-election declaratory judgment that the election on Proposal A is void. Then, the court must enter a pre-election preliminary and permanent injunction (1) enjoining the scheduled November 2, 2004 vote on Proposal A, (2) compelling the Director and the Election Commission to remove the Proposal A ballots from the polling places on November 2, 2004, and (3) enjoining the Director and the Election Commission from tabulating any mailed or other ballots on Proposal A.

DOOLEY ROBERTS & FOWLER LLP

Dated: October 25, 2004

By: _____

**THOMAS L. ROBERTS**
Attorneys for Plaintiffs Jay Merrill on his own
behalf and on behalf of all other similarly situated
voters desirous of casting a vote in favor of
Proposal A at a fair and legal election

Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Drive
Tamuning, Guam 96913
Telephone:     (671) 646-1222
Facsimile:      (671) 646-1223

FILED
SUPERIOR COURT
OF GUAM

2004 OCT 25 AM 11: 09

ALFREDO M. BORLAS
CLERK OF COURT
BY:

Attorneys for Plaintiffs Jay Merrill,
on his own behalf and on behalf of all other
similarly situated voters desirous of casting a
vote in favor of Proposal A at a fair and legal election

IN THE SUPERIOR COURT

OF GUAM

| | |
|---|---|
| JAY MERRILL, on his own behalf and on behalf of all other similarly situated voters desirous of casting a vote in favor of Proposal A at a fair and legal election, <br><br> Plaintiffs, <br><br> vs. <br><br> THE GUAM ELECTION COMMISSION; GERALD A. TAITANO, in his individual capacity and in his capacity as the Executive Director of THE GUAM ELECTION COMMISSION, I MINA' BENTE SIETE NA LIHESLATURAN GUAHAN (The 27th Guam Legislature); FELIX P. CAMACHO, in his official capacity as the GOVERNOR OF GUAM. <br><br> Defendants. | CIVIL CASE NO. CV 1111-04 <br><br><br><br><br><br> **COMPLAINT FOR** <br> **(1) DECLARATORY RELIEF** <br> **(2) INJUNCTIVE RELIEF, AND** <br> **(3) ORDER COMPELLING SPECIAL ELECTION ON PROPOSAL A;** <br> **CLASS ACTION** |

COMES NOW Plaintiff Jay Merrill, on his own behalf and on behalf of all other

similarly situated voters desirous of casting a vote in favor of Proposal A at a fair and legal

election (hereinafter "the Class Plaintiffs"), and for their complaint against the Guam Election

Commission, Gerald A. Taitano, in his individual capacity and in his capacity as the Executive

EXHIBIT 1

Director of the Guam Election Commission, I Mina' Bente Siete Na Liheslaturan Guahan (The

27th Guam Legislature) and Felix P. Camacho, in his official capacity as the Governor Of Guam,

and allege as follows.

## PARTIES

1.    Plaintiffs are registered voters on Guam.  Plaintiffs desire to cast a valid and

meaningful vote on the Guam Casino Gaming Control Commission Act, otherwise known and

referred to herein as "Proposal A".

2.    The Guam Election Commission ("Election Commission") is "an autonomous

instrumentality and an independent commission of the Government of Guam" pursuant to 3

G.C.A. § 2101(a).   Under 3 G.C.A. § 2106, the Election Commission has the capacity to sue and

be sued in its own name.

3.    Gerald A. Taitano is the Executive Director of the Election Commission (the

"Director") and a resident of the territory of Guam.

4.    I Mina' Bente Siete Na Liheslaturan Guahan is the Twenty Seventh Guam

Legislature (the "Legislature").

5.    Felix P. Camacho is the Governor of Guam (the "Governor").

## JURISDICTION

6.    This Court has jurisdiction over this matter pursuant to 7 G.C.A. §3105, 5 G.C.A.

§9303, 42 U.S.C. §1983, and Rule 23 of the Guam Rules of Civil Procedure.  Each of the three

counts contained in this complaint, for declaratory relief, for injunctive relief, and for an order compelling a special election, are brought under Guam law as well as the federal civil rights statute, 42 U.S.C. §1983. The court also has jurisdiction over this matter because lawsuits challenging election procedures known to be invalid prior to the election must legally be filed before the election.

## CLASS ACTION

7.     The Class Plaintiffs are so numerous that joinder of all members is impracticable, there are questions of law or fact common to the class, the claims of the representative parties are typical of the claims and defenses of the class, and the representative parties will fairly and adequately protect the interests of the class.

8.     The prosecution of separate actions by members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, and adjudications with respect to individual members of the class would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interest.

9.     The Defendants have acted and refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

10.     Questions of law or fact common to the members of the class predominate over any questions affecting only individual members.

11.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## FACTS

12.     Proposal A is on the ballot for the scheduled November 2, 2004 Guam general election. The Director and the Election Commission placed Proposal A on the ballot upon their determination that Proposal A met all legal requirements under Guam law for the placement of initiatives on the ballot.

13.     Plaintiffs are informed and believe that Election Commission's requested fiscal year 2004 budget to the 27th Guam Legislature was $850,000. Plaintiffs are informed and believe that in its request, the Election Commission informed the Legislature that $850,000 was sufficient to cover all operational costs for fiscal year 2004, and expressly stated that $850,000 was sufficient to ensure that Proposal A would be properly and legally placed on the ballot for the November 2, 2004 general election.

14.     On information and belief, the Legislature funded the Election Commission with a fiscal year 2004 budget of $450,000 rather than $850,000.

15.     On information and belief, shortly before the ballot pamphlet on Proposal A was to be mailed to the voters, the Director informed the Legislature and the Governor that the Election

Commission needed an additional $25,000 in funding to print and mail Proposal A ballot pamphlets to voters before the November 2, 2004 election.

16.     On information and belief, the Governor delivered the Director's requested additional $25,000 in funding.

17.     On information or belief, the Election Commission mailed Proposal A ballot pamphlets to the voters of Guam on or before October 1, 2004.

18.     Copies of the text of Proposal A itself were not included in the ballot pamphlets mailed to the voters by the Election Commission.

19.     By the Director's own public admission, he and the Election Commission, acting in their official capacities, intentionally, knowingly and willfully decided to not include the complete text of Proposal A in the ballot pamphlets they mailed to the voters thirty (30) days prior to the scheduled November 2, 2004 election on Proposal A.

20.     There are now less than thirty (30) days prior to the scheduled November 2, 2004 election.

21.     A true and correct copy of the complete text of Proposal A is attached hereto and made a part hereof as Exhibit 1.

22.     Plaintiffs have requested the Election Commission to pass upon the validity of the thirty (30) day mailing requirement of 3 G.A.R. §2114 discussed below. The Election Commission has effectively ruled that that 3 G.A.R. §2114 is valid, but has publicly stated that it did not and does

not have the funds to comply with it, and that the November 2, 2004 election on Proposal A will go
forward as scheduled unless and until a court rules otherwise.

23.    The Guam Attorney General's Office has written an opinion letter stating that the
Proposal A ballot pamphlets are legally flawed and that the November 2, 2004 vote on Proposal A
will be invalid and unenforceable for four numbered reasons and one unnumbered reason. A true
and correct copy of the Attorney General's opinion letter and its attachments are attached hereto and
made a part hereof as Exhibit 2. True and correct copies of the information on Proposal A actually
mailed to the voters by the Election Commission are attached to the Attorney General's opinion
letter itself and made a part hereof by this reference. As alleged above, the actual text of Proposal A
was not mailed to the voters.

24.    The Attorney General's Office has widely distributed its opinion letter to the public
and to the media. The opinion letter has caused massive public and private speculation on whether
any vote on Proposal A will be legal or otherwise binding. The Attorney General's Office has also
publicly stated that any vote for Proposal A will be invalid and ineffective. Moreover, the Attorney
General's Office has publicly stated that if Proposal A is passed by the voters on November 2, 2004,
the Attorney General's Office will file a lawsuit to declare the election void. The Attorney
General's Office has publicly stated that it will not be necessary to file a lawsuit to declare the
election void if Proposal A is not passed by the voters on November 2, 2004, because the issue will
then be moot.

## COUNT I

## DECLARATORY RELIEF

25.    Plaintiffs refer to and incorporate paragraphs 1 through 24 of this complaint as
though fully set forth herein.

26.    Plaintiffs request an immediate, pre-election declaratory judgment from the court on
the legality of the Proposal A ballot pamphlets mailed to the voters and the legality of the scheduled
November 2, 2004 election on Proposal A.

27.    Chapter 17 of Title 3 of the Guam Code Annotated ("G.C.A.") (the "Election
Code"), §§ 17101 through 17514, is entitled "Initiative, Referendum and Legislative Submission."
Section 17101 of the Election Code provides:

> It is the intent of the Legislature through the enactment of this
> measure that the people of the territory of Guam shall have the right
> to exercise the power of initiative and referendum with regard to
> legislative matters and that the legislature shall submit matters to the
> voters for approval or rejection.

28.    3 G.C.A. § 17509 is entitled "Contents of Pamphlet." It provides as follows:

> The Ballot pamphlets shall contain:
> (a) A complete copy of any measure submitted to the voters by:
>        (1) The Legislature.
>        (2) Initiative or referendum petition.
> (b) A copy of the specific statutory provision, if any, proposed to be
> affected.
> (c) A copy of the arguments provided for in this Chapter.
> (d) The analysis and ballot title provided for in this Chapter.

29. 3 G.C.A. §17511 is entitled "Mailing of Ballot Pamphlet". It provides:

   As soon as copies of the ballot pamphlet are available, the Election
   Commission shall mail immediately the following number of copies
   to the following persons and places:

   (a) One copy to each registered voter;
   (b) One copy to each village Commissioner;
   (c) One copy to each judge of the Superior Court; and
   (d) One copy to each Senator.

30. Title 3 of the Guam Administrative Rules and Regulations ("G.A.R.") was adopted

by the Guam Election Commission under Guam's Administrative Adjudication Law. See generally,

Title I, Guam Administrative Rules and Regulations, §§ 1101, 1102 (1997); 5 G.C.A §§ 9100

through 9312. 3 G.A.R. governs elections and the Election Commission.

31. 3 G.A.R. § 2112(5) is entitled "Ballot Pamphlets." It provides:

   (a) The Director shall cause to be printed one and one-tenth (1-1/10)
   times as many ballot pamphlets as there are registered voters, to be
   available not less than thirty (30) days prior to the election at which
   an initiative measure is to be presented to the voters.

   (b) The ballot pamphlets shall contain, in the following order:

   (1) On the first page, the ballot title described in 6 GAR § 2109;
   (2) Beginning on the next page, the analysis of the proposed
   measure, described in 6 GAR § 2111;
   (3) Beginning on the next page following the end of the analysis, the
   selected argument for the initiative measure provided such an
   argument has been submitted to the Commission;
   (4) Beginning on the next page following the end of the selected
   argument for the initiative measure, the selected argument against the

measure provided such an argument has been submitted to the
Commission;

(5) Beginning on the next page following the end of the argument
against the proposed measure, the complete text of the initiative
measure;

(6) If, in the opinion of legal counsel to the Commission, any existing
statutory provision or provisions would be affected by the measure,
the text of the specific statutory provision or provisions affected shall
be printed beginning on the next page following the end of the text of
the initiative measure. [Law governing 3 GCA §§ 17508-17510.]

32.     6 G.A.R. §2114 is entitled "Mailing of Ballot Pamphlets." It provides:

Not less than thirty (30) days prior to the election in which an
initiative measure is to be presented to the voters, and earlier if the
ballot pamphlets are available before that date, the Director shall
cause to be mailed the following number of copies of the ballot
pamphlet to the following persons and places:

(a) One (1) copy to each voter registered as of the deadline for
eligibility to vote in the election in which the initiative measure is to
be submitted to the voters;

(b) One (1) copy to each village Commissioner;

(c) One (1) copy to each judge of the Superior Court; and

(d) One (1) copy to each Senator. [Law governing 3 GCA § 17511.]

33.     Two years ago, in a Guam Supreme Court decision specifically addressing the

administrative rules and regulations adopted by Guam Election Commission, Wade v. Taitano, 2002

Guam 16, the court wrote:

"[a]n agency does not have the authority to ignore its own rules." ...
Regulations have the same legal effect as statutes ... and, "[w]hen an
agency has the authority to adopt rules and does so, it must follow
them." ... Therefore, an agency's procedural rules "are binding upon
the agency which enacts them as well as upon the public." ...
"Regulations governing procedure are just as binding upon both the

agency which enacts them and the public, and the agency does not,
as a general rule, have the discretion to waive, suspend, or disregard,
in a particular case, a validly adopted rule so long as such rule
remains in force."

\*         \*         \*

Although the Initiative statutes, 3 GCA §§ 17101-09, do not provide
the GEC with a time frame to complete the verification process, the
statutes do allow the GEC to promulgate rules and regulations to
effectuate the election statutes. 3 GCA §§ 2103(d), 2104. In enacting
regulation 2108(c), the GEC was merely imposing upon itself a time
frame within which to complete a task. ... We do not find the GEC's
mere imposition of *when* to complete a statutory duty to be, in and of
itself, inherently inconsistent with the performance of that duty.
[Citations and footnotes omitted].

34.     An actual, justifiable controversy now exists over (1) the legal efficacy of any votes

cast for or against Proposal A at the general election to be held on November 2, 2004, and (2) the

legal efficacy of the results of the scheduled November 2, 2004 general election on Proposal A.

The controversy affects each and every single registered voter on Guam, as well as unregistered

Guam voters who would have registered to vote within the time allowed by law but for the

controversy. Attached hereto as Exhibit 3 are true and correct copies of newspaper articles printed

in the Pacific Daily News and the Marianas Variety as well as true and correct copies in written

form of reports broadcast on television by KUAM news, all of which were printed or broadcast on

and after October 7, 2004, the date the Attorney General's Office publicly disseminated its opinion

letter.

35.     Without a declaratory judgment by the courts on the legality of the Proposal A ballot

pamphlets mailed to the voters by the Election Commission, a fair election on Proposal A cannot be

held on November 2, 2004, as scheduled, and any result of such vote on Proposal A in the absence

of a declaratory judgment by the courts may not reflect the true will of the electorate.

36.     For the foregoing reasons, Plaintiffs request an immediate, pre-election declaratory

judgment from the court on the legality of the Proposal A ballot pamphlets mailed to the voters and

the legality of the scheduled November 2, 2004 election on Proposal A.

## COUNT II

### INJUNCTIVE RELIEF

37.     Plaintiffs refer to and incorporate paragraphs 1 through 36 of this complaint as

though fully set forth herein.

38.     Proposal A legally qualified for placement on the ballots the at the November 2,

2004 general election.

39.     The Proposal A ballot pamphlets mailed to the voters thirty (30) days before the

scheduled November 2, 2004 election on Proposal A are legally defective under applicable Guam

law and duly adopted administrative regulations.

40.     The right to vote is a fundamental right guaranteed by the First and Fourteenth

Amendments to the United States Constitution and by the Organic Act of Guam, § 1421(b). The

First Amendment of the United States Constitution applies to Guam pursuant to 48 U.S.C. §
1421(b)(u).

41.    The right of Plaintiffs and the people of Guam to exercise the right of initiative is
guaranteed by the Organic Act of Guam, §1422(a), 48 U.S.C.A. § 1422(a), as amended ("the People
of Guam shall have the right of initiative and referendum, to be exercised under conditions and
procedures specified in the laws of Guam").

42.    As a result of the legally defective ballot pamphlets, and as a result of the Attorney
General's opinion-letter and the mass public speculation it has caused, the results of the scheduled
November 2, 2004 election on Proposal A will not be valid or binding under the Organic Act and
other applicable laws of Guam or under the United States Constitution.

43.    There is a probability that Plaintiffs will succeed on the merits of this action; the
possibility of immediate and irreparable injury exists; serious questions are raised; and the balance
of hardships tips sharply in Plaintiffs' favor.

## COUNT III

## ORDER COMPELLING SPECIAL ELECTION

44.    Plaintiffs refer to and incorporate by reference paragraphs 1 through 43 of this
complaint as though fully set forth herein.

45.    The Defendants have deprived Plaintiffs and the people of Guam of their
fundamental, constitutional and organic right to vote.

46. Under 3 G.C.A. §13103, the Governor has the power to call a special election on Proposal A, and thereby protect Plaintiffs and the people of Guam's fundamental right to vote, but he has refused to do so.

47. Under 3 G.C.A. §17203, the Legislature has the power to call a special election on Proposal A, and thereby protect Plaintiffs and the people of Guam's fundamental right to vote, but it has refused to do so.

48. Under 7 G.C.A. § 4104, both the Governor and the Legislature have the power to apply directly to the Guam Supreme Court for declaratory relief under certain circumstances "where it is a matter of great public interest and the normal process of law would cause undue delay", and thereby protect Plaintiffs and the people of Guam's fundamental right to vote, but the Governor and the Legislature have refused to do so.

49. The Attorney General is the Chief Legal Officer of the Territory of Guam, with standing and authority to institute legal proceedings to protect Plaintiffs and the people of Guam's fundamental right to vote right to vote, but he has refused to do so.

50. 3 G.C.A. §14103 of the Guam Elections Code provides that "(e)very person charged with the performance of any duty under the provisions of any law of this Territory relating to elections, who, in his official capacity, knowingly acts in contravention or violation of any of the provisions of such laws, is, unless a different classification is prescribed by this Title, guilty of a misdemeanor." 3 G.C.A. §14102 of the elections code provides that "(e)very person who willfully violates any of the provisions of laws of Guam relating to any election is, unless a different

classification is prescribed by this Title, guilty of a misdemeanor." Under Guam law, 9 G.C.A.

§80.34, a misdemeanor is punishable by imprisonment for up to one (1) year.

51.     Acting under color of territorial law, the Defendants have deprived Plaintiffs and the

people of Guam of their right to vote, which is a right and privilege secured by the Constitution of

the United States and the Organic Act of Guam.  Pursuant to 42 U.S.C. §1983 and Guam law, the

Defendants are liable to Plaintiffs in this action at law and in equity for any all and appropriate

redress.

52.     Under the circumstances of this case, no remedy other than a special election on

Proposal A can (1) restore the right to vote to Plaintiffs and the people of Guam, and (2) guarantee

that Plaintiffs and the people of Guam will not be deprived of their right to vote in any future

general elections on Proposal A.

        **WHEREFORE**, the Class Plaintiffs prays for relief as follow:

1.     An immediate, pre-election judicial declaration on (a) the legal efficacy of the

Proposal A ballot pamphlets mailed to the voters by the Directors and the Guam Election

Commission, and (b) an immediate, pre-election judicial declaration on whether the results of any

vote on Proposal A on November 2, 2004 will be invalid as a result of (i) the ballot pamphlets

mailed to the voters, and/or (ii) as a result of the mass public uncertainty caused by the Attorney

General's opinion.

2.     For a preliminary and permanent injunction (a) enjoining the scheduled November

2, 2004 vote on Proposal A, (b) compelling the Director and the Election Commission to remove

the Proposal A ballots from the polling places on November 2, 2004, and (c) enjoining the Director

and the Election Commission from tabulating any absentee votes cast on Proposal A.

     3.     For an order compelling the Governor to call for a special election on Proposal A

pursuant to 3 G.C.A. §13103, or an order compelling the Legislature to call for a special election on

Proposal A pursuant to 3 G.C.A. §17203, or an order compelling the Election Commission to

schedule and hold a special election on Proposal A, to be held not later than sixty (60) days after the

date of the court's order, under the following procedure:

     a.     That within twenty (20) days after the court's order, which will be forty (40)

days before the special election, the Election Commission and the Director must appear before the

court to affirmatively demonstrate their readiness, willingness, and ability to meet all Guam laws

and all election rules and regulations applicable to the people's right to initiative and special

elections, specifically with regard to the special election on Proposal A.

     b.     That within twenty five (25) days after the court's order, which will be thirty

five (35) days prior to the special election, the Election Commission and the Director must appear

before the court to prove to the court's satisfaction that they have in fact complied with all Guam

laws and all election rules and regulations applicable to the people's right to initiative and special

elections, specifically with regard to the special election on Proposal A.

     c.     That a further proceedings hearing be had in this court one (1) day after the

special election on Proposal A, at which hearing the Election Commission and the Director must

testify, under oath, about any irregularities or other events occurring during the election that may, in

their reasonable judgment, have interfered with a free and fair election on Proposal A.

4. For costs of suit;

5. For attorneys' fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988, or as

otherwise permitted by law or pursuant to the court's inherent powers;

6. For such other relief as the court deems just, necessary and proper.

DOOLEY ROBERTS & FOWLER LLP

Dated: <u>October 25, 2004</u>      By: _____

**THOMAS L. ROBERTS**
Attorneys for Plaintiffs Jay Merrill and
on his own behalf and on behalf of all other
similarly situated voters desirous of casting a
vote in favor of Proposal A at a fair and legal
election

P:\Documents\Thomas L Roberts (07.04)\C325 CFED\Pleadings\Superior Court (Class Action)\C325 - Complaint 10 25 2004.doc

Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Drive
Tamuning, Guam 96913
Telephone:    (671) 646-1222
Facsimile:    (671) 646-1223

Attorneys for Plaintiffs Jay Merrill on his own behalf and on behalf of all
other similarly situated voters desirous of casting a vote in favor of Proposal A
at a fair and legal election

## IN THE SUPERIOR COURT

## OF GUAM

| | |
|---|---|
| JAY MERRILL, on his own behalf and on behalf of all other similarly situated voters desirous of casting a vote in favor of Proposal A at a fair and legal election, <br><br> Plaintiffs, <br><br> vs. <br><br> THE GUAM ELECTION COMMISSION; GERALD A. TAITANO, in his individual capacity and in his capacity as the Executive Director of THE GUAM ELECTION COMMISSION, I MINA' BENTE SIETE NA LIHESLATURAN GUAHAN (The 27th Guam Legislature); FELIX P. CAMACHO, in his official capacity as the GOVERNOR OF GUAM. <br><br> Defendants. | CIVIL CASE NO. CV 1111-04 <br><br><br><br><br><br> *EX PARTE* NOTICE OF MOTION AND MOTION AND MEMORANDUM IN SUPPORT OF PRE-ELECTION (1) INJUNCTIVE RELIEF AND (2) DECLARATORY RELIEF |

## EX PARTE NOTICE OF MOTION AND MOTION FOR PRE-ELECTION DECLARATORY AND INJUNCTIVE RELIEF

Please take notice that on the 28th day of October, 2004, at the hour of 2:00 p.m., before the

Honorable Katherine A. Maraman, Judge of the Superior Court of Guam, Plaintiffs will move this

court, and by this notice of motion do herby move *ex parte*, for pre-election (1) injunctive relief and

(2) declaratory relief.

**EXHIBIT   2**

Plaintiffs' motion for a special election does not legally need to be heard on its merits before the November 2, 2004 election. But, the event the court grants Plaintiffs' motion for pre-election declaratory and injunctive relief, the interests of the parties and the interests of the public require that the hearing on the motion for a special election be heard as expeditiously as possible. Therefore, at the hearing on Plaintiffs' motion for declaratory and injunctive relief, Plaintiffs will also request, and hereby do request, that the court set a reasonably expedited hearing date on the motion for a special election and a reasonably expedited briefing schedule.

This ex parte motion is based on the October 25, 2004 complaint on file on this case, the supporting memorandum immediately following, and the October 18, 2004 complaint and supporting memorandum and all other documents on file CV1103-04, all of which are incorporated herein and made a part hereof by this reference.

DOOLEY ROBERTS & FOWLER LLP

Dated: October 25, 2004          By: _____

**THOMAS L. ROBERTS**
Attorneys for Plaintiffs Jay Merrill
on his own behalf and on behalf of all
other similarly situated voters desirous
of casting a vote in favor of Proposal A
at a fair and legal election

## MEMORANDUM IN SUPPORT OF EX PARTE MOTION FOR PRE-ELECTION DECLARATORY RELIEF AND PRELIMINARY AND PERMANENT INJUNCTION

A.  <u>Pre-Election Declaratory Relief.</u>  Plaintiffs move for an immediate, pre-election declaratory judgment on (a) the legal efficacy of the Proposal A ballot pamphlets mailed to the voters by the Directors and the Guam Election Commission, and (b) whether the results of any vote on Proposal A on November 2, 2004 will be invalid as a result of (i) the ballot pamphlets mailed to the voters, and/or (ii) the mass public uncertainty caused by the Attorney General's opinion.  Under Rule 57 of the Guam Rules of Civil Procedure, the existence of alternative or cumulative or narrower remedies "does not preclude a judgment for declaratory relief in cases where it is appropriate."  Additionally, "(t)he court may order a speedy hearing of an action for a declaratory judgment and may advance it on the calendar", and Plaintiffs so request.

The undisputed facts and law supporting Plaintiffs' request for a pre-election declaratory judgment are set forth in the October 18, 2004 complaint and supporting memorandum, which are incorporated herein and made a part hereof by this reference.

The applicable facts are set forth in the complaint.  These facts are not disputable.  No one can dispute, and no one has even attempted to dispute, that the Guam Election Commission and its Director did not follow the relevant statutes and regulations in putting Proposal A on the ballot for the November 2, 2004 election.  Specifically, the actual text of Proposition A was not mailed to the voters, as required by Guam law.  The Director himself has freely and publicly admitted this undeniable fact, and he will freely and publicly admit this fact through his attorneys

at the hearing on this motion. The Attorney General's Office and the Attorney General himself have announced to the public that their votes for or against Proposal A on November 2, 2004 will be meaningless, as will the results of any such election. Voters cannot be expected to intelligently vote on a law the government has failed to provide to them. The Attorney General's Office has identified no less than four other statutes or rules that were also violated by the Director and the Election Commission, as explained in Exhibit 2 to the complaint in this case.

The applicable law is also set forth in the complaint as well as in this supporting memorandum. First, it is legally undisputed that legal challenges to elections known in advance to be procedurally flawed must be brought before the election. Post-election procedural challenges are barred.[1]

---

[1] Lewis v. Cayetano, 823 P.2d 738, 72 Haw. 499, 503-504 (1992) ("efficient use of public resources demand that we not allow persons to gamble on the outcome of the election contest then challenge it when dissatisfied with the results, especially when the same challenge could have been made before the public is put through the time and expense of the entire election process."); Soules v. Kauaians for Nukolii Campaign Committee, 849 F.2d 1176, 1180-1181 (9th Cir. 1988) ("the courts have been wary lest the granting of post-election relief encourage sandbagging on the part of wily plaintiffs … if aggrieved parties, without adequate explanation, do not come forward before the election, they will be barred from the equitable relief of overturning the results of the election."); Fairness & Accountability in Ins. Reform v. Greene, 886 P.2d 1338, 180 Ariz. 582, 587 (1994) ("the procedures 'leading up to an election cannot be questioned' after the vote but 'must be challenged before the election is held.'"); Tilson v. Mofford, 737 P.2d 1367, 1369-1370, 153 Ariz. 468, 470-471 (1987) ("the courts do have the duty of ensuring that the constitutional and statutory provisions protecting the electoral process (i.e., the manner in which an election is held) are not violated … the procedures leading up to an election cannot be questioned after the people have voted, but instead the procedures must be challenged before the election is held."); Kerby v. Griffin, 62 P.2d 1131, 48 Ariz. 434, 444-446 (1936) ("to hold a court of equity could not intervene to prevent an election being held, when every constitutional and statutory provision setting forth what must be done before holding a legal election had been violated, would result in an absurdity.") Bell v. Eagerton, 2002 Ala. LEXIS 116, 7-8 (Ala. 2002) ("The rights and interests of the electorate are better promoted by a decision in advance, advising the commissioners of their want of power, and restraining them from proceeding with a meaningless and useless election."); Miami Dolphins, Ltd. v. Metropolitan Dade County, 394 So. 2d 981, 986 (Fla. 1981) (courts must "preclude or forestall possible expenditure of substantial sums of public monies in the doing of what could be a vain and useless thing.").

Second, it is undisputed that because the Director and the Guam Election Commission failed to follow the law and their own regulations, the election is illegal and the results invalid, just as the Attorney General's Office has already opined. Wade v. Taitano, 2002 Guam 16. Two years ago, in Wade, the Guam Supreme Court expressly warned the Guam Election Commission and the Director that if they fail to follow the law and their own regulation, their actions are void.[2] It does not appear that they were listening.

On the motion for pre-election declaratory relief, there is really nothing to dispute. The law is clear. The facts are clear. The required relief is clear. The court's duty is clear.

    B.    Pre-Election Preliminary and Permanent Injunction.  Plaintiffs also move for a preliminary and permanent injunction pursuant to Rule 65 of the Guam Rules of Civil Procedure. Rule 65 provides that "(b)efore or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application," and Plaintiffs so request.

For the reasons stated in the supporting memorandum filed in CV1103-04, which is incorporated herein and made a part hereof by this reference, and for the reasons stated below, the court should enter an order (1) enjoining the scheduled November 2, 2004 vote on Proposal

---

[2] "We begin our analysis by outlining two fundamental principles in statutory and regulatory constructions. The first principle is that "[a]n agency does not have the authority to ignore its own rules." ... Regulations have the same legal effect as statutes ... and, "[w]hen an agency has the authority to adopt rules and does so, it must follow them." ... Therefore, an agency's procedural rules "are binding upon the agency which enacts them as well as upon the public." ... "Regulations governing procedure are just as binding upon both the agency which enacts them and the public, and the agency does not, as a general rule, have the discretion to waive, suspend, or disregard, in a particular case, a validly adopted rule so long as such rule remains in force." Wade v. Taitano, 2002 Guam 16 at ¶¶ 7-8 (citations omitted).

A, (2) compelling the Director and the Election Commission to remove the Proposal A ballots from the polling places on November 2, 2004, and (3) enjoining the Director and the Election Commission from tabulating any mailed or other ballots on Proposal A.

The same cases cited above require the court to grant Plaintiffs' requested injunctive relief. When an election is procedurally flawed, the courts must step in before the election and stop it.[3]

As first suggested in the supporting memorandum in CV1103-04, and as has now been publicly stated by one of Proposal A's most vocal opponents, the November 2, 2004 election on Proposal A is now a mere "straw poll". But "straw polls" are not permitted on initiatives under Guam law. How is the court supposed to rule that the election is legally flawed, yet order that a "straw poll" be held on the initiative anyway? The answer to this question is pretty easy. It is an even easier answer when one considers that the electorate has not been given a copy of the actual law they are supposed to be voting on, the Guam Casino Gaming Control Commission Act, Proposal A. The Act is lengthy and it creates an entire autonomous agency of the Government of Guam. Under these circumstances, the vast majority of the electorate would not know what they were actually voting on. The "straw poll" would merely be a "yes" or "no" vote on the idea of

---

[3] Miami Dolphins, Ltd. v. Metropolitan Dade County, supra ("courts must preclude or forestall possible expenditure of substantial sums of public monies in the doing of what could be a vain and useless thing."); Bell v. Eagerton, *supra* (courts must enjoin election officials in advance, "restraining them from proceeding with a meaningless and useless election."); Lewis v. Cayetano, supra (courts must "prevent use of a ballot not in conformity with the law and to compel officials to prepare and distribute proper ballots.").

gambling itself. But the "idea of gambling" is obviously not what we are supposed to be voting on in the election.

The only legitimate or disputed issue in this case is whether the court should order a special election, which is discussed below.

For now, the court must grant the motion for an order shortening time and set a pre-election hearing on Plaintiffs' motion for a declaratory judgment and injunctive relief. At the hearing, the court must enter a pre-election declaratory judgment that the election on Proposal A is void. Then, the court must enter a pre-election preliminary and permanent injunction (1) enjoining the scheduled November 2, 2004 vote on Proposal A, (2) compelling the Director and the Election Commission to remove the Proposal A ballots from the polling places on November 2, 2004, and (3) enjoining the Director and the Election Commission from tabulating any mailed or other ballots on Proposal A.

DOOLEY ROBERTS & FOWLER LLP

Dated: <u>October 25, 2004</u>                By: _____

**THOMAS L. ROBERTS**
Attorneys for Plaintiffs Jay Merrill on his own
behalf and on behalf of all other similarly situated
voters desirous of casting a vote in favor of
Proposal A at a fair and legal election

DAVID W. DOOLEY
THOMAS L. ROBERTS
KEVIN J. FOWLER
JON A. VISOSKY

RACHEL ZELLARS, Paralegal

SUITE 201, ORLEAN PACIFIC PLAZA
865 SOUTH MARINE DRIVE
TAMUNING, GUAM 96913
TELEPHONE: (671) 646-1222
FACSIMILE: (671) 646-1223
www.GuamLawOffice.com

Of Counsel:
MELINDA C. SWAVELY

Writer's Direct Email:
Roberts@GuamLawOffice.com

October 25, 2004

Via Facsimile Transmission

Cesar Cenzon Cabot, Esq.
**LAW OFFICES OF CESAR C. CABOT, P.C.**
BankPacific Building, Suite 201
825 South Marine Drive
Tamuning, Guam 96911
Facsimile No.: 646-0777

Therese M. Terlaje Esq.
**LAW OFFICE OF THERESE M. TERLAJE**
Post Office Box 864
Hagåtña, Guam 96932
Facsimile No.: 472-8896

Robert Weinberg, Esq.
Office of the Attorney General
Suite 2-200E, Guam Judicial Center
120 West O'Brien Drive
Hagåtña, Guam 96910
Facsimile No.: 472-2493

Shannon Taitano, Esq.
Legal Counsel
OFFICE OF THE GOVERNOR OF GUAM
Post Office Box 2950
Hagåtña, Guam 96932
Facsimile: 477-6666

Re:   Aguon-Schulte v. The Guam Election Commission; CV1103-04

Dear Counsel:

At last Friday's *ex parte* hearing, Judge Maraman disclosed to counsel for all parties that Lou Aguon-Schulte's sister was her good friend, and that Lou was her friend as well. Judge Maraman also stated, however, that because all the other judges of the Superior Court had recused himself or herself from the case, she was willing to hear it out of simple judicial

Cesar Cenzon Cabot, Esq.
Therese M. Terlaje Esq.
Robert Weinberg, Esq.
Shannon Taitano, Esq.
October 25, 2004
Page 2

necessity unless there were any objections. To the best of my knowledge, none of the existing attorneys for the existing parties have any objections, due to the urgency of the case, the obvious need for a pre-election declaration, and because Ms. Aguon-Schulte was only a named plaintiff because she is a registered voter, not because she has any personal interest in the case that is necessarily any different than the interests of any other voter on Guam.

Late last Friday, however, Jay Arriola, counsel for Lina'la' Sin Casino, informed me that he intended to file a motion to intervene in this case and a motion to disqualify Judge Maraman. Under the order issued by Judge Maraman at last Friday's *ex parte* hearing, the motion to disqualify will come on for hearing this Thursday, October 28, 2004. This is only two (2) working days before the November 2, 2004 election. Since every other Judge of the Superior Court has recused himself or herself from the case, as a practical matter, any disqualification of Judge Maraman would deprive my clients (as well as the voting public) of any pre-election declaration on the validity of the election itself. This created an unacceptable dilemma for my client as well as for the people of Guam, who have a right to a pre-election judicial declaration on whether their vote for or against Proposal A on November 2, 2004 is legally meaningful or legally meaningless.

Therefore, this morning I filed a new class action lawsuit on behalf of Jay Merrill individually as well as "on behalf of all other similarly situated voters desirous of casting a vote in favor of Proposal A in a fair and legal election." The complaint in the new case, Superior Court Civil Case No. CV. 1111-04, has been filed against the same Defendants as in the Aguon-Schulte case. I have faxed you a copy of the new complaint along with this letter (except the exhibits, which are identical to exhibits to the other complaint). Aside from the class action allegations, the new Merrill, et. al. complaint is identical to the complaint in the Aguon-Schulte case.

Finally, I have filed an *ex parte* notice of motion and motion for declaratory and injunctive relief in the new case, as well. I have also faxed these documents to you with this letter. They are identical to the *ex parte* motions filed in the other case. I have asked the court to also hear the *ex parte* motion in CV1111-04 this Thursday, October 4, 2004 at 2:00 p.m. Please let me know whether you oppose the *ex parte* motion and whether you intend to be present at the hearing.

Finally, I should mention that Jay's statements today in open court that voters do not have standing to challenge flawed elections is absolutely wrong. Individual voters absolutely do have standing to sue in election challenges. Being a registered voter was "sufficient to confer standing on plaintiff-voters in the landmark cases establishing the one person-one vote principle for

Cesar Cenzon Cabot, Esq.
Therese M. Terlaje Esq.
Robert Weinberg, Esq.
Shannon Taitano, Esq.
October 25, 2004
Page 3

legislative districts, <u>Baker v. Carr</u>, 369 U.S. 186, 207-08, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962) (holding that voters had standing), and <u>Reynolds v. Sims</u>, 377 U.S. 533, 537, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964) (assuming that voters had standing)." <u>Hawkins v. Wayne Twp. Bd.</u>, 183 F. Supp. 2d 1099, 1103 (D. Ind. 2002). As the <u>Hawkins</u> court also noted, "(i)n the terms of Lujan [<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 112 S. Ct. 2130 (U.S. 1992)]: (1) Baird had a concrete, actual, and imminent right to have all votes given equal weight in the election of township board members; (2) the alleged conduct of both the Wayne Township Board and the Marion County Election Board contributed to cause the alleged injury to Baird's right; and (3) the relief Baird seeks, at least in the form of a new election in two districts, would remedy the alleged injury to his Fourteenth Amendment right by giving all votes equal weight."

Since the Supreme Court's historic decision in <u>Baker v. Carr</u>, 369 U.S. 186, 206-207, 82 S. Ct. 691 (1962) it has been "squarely held that voters who allege facts showing disadvantage to themselves as individuals have standing to sue." In <u>Dillard v. Baldwin County Comm'rs</u>, 225 F.3d 1271, 1280 (11th Cir. 2000), the court reaffirmed that "(o)ur decision in Meek [<u>Meek v. Metropolitan Dade County</u>, 985 F.2d 1471 (11th Cir. 1993)], is altogether consonant with the holdings of other circuits granting voters standing to challenge election schemes to which they are subject."

<u>ACLU of Ohio v. Taft</u>, 2004 U.S. App. LEXIS 20291, 6-8 (6th Cir. 2004) was a voting rights case filed under 42 U.S.C. §1983. Citing the U.S. Supreme Court's decision in <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561-562 (U.S. 1992), the court held that to bring suit on behalf of its members, an association must show "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." In <u>ACLU</u>, plaintiff "demonstrated that its members would have had 'standing to sue in their own right.'" Those members were "registered to vote in that district, and desired to vote in a special election ...". They had "suffered an actual injury" and they "had been threatened with the imminent denial of their right to vote." The injury was "fairly traceable" to the Governor's refusal to call for a special election and it was "redressable by injunctive and declaratory relief, in that an injunction requiring Governor Taft to issue a writ of election would have allowed residents of the district to exercise their right to vote ...". The case was remanded to the District Court with instructions to determine the proper amount of attorneys' fees to award to the ACLU under 42 U.S.C. §1988.

In <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561-562 (U.S. 1992), supra, the Supreme Court held that the standing determination "depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily

Cesar Cenzon Cabot, Esq.
Therese M. Terlaje Esq.
Robert Weinberg, Esq.
Shannon Taitano, Esq.
October 25, 2004
Page 4

little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." Here, plaintiff is a registered voter. Again, she has a right to vote in a meaningful election. She is therefore the "object of the action (or forgone action) at issue." Therefore, the challenged "action or inaction has caused (her) injury, and that a judgment preventing or requiring the action will redress it." Plaintiff therefore has standing.

In sum, a single voter has standing to challenge a denial of his or her right to vote. The Guam Supreme Court has basically already determined this. "The purpose of the standing requirement is to ensure that the plaintiff has a concrete dispute with the defendant." See, <u>Guam Tai-Pan Development v. Yigo Alta Estates</u>, 2002 Guam 20, ¶17.

See you on Thursday.

Sincerely,

DOOLEY ROBERTS & FOWLER LLP

**Thomas L. Roberts**

TLR/fad F:\Documents\Thomas L Roberts (07.04)\C325 CFED\C325 - Counsel L01.doc
Enclosures

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

04-00046

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS** Jay Merrill, etc. et. al

**DEFENDANTS** Guam Election Commission
Legislature of Guam
Felix P. Camacho, Governor of Guam

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Guam
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Guam
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Thomas L. Roberts, Esq.
865 South Marine Drive Suite 201
Tam. Guam 96913

ATTORNEYS (IF KNOWN) Robert M. Weinberg, Assistant AG
Office of the Attorney General
120 W. O'Brien Dr. Hagatna Guam 96910
(671) 475-3324

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| | PERSONAL INJURY | PERSONAL INJURY | | | |
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | PERSONAL PROPERTY | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | LABOR | SOCIAL SECURITY | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| | | | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | FEDERAL TAX SUITS | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | HABEAS CORPUS: | | | |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | | ☐ 535 Death Penalty | | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | | |
| ☐ 290 All Other Real Property | ☒ 440 Other Civil Rights | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Removed civil action from Guam Superior Court of Guam alleging violation of 1st.
and 14th Amendments and Organic Act of Guam by Guam election officials.

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION ☒ UNDER F.R.C.P. 23
DEMAND $ No.
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE Lourdes P. Aguon-Schulte v. Guam Election Commission
DOCKET NUMBER

DATE
10/26/04

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #         AMOUNT         APPLYING IFP         JUDGE         MAG. JUDGE