1 | **SHANNON TAITANO, ESQ.**
**OFFICE OF THE GOVERNOR OF GUAM**
2 | Ricardo J. Bordallo Governor's Complex
3 | Adelup, Guam 96910
Telephone:     (671) 472-8931
4 | Facsimile:     (671) 477-4826

**FILED**
DISTRICT COURT OF GUAM

DEC 21 2004 ⁹ᵖ

MARY L. M. MORAN
CLERK OF COURT

(87)

5 | **RODNEY J. JACOB, ESQ.**
**MICHAEL A. PANGELINAN, ESQ.**
6 | **DANIEL M. BENJAMIN, ESQ.**
7 | **CALVO AND CLARK, LLP**
Attorneys at Law
8 | 655 South Marine Drive, Suite 202
Tamuning, Guam 96913
9 | Telephone:     (671) 646-9355
Facsimile:     (671) 646-9403
10 |
11 | Attorneys for *Felix P. Camacho, Governor of Guam*

12 |              IN THE UNITED STATES DISTRICT COURT

13 |                        DISTRICT OF GUAM

14 |

| | |
|---|---|
| LOURDES P. AGUON-SCHULTE, | CIVIL CASE NO. 04-00045 |
| Plaintiff, | (Superior Court of Guam Civil Case No. CV1103-04) |
| -v- | |
| THE GUAM ELECTION COMMISSION, et. al. | |
| Defendants. | |
| JAY MERRILL, et. al., | CIVIL CASE NO. 04-00046 |
| Plaintiffs, | (Superior Court of Guam Civil Case No. CV1111-04) |
| -v- | |
| THE GUAM ELECTION COMMISSION, et. al. | **DECLARATION OF DANIEL M. BENJAMIN IN SUPPORT OF THE GOVERNOR OF GUAM'S SUPPLEMENT TO HIS OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

**ORIGINAL**

1    I, DANIEL M. BENJAMIN, declare that:

2        1.    I am an attorney with the law firm of Calvo and Clark, LLP, counsel of

3    record for Defendant Felix P. Camacho, Governor of Guam. I make this declaration on personal

4    knowledge, and if called to testify I could and would testify competently thereto.

5
         2.    Attached as Exhibit "4" is a true and correct copy of the transcript of the

6    Deposition of Gerald A. Taitano, taken on November 18, 2004

7

8        I declare under penalty of perjury pursuant to the laws of the United States and of

9    the Territory of Guam that the foregoing declaration is true and correct.

10       Executed this 20th day of December, 2004, in Tamuning, Guam.

11

12

13                                    DANIEL M. BENJAMIN

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

JAY MERRILL, on his own behalf) CIVIL CASE NO. CIV04-00046
and on behalf of all other   )
similarly situated voters     )
desirous of casting a vote in )
favor of Proposal A at a fair )
and legal election,           )
                              )
              Plaintiffs,     )
                              )
       vs.                    )
                              )
THE GUAM ELECTION COMMISSION; )
GERALD A. TAITANO, in his     )
capacity as the Executive     )
Director of THE GUAM ELECTION )
COMMISSION, I MINA' BENTE      )
SIETE NA LIHESLATURAN GUAHAN  )
(The 27th Guam Legislature);  )
FELIX P. CAMACHO, in his      )
official capacity as the      )
GOVERNOR OF GUAM,             )
                              )
              Defendants.     )
_____)

**COPY**

## DEPOSITION OF GERALD TAITANO

Taken on behalf of the Plaintiff

BE IT REMEMBERED That, pursuant to the Guam

Rules of Civil Procedure, the Deposition of GERALD TAITANO

was taken before Veronica Flores, Certified Shorthand

Reporter, on Thursday, the 18th day of November 2004, at 1:11

p.m. in the Law Offices of Dooley Roberts & Fowler, Suite

201, Orlean Pacific Plaza, 865 South Marine Drive, Tamuning,

Guam.

**EXHIBIT "4"**

Veronica A. Flores, CSR-RPR
Certified Shorthand Reporter
Case 1:04-cv-00046 Document 101 * Filed 05/21/2004-1045 Page 3 of 45
E-mail: floresroni@hotmail.com

APPEARANCES


Appearing on behalf of the plaintiff:


        DOOLEY ROBERTS & FOWLER
        Suite 201, Orlean Pacific Plaza
        865 S. Marine Drive
        Tamuning, Guam 96911
        By:  Thomas Roberts, Esq.
        Phone:  671.646.1222


Appearing on behalf of Felix P. Camacho:


        CALVO & CLARK
        655 Marine Drive
        First Savings & Loan Bldg.
        Tamuning, Guam 96911
        By:  Michael Pangelinan, Esq.
        Phone:  671.646.9350


Appearing on behalf of The Guam Election Commission; Gerald
A. Taitano:


        LAW OFFICE OF CESAR CABOT
        Suite 201, Guam Savings & Loan Bldg.
        Tamuning, Guam 96911
        By:  Cesar Cabot, Esq.
        Phone:  671.646.2001


Appearing on behalf of the defendants:


        OFFICE OF THE ATTORNEY GENERAL
        120 W O'Brien Drive
        Suite 2-200E
        Hagatna, Guam 96910
        By:  Robert Weinberg, Esq.
        Phone:  671.475.3324

Veronica A. Flores, CSR-RPR
Certified Shorthand Reporter
Tel: (671) 734-1041 * Fax: (671) 734-1045
E-mail: floresrohr@hotmail.com
Case 1:04-cv-00046   Document 91   Filed 12/21/2004   Page 4 of 45

Appearing on behalf of Linala Sin:

ARRIOLA COWAN & ARRIOLA
259 Martyr Street
C & A Professional Bldg., Ste. 201
Hagatna, Guam 96910
By: Joaquin Arriola, Jr., Esq.
Phone: 671.477.9700

Veronica A. Flores, CSR-RPR
Certified Shorthand Reporter
Tel: (671) 734-1041 * Fax: (671) 734-1045
E-mail: floresroni@hotmail.com
Case 1:04-cv-00046   Document 91   Filed 12/21/2004   Page 5 of 45

# I N D E X

## Examination
|  | Direct | Cross |
|---|---|---|
| Mr. Roberts: | 5 |  |
| Mr. Cabot: |  | (None) |
| Mr. Pangelinan: |  | (None) |
| Mr. Weinberg: |  | (None) |
| Mr. Arriola: |  | (None) |

## Exhibits

|  |  | Page |
|---|---|---|
| Exhibit 1: | Act................................. | 14:21 |
| Exhibit 2: | Case for casino gambling.............. | 25:14 |
| Exhibit 3: | Gambling; Defined & Punished.......... | 30:17 |
| Exhibit 4: | Importation of gambling devices....... | 31:11 |
| Exhibit 5: | Slot machines........................ | 31:21 |
| Exhibit 6: | Organizations authorized.............. | 36:9 |
| Exhibit 7: | October 25, 2004 letter.............. | 32:12 |

```
 1                    GERALD TAITANO,
 2   called as an adverse party witness on behalf of the
 3   plaintiff, having first been duly sworn, was examined and
 4   testified as follows:
 5
 6                   DIRECT EXAMINATION
 7   BY MR. ROBERTS:
 8        Q.    This is the time and place set for the deposition of
 9   Gerald Taitano in his official capacity, and I think I have
10   filed the deposition notice in CV1111-04, the Merrill versus
11   Merrill et al case.  Mr. Taitano, have you ever had your
12   deposition taken before?
13        A.    Yes, I have.
14        Q.    Would that, by any chance, have been in connection
15   with the lawsuits two years ago over the gambling?
16        A.    No, I don't think so.
17        Q.    What were they involved in?
18        A.    It was an administrative hearing in San Francisco.
19   I remember being a management representative appearing before
20   the Mayor Assistance Protection Board and the plaintiff in
21   that action, or the complainant in that action, had me
22   deposed.
23        Q.    All right.  So I'll give a quick summary, then, of
24   what's going on here today.  You're under oath.  I get to ask
25   you questions and you're under oath.  If you'll do me a favor
```

1    and wait until I'm done answering my question before you give

2    your answer, it will make for a cleaner transcript.  Okay?

3        A.   Okay.

4        Q.   I sometimes ask long questions and I sometimes

5    change the question in the middle of the question, so it

6    comes out garbled.  And if I do that, you're free to insult

7    me and tell me you're not gonna answer that.  Just tell me to

8    ask a better question and I will.  Okay?

9        A.   Okay.

10       Q.   And just the same, you have to answer just like you

11   are now, out loud.  You can't shake your head yes or no

12   because that doesn't show up very well in the transcript.

13       A.   I understand.

14       Q.   All right.  You are the Executive Director of the

15   Guam Election Commission, right?

16       A.   Yes, I am.

17       Q.   How long have you held that job?

18       A.   Approximately five years.

19       Q.   And you were the Election Commissioner -- the

20   Director -- Can I call you the Commissioner or the Director?

21       A.   Director.

22       Q.   You were the Director two years ago?

23       A.   Yes, I was.

24       Q.   Do you happen to recall that people were attempting

25   to qualify Proposal A for placement on the ballot two years

1  ago?

2      A.   Yes, sir, I remember.

3      Q.   Was it the same Prop A that qualified for the 2004

4  election?

5      A.   Yes, it was.

6      Q.   Do you remember why Prop A was not placed on the

7  ballot two years ago?

8      A.   If I remember correctly, the Proposal was submitted

9  to the Election Commission in such a time frame where the

10  120-day period for signatures did not allow us to develop the

11  ballot at a sufficient time to send it out to all the voters,

12  and so being late, it opted, or the Board opted to have it

13  scheduled for the next general election, which is 2004.

14      Q.   Could that have been a 90-day period you're talking

15  about?

16      A.   I believe it's a 120-day period.

17      Q.   Would that have been the educational period?

18      A.   That would be the period for the petitioner to

19  gather signatures to qualify the petition.

20      Q.   So you're saying that by the time that the

21  proponents submitted the initiative itself to you guys, there

22  was only a certain amount of time left for the proponents to

23  go out and gather the requisite number of signatures?

24      A.   Yes, that's correct.

25      Q.   I guess, did you determine, and I'm not trying to

1  put words in your mouth, was it the Board's determination

2  that the proponents had left themselves insufficient time to

3  gather the required number of signatures?

4      A.   I don't understand the question.

5      Q.   Let me ask you this.  Under the Guam initiative

6  scheme, do proponents of an initiative submit the initiative

7  first to the Election Commission and then go get signatures?

8      A.   What happens in the initiative process is that the

9  proponent will present to the Commission, to myself, a

10  proposed initiative measure or a proposed referendum.

11  Depending on how it's worded, there are particular sections

12  in the code that apply.

13          The first thing that I do, of course, is I send it

14  to legal counsel for a determination, whether or not it

15  comprises unrelated subjects.  And then once that's done,

16  legal counsel will come back to us and say it does not

17  encompass unrelated subjects.  And then, legal counsel is

18  then directed to provide a summary title and a summary

19  description or a ballot title and a summary description.

20          Once all that is done, then I communicate with the

21  petitioner and say, okay, you're initiative measure has gone

22  through our legal review.  We have taken the relevant

23  portions of your proposed measure in order to develop the

24  hundred word summary description.

25          In addition, we have also taken what you have

1  proposed and developed the proposed ballot title.  If you

2  have any objections to this, please advise me accordingly.

3  If you don't have any objections, then the date on my letter

4  constitutes the summary date and you have 120 days to gather

5  your signatures to determine community interest so that we

6  can validate the signatures and so that we can determine

7  whether or not the threshold in the code has been met.

8      Q.   Let me stop you there.  Was there any delay last

9  time two years ago in you doing what you needed to do to

10  prepare this summary and do all the things that you needed to

11  do before you gave the summary date back to the proponent?

12      A.   To the best of my recollection, no, there wasn't.

13  We had been encouraging the petitioner at that time to be

14  submitting to the Election Commission signatures as they

15  gathered them so that we don't have a bottleneck toward a 120

16  days, towards the 120th day.  Recognizing that we were

17  closing, or we were closing very fast toward the 90-day or

18  the 45-day period before we had to send out the absentee

19  ballots.

20      Q.   Nonetheless, can I ask you whether the proponents of

21  Proposal A met all legal requirements back in 2002 for the

22  place of Prop A on the ballot?

23      A.   To my understanding, yes.

24      Q.   So the Board determined that there was just

25  insufficient time for things to get done and determined to

1  put it on the 2004 election instead?

2      A.   Well, that was my recommendation to the Board.  Had

3  the petitioners submitted the requisite signatures before the

4  120th day, then we would have had sufficient time to design

5  the ballot and then print the ballot so that it met the

6  45-day period to send out the absentee ballots.

7      Q.   But, under Guam law, was there a requirement that

8  they gather the signatures before submitting the Proposal to

9  the Election Commission?

10     A.   No, they were given 120 days maximum.

11     Q.   So they met all legal requirements?

12     A.   Yes, they did.

13     Q.   Okay, we're going to jump ahead.  Is it you, on

14 behalf of the Election Commission, that prepares the annual

15 budget and request for funds to the Legislature?

16     A.   Yes.

17     Q.   And did you do that for Fiscal Year 2004?

18     A.   Yes.

19     Q.   Do you remember when you would have sent your

20 budgetary requests to the Legislature for Fiscal Year 2004?

21     A.   I don't remember the specific date, but my

22 submission of the budget takes a two-prong approach.  The

23 first one is understanding that I'm still subjected to the

24 Bureau of Budget Review.  So my budget gets reviewed by

25 Bureau of Budget, but I'm also recognizing the fact that the

1    law says that all my expenses have to be paid through

2    Legislative appropriations.  So I sent a similar budget, in

3    fact, the identical budget to the Guam Legislature and I

4    would have submitted before, of course, the start of Fiscal

5    Year 2004.

6        Q.    What was your budgetary request for Fiscal Year

7    2004?

8        A.    I don't remember specifically the amount, but it was

9    around eight hundred and fifty thousand dollars.

10       Q.    If the Legislature had appropriated that money,

11   would that have been sufficient to mail copies of the

12   complete text of Prop A to the voters?

13       A.    Uhm --

14       Q.    Let me withdraw the question.  When you submitted

15   your budgetary request, were you aware that Prop A was

16   scheduled to be on the November 2, 2004 election?

17       A.    Yes, I was.

18       Q.    Did you include in your budgetary requests funds

19   sufficient to comply with Guam law in connection with the

20   November election for Prop A?

21       A.    Yes, I did.

22       Q.    What did the Legislature do to your budget?

23       A.    I was advised that because of the Fiscal situation

24   of the government that my agency could not be allotted more

25   than a hundred and fifty-five -- no, four hundred and

1    fifty-five thousand dollars, I believe.  My numbers may be a

2    little bit off, but it's around there.

3        Q.  All right.  Fair enough.  Have you spent that four

4    hundred and fifty thousand for this year, for 2004?

5        A.  Yes, I have.

6        Q.  My question is, on what?  What's it cost to run your

7    office?  I take it the four hundred fifty thousand includes

8    your salary, right?

9        A.  Yes, primarily it's salaries and related benefits.

10   The four hundred fifty thousand, about maybe two hundred

11   thousand of that will be salary and benefits, a large

12   majority of it is to -- is for rental and then we put a lot

13   of it into contractual to prepare for the 2004 election.

14   2003 budget would have purchased all of the ballot stock and

15   committed the contracts for the 2004 election.

16       Q.  Why was four hundred and fifty-five approximate

17   thousand dollars not enough to pay for mailing complete

18   copies of Prop A to the voters?

19       A.  Because the portion that had to be cut had to deal

20   with contractual services on the designing of the ballot and

21   then in the printing costs, also on the contractual services.

22       Q.  Let me take a break I'm going to get something up

23   front.

24                        (Off the record.)

25                        (Back on the record.)

1  BY MR. ROBERTS: (CONTINUING)

2      Q.   Mr. Taitano, were you aware of any font size

3  requirements or type size requirement in Guam law for mailing

4  a complete copy of an initiative to the voters?

5      A.   No, I don't.  Or I'm not aware.

6      Q.   Are you aware of any Guam law or Guam rule or

7  regulation that prohibits mailing copies of the initiative on

8  double-sided paper?

9      A.   No, I'm not aware of any Guam law.

10     Q.   Do you know how much it would have cost to mail

11 complete copies of an 86-page initiative to all registered

12 voters on Guam?

13     A.   I have an idea.

14     Q.   What's that idea?

15     A.   First of all, my statement that I'm not aware of any

16 Guam law is of course true.  But we do have some federal

17 guidelines under the Help America Vote Act that deals with

18 how election materials and information is presented to the

19 sight impaired.

20          And so, of course, the guideline is not very

21 specific but it generally -- can we accommodate the sight

22 impaired, or I'm sorry, hearing impaired, sight impaired.

23 Sight impaired.  Based on that, what we do in the polls, is

24 that we provide magnifying glasses on regular ten or twelve

25 font ballot paper or ballot print.

1          We tend to apply that federal policy to our local

2    election information pamphlet so that we don't discriminate

3    against individuals who are, who have a sight impairment.

4    The 80-page document, when we were researching how much it

5    would cost, the cost ranged anywhere from sixty thousand

6    dollars to like a hundred and forty thousand dollars, moneys

7    in which, of the course, the Guam Election Commission does

8    not have.

9          Q.    Guam is subject to the -- Let me back up.  The Help

10   America Vote Act was passed in 2002, I believe, by Congress?

11         A.    That's correct.

12         Q.    And Guam is subject, to the best of your knowledge,

13   to the Help America Vote Act?

14         A.    To the best of my knowledge, Guam law is subservient

15   to all federal laws.  Yes, it is subject to --

16         Q.    If we're not, you're not gonna get hung up on these

17   legal questions, don't worry.  If I say, is there a law, and

18   you say not to my knowledge, if there is a law, it means

19   you're not stuck with your answer.  Let me show you something

20   we'll mark as Exhibit 1.

21                        (Exhibit 1 marked.)

22         Q.    This is the complete text of Proposal A on smaller

23   font, double-sided paper, and it is smaller than 86 pages.

24   Take a look at this document and you can -- I'll represent to

25   you it is a complete copy of the initiative itself.  How much

1   would it have cost, in your opinion, to mail this document to

2   the voters of Guam?

3       A.    I have no idea.

4       Q.    Would you say it would have been substantially less

5   than the cost of mailing an 86-page document?

6       A.    I have no idea.  I would have some problems,

7   however, presenting this to the Board for release.

8       Q.    Why?

9       A.    Because I will be hearing very quickly from Daniel

10  Somerfleck, who is the head of the Guam Legal Service Office.

11  He is an advocate of individuals with sight impairment and

12  all kinds of impairment and he will sue me.  So I will very

13  reluctant to present this document to the Board and say that

14  I recommend that we make copies of this and send it out to

15  all the voters in Guam.

16      Q.    Moving ahead, all lawyers get your objections ready.

17  I have read in the Pacific Daily News that you received a

18  letter on July 29 from your legal counsel advising you that

19  Guam law required the mailing of a complete copy of Prop A to

20  the voters.  Did you get such a letter?

21           **MR. CABOT:**  Objection; privileged,

22  attorney-client confidential communication.

23           **MR. ROBERTS:**  I will respect that objection,

24  although I respectfully disagree.  I believe it's public

25  knowledge and I believe it's included in the PDN and I

1  believe -- I can't say this for sure, Cesar, but I think you

2  stated to the press that you sent such a letter.

3         MR. CABOT:  For the record, I never stated to

4  the press, but I will allow the client to answer subject to

5  my objection.

6         MR. ROBERTS:  And my other response is, I think

7  -- Actually, I built the content of the letter into my

8  question.

9  BY MR. ROBERTS: (CONTINUING)

10      Q.  But go ahead, your counsel said go ahead.  Did you

11 get such a letter?

12      A.  I don't remember specifically, but I may have

13 received a letter.  One thing about myself and legal counsel

14 is that legal counsel is free to provide opinions.

15 Eventually, the Board will have to make a decision whether or

16 not to accept the opinion or not.  I did not -- I don't

17 believe I presented that opinion to the Board or the Board's

18 deliberation because I disagree.

19      Q.  I'm going to read something to you from the October

20 8, 2004 Pacific Daily News, and it's a quote attributed to

21 you.  Then when I'm done reading, I'm going to ask you, did

22 you say that.  "Taitano yesterday afternoon told the Pacific

23 Daily News that the entire casino text was not included in

24 the pamphlet because lawmakers did not fund it.  Later in the

25 afternoon, he acknowledged that he did not ask lawmakers for

1   the money needed to print and mail the 80-page pamphlet, nor

2   did he intend to ask for it.  Taitano said he ruled out the

3   possibility of mailing an 80-page casino proposal to voters

4   because of the potential cost to the government.  Taitano

5   said he did not ask the Commission Board to vote on the final

6   version of the pamphlet or to approve his decision to leave

7   the complete text out of the pamphlet."  Did you say that to

8   a PDN representative?

9        A.    I don't remember my specific quote, but it sounds

10  like I did up until that last portion where it says -- Can

11  you repeat that last portion?

12       Q.    Yeah, I think you're talking about --

13       A.    About presenting it to the Board.  It is my practice

14  always before the office releases anything to the public is

15  that I have the Board review whatever is to be submitted.

16       Q.    But do you agree with the comments attributed to you

17  that the entire text wasn't included is because lawmakers

18  didn't fund it?

19       A.    That's a true statement.

20       Q.    And do you agree with the statements attributed to

21  you that you didn't ask lawmakers for the money needed to

22  print and mail the 80-page pamphlet and you didn't intend to

23  ask for it?

24       A.    That's correct.

25       Q.    And do you agree with the statement, "Taitano said

1    he ruled out the possibility of mailing out an 80-page casino

2    proposal to voters because of the potential cost to the

3    government"?

4         A.    Not necessarily.  That may have been -- that may

5    have had an editorial change or something, but it was never

6    my intent to send out an 80-page document.  I think that's --

7    that was my statement and I'll stand with that statement.

8         Q.    I've been misquoted myself about this issue by the

9    PDN, so I understand.  I'm going to skip ahead to a printed

10   version of the October 7 KUAM news and there are more quotes

11   attributed to you and I'll ask you if you agree or not agree

12   that you said it.  This is what Ken Wetmore reported on --

13              MR. CABOT:  What is the date of the --

14              MR. ROBERTS:  October 7.  It's one of the

15   exhibits to my complaint.

16   BY MR. ROBERTS: (CONTINUING)

17        Q.    "Taitano admits the law does require the mailing out

18   of the entire proposal but points out it is an 80-page, it is

19   80 pages long, and the Guam Legislature did not give him the

20   budget he requested.  "Advise the Executive Director to

21   submit a budget to the Guam Legislature and the Legislature

22   sees fit to exclude those items, then to me, it's either a

23   concession that I don't have to send out an 80-page document

24   to every voter on the island because it's not cost

25   effective."  Does that sound something like you told Ken

1  Wetmore?

2      A.   Yes, again, it may have had some editorial changes

3  in there.  I believe my statement was that we have a legal

4  opinion that says that the 80-page document may have to be

5  sent out, not necessarily -- It was never my position to send

6  out an 80-page document.

7      Q.   And when you say the legal opinion, are you

8  referring to the one from Mr. Cabot in July?

9      A.   Yes.

10     Q.   It's your turn off the hot seat.  Now it's

11 Mr. Cabot's turn to be in the hot seat a little bit.  I'm

12 going to quote from the October 15 PDN, and I'll quote --

13 there are some quotes attributed to Mr. Cabot and when I ask

14 you not did he make those, I'm going to ask you if you agree

15 with them.  "Cabot several months ago tried to address the

16 pamphlet issue.  Cabot on July 29 sent a letter to Commission

17 Executive Director Gerald Taitano regarding the informational

18 pamphlets for the casino initiative.  "I am concerned because

19 if we are to follow the letter of the law, Section 17509-A

20 requires a complete copy of the text of the measure to be

21 mailed to all registered voters."

22         Cabot's letter states, "As you know, the gaming

23 initiative is rather voluminous and over sixty pages long.  I

24 am concerned that the amount of funding that the GEC is

25 presently requesting from the Legislature may not be

1   sufficient to follow the strict requirement of the law." Do

2   you recall if that's what Mr. Cabot's letter said?

3           MR. CABOT:  For the record, I'll have a

4   continuing objection; same objection as before.

5           DEPONENT:  If I remember --

6           MR. ROBERTS:  Let's go off the record for one

7   second.

8                       (Off the record.)

9                       (Back on the record.)

10  BY MR. ROBERTS: (CONTINUING)

11      Q.   Subject to Attorney Cabot's objection, you can go

12  ahead and answer the question.

13      A.   If I remember correctly, my discussion with counsel

14  is that --

15      Q.   Wait, don't tell me your discussion with counsel.

16  I'm just asking about this letter.  To the best of your

17  recollection, is that what Cesar's letter said?

18      A.   I don't remember exactly what Cesar's letter said.

19  I do remember in discussions that it was always counsel's

20  position, in my recollection, that the way the law is

21  written, that one could possibly perceive that the entire

22  pamphlet, the entire -- that the entire copy of the proposed

23  statute has to be sent out to every registered voter.  That

24  was my continuing debate with counsel on that.  I disagreed

25  right from the beginning.

1        If you read the law, there has never been -- well,
2   first of all, it is my reading of the statute that what needs
3   to be presented to the voters is a copy of the measure.  Now,
4   the measure, if you go into the law and read what a measure
5   is -- and you gotta differentiate that from an initiative
6   measure.  The measure on its own says, what is the question.

7        So if I presented to the voters a copy of what the
8   question is going to be on the ballot, that, to me, is
9   sufficient notification under the law.  That is the way that
10  this initiative was presented.  That was the way that the
11  initiative on the minimum drinking age was presented, and
12  that is the way all other initiatives in GEC's history has
13  always been presented.

14       It is ludicrous to send out an 80-page document to
15  every voter on this island because of the cost associated
16  with it.  What the Election Commission staff and our practice
17  is, take a look at the measure.  What is the measure?  The
18  measure is the question.  And in the information pamphlet
19  that we sent out, it had, this is the way it's going to show;
20  initiative measure, an explanation, the 100-word document
21  developed by counsel, and then the question.  And then in the
22  Chamorro and in the English, the two official languages of
23  this island.

24  Q.   So this will be up to the courts, obviously, but in
25  your opinion, it would have been legally sufficient just to

1   send out a question saying should we adopt controlled casino

2   gaming on Guam or not?

3       A.    Not phrased that way, because I don't think that the

4   question was presented in that manner.  What would be

5   sufficient or what would be correct would be to take a look

6   at what the ballot says, the wording on the ballot, and if

7   that is represented in the information pamphlet, then that

8   would be sufficient.

9       Q.    But under your interpretation of the election laws,

10  the words "the measure," means the question presented.  And

11  in fact, isn't that the question presented, should we vote

12  yes on gambling or not?

13      A.    No, I believe the question is more artfully

14  presented than that.

15      Q.    Well, again, it would be up to the court, so I'm

16  going to move on.  Okay?

17      A.    Okay.

18          MR. CABOT:  I think it, says should Proposition

19  A be adopted by voters of the Territory of Guam.

20          DEPONENT:  By the voters of Guam, I believe.

21  BY MR. ROBERTS: (CONTINUING)

22      Q.    And I guess it's your position that the voters of

23  Guam don't have to actually have or know what Proposal A says

24  in order to intelligently vote on that question?

25      A.    Can you rephrase that?

1     Q.    Under your interpretation of the election laws, the

2    voters of Guam, and, again, this is all prior to Bill 457,

3    the voters of Guam -- I forgot my question.

4                              (Reporter requested to read back.)

5     A.    No, what I'm trying to say is that the law, as

6    written, does not require me to send out an 80-page document

7    to all the voters in Guam.  As to the question of whether or

8    not they need to look at it, make copies available to those

9    who desire copies, it's on our website.  It's available in

10   our office.  Any individual that desires a copy can come down

11   to our office and get a complete copy.

12    Q.    Let me move on.  Did you ever ask for additional

13   funds to fund the election on Proposal A?  In other words, to

14   mail the ballot pamphlets?

15    A.    Yes, I did.

16    Q.    From who?

17    A.    I asked for funding from the Guam Legislature in

18   accordance with Title 3.

19    Q.    How much?

20    A.    Twenty thousand.  Somewhere around there.

21    Q.    Twenty-five thousand?

22    A.    Twenty-five thousand, yeah.

23    Q.    And did the money come from the Legislature or the

24   Governor's office?

25    A.    Well, what happened is that under the law, all

1  election expenses must be appropriated by the Legislature.

2  So I went to the Legislature and I said I need twenty-five

3  thousand.  I need my information pamphlet to be sent out.

4  You guys took it out of the budget, now restore it.

5          The Legislature apparently communicated with the

6  Governor's office requesting that the Governor utilize his

7  transfer authority to provide some moneys in our account,

8  twenty-five thousand is the amount that I estimated, and that

9  was again to send out the information pamphlet.  That would

10 have covered the cost for the design of the ballot, the

11 printing of the ballot, and then the mailing out of the

12 ballot.  I'm sorry, ballot; information pamphlet.

13     Q.   Did you get that money?

14     A.   Yes, I did.

15     Q.   Did that twenty-five thousand dollars include the

16 costs necessary to send complete copies of Prop A to all the

17 registered voters on Guam?

18     A.   No, it did not.

19     Q.   This is Exhibit 2 to the complaint I filed in this

20 case.  Exhibit 2 is a letter written by Assistant Attorney

21 General Rob Weinberg, who is with us today, and attachments.

22 And what he's attached is the -- it looks like the voter

23 information pamphlet.  Can you take a look at Exhibit A to

24 Exhibit 2 to my complaint and tell me if that's what you sent

25 out to the voters.  It's a couple pages long.

1      A.    Yeah, this is -- well, this is a photocopy of what I

2   sent out to the voters.  It's not really an exact copy,

3   but --

4      Q.    It's a faxed copy.

5      A.    It's a facsimile.

6      Q.    But, okay, it's a faxed copy, I'll admit that.  But

7   other than that, does it appear to be the complete contents

8   of what you sent to the voters?

9      A.    Yes.

10     Q.    Do you see the proponents' view of Prop A on the

11  second page of the ballot pamphlet?

12     A.    Yes.

13     Q.    Let me show you Exhibit 2.

14                         (Exhibit 2 marked.)

15  BY MR. ROBERTS: (CONTINUING)

16     Q.    Do you recognize Exhibit 2?  Was Exhibit 2 sent to

17  you by Greg Schulte of CFED?

18     A.    I don't remember if I got this.  If I did, then I

19  can look for it.

20     Q.    Do you remember changing the version of the

21  proponents' view of Prop A that was sent to you?

22     A.    No, I don't.  I don't change any proposals.  I don't

23  remember changing anything.

24     Q.    Do you remember taking out the head notes in the

25  version of the case for Prop A?

1    A.    What I remember doing is receiving a letter from
2    CFED and then basically taking their presentation and then
3    typing it into the information pamphlet format.  Of course I
4    could not go ahead and copy what was presented to be because
5    I had to fit it on column-type designs.
6    Q.    Do you remember changing Mr. Arriola's case against
7    Prop A for inclusion of the ballot pamphlet?
8    A.    I don't believe I've changed any of his wording or
9    anything.
10    Q.    All right.  Do you remember when the ballot
11    pamphlets were mailed to the voters?
12    A.    I don't remember the specific date, but I know that
13    it was -- I think forty-five days -- forty-five or forty-six
14    days before the election.  I don't remember the specific
15    date.
16    Q.    How could you determine the specific date?
17    A.    I can find out when I got invoiced on it, when I
18    paid the post office.  I can find that out.
19    Q.    All right.  Is there any way for your office to tell
20    whether or not you actually sent copies of the ballot
21    pamphlet to every single registered voter on Guam?
22    A.    Yes.
23    Q.    How would you tell that?
24    A.    Based on our voter registration file, and our voter
25    registration file is kept current.  It's an ongoing list.

1   It's a work in progress.  Now, the way we develop our address

2   listing is we take a look at our database and we say, okay,

3   this encompasses the universe of our voters.

4           And so we go to the University of Guam who houses

5   our database and ask for a -- for an address label for every

6   registered voter.  And so that's given to us on a disk and

7   then that disk is then given to our contractor who sends it

8   all out, uses their automated process, sends it all out,

9   provides a stamp.

10      Q.   Who's your contractor?

11      A.   I pay the post office and then that's what happens

12  to the mail-out.

13      Q.   Who's your contractor?

14      A.   Graphics Design.

15      Q.   Do you know who owns Graphics Design?

16      A.   No, I don't.

17      Q.   What did it cost to mail this ballot pamphlet to all

18  the voters of Guam?

19      A.   To the best of my recollection, I believe we spent

20  about sixteen thousand; somewhere around there.  That's, of

21  course, to print it out and to send it out.  There's other

22  costs associated with actually designing the ballot and then

23  labor costs to transport it to the post office.  The majority

24  of the cost is postal and printing.

25      Q.   Do you remember what the postage cost itself was,

1  the ballot pamphlet mailed to the voters?

2       A.    No, I don't.

3       Q.    Do you remember if it was $0.37, the cost of a

4  stamp?

5       A.    There were several bulks that were sent out bulk

6  mail. But there were also large chunk that had to be sent

7  out using US first class mail or $0.37, and that's because of

8  the way it's addressed. And I'm not sure how the postal

9  service does that. But there were several general delivery

10 addresses that had to be $0.37, but I think half or three

11 fourths could go bulk mail.

12      Q.    Describe bulk mail for me.

13      A.    What happens with bulk mail is that it is convenient

14 to, and this is my understanding, as it is convenient to the

15 postal service, is that you can contract with the postal

16 service to send off identical documents at basically a bulk

17 rate provided that they have a common address, like a box

18 number or a zip code or what have you. I'm not too familiar

19 with the intricacies of the US Postal Service or their

20 policies over there.

21      Q.    Would your contractor, Graphics Design, have records

22 of who was sent copies of this ballot pamphlet and who

23 wasn't?

24      A.    Their instructions were to send it out to everyone

25 on the voter registration listing.

1      Q.   Did you provide your contractor with a copy of the

2   voter registration listing?

3      A.   Yes, I did.

4      Q.   Did you ever follow-up with your contractor to find

5   out if everybody on the voter registration listing was mailed

6   a copy of the ballot pamphlet?

7      A.   Yes, I did ask if all the information pamphlets were

8   sent out, and they said, yes.  And so I took that to be a

9   follow-up action to my direction.

10      Q.   I take it you received a copy of Mr. Weinberg's

11   October 7, 2004 letter?

12      A.   I'm not sure.  Can you refresh my memory?

13      Q.   Sure, it's Exhibit 2 to my complaint.  It's the one

14   saying certain things weren't complied with.

15      A.   Yes.

16      Q.   On the second page of the Attorney General's letter,

17   there are four problems listed and then there's an unnumbered

18   problem listed.  Do you see that?

19      A.   (No response.)

20      Q.   Do you see the four numbered ones?

21      A.   Yes, I do.

22      Q.   And then there's a paragraph that begins "Most

23   glaringly, with respect to the analysis of the measure

24   required by 3GCA section 17507, there is no impartial

25   analysis of the measure showing the affect of the measure on

1   existing law and the operation of the measure." Do you see

2   that?

3       A.   Yes, I see that.

4       Q.   Do you agree with that or disagree with that?

5       A.   I disagree with that.

6       Q.   Can you take a look at the ballot pamphlet that you

7   sent out and show me where you have informed the voters of

8   the affect of Prop A on existing law.

9       A.   First of all, there is no existing law, so we can't

10  comment on anything existing because there is none.  But, the

11  Proposal, as presented, shall and will establish, proposes to

12  establish the Guam Casino Gaming Controlled Commission Act.

13  And then, after that, it shows what the Act is going to do.

14  Because there is no existing law, we can't comment on how it

15  affects the existing law.

16      Q.   Let me show you Exhibit 3.

17                       (Exhibit 3 marked.)

18  This is a copy of 9GCA Section 6410 and it's entitled

19  Gambling; Defined & Punished.  Wouldn't Prop A have affected

20  this existing law?

21           MR. CABOT:  Objection; the statute speaks for

22  itself, calls for a legal conclusion.  You can give your

23  personal opinion.

24           DEPONENT:  No, it doesn't.

25  BY MR. ROBERTS:  (CONTINUING)

1    Q.    I'm sorry?

2    A.    No, it's my opinion that it doesn't.

3    Q.    That it, you mean Proposal A does not affect this?

4    A.    That the proposal does not affect this.  Proposal A

5 primarily proposes to establish a casino gaming controlled

6 commission act.  This, in my reading, speaks more towards

7 games, contests, lotteries; not the big game Las Vegas-type

8 issues.  But then again, I don't think I'm qualified to

9 comment on that.

10   Q.    Let me show you Exhibit 4.

11                      (Exhibit 4 marked.)

12   Q.    This is a provision of Guam law that prohibits the

13 importation of gambling devices.

14        MR. CABOT:  For the record, same objection.

15 BY MR. ROBERTS: (CONTINUING)

16   Q.    Including slot machines, etc.  Wouldn't Prop A have

17 affected this law?

18   A.    It's my opinion that I don't know.

19   Q.    Okay.  One more time.  Here's what we'll mark as

20 Exhibit 5.

21                      (Exhibit 5 marked.)

22   Q.    And this is a provision of Guam law that's entitled

23 Slot Machines.  To me, this prohibits slot machines.

24 Wouldn't Proposal A have affected this existing law?

25        MR. CABOT:  Same objection for the record.

1      **DEPONENT:** I don't think so. I'm not that

2   familiar with casinos and slot machines and gaming poker

3   machines. I have no interest or activity involving those

4   activities.

5   BY MR. ROBERTS: (CONTINUING)

6      Q.   And then finally, Exhibit 6, this is Organizations

7   Authorized to Conduct Gambling: Permit Procedure. Same

8   objection is acknowledged.

9                        (Exhibit 6 marked.)

10     A.   I still have no comment on this.

11     Q.   All right. This will be Exhibit 7.

12                       (Exhibit 7 marked.)

13     Q.   And this is Bill 374. Have you ever seen Bill 374?

14     A.   Yes, I have.

15     Q.   Where did you first see a copy of Bill 374?

16     A.   I believe a copy was delivered to my office as part

17  of our routine communications from Central Files.

18     Q.   Did anybody from the Legislature call you to advise

19  you of the passage of Bill 374?

20     A.   I don't remember.

21     Q.   Did anybody from the Legislature call you and tell

22  you that Bill 374 imposed certain obligations on the Guam

23  Elections Commission?

24     A.   I don't remember.

25     Q.   Did you read Bill 374 before November 2nd of 2004?

1    A.   I don't remember.

2    Q.   Have you ever read a copy of Bill 374?

3    A.   Yes, yes; I probably glanced at it.

4    Q.   Can you look at the last sentence of Section 3 of

5  Bill 374?

6    A.   Okay.

7    Q.   That says, "GEC shall immediately publish in a

8  newspaper of general circulation the availability of copies

9  of the measure." And it's referring to a bunch of places

10 that are listed earlier. Did the Guam Elections Commission

11 ever publish a notice in a newspaper of general circulation

12 concerning the availability of Proposal A at any particular

13 place?

14   A.   I don't remember, but I -- I don't think so. We may

15 have included it in some of our -- just to save money, some

16 of our advertisings. But I don't remember whether we

17 specifically said a copy of is available at the office. I

18 know that we respond to telephone calls and all that, but I

19 don't think so.

20   Q.   Well, we can't find it.

21   A.   I won't disagree that it's not there.

22   Q.   Let me show you a declaration signed by the mayor of

23 Tamuning-Tumon. Why don't you read that to yourself. It has

24 not been filed in court yet. Do you have any reason to

25 believe that the mayor of Tumon-Tamuning is lying in this

1 declaration?

2     A.   Can you repeat your question?

3     Q.   Do you have any reason to believe that the Mayor of

4 Tamuning-Tumon, Concepcion Duenas, is lying in this

5 declaration?

6     A.   I don't know about lying, but copies of the 82-page

7 document were sent to every mayor in Guam and every senator.

8 I do have a copies of the transmittal letters going to them.

9 Now, I don't understand why she wouldn't post a copy if it

10 was provided to her.

11     Q.   No, she swears that you didn't give her one.  She

12 swears the Election Commission, the Executive Director of the

13 Guam Election Commission and the Legislature did not supply

14 the Tamuning-Tumon Mayor's office with a complete copy of

15 Proposal A before or during the November 2, 2004 election.

16 Do you have any reason to believe that Ms. Concepcion Duenas

17 is lying?

18     A.   Again, I don't know about lying, but I do know that

19 a copy of the Proposal was delivered, as we always do, to

20 every mayor on this island through the Mayor's Council.

21     Q.   How about the Mayor of Mangilao, Nonito Blas; do you

22 want to look at his declaration?

23     A.   It's the same thing, our communications with the

24 mayors go through the central organization, which is the

25 Mayor's Council.  It's the same thing with communications

1    with all government agencies, including the Legislature; we

2    go through Central Files.

3         Q.   And let me show you another one.  This is the

4    declaration of Peter Aguon, the Mayor of Barrigada.  He's

5    signed an identical declaration saying the Legislature didn't

6    provide him a copy of Proposal A before the election.  Do you

7    have any reason to believe he's lying?

8         A.   No, I don't.  Again, copies were made available to

9    each mayor in this island through the Guam Mayor's Council,

10   which is our normal procedure in communicating with the

11   mayor.

12        Q.   All right.  Here's a declaration from the Mayor of

13   Agana Heights, Paul McDonald.  He states, "The Friday before

14   the November 2nd election, my office received a thick

15   envelope from the Guam Election Commission.  In the ordinary

16   course of business, the envelope was not opened until after

17   election day, which was a holiday.  The envelope contained a

18   copy of Proposal A.  Proposal A was not posted at the Agana

19   Heights Mayor's Office before or during the November 2nd

20   election.  There were no complete copies of Proposal A to any

21   registered voters at the Agana Heights Mayor's Office before

22   or during the November 2nd, 2004 election."  Do you have any

23   reason to believe that Mr. Aguon is lying?

24             MR. ARRIOLA:  McDonald.

25             MR. ROBERTS:  Mr. McDonald.

1          DEPONENT:  Again, I hate to call people liars or

2    saying that they're lying, but apparently, he picked up his

3    mail.  The other three before that probably did not pick up

4    their mail, but he may have picked up his mail late, but he

5    did pick it up, and based on my instructions to him, post it

6    in your office.

7    BY MR. ROBERTS: (CONTINUING)

8       Q.   He says it wasn't posted because it wasn't opened

9    until after the election.

10      A.   Well, I can't vouch or I can't --

11          MR. CABOT:  I'll object.  The question has been

12   answered; calls for speculation and I'd ask that you move on.

13          MR. ROBERTS:  We will move on and I'll withdraw

14   the question.

15   BY MR. ROBERTS: (CONTINUING)

16      Q.   I'm going to read you three sentences from my

17   complaint and ask you if you agree or disagree.  The Attorney

18   General's -- Let me preface this by saying I'm talking about

19   the Attorney General's letter of October 7, the one they

20   faxed to you saying, hey, there were some mistakes made with

21   the mailing.  Remember that letter?

22      A.   Yes, I do.

23      Q.   Okay.  I'm quoting now, "The Attorney General's

24   Office has widely distributed its opinion letter to the

25   public and to the media."  Do you know if that's true or not?

1    A.    I don't know.

2    Q.    The second sentence, I'd ask you if you agree or

3  disagree with is; "The opinion letter has caused massive

4  public and private speculation on whether any vote on

5  Proposal A will be legal or otherwise binding." Do you think

6  that's true or not true?

7            MR. CABOT:   Objection; calls for speculation.

8  You can give your personal.

9            MR. WEINBERG:   I'm going to concur in that

10 objection with my co-counsel.

11 BY MR. ROBERTS: (CONTINUING)

12   Q.    But you can go ahead and answer unless they tell you

13 not to answer.

14   A.    Can you read that over?

15   Q.    Sure.  "The opinion letter has caused massive public

16 and private speculation on whether any vote of Proposal A

17 will be legal or otherwise binding."

18   A.    May I ask what was the opinion letter?  That was the

19 Attorney General's?

20   Q.    Uh-huh.

21   A.    The Attorney General's?

22   Q.    Yes.

23   A.    Again, I'd have to speculate on that I don't know

24 what type of reaction the public will have on that opinion

25 letter.  I personally did not respond to it or react to it.

1    Q.   When you say you didn't respond to it, you mean you

2 didn't respond to Mr. Weinberg, but you gave statements to

3 the newspapers and to KUAM about it, right?

4    A.   I don't remember.  I believe what I stated to the

5 newspaper is that I am in receipt of the Attorney General's

6 letter, or the Assistant Attorney General's letter, and that

7 we are reviewing the opinions that were in there.

8    Q.   Do you remember this headline?  This is the October

9 27, 2004 PDN front page.  I will tell you this a statement by

10 the Attorney General's Office asking the Governor not to sign

11 Bill 274 (sic).  Do you remember this headline?

12    A.   I remember the headline, the headline AG Veto Prop A

13 Bill.

14    Q.   In your opinion, did the Attorney General's Office

15 -- did its public statements that -- calling on the Governor

16 not to sign Bill 374 cause or perpetuate any public confusion

17 on whether the vote on Prop A was going to be valid or

18 invalid?

19              **MR.  WEINBERG:**  Object to form.

20              **DEPONENT:**  Again, I have to speculate.  I don't

21 know.

22              **MR. ROBERTS:**  We're going to take a one-minute

23 break.  All right?

24              **DEPONENT:**  Sure.

25                    (Recess taken.)

1                    (Back on the record.)

2  BY MR. ROBERTS: (CONTINUING)

3       Q.   I'm going to quote Mr. Cabot again from the

4  Tuesday, October 12 PDN and ask you if you agree with

5  Mr. Cabot's statements.  "Election Commission Attorney Cesar

6  Cabot said the Commission did not include the complete text

7  in the pamphlet because it did not have enough money in its

8  budget to pay for it."

9       A.   I'd have to agree a little bit with that and also

10  not agree to the entire text because that is not the whole

11  reason why it wasn't included.  No. 1, it wasn't included

12  because in my opinion and in my practice and in our tradition

13  and the Election Commission, we do not include the entire

14  text of any proposed initiative measure.  And No. 2, yes, we

15  didn't have any money.

16       Q.   Here's the problem, Mr. Taitano, I have with your

17  testimony, and I'll quote from -- this is October 8; this is

18  the day after the Attorney General's letter.  It's a quote in

19  the PDN.  "Taitano yesterday afternoon told the Pacific Daily

20  News that the entire casino text was not included in the

21  pamphlet because law makers did not fund it.  Later in the

22  afternoon, he acknowledged that he did not ask law makers

23  for the money needed to print and mail an 80-page pamphlet

24  nor did he intend to ask for it."

25            Why would you tell the PDN that you didn't put the

1   entire text of the Act because they didn't fund it?  Because

2   the Legislature didn't fund it?  Why would you tell them

3   that?

4       A.   I don't remember what exactly I told the PDN, but I

5   do know that I did not speak those words verbatim as it was

6   presented.  I did indicate to the PDN that I did not include

7   it because it was -- in my opinion, it was not required and,

8   No. 2, because the Legislature did not provide sufficient

9   moneys.

10      Q.   Why would the Legislature have to supply sufficient

11  moneys to mail out the complete text of the Act if, in your

12  opinion, it wasn't legally required?

13      A.   Because even if I were asked to do it, there

14  wouldn't be sufficient funds to send copies, complete copies,

15  to every voter.

16      Q.   Isn't it your opinion that it's irrelevant whether

17  the Legislature funded the mailing or not because you don't

18  have to send out a complete copy?

19      A.   That's true.

20      Q.   So --

21      A.   That's my position.

22      Q.   In your position, it's irrelevant whether or not the

23  Legislature budgeted enough money for you to mail out a

24  complete copy of the Act?

25      A.   That's correct.  And, again, what our practice has

1   always been, of course, is what we follow, what I follow.

2   But that doesn't prevent the Guam Election Commission upon

3   the request of the Governor, for example, or upon the request

4   of the Legislature or upon the request of the Board members

5   to ask if we could send out a copy.

6          At the time that these headlines were coming out,

7   the whole community was convinced or the communities or

8   majority of the community was saying that, yes, maybe the

9   entire 82-page document has to be sent to every voter where

10  I've always disagreed with that.

11         But, if people hear what they want to hear, they

12  want to find fault in the information pamphlet as for

13  whatever ulterior motive or reasons that they have, and it

14  became such a high community interest that it is not

15  unreasonable to be expecting the Governor to call my office

16  and say, Jerry, to pacify the community, send out a copy of

17  the 82-page document, or the Legislature or my Board, or

18  members of my Board can come in and say, Jerry, send out a

19  copy of the 82-page document, and then my response would be,

20  how am I going to pay for that.

21  Q.   Well, you talked about community concern.  Let me

22  read you a quote that Ken Wetmore attributed to you on the

23  evening of October 2nd and this is October 7, and this is the

24  day the Attorney General's letter came out; "Taitano admits

25  the law does require the mailing out of the entire Proposal."

1  Did you tell Ken Wetmore that or not?

2       A.   I don't remember.

3       Q.   Let me read you a quote from Caesar Cabot and ask

4  you if you agree with it.  This is from the Friday, October 8

5  PDN; "The code does indicate that a complete copy of the

6  measure is to be submitted to the voters."  You've already

7  said you disagree with that, right?

8       A.   Yes.

9       Q.   Before October as you were in the process of putting

10 the ballot pamphlets together, did you ever receive any

11 telephone calls or letters from any of the opponents of

12 Proposal A, such as the citizen opposed to Prop A or Linala

13 Sin Casino?

14      A.   I'd have to say, yes, we were in communications with

15 both the proponents and the opponents of the measure.  What

16 the parties or what the groups would do is ask me to have

17 voter registration classes or communicate with me with regard

18 to where are we as far as the initiative measure is at.  We

19 will also talk about the responses to the -- or the 500-word

20 responses to -- or position papers that will eventually be in

21 the information pamphlet, both proponent and opponent.

22      Q.   Can I stop you?  Actually, the answer to the

23 question would have been a yes or no and then I would ask a

24 follow-up question.  So I guess the answer to the question

25 was yes?

1     A.    Yes.

2     Q.    Before the actual mailing of the ballot pamphlets,

3     did you ever get any telephone calls from anyone at Duty Free

4     Shoppers such as, for example, Joe Camacho?

5     A.    I don't remember a telephone call from Joe Camacho.

6     Q.    Any letters or written material from DFS?

7     A.    I don't remember.  It doesn't ring a bell.

8     Q.    Have you ever had any conversations about Proposal A

9     with anyone affiliated with an organized religion?

10    A.    I'd have to say yes.

11    Q.    Who would that have been?

12    A.    Well, I'm a practicing Catholic.  I belong to the

13    Agana Cathedral Parish.  I'm also the Parish Council

14    President and the Finance Chairman for the Catholic

15    Cemeteries.  And so I would talk with my wife.  She's also a

16    member of the same parish, my friends, associates at church

17    and all that.  It would -- you know, the whole Proposal A

18    issue would come up and we'd talk about it.  Very cautious,

19    however, to elaborate too much on the issue.  I tend to just

20    say, let's do church work and that's all.

21    Q.    Did you ever have any conversations with church

22    officials?

23    A.    Not that I remember.  Church officials; you're

24    talking about -- Can you clarify?

25    Q.    Yeah.  Is the Archbishop a friend of yours?  A

1   family friend?

2       A.    No.

3       Q.    Have you ever had a conversation with the Archbishop

4   about Proposal A?

5       A.    No.  I don't have too much of a conversation with

6   the Archbishop, to be honest.

7       Q.    Any other church officials you might have had a

8   conversation with about Proposal A?

9       A.    You're talking about priests?  Because church

10  officials would include, you know, like my wife was in charge

11  of the eucharistic ministry.

12      Q.    I'm actually not talking about your wife.

13      A.    Okay.

14      Q.    I'll give you a pass on that.

15      A.    Like priests, no.

16      Q.    Yeah.

17      A.    No.

18      Q.    Let me just ask you; don't you have dinner at the

19  Archbishop's house on a regular basis?

20      A.    No.

21      Q.    Before the mailing of the ballot pamphlet, did you

22  ever speak on the telephone with Jay Arriola or Jackie

23  Marati?

24      A.    I've spoken with both, I remember.  Specifically

25  regarding whatever issues, I don't remember.  But it would

1   have to deal with Proposal A.

2       Q.   Did you ever receive a letter from Jay Arriola or

3   Jackie Marati or COPA or Linala Sin Casino before the mailing

4   advising you that Guam law required the Election Commission

5   to include a complete text of Proposal A in the ballot

6   pamphlet to be mailed to the voters?

7       A.   I think so.  Yes, I'll say I received a copy.

8       Q.   Do you happen to have a copy with you?

9       A.   No, I didn't bring any documents.

10      Q.   Bill 374 required you to mail copies of Proposal A

11  to every branch of the Guam Public Library system.  Did you

12  do that?

13      A.   Yes.

14      Q.   And Bill 374 required the Election Commission to

15  mail copies of Proposal A to the Robert F. Kennedy Library at

16  the University of Guam.  Did you do that?

17      A.   Yes.

18      Q.   And how about the Office of the Public Auditor; did

19  you do that?

20      A.   Yes.

21      Q.   Let's take a quick break because I think I'm

22  through, I think.

23                         (Off the record.)

24                         (Back on the record.)

25              **MR. ROBERTS:**  At this time, I have no further

1  questions. Mr. Taitano, thank you very much.

2          **MR. CABOT:** No questions from Cesar Cabot,

3  attorney for GEC and Mr. Taitano.

4          **MR. PANGELINAN:** No questions for Mike

5  Pangelinan, attorney for the Governor of Guam.

6          **MR. WEINBERG:** No questions from the Attorney

7  General's Office on behalf of the defendants.

8          **MR. ROBERTS:** Then that will terminate the

9  deposition. The record should reflect that Jay Arriola was

10  here, I believe, in his capacity as the attorney for Linala

11  Sin. As an observer, he's a proposed intervener in the

12  lawsuit, although no order granting intervention has yet been

13  granted.

14

15                          [Whereupon, at 2:36 p.m. the

16                          deposition was concluded.]

17

18

19

20

21

22

23

24

25

CERTIFICATE OF WITNESS

SUPERIOR COURT OF GUAM     )

        I, Gerald Taitano, being first duly sworn on
oath, depose and say that I am the witness named in the
foregoing deposition transcript and that I have read the
questions and answers thereon as contained in the foregoing
deposition, consisting of pages 1 through 46; that the
answers are true and correct as given by me at the time of
taking the deposition, except as indicated on the correction
sheet.


                              _____
                              Gerald Taitano

# REPORTER'S CERTIFICATE

SUPERIOR COURT OF GUAM       )

       I, Veronica A. Flores, Certified Shorthand Reporter, hereby certify that GERALD TAITANO personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 46, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

       Witness my hand at Barrigada, Guam, this 15th day of December 2004.

_____
Veronica A. Flores, CSR-RPR

# NOTARY PUBLIC'S CERTIFICATE

HAGATNA      ) ss

      I, Veronica A. Flores, Notary Public in and for Guam, do hereby certify that on the 18th day of November 2004 at the hour of 1:11 p.m., there appeared before me **Gerald Taitano**, at the law offices of Dooley Roberts & Fowler, Suite 201, Orlean Pacific Plaza, 865 S. Marine Drive, Tamuning, Guam 96911, the witness herein, produced to give his deposition in the within-entitled and numbered Civil Case No. CIV04-00046; that prior to examination the witness was by me duly sworn upon his oath; that thereafter, the transcript was prepared by me or under my supervision, and the original deposition transcript was retained by my office for the deponent's review, corrections, if any, and execution.

      I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

      In testimony whereof, I have hereunto set my hand and seal of Court this 15th day of December 2004.

**VERONICA A. FLORES**
**NOTARY PUBLIC**
In and for Guam, U.S.A.
My Commission Expires: March 13, 2005
225 Puti Tai Nobio St. Barrigada, GU 96913

Veronica A. Flores

# An Act to Establish the

# GUAM CASINO
# GAMING CONTROL COMMISSION


PLAINTIFF'S
EXHIBIT 67

AN ACT TO ADD TITLE 23 TO THE GUAM CODE ANNOTATED TO ESTABLISH THE GUAM CASINO GAMING CONTROL COMMISSION TO OVERSEE AND DIRECT THE DEVELOPMENT AND OPERATION OF CASINO GAMING WITHIN GUAM AND TO RESERVE ONE-HALF OF THE TAX REVENUE DERIVED FROM CASINO GAMING IN A TRUST, THE INCOME OF WHICH SHALL BE DEDICATED TO MAKING LONG-TERM IMPROVEMENTS IN THE ISLAND'S INFRSTRUCTURE AND TO RESERVE ONE-HALF OF THE TAX REVENUE DERIVED FROM CASINO GAMING FOR EXPENDITURE ONLY TO SUPPORT WORTHY ENDEAVORS SPECIFICALLY IDENTIFIED BY THE PEOPLE THROUGH A QUADRENNIAL REFERENDUM; TO FIX THE DATE UPON WHICH THIS INITIATIVE SHALL BECOME LAW; AND TO MAKE THE INITIAL APPROPRIATION OF FUNDS FOR THE OPERATION OF THE GUAM CASINO GAMING CONTROL COMMISSION.

BE IT ENACTED BY THE PEOPLE OF THE TERRITORY OF GUAM:

Section 1. Title 23 is added to the Guam Code Annotated to read:

"TITLE 23-GUAM CASINO GAMING CONTROL COMMISSION:

## Article 1 - Short Title, Statement of Legislative Findings and Definitions

### Section 1001. Short title.
This Act shall be known and may be cited as the 'Guam Casino Gaming Control Commission Act.'

### Section 1002. Statement of public policy.
The people of Guam, the enactors of this legislation by initiative, hereby find and declare the following to be the public policy of Guam:

(a) The hospitality industry--consisting of tourist, resort and incipient convention activities--is a critical component of Guam's economic structure and, if properly developed, controlled and fostered, is capable of substantially contributing to the general welfare, health and prosperity of Guam and its inhabitants.

(b) By reason of its location, Guam is for Asia, and the south and western Pacific, a convenient and hospitable destination rich not only in the island's indigenous Chamorro heritage but also a wide range of the cultural and economic features of America.

(c) Guam has many competitors for visitors from abroad, however, and to maintain and enhance its standing as a destination of choice, it must be innovative and dynamic in encouraging the development of the sort of recreational activities that sophisticated travelers seek.

(d) One innovation that is alluring foreign visitors in great numbers from abroad to the United States, Australia, and the Philippines is casino gaming. Continental Airlines already provides twice weekly direct service through Guam from Japan to Cairns, Queensland, and hundreds of travelers transit Guam each week to visit not only the natural beauties of this competing Australian destination, but also to be entertained at the Reef Hotel Casino in Cairns. In the mainland of the United States 425 commercial casinos are operating in 11 states. According to an independent survey performed for the American Gaming Association ("AGA"), 14,000 new jobs were created in the commercial casino industry in the US in 2000 and the industry as a whole generated $25 billion in gross gaming revenues, figures that do not include the 87 Native American gaming enterprises operating in 23 states and that generated more than $9.2 billion in gross gaming revenue in 2000.

(e) The AGA survey also noted that 370,000 employees in stateside casinos earned $10.9 billion in wages (including tips and benefits) and that the nearly $3.5 billion paid in taxes by the commercial casinos was responsible for construction of new roads, schools and hospitals, enhancement of local emergency services, development of parks and recreation areas, and other quality-of-life improvements.

(f) While casino gaming holds promise as a source of economic stimulation and enhanced revenues for the government, it is not to be viewed as a panacea for the prolonged economic recession Guam has experienced in conjunction with Japan's depressed financial status. Casino gaming can be, however, a hospitality attraction innovation that will induce not only more visitors to Guam from Japan but also help in the island's efforts to enlarge its visitor count from Korea, China and Taiwan.

(g) Through this initiative the people have given their stamp of approval to the establishment of a limited number of closely controlled and monitored casino gaming facilities in resort hotels. They have also made clear that, to the greatest extent possible, the Guam Casino Gaming Control Commission shall encourage not only the investment of outside capital in these projects, but also require that real opportunity for investment and employment in the casino gaming enterprises shall be provided for and insisted upon for the citizens of the United States born on Guam. Toward this end, strict citizenship and residency requirements are established for the Commissioners who shall establish the policies and rules of the Guam Casino Gaming Control Commission, it being the belief of the people that those who call Guam home know it best and are most likely to protect the island's people and institutions.

(h) The restriction of gaming to a limited number of hotels affording traditional visitor recreation activities is designed to assure that the existing family-oriented nature and tone of the island's hospitality industry be preserved, and that the casinos licensed pursuant to the provisions of this act are always offered and maintained as an integral element of such hospitality facilities, rather than as an industry unto itself.

(i) To assure the public's confidence and trust in the oversight exercised by the government vis a vis the casino gaming enterprises, the regulatory provisions of this act are designed to impose strict regulation on persons, locations, practices and activities related to the operation of licensed gaming casino. In addition, licensure of a limited number of casino establishments, with the comprehensive law enforcement

supervision attendant thereto, is further designed to contribute to the public confidence and trust in the efficacy and integrity of the regulatory process.

(j) Legalized casino gaming in Guam can attain and retain integrity, public confidence and trust, and remain compatible with the general public interest only under such a system of control and regulation as insures, so far as practicable, the exclusion from participation therein of persons with known criminal records, habits or associations, and the exclusion or removal from any positions of authority or responsibility within casino gaming operations of any persons known to be so deficient in business probity, either generally or with specific reference to gaming, as to create or enhance the dangers of unsound, unfair or illegal practices, methods and activities in the conduct of gaming or the carrying on of the business and financial arrangements incidental thereto.

(k) Because the public has a vital interest in casino gaming in Guam and has, through this act, enlarged the opportunities on island for gaming for private gain, participation in casino gaming operations as a licensee or registrant under this act shall be deemed a revocable privilege conditioned upon the proper and continued qualification of the individual licensee or registrant and upon the discharge of the affirmative responsibility of each such licensee or registrant to provide to the regulatory authorities designated by this act any assistance and information necessary to assure that the policies declared by this act are achieved.

(l) Casino gaming operations are especially sensitive and in need of public control and supervision; therefore, it is vital to the interests of the people of this island to prevent entry, directly or indirectly, into such operations of persons who have pursued economic gains in an occupational manner or context which are in violation of the criminal or civil public policies of Guam or of another jurisdiction where they have engaged in the gaming industry. Accordingly, the regulatory and investigatory powers and duties of the Guam Casino Gaming Control Commission and other agencies of the government who shall participate in the enforcement of this act shall be exercised to the fullest extent consistent with law to avoid the entry of undesirable persons into casino gaming operations on Guam.

(m) Because the economic stability of casino gaming operations is in the public interest and competition should help foster such stability, the regulatory powers and duties conferred by this act shall include the power and duty to regulate, control and prevent economic concentration in the casino gaming operations to encourage and preserve competition.

### Section 1003. Definitions.
The following terms and words shall have the following definitions. In the construction of this Act, the defined words and terms shall be understood in their plain English meaning unless the context of the provision clearly requires a different construction.

(a) "Applicant" --Any person who on his or her own behalf or on behalf of another has applied for permission to engage in any act or activity which is regulated under the provisions of this act.

(b) "Application" --A written request for permission to engage in any act or activity that is regulated under the provisions of this act.

(c) "Attorney" --Any attorney licensed to practice law in Guam or any other jurisdiction, including an employee of a casino licensee. Any attorney not licensed to practice law in Guam and who is not an employee of the federal or a state government may act as an attorney before the Commission only in accordance with the laws of Guam pertaining to pro hac vice admission.

(d) "Authorized game" --Roulette, baccarat, blackjack, poker, craps, big six wheel, slot machines, mahjong, pachinko, minibaccarat, red dog, pai gow, and sic bo; any variations or composites of such games, provided that such variations or composites are found by the Commission suitable for use after an appropriate test or experimental period under such terms and conditions as the Commission may deem appropriate; and any other game which is determined by the Commission to be compatible with the public interest and to be suitable for casino use after such appropriate test or experimental period as the Commission may deem appropriate. "Authorized game" includes gaming tournaments in which players compete against one another in one or more of the games authorized herein or by the Commission or in approved variations or composites thereof if the tournaments are authorized by the Commission.

(e) "Casino" or "casino room" or "licensed casino" – One or more locations or rooms in a casino hotel facility that have been approved by the Commission for the conduct of casino gaming in accordance with the provisions of this act.

Case 1:04-cv-00046    Document 91-2    Filed 12/21/2004    Page 8 of 34

the Commission or in any proceeding for judicial review of any action, decision or order of the Commission.

(tt) "Person" –Any natural person as well as any corporation, association, operation, firm, partnership, trust or other form of business association.

(uu) "Principal employee" –Any employee who, by reason of remuneration or of a management, supervisory or policy-making position or such other criteria as may be established by the Commission by regulation, holds or exercises such authority as shall in the judgment of the Commission be sufficiently related to the operation of a licensee so as to require approval by the Commission in the protection of the public interest.

(vv) "Property" –Real property, tangible and intangible personal property, and rights, claims and franchises of every nature.

(ww) "Publicly traded corporation" –Any corporation or other legal entity, except a natural person, which:

(1) Has one or more classes of security registered pursuant to section 12 of the Securities Exchange Act of 1934, as amended (15 U.S.C. □ 78l), or

(2) Is an issuer subject to section 15(d) of the Securities Exchange Act of 1934, as amended (15 U.S.C. □ 78(o)), or

(3) Has one or more classes of securities traded in any open market in any foreign jurisdiction or regulated pursuant to a statute of any foreign jurisdiction which the Commission determines to be substantially similar to either or both of the aforementioned statutes.

(xx) "Registration" –Any requirement other than one which requires a license as a prerequisite to conduct a particular business as specified by this act.

(yy) "Registrant" –Any person who is registered pursuant to the provisions of this act.

(zz) "Regulated complimentary service account" –An account maintained by a casino licensee on a regular basis which itemizes complimentary services and includes, without limitation, a listing of the cost of junket activities and any other service provided at no cost or reduced price.

(aaa) "Resident" –Any person who occupies a dwelling within Guam, has a present intent to remain within Guam for an indefinite time, and manifests the genuineness of that intent by establishing an ongoing physical presence within Guam together with indicia that his or her presence within Guam is something other than merely transitory in nature.

(bbb) "Respondent" –Any person against whom a complaint has been filed or a written request for information served.

(ccc) "Restricted Casino Areas" –The cashier's cage, the soft count room, the hard count room, the slot cage booths and runway areas, the interior of table game pits, the surveillance room and catwalk areas, the slot machine repair room and any other area specifically designated by the Commission as restricted.

(ddd) "Security" –Any instrument evidencing a direct or indirect beneficial ownership or creditor interest in a corporation, including but not limited to, stock, common and preferred; bonds; mortgages; debentures; security agreements; notes; warrants; options and rights.

(eee) "Slot machine" –Any mechanical, electrical or other device, contrivance or machine which, upon insertion of a coin, token or similar object therein, or upon payment of any consideration whatsoever, is available to play or operate, the play or operation of which, whether by reason of the skill of the operator or application of the element of chance, or both, may deliver or entitle the person playing or operating the machine to receive cash or tokens to be exchanged for cash, or to receive merchandise or any thing of value whatsoever, whether the payoff is made automatically from the machine or in any other manner whatsoever, except that the cash equivalent value of any merchandise or other thing of value shall not be included in the total of all sums paid out as winnings to patrons for purposes of determining gross revenues or be included in determining the payout percentage of any slot machine. The Commission shall promulgate rules defining "cash equivalent value" in order to assure fairness, uniformity and comparability of valuation of slot machine payoffs.

(fff) "State –Any state of the United States, the District of Columbia, Puerto Rico, the U. S. Virgin Islands, American Samoa, the Northern Mariana Islands, and any state associated with the United States in a compact of free association.

(ggg) "Statement of compliance" –A statement by the Commission which may be issued to an applicant indicating satisfactory completion of a particular stage or stages of the license application process, and which states that unless there is a change of any material circumstance pertaining to such particular stage or stages of license application involved in the statement, such applicant has complied with requirements mandated by this act and by the Commission and is therefore approved for license qualification to the stage or stages for which the statement has been issued.

(hhh) "Subsidiary" (1) Any corporation, any significant part of whose outstanding equity securities are owned, subject to a power or right of control, or held with power to vote, by a holding company or an intermediary company; or (2) A significant interest in any firm, association, partnership, trust or other form of business organization, not a natural person, which is owned, subject to a power or right of control, or held with power to vote, by a holding company or an intermediary company.

(iii) "Transfer" –The sale and every other method, direct or indirect, of disposing of or parting with property or with an interest therein, or with the possession thereof, or of fixing a lien upon property or upon an interest therein, absolutely or conditionally, voluntarily or involuntarily, by or without judicial proceedings, as a conveyance, sale, payment, pledge, mortgage, lien, encumbrance, gift, security or otherwise. The

retention of a security interest in property delivered to a corporation shall be deemed a transfer suffered by such corporation.

(jjj) "United States -When used in a geographical sense, Guam, every state of the United States, the District of Columbia, Puerto Rico, the U. S. Virgin Islands, American Samoa, the Northern Mariana Islands, and any state associated with the United States in a compact of free association.

## Article 2 - Establishment and Organization of Guam Casino Gaming Control Commission

**Section 2001. Guam Casino Gaming Control Commission; number of Commissioners; and their appointment**

There is within the government of Guam an autonomous corporation known as the Guam Casino Gaming Control Commission. The Commission shall be directed by a by a board consisting of five (5) persons who are appointed by the Governor, subject to the advice and consent of the Legislature.

**Section 2002. Qualifications of Commissioners.**

No person shall qualify as a Commissioner unless he or she is a citizen of the United States and has been resident of Guam for at least five (5) years immediately preceding his or her appointment by the Governor. In addition, no person holding any elective or appointed office in or employed by the federal or local government shall be eligible to be a Commissioner until at least two (2) years have elapsed since the person ceased to hold the elective or appointed office or be so employed. No more than three (3) Commissioners may be of the same sex. No person who has been convicted of a felony shall be eligible to be a Commissioner. One of the Commissioners shall be a certified public accountant, a certified fraud examiner or a certified government financial manager.

**Section 2003. Terms of Commissioners; officers of the Commission; compensation of Commissioners; removal of Commissioners.**

(a) Initial appointments. From the first five (5) Commissioners appointed, the Governor shall appoint one person to a term of five (5) years, one person to a term of four (4) years, and three (3) persons to a term of three (3) years each. The Governor shall designate one person to be the Chairman of the Commission. The term of office of each Commissioner shall commence on the first day after his or her appointment has been confirmed by the Legislature and he or she has taken her oath of office. A Commissioner shall continue to hold office until his or her successor is appointed and confirmed, provided, however, if a successor has not been appointed and confirmed by one hundred twenty (120) days after the expiration of the incumbent's term, the position shall be vacant.

(b) Subsequent appointments and term limits . After the initial appointments, each Commissioner shall be appointed for a term of five (5) years, provided, however, that no person shall serve for more than two (2) terms and this shall be regardless of the length of the term of a person's initial appointment.

(c) Filling an appointment caused by a vacancy . An appointment to fill a vacancy on the Commission shall be for the length of the unexpired term of the Commissioner who is replaced.

(d) Term of chairman and replacement of chairman . The Commissioner appointed by the Governor as chairman shall serve in such capacity throughout his or her term. Upon a vacancy in the office of chairman, the Governor may appoint a sitting Commissioner or a replacement Commissioner as chairman.

(e) Chairman chief executive officer. The chairman shall be the chief executive officer of the Commission.

(f) Subordinate officers of Commission. The Commissioners shall elect annually from their number a vice chairman, a treasurer and a secretary. The vice chairman shall be empowered to carry out all of the responsibilities of the chairman during the chairman's disqualification or inability to serve.

(g) Commission appointment a full-time occupation ___. Each Commissioner shall devote his or her full time to his or her duties of office and no Commissioner shall pursue or engage in any other business, occupation or other gainful employment so long as he or she is a Commissioner.

(h) Compensation and expenses of Commissioners ___. The Chairman of the Commission shall be paid a salary of one hundred thousand ($100,000) per year. Each of the other Commissioners shall be paid a salary of ninety-five thousand ($95,000) per year. In addition to his or her salary, each Commissioner shall be reimbursed for actual and necessary expenses incurred by him or her in the performance of his or her duties as a Commissioner.

(i) Removal of a Commissioner . A Commissioner may be removed from office for misconduct in office, willful neglect of duty, or other conduct evidencing unfitness or incompetence in his or her office. A proceeding for removal may be instituted by the Attorney General in the Superior Court upon the Attorney General's own motion or upon the motion of a majority of the Commissioners or upon the motion of the Public Auditor. Notwithstanding any other provision of law, any Commissioner or any employee of the Commission shall automatically forfeit his or her office or position upon his or her conviction of any felony.

**Section 2004. Organization and employees of the Commission.** (a) Organizational structure. The Commission may establish, and from time to time

be employed by, or represent in any capacity any applicant for or any person licensed or regulated by the Commission for a period of two (2) years following the date on which his or her term on or employment or contract with the Commission ends, provided, however, that this prohibition shall not apply to a person who has been employed in a clerical or custodial capacity.

(b) Exception for reduction in work. Notwithstanding the provisions of paragraph (a), if the employment of a Commission employee or the contract of a person who is bound to the Commission by a contract is terminated as a result of a reduction in the work of the Commission, the affected person may accept employment that would otherwise be prohibited provided that the Commission by its adoption of a written resolution waives the time bar. If the Commission refuses to give its approval, the Commission shall state in writing its basis for the denial.

(c) Bar not applicable in government representation. The bars in subparagraph (a) shall not apply to any person who appears before the Commission as a representative of the government of Guam or the federal government.

(d) Ban on representations by organizations. No partnership, firm or corporation in which a former Commissioner or employee has an interest, nor any partner, officer or employee of any such partnership, firm or corporation, shall make any appearance or representation which is prohibited to the former Commissioner, employee or person that was bound to the Commission by a contract, provided, however, that this prohibition shall not apply to a person who has been employed in a clerical or custodial capacity.

(e) Liability for violations.

(1) Violations by licensees. No applicant or person or organization licensed or regulated by the Commission shall employ or offer to employ, or provide, transfer or sell, or offer to provide, transfer or sell any interest, direct or indirect, in any business or activity licensed or registered by the Commission to any person restricted from such transactions by the provisions of this section. A violation of this section shall be a felony of the third degree. In addition, the Commission may impose such administrative penalties as may be further provided by law or regulation.

(2) Violations by former Commissioners, employees or persons bound to the Commission by contract. Any former Commissioner, employee or person bound to the Commission by contract who violates any provision of this section shall be guilty of a felony of the third degree. In addition, the Commission may impose such administrative penalties as may be further provided by law or regulation.

## Article 4 - Commission Duties and Powers

### Section 4001. General duties and powers.

The Commission shall have general responsibility for the implementation of this act, including, without limitation, the responsibility to:

(a) Hear and decide promptly and in reasonable order all license, regulation, registration, certification and permit applications and causes affecting the granting, suspension, revocation, or renewal thereof;

(b) Conduct all hearings pertaining to civil violations of this act or rules promulgated hereunder and conduct investigative hearings concerning the conduct of gaming and gaming operations as well as the development and well-being of the activities controlled by this act;

(c) Promulgate such rules as in its judgment may be necessary to fully implement this act;

(d) Collect all license, regulation and registration fees and taxes imposed by this act and the rules issued pursuant thereto;

(e) Levy and collect penalties for the violation of provisions of this act and the rules promulgated hereunder;

(f) Be present through its inspectors and agents at all times during the operation of any casino for the purpose of certifying the revenue thereof, receiving complaints from the public relating to the conduct of gaming operations, examining records of revenues and procedures, and conducting periodic reviews of operations and facilities for the purpose of evaluating the compliance with appropriate laws and rules of all persons licensed or regulated under this act;

(g) Refer, as appropriate, to the Public Auditor for investigation and to the Attorney General for investigation and prosecution, any evidence of a violation of this act or the rules issued pursuant thereto;

(h) Review and rule upon any complaint by a casino licensee regarding any investigation procedures by the Commission's staff which are unreasonably disruptive of a casino's operation, which complaint shall not be established except upon the production of clear and convincing evidence establishing that the investigative procedures had no reasonable law enforcement purpose and that the procedures were so disruptive as to inhibit unreasonably the casino's operations;

(i) Exercise, through those employees that it designates as peace officers, such investigative powers as are granted by this act;

(j) Sue and be sued; and

(k) Maintain an Internet website containing at a minimum this act, the rules issued pursuant thereto and notice of its meetings and of proposed rules and of orders issued by the Commission.

### Section 4002. Commission powers regarding denials and sanctions.

The Commission shall assure, to the extent required by this act, that no license, approval, certificate, or permit shall be issued to nor held by, nor shall there be any

material involvement, directly or indirectly, with a licensed casino's operation or ownership by unqualified or disqualified persons or persons whose operations are conducted in a manner not conforming with the provisions of this act. For purposes of this section, 'unqualified person' means any person who is found by the Commission to be unqualified pursuant to criteria set forth in Section 4007. In enforcing the provisions of this act, the Commission shall have the power and authority to deny any application; limit or restrict any license, registration, certificate, permit or approval; suspend or revoke any license, registration, certificate, permit or approval; and, impose a penalty on any person licensed, regulated, registered, or previously approved for any cause deemed reasonable by the Commission pursuant to this act and the Commission's rules, except that no such denial, limitation, suspension or revocation shall be issued solely by reason of the fact that an applicant, registrant, or licensee holds an interest in or is associated with any licensed casino enterprise in any other jurisdiction.

### Section 4003. Subpoenas, oaths.

The Commission shall have the power and authority to issue subpoenas and to compel the attendance of witnesses at any place within Guam, to administer oaths and to require testimony under oath before the Commission in the course of any investigation or hearing conducted under this act. The Commission may serve or cause to be served its process or notices in a manner provided for the service of process and notice in civil actions in accordance with the Guam Rules of Civil Procedure. The Commission shall have the authority to propound written interrogatories and the Commission may appoint hearing examiners, to whom may be delegated the power and authority to administer oaths, issue subpoenas, propound written interrogatories, and require testimony under oath pertaining to any aspect of any gaming activity and casino operations and ownership conducted pursuant to this act.

### Section 4004. Testimonial immunity.

The Commission may order any person to answer a question or questions or produce evidence of any kind and confer immunity as provided in this section, If, in the course of any investigation or hearing conducted under this act, a person refuses to answer a question or produce evidence on the ground that he or she will be exposed to criminal prosecution thereby, then in addition to any other remedies or sanctions provided for by this act, the Commission may, by a majority vote of the Commissioners and after the written approval of the Attorney General, issue an order to answer or to produce evidence with immunity. If, upon issuance of such an order, the person complies therewith, he or she shall be immune from having such responsive answer given by him or her or such responsive evidence produced by him or her, or evidence derived there from, used to expose him or her to criminal prosecution, except that such person may nevertheless be prosecuted for any perjury committed in such answer or in accordance with the order of the Commission. A person who refuses to respond despite a grant of immunity shall be held in contempt of the Commission and the matter shall then be referred to the Superior Court for a determination of the appropriate penalty, which in no case shall exceed twelve (12) months of incarceration at the Department of Corrections.

### Section 4005. Collection of fees, interest or penalties.

At any time within three (3) years after any amount of fees, interest, or penalties required to be paid pursuant to the provisions of this act shall become due and payable, the Commission may bring a civil action in the Superior Court or any other court of appropriate jurisdiction, in the name of the government of Guam, to collect the delinquent amount, together with penalties and interest. If the amount owed has been concealed from the Commission by fraud, the time to commence an action shall not run until the fraud has been or should have been discovered by the Commission. An action may be brought whether or not the person owing the amount is at such time an applicant, licensee or registrant pursuant to the provisions of this act. If such action is brought in Guam, a writ of attachment may be issued and no bond or affidavit shall be required prior to the issuance thereof. In all actions in Guam, the records of the Commission shall be prima facie evidence of the determination of the fee or tax or the amount of the delinquency.

Each debt that is due and payable as a result of fees, interest or penalties required to be collected pursuant to the provisions of this act or the rules promulgated hereunder, including any amount authorized as compensation or costs incurred because of the necessity of the appointment of a conservator, and each regulatory obligation imposed as a condition upon the issuance or renewal of a casino license which requires the licensee to maintain, as a fiduciary, a fund for a specific regulatory purpose, shall constitute a lien on the real property in Guam owned or hereafter acquired by the applicant, licensee, or registrant owing such a debt or on whom such an obligation has been imposed.

### Section 4006. Emergency Rules.

(a) The Commission, in emergency circumstances, may summarily adopt, amend or repeal any regulation pursuant to the Administrative Adjudication Law.

(b) Notwithstanding any other provision of this act or the Administrative Adjudication Law to the contrary, the Commission, after notice provided in accordance with this subsection, may authorize the temporary or interim adoption, amendment or repeal of any rule concerning the conduct of gaming or the use or design of gaming equipment, or the internal procedures and administrative and accounting controls of a licensee for a period not to exceed one (1) year for the purpose of determining

distribution by federal law shall be made available to the Commission as may be necessary to the effective administration of this act.

(g) The following information to be reported periodically to the Commission by a casino licensee shall not be considered confidential and shall be available for public inspection:

(1) A licensee's gross revenue from all authorized games;

(2) (a) The dollar amount of patron checks initially accepted by a licensee, (b) the dollar amount of patron checks deposited to the licensee's bank account, (c) the dollar amount of such checks initially dishonored by the bank and returned to the licensee as "uncollected," and (d) the dollar amount ultimately uncollected after all reasonable efforts;

(3) The amount of gross revenue tax actually paid;

(4) A list of the premises and the nature of improvements, costs thereof and the payees for all such improvements, which were required to be made by the casino owner as a condition of the granting of the casino license; and

(5) All quarterly and annual financial statements required to be submitted to the Commission.

(6) Nothing in this subsection shall be construed to limit access by the public to those forms and documents required to be filed pursuant to Article 11 of this act.

### Section 4014. Appointment of peace officers.

Pursuant to the power granted to the Commission by Section 4001(f), the Commissioners may appoint employees peace officers and as peace officers those employees shall have the power to:

(a) promptly and in reasonable order investigate all applications, complaints made against persons licensed or regulated by this act or persons making an application for any benefit under this act, enforce the provisions of this act and all rules promulgated hereunder, and prosecute before the Commission all proceedings for violations of this act or any rules promulgated hereunder; and

(b) Provide the Commission with all information necessary for all action pertaining to licensing and for all proceedings involving enforcement of the provisions of this act or any rules promulgated hereunder.

### Section 4015. Specific duties of peace officers.

The Commission's peace officer employees shall:

(a) Investigate the qualifications of each applicant before any license, certificate, or permit is issued to any person;

(b) Investigate the circumstances surrounding any act or transaction for which Commission approval is required;

(c) Investigate violations of this act and rules promulgated hereunder and refer to the Attorney General for prosecution all criminal violations of this act;

(d) Conduct continuing reviews of casino operations through on-site observation and other reasonable means to assure compliance with this act and rules promulgated hereunder;

(e) Receive and take appropriate action on any referral from the Commission relating to any evidence of a violation of this act or the rules promulgated hereunder;

(f) Cooperate and exchange with appropriate law enforcement agencies both within and without the United States criminal history record information for use in considering applicants for any license or registration issued pursuant to the provisions of this act;

(g) Assist the Public Auditor in audits of casino operations at such times, under such circumstances, and to such extent as the Commission or Public Auditor shall determine, including reviews of accounting, administrative and financial records, and management control systems, procedures and records utilized by a casino licensee;

(h) Be entitled to request and receive information, materials and any other data from any licensee or registrant, or applicant for a license or registration under this act.

### Section 4016. Cooperation by licensees, registrants or applicants.

Each licensee or registrant, or applicant for a license or registration under this act shall cooperate with the Commission's peace officer employees and the Public Auditor in the performance of their duties.

### Section 4017. Inspection, seizure and warrants.

(a) The peace officer employees, upon approval of the Commission's Attorney, without notice and without warrant, shall have the authority to:

(1) Inspect and examine all premises wherein casino gaming is conducted; or gaming devices or equipment are manufactured, sold, distributed, or serviced; or wherein any records of such activities are prepared or maintained;

(2) Inspect all equipment and supplies in, about, upon or around such premises;

(3) Seize summarily and remove from such premises and impound any such equipment or supplies for the purposes of examination and inspection;

(4) Inspect, examine and audit all books, records, and documents pertaining to a casino licensee's operation;

(5) Seize, impound or assume physical control of any book, record, ledger, game, device, cash box and its contents, counting room or its equipment, or casino operations; and

(6) Inspect the person, and personal effects present in a casino facility licensed under this act, of any holder of a license or registration issued pursuant to this act while that person is present in a licensed casino facility.

(b) The provisions of subsection (a) shall in no way be deemed to limit warrantless inspections except in accordance with constitutional requirements.

(c) To effectuate further the purposes of this act, the peace officer employees may obtain administrative warrants for the inspection and seizure of any property possessed, controlled, bailed or otherwise held by any applicant, licensee, registrant, intermediary company, or holding company.

(d) Issuance and execution of warrants for administrative inspection shall be in accordance with the following:

(1) Any judge of the Superior Court or the Supreme Court may, upon proper oath or affirmation showing probable cause, issue warrants for the purpose of conducting administrative inspections authorized by this act or rules hereunder and seizures of property appropriate to such inspections. For the purposes of this section, "probable cause" means a valid public interest in the effective enforcement of the act or rules sufficient to justify administrative inspection of the area, premises, building or conveyance in the circumstances specified in the application for the warrant.

(2) A warrant shall issue only upon an affidavit of a person duly designated and having knowledge of the facts alleged, sworn to before the judge and establishing the grounds for issuing the warrant. If the judge is satisfied that grounds for the application exist or that there is probable cause to believe they exist, he or she shall issue a warrant identifying the area, premises, building or conveyance to be inspected; the purpose of such inspection; and, where appropriate, the type of property to be inspected, if any. The warrant shall identify the item or types of property to be seized, if any. The warrant shall be directed to a person authorized to execute it. The warrant shall state the grounds for its issuance and the name of the person or persons whose affidavit has been taken in support thereof. It shall command the person to whom it is directed to inspect the area, premises, building, or conveyance identified for the purpose specified, and where appropriate, shall direct the seizure of the property specified. The warrant shall direct, except in emergent circumstances, that it be served during normal business hours of the licensee. It shall designate the judge to whom it shall be returned.

(3) A warrant issued pursuant to this section must be executed and returned within ten (10) days of its date. If property is seized pursuant to a warrant, the person executing the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken. The return of the warrant shall be made promptly and shall be accompanied by a written inventory of any property taken. The inventory shall be made in the presence of the person executing the warrant and of the person from whose possession or premises the property was taken, if they are present, or in the presence of at least one credible person other than the person executing the warrant. The clerk of the court, upon request, shall deliver a copy of the inventory to the person from whom or from whose premises the property was taken and to the applicant for the warrant.

(4) The judge who has issued a warrant under this section shall attach to the warrant a copy of the return and all papers filed in connection therewith and shall cause them to be filed with the court which issued such warrant. (e) The peace officer employees are authorized to make administrative inspections to check for compliance by any applicant, licensee, registrant, intermediary company or holding company with the provisions of this act or rules promulgated hereunder, and to investigate any violations thereof.

(f) This section shall not be construed to prevent entries and administrative inspections, including seizures of property, without a warrant:

(1) With the consent of the owner, operator or agent in charge of the controlled premises;

(2) In situations presenting imminent danger to health or safety;

(3) In situations involving inspection of conveyances where there is reasonable cause to believe that the mobility of the conveyance makes it impractical to obtain a warrant or in any other exceptional or emergent circumstance where time or opportunity to apply for a warrant is lacking;

(4) In accordance with the provisions of this act; or

(5) In all other situations where a warrant is not constitutionally required.

### Section 4018. Powers not enumerated.

The Commission may exercise any proper power or authority necessary to perform the duties assigned to it by law, and no specific enumeration of powers in this act shall be read to limit the authority of the Commission to administer this act.

## Article 5 - Licensing

### Section 5001. General provisions.

(a) Limit on number of casino licenses. No more than ten (10) casino licenses shall be issued pursuant to this act and no license shall be issued except to operate a casino in an approved hotel.

(b) Affirmative responsibility of applicants and licensees. It shall be the affirmative responsibility of each applicant and licensee to establish by clear and convincing evidence the individual qualifications that are requisite for the obtaining of a license, and for a casino license the qualifications of each person who is required to be qualified under this act as well as the qualifications of the facility in which the casino is to be located.

Guam Casino Gaming Control Commission

(g) As to agreements for the management of a casino, the Commission shall require that each party thereto hold a casino license, that the party thereto who is to manage the casino gaming operations own at least ten percent (10%) of all outstanding equity securities of any casino licensee or of any eligible applicant for a casino license if the said licensee or applicant is a corporation and the ownership of an equivalent interest in any casino licensee or in any eligible applicant for a casino license if the same is not a corporation, and that such an agreement be for the complete management of all casino space in the casino hotel, provide for the sole and unrestricted power to direct the casino gaming operations of the casino hotel which is the subject of the agreement, and be for such a term as to assure reasonable continuity, stability and independence in the management of the casino gaming operations;

(h) The Commission may permit an agreement for the management of a casino to provide for the payment to the managing party of an interest, percentage or share of money derived from gaming at all authorized games or derived from casino gaming activity or of revenues or profits of casino gaming operations; and

(i) As to agreements to lease an approved casino hotel or the land there under, agreements to jointly own an approved casino hotel or the land there under and agreements for the management of casino gaming operations, the Commission shall require that each party thereto, except for the government of Guam or any political subdivision or any agency or instrumentality thereof, shall be jointly and severally liable for all acts, omissions and violations of this act by any party thereto regardless of actual knowledge of such act, omission or violation and notwithstanding any provision in such agreement to the contrary.

(j) No corporation shall be eligible to apply for a casino license unless:

(1) The corporation is incorporated in Guam, although such corporation may be a wholly or partially owned subsidiary of a corporation that is organized pursuant to the laws of another state of the United States or of a foreign country;

(2) The corporation maintains an office of the corporation in the casino hotel licensed or to be licensed;

(3) The corporation complies with all the requirements of the laws of the Guam pertaining to corporations;

(4) The corporation maintains a ledger in the principal office of the corporation in Guam which shall at all times reflect the current ownership of every class of security issued by the corporation and shall be available for inspection by the Commission at all reasonable times without notice;

(5) The corporation maintains all operating accounts required by the Commission in a bank or banks in Guam;

(6) The corporation states in its articles of incorporation that a purpose for which it is organized to conduct casino gaming and further includes in the articles all provisions required by this act, the rules issued pursuant thereto or by order of the Commission;

(7) The corporation, if it is not a publicly traded corporation, files with the Commission such adopted corporate charter provisions as may be necessary to establish the right of prior approval by the Commission with regard to transfers of securities, shares, and other interests in the applicant corporation; and, if it is a publicly traded corporation, provides in its corporate charter that any securities of such corporation are held subject to the condition that if a holder thereof is found to be disqualified by the Commission pursuant to the provisions of this act, such holder shall dispose of his interest in the corporation;

(8) The corporation, if it is not a publicly traded corporation, establishes to the satisfaction of the Commission that appropriate charter provisions create the absolute right of such non-publicly traded corporations and companies to repurchase at the market price or the purchase price, whichever is the lesser, any security, share or other interest in the corporation in the event that the Commission disapproves a transfer in accordance with the provisions of this act;

(9) Any publicly traded holding, intermediary, or subsidiary company of the corporation, whether the corporation is publicly traded or not, contains in its corporate charter the same provisions required under paragraph (7) for a publicly traded corporation to be eligible to apply for a casino license; and

(10) Any non-publicly traded holding, intermediary or subsidiary company of the corporation, whether the corporation is publicly traded or not, establishes to the satisfaction of the Commission that its charter provisions are the same as those required under paragraphs (7) and (8) for a non-publicly traded corporation to be eligible to apply for a casino license. The provisions of this subsection shall apply with the same force and effect with regard to casino license applications and casino licensees that have a legal existence that is other than corporate to the extent to which it is appropriate.

(k) No person shall be issued or be the holder of more than two casino licenses. For the purposes of this subsection a person shall be considered the holder of a casino license if such license is held by any holding, intermediary or subsidiary company thereof, or by any officer, director, casino key employee or principal employee of such person, or of any holding, intermediary or subsidiary company thereof.

### Section 5004. Approved hotel.

(a) For the purposes of this act an approved hotel is a single building or two or more buildings which are physically connected in a manner deemed appropriate by the Commission and which is operated as one casino-hotel facility under a license granted by the Commission. An approved hotel must have not less than the number of rooms

specified hereafter used for providing guests or visitors overnight accommodations. In no event shall the only access to an approved hotel be through a casino. In addition, an approved hotel must have a twenty-four (24) hour public food service facility capable of seating not fewer than sixty (60) persons, recreation facilities, including a swimming pool and a children's enclosed recreation area that is available to guests from 10 a.m. until 6 p.m. daily and that is supervised by qualified hotel personnel.

(b) The following classes of approved hotels are established and must conform to the following space standards:

| Class | Required Guest Rooms | Required Casino Area |
|---|---|---|
| A | Not less than 100 | Not more than 25,000 square feet |
| AA | Not less than 300 | Not more than 50,000 square feet |
| AAA | Not less than 500 | Not more than 75,000 square feet |
| AAAA | Not less than 700 | Not more than 100,000 square feet |

(c) Once a hotel is initially approved, the Commission may permit it to change its category, providing that the hotel complies with the space standards of the class to which it wishes to move and such other conditions that the Commission may determine are reasonably necessary to protect the island's people, its economy and its ecological environment.

(d) The Commission may permit an approved hotel to deviate from its space requirements for a reasonable time if the Commission finds that such deviation is warranted in order that the approved hotel can be rehabilitated, renovated or altered.

(e) The Commission shall not impose any unreasonable criteria or requirements regarding the contents of the approved hotel in addition to the criteria and requirements expressly specified in this act, provided, however, that the Commission shall be authorized to require each casino licensee to establish and maintain an approved hotel which is in all respects a facility of good quality which will help develop and improve Guam's international reputation as a resort, tourist and convention destination.

### Section 5005. Casino license; applicant requirements.

Any applicant for a casino license must produce information, documentation and assurances that establish to the satisfaction of the Commission that:

(a) The financial background and resources and the financial stability, integrity and responsibility of the applicant, including but not limited to bank references, business and personal income and disbursement schedules, tax returns and other reports filed with governmental agencies, and business and personal accounting and check records and ledgers. In addition, each applicant, in writing, shall authorize the Commission to exam all bank accounts and records as the Commission deems necessary;

(b) The integrity of all financial backers, investors, mortgagees, bondholders, and holders of indentures, notes or other evidences of indebtedness, either in effect or proposed, which bears any relation to the casino proposal submitted by the applicant or applicants; provided, however, that this section shall not apply to banking or other licensed lending institutions and institutional investors. Any such banking or licensed lending institution or institutional investor, however, shall produce for the Commission upon request any document or information that bears any relation to the casino proposal submitted by the applicant or applicants. The integrity of financial sources shall be judged upon the same standards as the applicant. In addition, the applicant shall produce whatever information, documentation or assurances as may be required to establish by clear and convincing evidence the adequacy of financial resources both as to the completion of the casino proposal and the operation of the casino;

(c) The applicant's good character, honesty and integrity. Such information shall include, without limitation, information pertaining to family, habits, character, reputation, criminal and arrest record, business activities, financial affairs, and business, professional and personal associates, covering at least the ten (10) years immediately preceding the filing of the application. Each applicant shall notify the Commission of any civil judgments obtained against any applicant pertaining to antitrust or security regulation laws of the federal government, of Guam or of any state or any other jurisdiction, province or country. In addition, each applicant shall produce letters of reference from law enforcement agencies having jurisdiction in the applicant's place of residence and principal place of business, which letters of reference shall indicate that such law enforcement agencies do not have any pertinent information concerning the applicant, or if such law enforcement agency does have information pertaining to the applicant, shall specify what the information is. If the applicant has conducted gaming operations in a jurisdiction which permits such activity, the applicant shall produce letters of reference from the gaming or casino enforcement or control agency which shall specify the experiences of such agency with the applicant, his or her associates, and his or her gaming operation; provided, however, that if no such letters are received within six (6) months of the request therefore, the applicant may submit a statement under oath that he is or was during the period such activities were conducted in good standing with such gaming or casino enforcement or control agency.

(d) The applicant has sufficient business ability and casino experience as to establish the likelihood of creation and maintenance of a successful, efficient casino operation. The applicant shall produce the names of all proposed casino key employees as they become known and a description of their respective or proposed responsibilities, and a full description of security systems and management controls proposed for the casino and related facilities.

(e) Subject to the Commission's powers under Section 5004(e), the suitability of the hotel casino and related facilities to its proposed location. Each applicant shall submit

Case 1:04-cv-00046    Document 91-2    Filed 12/21/2004    Page 12 of 34

the policies of this act or to legalized gaming in Guam. For purposes of this section, occupational manner or context shall be defined as the systematic planning, administration, management, or execution of an activity for financial gain;

(f) The identification of the applicant or any person who is required to be qualified under this act as a condition of a casino license as a career offender or a member of or participant in a career offender cartel or an associate of a career offender or career offender cartel in such a manner which creates a reasonable belief that the association is of such a nature as to be inimical to the policy of this act and to gaming operations. For purposes of this section, career offender shall be defined as any person whose behavior is pursued in an occupational manner or context for the purpose of economic gain, utilizing such methods as are deemed criminal violations of the public policy of Guam or the federal government. A career offender cartel shall be defined as any group of persons who operate together as career offenders;

(g) The engaging in or attempt to engage in by the applicant or any person who is required to be qualified under this act as a condition of a casino license of any act or acts which would constitute any offense under subsection (c) of this section, even if such conduct has not been or may not be prosecuted under the laws of Guam or any other jurisdiction or has been prosecuted under the criminal laws of Guam or any other jurisdiction and such prosecution has been terminated in a manner other than with a conviction; and

(h) Contumacious defiance by the applicant or any person who is required to be qualified under this act of any legislative investigatory body or other official investigatory body of Guam or any state, territory, commonwealth, district or freely associated state of the United States or of the United States when such body is engaged in the investigation of crimes relating to gaming, official corruption, or organized crime activity.

### Section 5008. Investigation of applicants for casino licenses; order approving or denying license.

(a) Upon the filing of an application for a casino license and such supplemental information as the Commission may require, the Commission shall cause an investigation to be made into the qualification of the applicant, and the Commission shall conduct a hearing thereon concerning the qualification of the applicant in accordance with its rules. The Commission shall not approve any casino license for any person except after a public hearing for which appropriate public notice has been given.

(b) After such investigation and hearing, the Commission may either deny the application or grant a casino license to an applicant whom it determines to be qualified to hold such license.

(c) The Commission shall have the authority to deny any application pursuant to the provisions of this act. When an application is denied, the Commission shall prepare and file an order denying such application with the general reasons therefor, and if requested by the applicant, shall further prepare and file a statement of the reasons for the denial, including a specific findings of facts.

(d) After an application is submitted to the Commission, final action of the Commission shall be taken within three (3) months of the completion of all hearings and investigations and the receipt of all information required by the Commission.

(e) If satisfied that an applicant is qualified to receive a casino license, and upon tender of all license fees and taxes as required by law and rules of the Commission, and such bonds as the Commission may require for the faithful performance of all requirements imposed by law or rules, the Commission shall issue a casino license for the term of one (1) year or a casino reservation or a contingent casino gaming license for such term as is appropriate under this act.

(f) The Commission shall fix the amount of the bond or bonds to be required under this section in such amounts as it may deem appropriate by rules of uniform application. The bonds so furnished may be applied by the Commission to the payment of any unpaid liability of the licensee under this act. The bond shall be furnished in cash or negotiable securities, by a surety bond guaranteed by a satisfactory guarantor, or by an irrevocable letter of credit issued by a banking institution of Guam acceptable to the Commission. If furnished in cash or negotiable securities, the principal shall be placed without restriction at the disposal of the Commission, but any income shall inure to the benefit of the licensee.

### Section 5009. Renewal of casino licenses.

(a) Subject to the power of the Commission to deny, revoke, or suspend licenses, any casino license in force shall be renewed by the Commission for the next succeeding license period upon proper application for renewal and payment of license fees and taxes as required by law and the rules of the Commission. The license period for a renewed casino license shall be up to one year for each of the first two renewal periods succeeding the initial issuance of the casino license. Thereafter the renewal periods shall be up to (4) four years each, but the Commission may reopen licensing hearings at any time. In addition, the Commission shall reopen licensing hearings at any time at the request of the Public Auditor or the Attorney General.

(b) The application for renewal shall be filed with the Commission not less than three (3) months prior to the expiration of the current license, and all license fees and taxes required by law shall be paid to the Commission on or before the date of expiration of the current license.

### Section 5010. Licensing of casino key employees.

(a) No person may be employed as a casino key employee unless he or she is the holder of a valid casino key employee license issued by the Commission.

(b) Each applicant for a casino key employee license, must produce prior to the issuance of the license information, documentation and assurances that establish to the Commission's satisfaction:

(1) The applicant's financial stability, integrity and responsibility, including but not limited to bank references, business and personal income and disbursements schedules, tax returns and other reports filed with governmental agencies, and business and personal accounting and check records and ledgers. In addition, each applicant shall authorize the Commission in writing to exam all bank accounts and records as may be deemed necessary by the Commission.

(2) The applicant's good character, honesty and integrity. Such information shall include, without limitation, data pertaining to family, habits, character, reputation, criminal and arrest record, business activities, financial affairs, and business, professional and personal associates, covering at least the ten (10) years immediately preceding the filing of the application. Each applicant shall notify the Commission of any civil judgments obtained against such applicant pertaining to antitrust or security regulation laws of the federal government, of Guam or of any other jurisdiction. In addition, each applicant shall, upon request of the Commission or the division, produce letters of reference from law enforcement agencies having jurisdiction in the applicant's place of residence and principal place of business, which letters of reference shall indicate that such law enforcement agencies do not have any pertinent information concerning the applicant, or if such law enforcement agency does have information pertaining to the applicant, shall specify what that information is. If the applicant has been associated with gaming or casino operations in any capacity, position or employment in a jurisdiction which permits such activity, the applicant shall, upon request of the Commission, produce letters of reference from the gaming or casino enforcement or control agency, which shall specify the experience of such agency with the applicant, his associates and his participation in the gaming operations of that jurisdiction; provided, however, that if no such letters are received from the appropriate law enforcement agencies within six (6) months of the applicant's request therefor, the applicant may submit a statement under oath that he is or was during the period such activities were conducted in good standing with such gaming or casino enforcement or control agency.

(c) Each applicant must be a resident of the Guam prior to the issuance of a casino key employee license; provided, however, that upon petition by the holder of a casino license, the Commission may waive this residency requirement for any applicant whose particular position will require him to be employed outside Guam.

(d) The Commission shall deny a casino key employee license to any applicant who is disqualified on the basis of the criteria contained in Section 5007(c) of this act, provided, however, that the Commission may waive the disqualification pursuant to Section 5007(e)(2).

(e) Upon petition by the holder of a casino license, the Commission may issue a temporary license to an applicant for a casino key employee license, provided that:

(1) The applicant for the casino key employee license has filed a complete application as required by the Commission;

(2) The completed form of the Commission's casino key employee license application has been in the possession of the Commission for at least fifteen (15) days; and

(3) The petition for a temporary casino key employee license certifies, and the Commission finds, that an existing casino key employee position of the petitioner is vacant or will become vacant within two (2) months of the date of the petition and that the issuance of a temporary key employee license is necessary to fill the said vacancy on an emergency basis to continue the efficient operation of the casino, and that such circumstances are extraordinary and not designed to circumvent the normal licensing procedures of this act.

(f) In the event that an applicant for a casino key employee license is the holder of a valid casino employee license, and if the provisions of paragraphs (e)(1) and (2) of this subsection are satisfied, the Commission may issue a temporary casino key employee license upon petition by the holder of a casino license, if the Commission finds the issuance of a casino key employee license will be delayed by necessary investigations and the said temporary casino key employee license is necessary for the operation of the casino.

(g) Unless otherwise terminated pursuant to this act, any temporary casino key employee license issued pursuant to this section shall expire one (1) year from the date of its issuance.

### Section 5011. Licensing of casino employees.

(a) No person may commence employment as a casino employee unless he is the holder of a valid casino employee license.

(b) Any applicant for a casino employee license must, prior to the issuance of any such license, produce sufficient information, documentation and assurances to meet the qualification criteria.

(c) The Commission may require that all applicants for casino employee licenses be residents of Guam for a period not to exceed six (6) months immediately prior to the issuance of such license, but application may be made prior to the expiration of the required period of residency. The Commission may waive the required residency

Case 1:04-cv-00046    Document 91-2    Filed 12/21/2004    Page 13 of 34

operations, including its approved hotel in a manner and location approved by the Commission. All such books, records and documents shall be immediately available for inspection during all hours of operation in accordance with the rules of the Commission and shall be maintained for such period of time as the Commission shall require.

**Section 6002. Hours of operation.**

(a) The Commission shall establish by rule uniform hours during which a casino may operate.

**Section 6003. Casino facility requirements.**

(a) Each casino licensee shall arrange the facilities of its casino in such a manner as to promote optimum security for the casino and its patrons and shall comply in all respects with rules of the Commission pertaining thereto.

(b) Each casino hotel shall include:

(1) A closed circuit television system according to specifications approved by the Commission, with access on the licensed premises to the system or its signal provided to the Commission, in accordance with rules\s pertaining thereto;

(2) Design specifications that insure that visibility in a casino is not obstructed in any way that might interfere with the ability of the Commission to supervise casino operations.

**Section 6004. Internal controls.**

(a) Each casino licensee shall submit to the Commission a description of its system of internal procedures and administrative and accounting controls for gaming operations and a description of any changes made after the initial submission. Such submission shall be made at least one (1) month before such operations are to commence or at least one (1) month before any change in those procedures or controls is to take effect, unless otherwise directed by the Commission.

(b) The Commission shall review each submission of the casino licensee and shall determine whether it conforms to the requirements of this act and to the Commission's rules and whether the system submitted provides adequate and effective controls for the operations of the particular casino hotel submitting it. If the Commission finds any insufficiencies, it shall specify them in writing to the casino licensee, who shall make appropriate alterations. When the Commission determines a submission to be adequate in all respects, it shall notify the casino licensee of that fact. Except as otherwise provided in subsection (a), no casino licensee shall commence or alter gaming operations until such system of controls is approved by the Commission.

**Section 6005. Games and gaming equipment.**

(a) This act shall not be construed to permit any gaming except the conduct of authorized games in a casino room in accordance with this act and the Commission's rules. The Commission shall have exclusive discretion to determine the types of games to be played in a casino.

(b) Gaming equipment shall not be possessed, maintained or exhibited by any person on the premises of a casino hotel except in a casino room or in restricted casino areas used for the inspection, repair or storage of such equipment and specifically designated for that purpose by the casino licensee with the approval of the Commission. Gaming equipment which supports the conduct of gaming in a casino but does not permit or require patron access, such as computers, may be possessed and maintained by a casino licensee in restricted casino areas specifically designated for that purpose by the casino licensee with the approval of the Commission. No gaming equipment shall be possessed, maintained, exhibited, brought into or removed from a casino room unless such equipment is necessary to the conduct of an authorized game, has permanently affixed, imprinted, impressed or engraved thereon an identification number or symbol authorized by the Commission, is under the exclusive control of a casino licensee or his employees, and is brought into or removed from the casino room or following 24-hour prior notice given to an authorized agent of the Commission. Notwithstanding the foregoing, a person may, with the prior approval of the Commission and under such terms and conditions as may be required by the Commission, possess, maintain or exhibit gaming equipment in any other area of the casino hotel, provided such equipment is not used for gaming purposes.

(c) Each casino hotel shall contain a count room and such other secure facilities as may be required by the Commission for the counting and storage of cash, coins, tokens and checks received in the conduct of gaming and for the inspection, counting and storage of dice, cards, chips and other representatives of value. All drop boxes and other devices wherein cash, coins, or tokens are deposited at the gaming tables or in slot machines, and all areas wherein such boxes and devices are kept while in use, shall be equipped with two locking devices, one key to which shall be under the exclusive control of the Commission and the other under the exclusive control of the casino licensee, and said drop boxes and other devices shall not be brought into or removed from a casino room or locked or unlocked, except at such times, in such places, and according to such procedures as the Commission may require.

(d) All chips used in gaming shall be of such size and uniform color by denomination as the Commission shall require.

(e) All gaming shall be conducted according to rules promulgated by the Commission. All wagers and pay-offs of winning wagers shall be made according to rules promulgated by the Commission, which shall establish such limitations as may be

necessary to assure the vitality of casino operations and fair odds to patrons. Each slot machine shall have a minimum payout of 83%.

(f) Each casino licensee shall make available in printed form to any patron upon request the complete text of the rules of the Commission regarding games and the conduct of gaming, pay-offs of winning wagers, an approximation of the odds of winning for each wager, and such other advice to the player as the Commission shall require. Each casino licensee shall prominently post within a casino room such information about gaming rules, pay-offs of winning wagers, the odds of winning for each wager, and such other advice to the player as the Commission shall require.

(g) Each gaming table shall be equipped with a sign indicating the permissible minimum and maximum wagers pertaining thereto. It shall be unlawful for a casino licensee to require any wager to be greater than the stated minimum or less than the stated maximum; provided, however, that any wager actually made by a patron and not rejected by a casino licensee prior to the commencement of play shall be treated as a valid wager.

(h)(1) No slot machine shall be used to conduct gaming unless it is identical in all electrical, mechanical and other aspects to a model thereof which has been specifically tested and licensed for use by the Commission. The Commission, in its discretion, and for the purpose of expediting the approval process, may refer testing to any testing laboratory licensed by the Commission to perform such service as a casino service industry. The commission shall establish such technical standards for licensure of slot machines, including mechanical and electrical reliability, security against tampering, the comprehensibility of wagering, and noise and light levels, as it may deem necessary to protect the player from fraud or deception and to insure the integrity of gaming. The denominations of such machines shall be set by the licensee; the licensee shall simultaneously notify the commission of the settings.

(2) The Commission shall, by regulation, determine the permissible number and density of slot machines in a licensed casino so as to:

(A) promote optimum security for casino operations;

(B) avoid deception or frequent distraction to players at gaming tables;

(C) promote the comfort of patrons;

(D) create and maintain a gracious playing environment in the casino; and

(E) encourage and preserve competition in casino operations by assuring that a variety of gaming opportunities is offered to the public.

Any rule promulgated by the Commission which determines the permissible number and density of slot machines in a licensed casino shall provide that all casino floor space shall be included in any calculation of the permissible number and density of slot machines in a licensed casino.

(i) It shall be unlawful for any person to exchange or redeem chips for anything whatsoever, except for currency, negotiable personal checks, negotiable counter checks, other chips, coupons or complimentary vouchers distributed by the casino licensee, or, if authorized by the rules of the Commission, a valid charge to a credit or debit card account. A casino licensee shall, upon the request of any person, redeem that licensee's gaming chips surrendered by that person in any amount over $100 with a check drawn upon the licensee's account at any banking institution in this Guam and made payable to that person.

(j) It shall be unlawful for any casino licensee or its agents or employees to employ, contract with, or use any shill or barker to induce any person to enter a casino or play at any game or for any purpose whatsoever.

(k) It shall be unlawful for a dealer in any authorized game in which cards are dealt to deal cards by hand or other than from a device specifically designed for that purpose, unless otherwise permitted by the rules of the Commission.

(l) It shall be unlawful for any casino key employee or any person who is required to hold a casino key employee license as a condition of employment or qualification to wager in any casino in Guam, or any casino employee, other than a junket representative, bartender, waiter, waitress, or other casino employee who, in the judgment of the commission, is not directly involved with the conduct of gaming operations, to wager in a casino in the casino hotel in which the employee is employed or in any other casino in Guam that is owned or operated by the same casino licensee.

(m) (1) It shall be unlawful for any casino key employee, boxman, floorman, or any other casino employee who shall serve in a supervisory position to solicit or accept, and for any other casino employee to solicit, any tip or gratuity from any player or patron at the casino hotel where he or she is employed.

(2) A dealer may accept tips or gratuities from a patron at the table at which such dealer is conducting play, subject to the provisions of this subsection. All such tips or gratuities shall be immediately deposited in a lockbox reserved for that purpose, accounted for, and placed in a pool for distribution pro rata among the dealers, with the distribution based upon the number of hours each dealer has worked, except that the Commission may permit a separate pool to be established for dealers in the game of poker, or may permit tips or gratuities to be retained by individual dealers in the game of poker.

**Section 6006. Credit.**

(a) Except as otherwise provided in this section, no casino licensee or any person licensed under this act, and no person acting on behalf of or under any arrangement with a casino licensee or other person licensed under this act, shall:

Case 1:04-cv-00046     Document 91-2     Filed 12/21/2004     Page 14 of 34

(2) The check otherwise complies with the requirements of subsection (b) and is processed by the casino licensee in accordance with all other provisions of this section and the regulations of the commission; and

(3) Any check accepted by a casino licensee pursuant to the provisions of this subsection:

(A) is clearly marked as such in a manner approved by the Commission; and

(B) may not be deducted from the total of all sums received in calculating gross revenue, even if such check should subsequently prove uncollectible or the casino licensee completes all of the required verifications prior to its deposit or presentment.

### Section 6007. Noncitizen patrons; proof of identity to establish accounts, multiple transactions.

No casino licensee or any person licensed under this act, and no person acting on behalf of or under any arrangement with a casino licensee or other person licensed under this act, shall, in a single transaction during a gaming day, accept cash from a person offered for the purposes of establishing an account, when the amount offered totals ten thousand dollars ($10,000) or more, unless the person presents proof of his identity and passport identification number if he is not a United States citizen. Multiple currency transactions shall be treated as a single transaction if the casino licensee or any person licensed under this act has knowledge that the transactions are by or on behalf of one person and result in either cash in or cash out totaling more than ten thousand dollars ($10,000) during a gaming day.

### Section 6008. Non-citizen patrons, proof of identity to redeem chips or markers.

No casino licensee or any person licensed under this act, and no person acting on behalf of or under any arrangement with a casino licensee or other person licensed this act, shall, in a single transaction during a gaming day, redeem for cash or credit any chips or markers in an amount of ten thousand dollars ($10,000) or more or exchange chips for cash in an amount of ten thousand dollars ($10,000) or more, from any one person, unless the person seeking to redeem the chips or markers presents proof of his identity and passport identification number if he is not a United States citizen. Multiple currency transactions shall be treated as a single transaction if the casino licensee or any person licensed under this act has knowledge that the transactions are by or on behalf of one person and result in either cash in or cash out totaling more than ten thousand dollars ($10,000) during a gaming day.

### Section 6009. Report of cash transactions.

Casino licensees, persons licensed under this act and persons acting on behalf of or under any arrangement with casino licensees or other persons licensed under this act who accept cash or redeem chips or markers totaling ten thousand dollars ($10,000) or more in a gaming day for which identification is required pursuant to Sections 6007 and 6008, shall at least once every thirty (30) days report the identities and passport numbers of the persons offering the cash, chips or markers, to the Commission.

### Section 6010. Junkets and complimentary services.

(a) No junkets may be organized or permitted except in accordance with the provisions of this act. No person may act as a junket representative or junket enterprise except in accordance with this section.

(b) A junket representative employed by a casino licensee, an applicant for a casino license or an affiliate of a casino licensee shall be licensed as a casino employee in accordance with the provisions of this act, provided, however, that said licensee need not be a resident of Guam. Any person who holds a current and valid casino employee license may act as a junket representative while employed by a casino licensee or an affiliate. No casino licensee or applicant for a casino license may employ or otherwise engage a junket representative who is not so licensed.

(c) Junket enterprises which, and junket representatives not employed by a casino licensee or an applicant for a casino license or by a junket enterprise who, are engaged in activities governed by this section shall be subject to the licensing provisions prescribed for casino service industries and such other provisions of this act as the Commission may determine by rule. Such of the owners, management and supervisory personnel, and other principal employees of a junket enterprise as the Commission may consider appropriate for qualification shall qualify under the standards, except for residency, established for qualification of a casino key employee.

(d) Prior to the issuance of any license required by this section, an applicant for licensure shall submit to the jurisdiction of Guam and shall demonstrate to the satisfaction of the Commission that he or she is amenable to service of process within Guam. Failure to establish or maintain compliance with the requirements of this subsection shall constitute sufficient cause for the denial, suspension or revocation of any license issued pursuant to this section.

(e) Upon petition by the holder of a casino license, an applicant for junket representative licensure may be issued a temporary license by the Commission upon such conditions as the Commission may prescribe by rule.

(f) Every agreement concerning junkets entered into by a casino licensee and a junket representative or junket enterprise shall be deemed to include a provision for its termination without liability on the part of the casino licensee, if the Commission orders the termination upon the suspension, limitation, conditioning, denial or revocation of the licensure of the junket representative or junket enterprise. Failure to

expressly include such a condition in the agreement shall not constitute a defense in any action brought to terminate the agreement.

(g) A casino licensee shall be responsible for the conduct of any junket representative or junket enterprise associated with it and for the terms and conditions of any junket engaged in on its premises, regardless of the fact that the junket may involve persons not employed by such a casino licensee.

(h) A casino licensee shall be responsible for any violation or deviation from the terms of a junket. Notwithstanding any other provisions of this act, the Commission may, after hearings in accordance with this act, order restitution to junket participants, assess penalties for such violations or deviations, prohibit future junkets by the casino licensee, junket enterprise or junket representative, and order such further relief as it deems appropriate.

(i) The Commission shall prescribe methods, procedures and forms for the delivery and retention of information concerning the conduct of junkets by casino licensees.

(j) Each casino licensee, junket representative or junket enterprise shall, in accordance with the rules of the Commission, file a report with the Commission with respect to each list of junket patrons or potential junket patrons purchased directly or indirectly by the casino licensee, junket representative or enterprise.

(k) The Commission shall have the authority to determine, either by regulation, or upon petition by the holder of a casino license, that a type of arrangement otherwise included within the definition of "junket" shall not require compliance with any or all of the requirements of this section. In granting exemptions, the Commission shall consider such factors as the nature, volume and significance of the particular type of arrangement, and whether the exemption would be consistent with the public policies established by this act. In applying the provisions of this subsection, the Commission may condition, limit, or restrict any exemption as the Commission may deem appropriate.

(l) No junket enterprise or junket representative or person acting as a junket representative may:

(1) Engage in efforts to collect upon checks that have been returned by banks without full and final payment;

(2) Exercise approval authority with regard to the authorization or issuance of credit pursuant;

(3) Act on behalf of or under any arrangement with a casino licensee or a gaming patron with regard to the redemption, consolidation, or substitution of the gaming patron's checks awaiting deposit;

(4) Individually receive or retain any fee from a patron for the privilege of participating in a junket;

(5) Pay for any services, including transportation, or other items of value provided to, or for the benefit of, any patron participating in a junket.

(m) No casino licensee shall offer or provide any complimentary services, gifts, cash or other items of value to any person unless:

(1) The complimentary item consists of room, food, beverage or entertainment expenses provided directly to the patron and his or her guests by the licensee or indirectly to the patron and his or her guests on behalf of a licensee by a third party; or

(2) The complimentary consists of documented transportation expenses provided directly to the patron and his or her guests by the licensee or indirectly to the patron and his or her guests on behalf of a licensee by a third party, provided that the licensee ensures that a patron's and his or her guests' documented transportation expenses are paid for or reimbursed only once; or

(3) The complimentary item consists of coins, tokens, cash or other complimentary items or services provided through a bus coupon or other complimentary distribution program approved by the Commission.

Notwithstanding the foregoing, a casino licensee may offer and provide complimentary cash or noncash gifts which are not otherwise included in paragraphs (1) through (3) of this subsection to any person, provided that any such gifts in excess of two thousand dollars ($2,000) per trip, or such greater amount as the Commission may establish by rule, are supported by documentation regarding the reason the gift was provided to the patron and his or her guests, including where applicable, a patron's player rating, which documentation shall be maintained by the casino licensee. For the purposes of this paragraph, all gifts presented to a patron and the patron's guests directly by the licensee or indirectly on behalf of the licensee by a third party within any five (5) day period shall be considered to have been made during a single trip. In the case of cash gifts, the Commission shall establish by rule the total amount of such gifts that a licensee may provide to a patron each year.

Each casino licensee shall maintain a regulated complimentary service account for those complimentaries which are permitted pursuant to this section, and shall submit a quarterly report to the Commission based upon such account and covering all complimentary services offered or engaged in by the licensee during the immediately preceding quarter. Such reports shall include identification of the regulated complimentary services and their respective costs, the number of persons by category of service who received the same, and such other information as the Commission may require.

(n) As used in this subsection, "person" means any officer or employee of the government of Guam who is subject to financial disclosure by law or executive order and any other officer or employee of the government of Guam who has responsibility for matters affecting casino activity; the Governor; any member of the Legislature or

Case 1:04-cv-00046     Document 91-2     Filed 12/21/2004     Page 15 of 34

Commission showing the degree of compliance achieved. The Commission may waive the bona fide resident employment requirement only upon a showing by a casino licensee or a casino service industry entity that despite diligent efforts to locate qualified, bona fide residents through the Guam Department of Labor and by a company's own recruitment efforts, the required percentages of bona fide resident employment could not be achieved.

(c) The Commission may establish an impose fines on casino licensees and casino service industry entities that does not comply with the bona fide resident employment requirement.

(d) If the Commission determines that a casino licensee casino service industry entity has failed to demonstrate compliance with the bona fide resident employment requirement, the casino licensee or casino service entity shall be granted three (3) months to achieve compliance before a fine is imposed.

(e) In the case of continued non-compliance, the Commission may suspend the license of a casino or a casino service industry entity.

(f) A violation of the bona fide resident employment requirement shall be a civil violation subject to the penalties established by the Commission and may be enforced by an action in the Superior Court.

## Article 7 - Hearings of the Commission

Section 7001. Conduct of hearings; rules of evidence; punishment of contempts; rehearing.

(a) At all hearings of contested cases the Commission may hear the case directly or permit the Chairman to designate any Commissioner or a qualified hearing officer to conduct the hearing.

(b) The proceedings at the hearing shall be recorded or transcribed.

(c) Oral evidence shall be taken only upon oath or affirmation.

(d) Each party to a hearing shall have the right to call and examine witnesses; to introduce exhibits relevant to the issues of the case, including the transcript of testimony at any investigative hearing conducted by or on behalf of the Commission; to cross-examine opposing witnesses in any matters relevant to the issue of the case; to impeach any witness, regardless of which party called him or her to testify; and to offer rebuttal evidence.

(e) If an applicant, licensee, registrant or person who shall be qualified pursuant to this act is a party and if such party shall not testify in his or her own behalf, he or she may be called and examined as if under cross-examination.

(f) The hearing shall not be conducted according to rules relating to the admissibility of evidence in courts of law. Any relevant evidence may be admitted and shall be sufficient in itself to support a finding if it is the sort of evidence upon which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in a civil action.

(g) The parties or their counsel may, by written stipulation, agree that certain specified evidence may be admitted, although such evidence may be otherwise subject to objection.

(h) The Commission or hearing officer may take official notice of any generally accepted information or technical or scientific matter in the field of gaming and of any other fact that may be judicially noticed by the courts of Guam. The parties shall be informed of any information, matters or facts so noticed and shall be given a reasonable opportunity, on request, to refute such information, matters or facts by evidence or by written or oral presentation of authorities, the manner of such refutation to be determined by the Commission or hearing officer. The Commission or hearing office has the discretion, before rendering a decision, to permit the filing of amended or supplemental pleadings and shall notify all parties thereof and provide a reasonable opportunity for objections thereto.

(i) If any person in proceedings before the Commission or a hearing officer disobeys or resists any lawful order, refuses to respond to a subpoena, refuses to take the oath or affirmation as a witness or thereafter refuses to be examined, or is guilty of misconduct at the hearing or so near the place thereof as to obstruct the proceeding, the person may be punished for contempt in accordance with the Rules of Court If the Commission or hearing officer certifies the facts underlying the contumacious behavior to the Superior Court. Thereafter, the courts shall have jurisdiction in the matter, and the same proceeding shall be had, the same penalties may be imposed, and the person charged may purge himself or herself of the contempt in the same way as in the case of a person who has committed contempt in the trial of a civil action before the Superior Court.

(j) The Commission, upon motion therefore made within ten (10) days after the service of the decision and order, may order a rehearing before the Commission upon such terms and conditions as it may deem just and proper when the Commission finds cause to believe that the decision and order should be reconsidered in view of the legal, policy or factual matters advanced by the moving party or raised by the Commission on its own motion.

(k) Upon motion made within a reasonable time, but in no event later than one (1) year from the service of the decision and order, the Commission may relieve a party from the decision and order upon a showing that there is additional evidence which is material and necessary and which would be reasonably likely to change the decision of the Commission, and that sufficient reason existed for failure to present such evidence

at the hearing or on a motion for reconsideration. The motion shall be supported by an affidavit of the moving party or his or her counsel showing with particularity the materiality and necessity of the additional evidence and the reason why it was not presented at the hearing or on a motion for reconsideration. Upon rehearing, rebuttal evidence to the additional evidence shall be admitted. After rehearing, the Commission may modify its decision and order as the additional evidence may warrant.

(l) A motion for relief from a decision and order which is based on any ground other than the presentation of newly discovered evidence shall be governed as to both timeliness and sufficiency by the rules of the Commission, which shall be modeled, to the extent practical, upon the rules then governing similar motions before the courts of Guam.

## Section 7002. Proceedings against licensees.

(a) Any proceeding against a licensee or registrant shall be brought on by written complaint, which shall include a statement setting forth in ordinary and concise language the charges and the acts or omissions supporting such charges.

(b) Upon the filing of the complaint the Commission shall serve a copy upon the licensee or registrant either personally or by certified mail to the address on file with the Commission.

(c) Within twenty (20) days after service upon of the complaint, the licensee or registrant may file with the Commission a responsive pleading which may:

(1) Request a hearing;

(2) Admit the accusation in whole or in part;

(3) Present new matters or explanations by way of defense; or

(4) State any legal objections to the complaint.

(d) The licensee or registrant shall be entitled to a hearing on the merits if a responsive pleading has been filed within the time allowed by subsection (c), and any such notice shall be deemed a specific denial of all parts of the complaint not expressly admitted. Failure to timely file a responsive pleading or to appear at the hearing shall constitute an admission of all matters and facts contained in the complaint and a waiver of the licensee's or registrant's right to a hearing, but the Commission, in its discretion, may nevertheless order a hearing. All affirmative defenses shall be specifically stated, and unless objection is taken as provided in paragraph (4) of subsection (c) of this section, all objections to the form of the complaint shall be deemed waived.

(e) The Commission shall determine the time and place of the hearing as soon as is reasonably practical after receiving the licensee's or registrant's responsive pleading. The Commission shall deliver or send by certified mail a notice to all parties at least ten (10) days prior to the hearing. Unless the licensee or registrant consents, the hearing shall not be held prior to the expiration time within which the licensee or registrant is entitled to file a responsive pleading.

(f) Prior to a hearing before the Commission, and during a hearing upon reasonable cause shown, the Commission shall issue subpoenas and subpoenas duces tecum at the request of a licensee, a registrant, or the Commission's attorney.

## Section 7003. Emergency orders.

Notwithstanding any provisions of this article, the Commission may issue an emergency order for the suspension, limitation or conditioning of any operation certificate or any license, other than a casino license, or any registration, or may issue an emergency order requiring the licensed casino to keep an individual from the premises of such licensed casino or not to pay such individual any remuneration for services or any profits, income or accruals on his or her investment in such casino, in the following manner:

(a) An emergency order shall be issued only when the Commission finds that:

(1) A licensee or registrant has been charged with the violation of a federal or Guam criminal law, or

(2) Such action is necessary to prevent a violation of a Guam or federal criminal law, or

(3) Such action is immediately necessary for the preservation of the public peace, health, safety, morals, good order and general welfare or to preserve the public policies declared by this act.

(b) An emergency order shall set forth the grounds upon which it is issued, including the statement of facts constituting the alleged emergency necessitating such action.

(c) The emergency order shall be effective immediately upon issuance and service upon the licensee, registrant, or resident agent of the licensee. The emergency order may suspend, limit, condition or take other action in relation to the approval of one or more individuals who were required to be approved in any operation, without necessarily affecting any other individuals or the licensed casino establishment. The emergency order shall remain in effect until further order of the Commission or final disposition of the case.

(d) Within five (5) days after issuance of an emergency order, the Commission shall cause a complaint to be filed and served upon the person or entity affected by the order. (e) Thereafter, the person or entity against whom the emergency order has been issued and served shall be entitled to a hearing before the Commission in accordance with the provisions of this article.

## Section 7004. Judicial review.

(a) Any person aggrieved by a final decision or order of the Commission made after hearing or rehearing by the Commission, whether or not a petition for hearing was

Case 1:04-cv-00046    Document 91-2    Filed 12/21/2004    Page 16 of 34

thousand dollars ($10,000), and in the case of a person other than a natural person, the amount of a fine may be up to fifty thousand dollars ($50,000).

(c) Any person violating the provisions of Section 6005(e) shall be guilty of a felony of the third degree and shall be punished as provided therefore, except that a fine of not more than twenty-five thousand dollars ($25,000) may be imposed in the case of an individual and in the case of a person other than a natural person, a fine of not more than one hundred thousand dollars ($100,000) may be imposed. Any licensee permitting or allowing such a violation shall also be punishable under this subsection, in addition to any other sanctions the Commission may impose.

### Section 8009. Persons prohibited from accepting employment violation, penalty.

(a) No applicant or person or organization licensed by or registered with the Commission knowingly shall employ or offer to employ any person who is prohibited by the provisions of this act from accepting such employment.

(b) An applicant or person or organization who violates the provisions of this section is guilty of a misdemeanor and shall be subject to not more than one (1) year of imprisonment or a fine of not more than ten thousand dollars ($10,000) or both and in the case of a person other than a natural person, to a fine of not more than fifty thousand dollars ($50,000).

### Section 8010. Unlawful entry by person whose name has been placed on list of excluded persons; penalty.

Any person whose name is on the list of persons promulgated by the Commission pursuant to Section 4007 who knowingly enters the premises of a licensed casino is guilty of a petty misdemeanor, except that any person who has been convicted of this offense three times is guilty of a misdemeanor for each subsequent offense.

### Section 8011. Gaming by certain persons prohibited; penalties; defenses.

(a) No person under the age of twenty-one (21) shall enter, or game in, a licensed casino; provided, however, that such a person may enter a casino by way of passage to another room, and provided further, however, that any such person who is licensed or registered under the provisions of this act may enter a casino in the regular course of the person's permitted activities.

(b) Any licensee or employee of a casino who allows a person under the age of twenty-one (21) to remain in or game in a casino is guilty of a petty misdemeanor; except that the establishment of all of the following facts by a licensee or employee allowing any such underage person to remain shall constitute a defense to any prosecution therefor:

(1) That the underage person falsely represented in writing that he or she was at or over the excludable age;

(2) That the appearance of the underage person was such that an ordinary prudent person would believe him or her to be at or over the age excludable age; and

(3) That the admission was made in good faith, relying upon such written representation and appearance, and in the reasonable belief that the underage person was actually at or over the excludable age.

### Section 8012. Prohibited political contributions; penalty.

Any person who makes or causes to be made a political contribution prohibited by the provisions of this act is guilty of a crime of a misdemeanor and is and subject to the penalty therefor, except that the amount of a fine may be up to ten thousand dollars ($10,000), and in the case of a person other than a natural person, the amount of a fine may be up to fifty thousand dollars ($50,000).

### Section 8013. Authority of gaming licensee and agents to detain or question persons suspected of cheating; immunity from liability; posted notice required.

(a) Any licensee or its officers, employees or agents may question any individual in the casino who is reasonably suspected of violating any of the provisions of Sections 8003, 8004, 8005, 8006 and 8007. No licensee or its officers, employees or agents shall be criminally or civilly liable by reason of any such questioning.

(b) Any licensee or its officers, employees or agents who shall have probable cause for believing there has been a violation of in the casino of Sections 8003, 8004, 8005, 8006 and 8007 by any person may refuse to permit such person to continue gaming or may take such person into custody and detain him or her in the establishment in a reasonable manner for a reasonable length of time, for the purpose of notifying law enforcement or Commission authorities. Such refusal or taking into custody and detention shall not render such licensee or its officers, employees or agents criminally or civilly liable for false arrest, false imprisonment, slander or unlawful detention, unless such refusal or such taking into custody or detention is unreasonable under all of the circumstances.

(c) No licensee or the officers, employees or agents of such licensee shall be entitled to any immunity from civil or criminal liability provided in this section unless there is displayed in a conspicuous manner in the casino a notice in bold face type clearly legible and in substantially this form:

"Any gaming licensee or officer, employee or agent thereof who has probable cause for believing that any person is violating any of the provisions of the Casino Control Act prohibiting cheating or swindling in gaming may detain such person in the establishment for the purpose of notifying a police officer or Casino Control Commission."

### Section 8014. Other offenses; general penalty.

(a) Notwithstanding any other law, any person who violates any provision of this act the penalty for which is not specifically fixed in this act is guilty of a misdemeanor and subject to imprisonment of not more than one (1) year and a fine of not more than Ten Thousand Dollars ($10,000).

(b) The maximum penalty for felonies as designated under this act, unless otherwise stated, is a term of imprisonment of five (5) years and a fine of Twenty-Five Thousand Dollars ($25,000) in the case of a natural person and a fine of One Hundred Thousand Dollars ($100,000) for other than natural persons.

(c) Notwithstanding any other law, and whether specifically stated in this act or not, the offenses set forth in this act and the penalties assessed therefore shall be and are in addition to any other offenses and penalties which may be charged and imposed pursuant to any other applicable criminal provision of the Guam Code Annotated.

### Section 8015. Continuing offenses.

(a) A violation of any of the provisions of this act which is an offense of a continuing nature shall be deemed to be a separate offense on each day that it occurs. Nothing herein shall be deemed to preclude the commission of multiple violations within a day of those provisions of this act which establish offenses consisting of separate and distinct acts.

(b) Any person who aids, abets, counsels, commands, induces, procures or causes another to violate a provision of this act is punishable as a principal and subject to all sanctions and penalties, both civil and criminal, provided by this act.

### Section 8016. Exemption from certain provisions of Title 9 of the Guam Code Annotated.

The provisions of Sections 64.10, 64.20, 64.21, 64.22 and 64.22A of Title 9 of the Guam Code Annotated shall not apply to any person who, as a licensee operating pursuant to the provisions of this act, or as a player in any game authorized pursuant to the provisions of this act, engages in gaming as authorized herein.

### Section 8017. Racketeer-influenced and corrupt organizations. Definitions of. For purposes of this act:

(a) "Racketeering activity" means

(1) any act or threat involving murder, kidnapping, gaming, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under Guam law and punishable by imprisonment for more than 1 year;

(2) any act which is indictable under any of the following provisions of Title 18, United States Code: section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471 through 509 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gaming information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful fund payments), section 1955 (relating to the prohibition of illegal gaming businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2421-2424 (relating to white slave traffic);

(3) any act which is indictable under Title 29, United States Code, section 186 (relating to restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds); or

(4) any offense involving bankruptcy fraud, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States.

(b) "Person" includes any individual or entity holding or capable of holding a legal or beneficial interest in property.

(c) "Enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not as a legal entity.

(d) "Pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this act and the last of which occurred within ten (10) years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

(e) "Unlawful debt" means a debt

(1) which was incurred or contracted in gaming activity which was in violation of the law of Guam, the United States, a state or political subdivision thereof; or

(2) which is unenforceable under Guam, state or federal law in whole or in part as to principal or interest because of the laws relating to usury; or

(3) which was incurred in connection with the business of gaming in violation of the law of Guam, the United States, a state or political subdivision thereof; or

(4) which was incurred in connection with the business of lending money or a thing of value at a rate usurious under Guam, state or federal law, where the usurious rate is at least twice the enforceable rate.

Case 1:04-cv-00046    Document 91-2    Filed 12/21/2004    Page 17 of 34

(1) Revoke the license or registration of any person for the conviction of any criminal offense under this act or for the Commission of any other offense or violation of this act which would disqualify such person from holding his, her or its license or registration;

(2) Revoke the license or registration of any person for willfully and knowingly violating an order of the Commission directed to such person;

(3) Suspend the license or registration of any person pending, hearing, and determination, in any case in which license or registration revocation could result;

(4) Suspend the operation certificate of any casino licensee for violation of any provisions of this act or rules promulgated hereunder relating to the operation of its casino, including games, internal and accountancy controls and security;

(5) Assess such civil penalties as may be necessary to punish misconduct and to deter future violations, which penalties may not exceed twenty-five thousand dollars ($25,000) in the case of any individual licensee or registrant, except that in the case of a casino licensee the penalty may not exceed one hundred thousand dollars ($100,000);

(6) Order restitution of any money or property unlawfully obtained or retained by a licensee or registrant;

(7) Enter a cease and desist order which specifies the conduct which is to be discontinued, altered or implemented by the licensee or registrant;

(8) Issue letters of reprimand or censure, which letters shall be made a permanent part of the file of each licensee or registrant so sanctioned and which may be considered by the Commission upon the licensee's application for renewal or a different license or registration; or

(9) Impose any or all of the foregoing sanctions in combination with each other.

## Article 9 - Miscellaneous

### Section 9001. Declaration of Guam's Limited Exemption from Operation of Provisions of Section 1172 of Title 15 of the U. S. Code.

Pursuant to Section 2 of an Act of Congress of the United States entitled "An act to prohibit transportation of gaming devices in interstate and foreign commerce," approved January 2, 1951, being chapter 1194, 64 Stat. 1134, and codified at Sections 1171-1177 of Title 15 of the U. S. Code, the people of Guam, acting directly through the initiative process authorized to them by the Congress through its enactment of Section 1422a(a) of Title 48 of the U. S. Code and implemented for them by the Legislature through its enactment of Chapter 17 of Title 3 of the Guam Code Annotate, do hereby, in accordance with and in compliance with the provisions of section 2 of said Act of Congress, declare and proclaim that section 2 of that Act of Congress shall not apply to any gaming device in Guam where the transportation of such a device is specifically authorized by and done in compliance with the provisions of this act, any other applicable statute of Guam, and any regulations promulgated pursuant thereto, and that any such gaming device transported in compliance with Guam law and regulations shall be exempt from the provisions of that Act of Congress.

### Section 9002. Legal shipment of gaming devices into Guam.

All shipments into Guam of gaming devices, including slot machines, the registering, recording and labeling of which has been duly had by the manufacturer or dealer thereof in accordance with sections 3 and 4 of an Act of Congress of the United States entitled "An act to prohibit transportation of gaming devices in interstate and foreign commerce," approved January 2, 1951, being chapter 1194, 64 Stat. 1134, and codified at Sections 1171-1177 of Title 15 of the U. S. Code, shall be deemed legal shipments thereof into Guam.

### Section 9003. Severability and preemption.

(a) If any part of this act or the application thereof to any person or circumstances shall be held to be invalid, such holding shall not affect, impair or invalidate the remainder of this act or the application of such remaining portion of the act to any other person or circumstances. The holding of invalidity shall apply only to the portion directly involved in such holding or to the persons or circumstances therein involved.

(b) If any provision of this act is inconsistent with, in conflict with, or contrary to any other provision of law, such provision of this act shall prevail over such other provision and such other provision shall be deemed to be amended, superseded or repealed to the extent of such inconsistency or conflict. The Commission shall have exclusive jurisdiction over all matters delegated to it or within the scope of its powers under the provisions of this act.

### Section 9004. Equal employment opportunity requirements.

The Commission shall not issue a license to any applicant, including a casino service industry, who has not agreed to afford equal employment opportunity to bona fide residents of Guam.

### Section 9005. Equal employment opportunity enforcement.

In addition to and without limitation of other powers that it may have by law, the Commission shall have the following powers to:

(a) Investigate and determine the percentage of population of bona fide residents of Guam employed in any casino or casino service industry in Guam;

(b) Establish and promulgate by rule such percentage guidelines in determining the adequacy of equal employment opportunity being afforded bona fide residents of Guam by the casino and casino service industry in Guam;

(c) Impose such sanctions as may be necessary to accomplish the equal employment opportunities for the bona fide residents of Guam in the casino and casino service industry in Guam;

(d) Refer to the Attorney General instances or circumstances which may constitute violations of law;

(e) Enforce in a court of law violations of the equal employment opportunity requirements of this act or to assist in any enforcement proceeding initiated by an aggrieved person who claims a violation of his or her equal employment opportunity right; and

f) Require a licensee to designate an equal employment opportunity officer to enforce the provisions of Section 9004 and any rules promulgated pursuant thereto.

## Article 10 - Conservatorship

### Section 10001. Institution of conservatorship and appointment of conservators.

(a) Notwithstanding any other provision of this act, (1) upon the revocation of a casino license, (2) upon, in the discretion of the Commission, the suspension of a casino license or operation certificate for a period of in excess of four (4) months, or (3) upon the failure or refusal to renew a casino license, and notwithstanding the pendency of any appeal therefrom, the Commission may appoint and constitute a conservator to, among other things, take over and into his or her possession and control all the property and business of the licensee relating to the casino and the approved hotel; provided, however, that this subsection shall not apply in any instance in which the casino in the casino hotel facility for which the casino license had been issued, in fact, has not been in operation and open to the public, and provided further that no person shall be appointed as conservator unless the Commission is satisfied that he or she is individually qualified according to the standard applicable to casino key employees, except that casino experience shall not be necessary for qualification.

(b) The Commission may proceed in a conservatorship action in a summary manner or otherwise and shall have the power to appoint and remove one or more conservators and to enjoin the former or suspended licensee from exercising any of its privileges and franchises, from collecting or receiving any debts and from paying out, selling, assigning or transferring any of its property to other than a conservator, except as the Commission may otherwise order. The Commission shall have such further powers as shall be appropriate for the fulfillment of the purposes of this act.

(c) Every conservator, before assuming his or her duties, shall execute and file a bond for the faithful performance of his or her duties payable to the Commission with such surety or sureties and in such form as the Commission shall approve and in such amount as the Commission shall prescribe.

(d) When more than one conservator is appointed pursuant to this section, the provisions of this article applicable to one conservator shall be applicable to all; the debts and property of the former or suspended licensee may be collected and received by any of them; and the powers and rights conferred upon them shall be exercised by a majority of them.

(e) The Commission shall require that the former or suspended licensee purchase liability insurance, in an amount determined by the Commission, to protect a conservator from liability for any acts or omissions of the conservator occurring during the duration of the conservatorship which are reasonably related to, and within the scope of, the conservator's duties.

### Section 10002. Instructions to, supervision of conservator.

Upon the appointment of a conservator, the Commission shall provide the conservator with written instructions which enumerate the specific powers and duties conferred by the Commission on the conservator with respect to the conservatorship. A conservator shall be under the direct supervision of the Commission and shall exercise only those powers and perform only those duties expressly conferred on the conservator by the Commission. The Commission, at any time after a conservatorship is established, may modify the powers of the conservator by providing the conservator with a new set of written instructions.

### Section 10003. Powers, authorities and duties of conservator.

(a) Upon his appointment, the conservator shall become vested with the title of all the property of the former or suspended licensee relating to the casino and the approved hotel, subject to any and all valid liens, claims, and encumbrances. The conservator shall have the duty to conserve and preserve the assets so acquired to the end that such assets shall continue to be operated on a sound and businesslike basis.

(b) Subject to the direct supervision of the Commission and pursuant to the written instructions of the Commission and any other order the Commission may deem appropriate, a conservator shall have power to:

(1) Take into his possession and the property of the former or suspended licensee relating to the casino and the approved hotel, including its books, records and papers;

(2) Institute and defend actions by or on behalf of the former or suspended licensee;

(3) Settle or compromise with any debtor or creditor of the former or suspended licensee, including any taxing authority;

(4) Continue the business of the former or suspended licensee and to that end enter into contracts, borrow money and pledge, mortgage or otherwise encumber the property of the former or suspended licensee as security for the repayment of the

Case 1:04-cv-00046     Document 91-2     Filed 12/21/2004     Page 18 of 34

**Section 11005. Tax on gross revenues.**

(a) There is hereby imposed on gross revenues as defined by Section 1003(bb) as annual tax, known as the Guam Casino Revenue Tax, as follows:

(1) Nine percent (9%) during the first two years of a casino's operation;

(2) Ten percent (10%) during the casino's third and fourth years of operation; and

(3) Eleven percent (11%) for each succeeding year.

(b) The tax on gross revenue shall not be reduced when or if the casino is sold or transferred to a new licensee or owner.

(c) Gross revenues from casino gaming shall not be subject to the gross receipts tax established pursuant to Chapter 26 of Title 11 of the Guam Code Annotated. However, gross revenues from any casino or casino-hotel revenues that are not subject to the gross revenue tax imposed by this section are subject to the gross receipts tax.

(d) The Director of Revenue and Taxation, with cooperation from the Commission, shall collect the gross revenues tax. The Director of Revenue and Taxation and the Commission shall collaborate in the preparation of rules necessary to implement and enforce the tax and the Commission, with the concurrence of the Director, shall promulgate the rules pursuant to the provisions of the Administrative Adjudication Law.

**Section 11006. Guam Casino Revenue Trust Fund.**

(a) There is hereby established a Guam Casino Revenue Trust Fund into which shall be deposited one-half (1/2) of all money derived from the tax imposed pursuant to Section 11005.

(b) The purpose of the fund is to establish an inviolable reservoir of capital, the income from which shall be dedicated to the improvement of the health, safety, education and quality of life of the people of Guam.

(c) The Commissioners shall be the trustees of the fund and have a fiduciary relationship to the people of Guam with regard to their management of the fund.

(d) The Commissioners, as trustees, shall discharge their duties with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. The Commissioners, as trustees, shall diversify the investments of the fund so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

(e) Any Commissioner who knowingly violates his or her fiduciary responsibility shall be removed from the Commission by the Governor and may be personally liable to the fund to the extent of the losses incurred by the fund. The Attorney General shall enforce the provisions of this subsection to hold a Commissioner personally liable. A Commissioner who the Governor seeks to remove under this subsection shall be entitled to notice of the charges against him or her and a hearing before an impartial hearing officer and shall not be removed unless his or her violation of his or her fiduciary responsibility is established by clear and convincing evidence. A Commissioner may appeal an order of removal to the Superior Court.

(f) The fund shall not be subject to appropriation for any purpose by the legislature and the Commissioners, as trustees, shall not permit the corpus of the fund to be invaded for any purpose whatsoever.

(g) The Commissioners, as trustees, may invest the corpus of the fund in the same type of investments as are permitted to the trustees of the Government of Guam Retirement Fund pursuant to Sections 8143 through 8159 of Title 4 of the Guam Code Annotated.

(h) Within four (4) months after the close of the Commission's fiscal year, the Commissioners, as trustees, shall transfer all of the prior year's earnings of the fund to the Director of Administration for deposit in the General Fund. At the same time, the Commissioners shall notify the Governor and the Legislature of the sum transferred to the General Fund.

**Section 11007. Expenditure of the Income of the Guam Casino Revenue Trust Fund.** Money from the Guam Casino Revenue Trust Fund deposited to the General Fund shall be appropriated by the Legislature exclusively for making long-term improvements in the island's infrastructure. For purposes of this section, infrastructure means roads, power, water and sanitary systems, public buildings, including hospitals and public health centers, schools and post secondary educational facilities, libraries, police, fire and correctional facilities, and sports, parks and recreational facilities. None of the money shall be appropriated for personnel costs.

**Section 11008. Disposition of second half of Guam Casino Revenue Tax.**

(a) There is hereby established a Guam Casino Revenue Benefits Fund into which shall be deposited one half (1/2) of all money derived from the tax imposed pursuant to Section 11005.

(b) The purpose of the fund is to provide an annual source of revenue for the support of worthy endeavors specifically identified by the people through a quadrennial referendum.

(c) Within four (4) months after the close of the Commission's fiscal year, the Director of Administration shall transfer one-half of the prior year's receipts from the Guam Casino Revenue Tax and any interest earned thereon into the General Fund. The Director shall notify the Governor and the Legislature of the sum transferred to the General Fund.

**Section 11009. Expenditure of the Income of the Guam Casino Revenue Benefit Fund.**

(a) Money from the Guam Casino Revenue Benefit Fund deposited to the General Fund shall be appropriated by the Legislature exclusively for the following purposes:

(1) Ten percent (10%) shall to the Mayors' Council of Guam for village improvements;

(2) Twenty percent (20%) to the Department of Education for books and other instructional materials and supplies to be utilized by the students in the public and nonpublic elementary, middle and high schools;

(3) Ten percent (10%) to organizations registered with the Department of Revenue and Taxation as nonprofit organizations pursuant to Section 501(c)(3) of the Internal Revenue Code and which have as a primary purpose of their existence the preservation and development of the myriad cultures which call Guam home;

(4) Ten percent (10%) for public safety purposes, which shall include the activities of the Guam Police Department, the Guam Fire Department, the Customs and Quarantine Agency, the conservation division of the Department of Agriculture, and the Marshals Office of the Supreme and Superior Courts;

(5) Fifteen percent (15%) to the Departments of Public Health and the Mental Health and Substance Abuse for health care for the indigent;

(6) Fifteen percent (15%) to the Departments of Labor and Public Health and Social Services for job training programs for the indigent;

(7) Ten percent (10%) to government and nonprofit agencies that assist victims of domestic, child, spousal and elderly abuse; and

(8) Ten percent (10%) for programs that are designed to combat injuriously addictive habits;

(b) In conjunction with each election for Governor, the Guam Election Commission shall conduct a referendum election to permit the people to express their preference as to how the money transferred to the General Fund pursuant to this section shall be apportioned. Any government of Guam agency or any organization registered with the Department of Revenue and Taxation as a nonprofit organization pursuant to Section 501(c)(3) of the Internal Revenue Code and which has as a primary purpose of its existence the preservation and development of a unique cultural heritage shall be granted a place on the referendum ballot if the advocates thereof submit to the Guam Election Commission a timely petition bearing the valid signatures of one thousand (1,000) of qualified registered voters.

(c) The Guam Election Commission shall submit the final tally of the referendum to the Legislature and commencing with the next ensuing fiscal year, the Legislature shall apportion the money transferred to it by this section among the eight (8) organizations or for the purposes receiving the highest number of votes. The apportionment shall be in direct ratio to the percentage of vote obtained by each of the organizations or purposes.

**Section 11010. Payment of taxes.**

(a) The tax imposed by Section 11005 shall be due and payable to the Director of Revenue and Taxation within thirty (30) calendar days following the last day of each previous month and shall be based upon gross revenues derived during the previous month. A licensee shall file its first return and shall report gross revenues from the time it commenced operations and ending on the last day of the first month in which it has conducted business pursuant to a license issued by the Commission. The taxpayer shall file with the Commission each month an information copy of the filed return.

(b) Any other law to the contrary notwithstanding, any business conducted by any person holding a license pursuant to this act shall, in addition to all other taxes imposed by this act, file a corporate or individual income tax return, as appropriate, and pay the taxes thereon to the Director of Revenue and Taxation. The taxpayer shall file with the Commission each month an information copy of the filed return.

**Section 11011. Determination of tax liability.**

The Director of Revenue and Taxation may or cause to be performed audits of the books and records of a casino licensee, at such times and intervals as he or she deems appropriate, for the purpose of determining the sufficiency of tax payments. If a return or deposit required by this act is not filed or paid, or if a return or deposit when filed or paid is determined to be incorrect or insufficient with or without an audit, the amount of tax or deposit due shall be determined by the Director of Revenue and Taxation. Notice of such determination shall be given to the licensee liable for the payment of the tax or deposit. Such determination shall finally and irrevocably fix the tax unless the person against whom it is assessed, within thirty (30) days after receiving notice of such determination, shall apply to the Director of Revenue and Taxation for a hearing, or unless the Director on his or her own motion shall redetermine the tax. After such hearing the Director shall give notice of his or her determination to the person against whom the tax is assessed. The power granted to the Director by this section shall not preclude the Commission or the Public Auditor from conducting such audits as they are permitted to perform pursuant to this act.

**Section 11012. Penalties.**

(a) Any licensee who shall fail to file his, her or its return when due or to pay any tax or deposit when the same becomes due, as herein provided, shall be subject to a penalty at the rate of five percent (5%) per month or any fraction thereof, but shall not exceed twenty-five percent (25%) in the aggregate.

Case 1:04-cv-00046   Document 91-2   Filed 12/21/2004   Page 19 of 34



CITIZENS
FOR
ECONOMIC
DIVERSITY

Get Guam growing again!

## The Case for Controlled Casino Gaming

Passage of Proposal A will legalize controlled hotel casino gaming by enacting the Guam Casino Gaming Control Commission Act. A maximum of 10 casino licenses will be issued, on a competitive basis, allowing casinos to be operated in hotels that contain a minimum of 100 rooms. Initially, it is expected only a few hotels will be granted licenses. The purpose of the act is to provide an additional form of entertainment for visitors, enhance Guam's visitor industry, and generate revenue and employment for the people of Guam.

**Proposal A Will Enhance Guam's Economic Development And Strengthen our Community.**

Passage of Proposal A will stimulate the creation of thousands of new jobs by assisting Guam's most established source of income — tourism. Surveys of Japanese visitors show that casinos are among their top four requested new attractions. Casino gaming has created more than $3.6 billion in wages and benefits for residents of 47 American states and will generate tax revenues of approximately $20 million annually over the next five years on Guam. Controlled casino gaming will attract investment that will build new attractions and make Guam a world-class visitor destination.

**Proposal A Is A Good Law That Will Increase Public Trust In Our Political And Governmental Processes.**

Passage of Proposal A will establish a self-funded commission of five members to oversee and direct the development and operation of Guam's casino hotels. The commissioners will be appointed by the Governor and confirmed by the legislature to staggered terms; no Governor can appoint all the commissioners. At least two of the commissioners must be women, one must be a Certified Public Accountant, and another must have law enforcement experience. The regulations governing the commission will be as comprehensive as in any location in the United States. The commission will receive continual public, legal and financial scrutiny; former FBI experts confirm the Act has the controls necessary to keep Guam's casinos crime free.

**Proposal A Will Decrease Guam's Social Problems And Positively Affect The Quality Of Life For All Of Us.**

Century Plaza Building, 219 S. Marine Corps Drive, Suite 122, Tamuning, Guam 96913
Tel: (1-671) 647-2333 • Fax (1-671) 647-2331
Email: info@guamgaming.com • Website: www.guamgaming.com



PLAINTIFF'S
EXHIBIT
2

Passage of Proposal A will create a substantial new tax source that will be paid for by Guam's visitors. Revenue for the community will grow from 9% to 11% over four years, generating approximately $20 million annually for Guam. Thousands of new jobs will be created to staff the casinos. Wages will be 10-15% higher than regular visitor industry wages. Fifty percent of gaming tax revenue will be spent on health care, education, public safety, cultural heritage, and the Mayor's Council; the other fifty percent will be held in trust by the Gaming Commission, to be spent on improving Guam's roads, water system, schools, and the hospital.

**Remember, you have the power, the vote is yours,—Vote YES on Proposal A.**

Century Plaza Building, 219 S. Marine Corps Drive, Suite 122, Tamuning, Guam 96913
Tel: (1-671) 647-2333  •  Fax (1-671) 647-2331
Email: info@guamgaming.com  •  Website: www.guamgaming.com

```
Citation/Title
GU ST T. 9, Sec. 64.10, Gambling; Defined & Punished.
```

**\*5911 9 G.C.A. § 64.10**

**Guam Code Annotated**
**TITLE 9. CRIMES AND CORRECTIONS.**
**CHAPTER 64. GAMBLING**
**ARTICLE 1. GAMBLING GENERALLY**

*Current through P.L. 27-61 (2003)*

### § 64.10. Gambling; Defined & Punished.

(a) Except as otherwise provided by this Chapter, a person commits a misdemeanor when he:

(1) makes or accepts a wager involving money or anything of monetary value upon the result of any game or contest;
(2) holds any money or anything of monetary value which he knows has been wagered in violation of Paragraph (1); or
(3) sets up or promotes any lottery or sells or buys any lottery ticket.

(b) As used in this Section, lottery means a plan whereby prizes are distributed by chance among persons who have paid or promised to pay anything of monetary value for a chance to win a prize.

*SOURCE: G.P.C. §§ 319-321, 330, 330a, 532b; See also §§ 322, 323, 331; \*Cal § 1555(a)(c) (1971).*

**NOTES, REFERENCES, AND ANNOTATIONS**

CROSS-REFERENCES: §§ 4.60, 4.65-Aiding, Facilitating an offense; § 64.30-Social Games; § 64.40--Cockfight; § 64.50-Authorized lotteries; §§ 64.60-64.68--Bingo.



© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Citation/Title
GU ST T. 9, Sec. 64.20, Importation of Gambling Devices to Guam Illegal: Defined
and Punished.

**\*5912 9 G.C.A. § 64.20**

**Guam Code Annotated**
**TITLE 9. CRIMES AND CORRECTIONS.**
**CHAPTER 64. GAMBLING**
**ARTICLE 1. GAMBLING GENERALLY**

*Current through P.L. 27-61 (2003)*

## § 64.20. Importation of Gambling Devices to Guam Illegal: Defined and Punished.

(a) A person commits a felony when he imports or attempts to import, or causes to import a gambling device, whether operable or not, into the territorial jurisdiction of Guam, or manufactures a gambling device within the Territory of Guam.

(b) As used in this Section, gambling device means any coin operated device which, when operated, may return winnings (other than free games not redeemable for cash) of value to the user based partially or completely upon chance, by the operation of which a person may become entitled to receive winnings of value. It does not include pinball and other amusement machines or devices which are predominantly games of skill, whether affording the opportunity of additional chances or free plays or not. It does include any slot machines, video poker machines and other machines or devices which afford the opportunity of winnings, payouts, malfunction refunds to the player, or giving the player or user anything of value under any guise or form based partially or completely upon chance.

(c) Any gambling device in violation of this Section shall be subject to seizure and forfeiture. Any slot machine shall be subject to seizure and forfeiture.

(1) Any property subject to forfeiture under this Section shall be seized by a peace officer, including Guam Customs Officer, upon process issued by the Superior Court, except that seizure without such process may be made when the seizure is incident to an arrest or a search under a search warrant or an inspection under an administrative inspection warrant; the property subject to seizure has been the subject of a prior judgment in a criminal injunction or forfeiture proceeding based upon this Section; or the peace officer has probable cause to believe that the property has been used or intended to be used in violation of this Section. In the event of a seizure pursuant to this Subsection, proceedings under Subsection (d) shall be instituted promptly.

(d) Property taken or detained under this Section shall not be repleviable, but shall be deemed to be in the custody of the government subject only to the orders and decrees of the Court. Whenever property is seized under the provisions of this Section, the government shall destroy all gambling devices seized and forfeited upon order of the Court.

**\*5913** (e) Any person found guilty of the importation, attempted importation or causing the importation of gambling devices to Guam, or who is found guilty of manufacturing a gambling device in Guam, shall be guilty of a felony and be subject to imprisonment for not more than five (5) years, a fine not to exceed Twenty-five Thousand Dollars ($25,000.00) per gambling device, or both such fine and imprisonment

### NOTES, REFERENCES, AND ANNOTATIONS

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.



PLAINTIFF'S
EXHIBIT
4

NOTE: § 6420 of Title 9, Guam Code Annotated, is hereby repealed and any and all remaining balances are reverted to the General Fund. All revenue previously earmarked into this Fund shall continue to be collected and credited to the General Fund.

P.L. 23-128:IV:13 repeals § 6420, 9 GCA. § 6420 of Title 9 GCA does not exist. Title 9 GCA, § 64.20, as enacted before this section, makes no reference to a Gambling Device Fund. However, the legislature intended to repeal and revert the balance of the Gambling Device Fund to the General Fund along with other special funds indicated in this act. Section 64.20 (g), Title 9 GCA, (enacted by P.L. 19-4:3) and section 22209, Title 11, GCA (enacted by P.L. 18-7:12 as amended) both of which made references to the revenues of the Gambling Device Fund was repealed by P.L. 19-24.

*SOURCE: G.P.C. § 330a; *Cal. § 1560 (1971). Subsection (b) amended by P.L. 18-07:11. R/R by P.L. 19-04:3, which became law on May 21, 1987; subsections (f) & (g) were repealed by P.L. 19-24:9. Reenacted by P.L. 24-1:3.*

### NOTES, REFERENCES, AND ANNOTATIONS

CROSS-REFERENCES: Hawaii Penal Code, §§ 712-1220(5) "Gambling Device."

COMMENT: § 64.20, as enacted, differs from the Commission's proposal in that Subsection (a) refers to certain authorized exceptions already contained in the Government Code of Guam allowing possession of slot machines in certain instances. Further, the definition of "gambling device" appeared to have been limited from the Commission's proposal. The Commission proposed that a "gambling device" means "a device that, as a result of the insertion of money ... ". It is unclear whether this definition includes devices which have, as their operating mechanism, electronics only and do not use mechanical wheels or mechanical force, even though these machines operate in an identical fashion to the traditional mechanical slot machines.

*5914 This Section is a great improvement over the Penal Code in that, for the first time, the mere possession of gambling devices is prohibited without any additional requirement that they actually be used for gambling. It is this grave deficiency of the Penal Code that has prohibited local authorities from seizing slot machines heretofore due to lack of proof of their actual use of gambling devices, despite the obvious fact that they may be so used. Further, Subsection (c) provides for the forfeiture of such machines.

COURT DECISIONS: SUPERIOR COURT, 1978. Import of statute is to hold liable one who has control, dominion and pecuniary interest in a " gambling device," rather than such person's employee if such employee has no such control, dominion or pecuniary interest. People v. Concepcion, Sup. Ct. Cr. #37-78 (Order, 06/27/78; Abbate, P.J.)

C.A.9 1981 Public Law 13-135, providing for a "gambling zone" at the airport, provides only a limited exemption to 15 U.S.C. § 1172 and the exemptions were not applicable to the machines in this case. U.S. v. Various Slot Machines on Guam, 658 F.2d 697.

*SOURCE: Reenacted by P.L. 24-1:3.*

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Citation/Title
GU ST T. 9, Sec. 64.22A, Slot Machines.

**\*5917 9 G.C.A. § 64.22A**

**Guam Code Annotated**
**TITLE 9. CRIMES AND CORRECTIONS.**
**CHAPTER 64. GAMBLING**
**ARTICLE 1. GAMBLING GENERALLY**

*Current through P.L. 27-61 (2003)*

### § 64.22A. Slot Machines.

No section of this Act shall be construed to allow the operation of slot machines in the Territory of Guam.

*SOURCE: P.L. 19-04:5, codified by Compiler.*

**NOTES, REFERENCES, AND ANNOTATIONS**

NOTE: "This Act" [P.L. 19-4] also dealt with gambling devices in the following sections: Sec. 2, repealing GC § 19200.5, exempting certain devices from provisions of 15 USC § 1172; Sec. 3, R/R 9 GCA § 64.20, importation of gambling devices; Sec. 4, adding 9 GCA § 64.22, hours of operation of gambling places; Sec. 6, adding 9 GCA § 64.23, minors" entry to gambling places; Sec. 7, adding GC § 19200.02 requiring meters on poker machines, and Sec. 8, effective date for Section 7.

NOTE: Section 64.23 was repealed by P.L. 19-24:11.

© 2004 West, a Thomson business. No claim to original U.S.


PLAINTIFF'S
EXHIBIT
5

Citation/Title
GU ST T. 9, Sec. 64.70, Organizations Authorized to Conduct Gambling: Permit
Procedure.

**\*5923 9 G.C.A. § 64.70**

**Guam Code Annotated**
**TITLE 9. CRIMES AND CORRECTIONS.**
**CHAPTER 64. GAMBLING**
**ARTICLE 2. AUTHORIZED ACTIVITIES**

*Current through P.L. 27-61 (2003)*

### § 64.70. Organizations Authorized to Conduct Gambling: Permit Procedure.

(a) Sections 64.10 and 64.20 do not apply to gambling activities sponsored, promoted and conducted by an organization which has been issued a permit to conduct such activities pursuant to Subsection (c).

(b) A permit to conduct gambling activities shall be issued by the Director of the Department of Revenue and Taxation if:

(1) the organization which applies for the permit has been organized and functioning actively as a nonprofit organization in the Territory for not less than two (2) years prior to filing its application and is:
(A) a church or religious organization;
(B) a fraternal or fraternal benefit society;
(C) an educational or charitable organization; or
(D) a club or organization organized and operated exclusively for pleasure, recreation and other nonprofit purposes not part of the net earnings of which inures to the benefit of any member or shareholder;
(2) the promotion and management of such bingo games or lottery (raffle tickets) are confined solely to the qualified members of the sponsoring organization, no member of which receives remuneration in any form for time or effort devoted to the promotion and management of the bingo games or lottery (raffle tickets); and
(3) all net proceeds derived from such gambling activities are used exclusively for the purposes stated in the sponsoring organization's application to conduct such activities, which purposes shall be limited to educational, charitable, religious, fraternal or civic purposes.

(c) An organization which meets the requirements of Subsection (b) and which desires to conduct or operate gambling activities shall apply for a permit to conduct such activities from the Director of the Department of Revenue and Taxation. The application form shall include the name and address of the applicant, the evidence on which the applicant relies in order to qualify under Subsection (b), the names of three (3) officers or members of the organization who shall be responsible for the operation of the gambling activities, and the uses to which the net proceeds will be applied. Upon receipt of such application the Director shall determine whether it is in conformity with this Section. If so, the Director shall forthwith issue a permit. The permit shall be valid for one (1) year from the date of its issuance. The Director shall retain a copy of the application. If there is any change subsequent to the making of the application for a permit in the facts set forth therein, the applicant shall forthwith notify the Director of such change, and the Director shall issue a permit if the applicant is qualified, or, if a permit has already been issued and the change in the facts set forth in the application disqualify the applicant, the Director shall revoke such permit.

**\*5924** If an application for a permit to conduct gambling activities is not acted upon within thirty (30) days after submission, or if the organization is denied a permit, or if a permit is revoked, any person named on the application may obtain a judicial

© 2004 West, a Thomson business. No claim to original U.S.

PLAINTIFF'S
EXHIBIT
6

Page 2

'GU ST T. 9, Sec. 64.70, Organizations Authorized to Conduct Gambling: Permit
Procedure.

review of such inaction, refusal or revocation by filing a petition for review in the Superior Court. Such petition for review shall be filed within ten (10) days of the refusal or revocation of a permit or within ten (10) days of the expiration of the thirty (30) day period. If the court is satisfied that there was no reasonable ground for refusing a permit and that the applicant was not prohibited by law from holding gambling activities, he may direct that such permit be issued.

(d) The Director shall immediately revoke a permit in case of violation of any provision of this Section, and the Director shall not issue any permit to such permittee within three (3) years following the date of such violation. Any person aggrieved by such action may appeal to the Superior Court provided that such appeal is filed within twenty (20) days following receipt of notification by the Director. The court shall hear all pertinent evidence and determine the facts; upon the facts so determined the court shall annul such action or make such decision as equity may require. This remedy shall be exclusive.

(e) An organization which is issued a permit shall submit a report to the Director on a form to be approved by him within thirty (30) days of the expiration of the permit. Such form shall require information concerning the nature of the gambling activities held, the amount of money received, the expenses incurred in connection with such activities, the net proceeds of such activities, and the uses to which the net proceeds were applied. The organization shall maintain and keep such books and records as may be necessary to substantiate the particulars of such report; such books and records shall be preserved for at least one (1) year after such report is submitted and shall be available for inspection. The report shall be certified to by the three (3) persons designated in the permit application as responsible for such gambling activities and by an accountant. Failure to file such a report shall constitute sufficient grounds for refusal to renew a permit to conduct gambling activities.

(f) As used in this Section:

(1) Bingo Games means a specific game of chance, commonly known as bingo, in which prizes are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random;
(2) Lottery (Raffle Tickets) means a plan whereby prizes are distributed by chance among persons who have paid or promised to pay anything of monetary value for a chance to win a prize; and
(3) Gambling Activities means either a lottery (raffle tickets) or bingo games and does not include any form of casino gambling.

*SOURCE: G.P.C. §§ 319-329. Enacted 1977; Subsection (b)(2) repealed and reenacted by P.L. 14-140, eff. 09/01/78; Subsection (f) added by P.L. 14-140, eff. 09/01/78; amended by P.L. 14-141.*

### *5925 NOTES, REFERENCES, AND ANNOTATIONS

COMMENT: § 64.70 continues and expands the exception and registration requirements, which permits the conduct of gambling by certain charitable, fraternal, educational or religious organizations. However, there have been significant changes made. It is the Director of Revenue and Taxation who now issues the required permit, not the Governor. Also, if a permit is denied or delayed for longer than thirty (30) days judicial review is permitted. § 64.70 provides that certain gambling activities are not punishable if sponsored, promoted and conducted by an organization which has been issued a permit to conduct such activities. Subsection (f) defines the types of gambling activities in question.

§ 64.70(b) sets forth the circumstances under which the Director of the Department of Revenue and Taxation shall issue permits to conduct gambling activities. The amendment to Subsection (b)(2) deleted the words "gambling activities" each time they appeared in the subsection, and substituted in their place the words "bingo games or lottery (raffle tickets)".

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.



FILE COPY

# MINA' BENTE SIETE NA LIHESLATURAN GUÅHAN
## TWENTY-SEVENTH GUAM LEGISLATURE
### 155 Hessler Place, Hagåtña, Guam 96910

October 25, 2004

*Certified as true copy:*
*Botwin C. Santos*
*Clerk of the Legislature.*
*10/27/04*

The Honorable Felix P. Camacho
*I Maga'lahen Guåhan*
*Ufisinan I Maga'lahi*
*Hagåtña,* Guam 96910

Dear *Maga'lahi* Camacho:

Transmitted herewith is Substitute Bill No. 374(LS) which was passed
by *I Mina' Bente Siete Na Liheslaturan Guåhan* on October 25, 2004.

Sincerely,

TINA ROSE MUNA BARNES
Senator and Legislative Secretary

Enclosure (1)

ACKNOWLEDGEMENT
Received By: _____
Time: 8:25 PM
Date: 10-25-04

PLAINTIFF'S
EXHIBIT
7

EXHIBIT A

ctor 472-3409 Fax: 472-3510 • Chief Fiscal Officer 472-3484 • Personnel 472-3520 • Protocol 472-3499 • Archives 472-3465 • Clerk of Legislature 472-3504

# I MINA'BENTE SIETE NA LIHESLATURAN GUÅHAN
## 2004 (SECOND) Regular Session

## CERTIFICATION OF PASSAGE OF AN ACT TO *I MAGA'LAHEN GUÅHAN*

This is to certify that **Substitute Bill No. 374 (LS)**, **"AN ACT TO CURE DEFECTS IN COMPLIANCE WITH 3 GCA §17509 AND §17511 AND TO *ADD* §17509.1; AND TO *REPEAL* 3 GCA §8103 TO ALLOW ADVERTISING ON ELECTION DAY,"** was on the 25th day of October, 2004, duly and regularly passed.

vicente (ben) c. pangelinan
Speaker

Attested:

Tina Rose Muña Barnes
Senator and Legislative Secretary

---

This Act was received by *I Maga'lahen Guåhan* this ___25th___ day of October, 2004, at ___8:25___ o'clock ___P___ .M.

Assistant Staff Officer
*Maga'lahi's* Office

APPROVED:

FELIX P. CAMACHO
*I Maga'lahen Guåhan*

Date: _____

Public Law No. _____

**Bill No. 374 (LS)**
As substituted by the Author,
and amended on the Floor.

Introduced by:

v. c. pangelinan
F. B. Aguon, Jr.
J. M.S. Brown
F. R. Cunliffe
Carmen Fernandez
Mark Forbes
L. F. Kasperbauer
R. Klitzkie
L. A. Leon Guerrero
J. A. Lujan
T. R. Muña Barnes
J. M. Quinata
R. J. Respicio
Toni Sanford
Ray Tenorio

## AN ACT TO CURE DEFECTS IN COMPLIANCE WITH 3 GCA §17509 AND §17511 AND TO *ADD* §17509.1; AND TO *REPEAL* 3 GCA §8103 TO ALLOW ADVERTISING ON ELECTION DAY.

1    BE IT ENACTED BY THE PEOPLE OF GUAM:

2    **Section 1.    Legislative Findings and Intent.** *I Liheslaturan Guåhan*

3    finds that a portion of Guam law that prohibits political campaigning from the

4    time the election polls open is repugnant to the findings of the Courts,

5    wherein similar statutes were unconstitutional regulation of free speech.

1 Similar cases brought before other court jurisdictions resulted in the same
2 decision that laws similar to Guam's are in violation of the First Amendment.

3    It is therefore the intent of *I Liheslatura* to repeal Guam's law in relation
4 to the cessation of political campaigning on Election Day.

5    Further, *I Liheslaturan Guåhan* finds that due to the Guam Election
6 Commission's failure to send out complete copies of the initiative entitled
7 "Proposal A" to all registered voters, *I Liheslatura* wishes to make these
8 documents publicly available at every village mayor's offices, the Guam
9 Election Commission office, at every branch of the Guam Public Library
10 System, the Robert F. Kennedy Library at the University of Guam, the Guam
11 Territorial Law Library, the Office of the Public Auditor, the Office of the
12 Attorney General, and the Senatorial offices, in order to keep voters informed
13 in time for the General Election in November 2004 and to avoid a Special
14 Election. Voting on Proposal A during the November 2004 General Election
15 would guarantee greater participation from voters than any special election.

16    **Section 2.**    §8103 of Chapter 8 of Title 3, Guam Code Annotated
17 (Cessation of Campaigning) is hereby *repealed* in its entirety.

18    **Section 3.**    (a)  Notwithstanding 3 GCA §§17509 and 17511, and any
19 rule or regulation, the initiative entitled "An Initiative to Establish the Guam
20 Casino Gaming Control Commission Act" (hereafter "Proposal A"), shall be
21 voted on in the November 2004 General Election.

22    (b)  Notwithstanding 3 GCA §§17509 and 17511, and any rule or
23 regulation, the Ballot Pamphlet for Proposal A need *not* contain a complete
24 copy of the initiative measure to be submitted to voters, but complete copies
25 of the proposal shall be posted at all village mayors' offices and the GEC

2

1  website (www.guamelection.org) prior to the General Election.  A complete
2  copy shall also be made available to any registered voter upon request at the
3  GEC headquarters, at every mayor's office, at every branch of the Guam
4  Public Library System, the Robert F. Kennedy Library at the University of
5  Guam, the Guam Territorial Law Library, the Office of the Public Auditor, the
6  Office of the Attorney General, and the Senatorial offices.  There shall be *no*
7  fee charged to any voter for one (1) copy of said proposal per registered voter.
8  GEC shall immediately publish in a newspaper of general circulation the
9  availability of copies of the measure.

10      **Section 4.**    A new §17509.1 is hereby *added* to Title 3, Guam Code
11  Annotated to read:

12          "**§17509.1.**  Any defect in the Ballot Pamphlet shall *not* cause a
13  delay in the election or be grounds to invalidate the election."



## 2004 (SECOND) Regular Session

I, vicente (ben) c. pangelinan, Speaker of *I Mina'Bente Siete Na Liheslaturan Guåhan*, hereby certify, in conformance with Title 2 Guam Code Annotated §2103, *Public Hearings Mandatory*, as amended, that an emergency condition exists involving danger to the public welfare of the people and therefore waive the statutory requirements for a public hearing on Bill Number 374 (LS), AN ACT TO REPEAL 3 GCA §8103, RELATIVE TO CESSATION OF CAMPAIGNING DURING ELECTION DAY, AND FOR OTHER 2004 ELECTION MATTERS," which was introduced on this date, September 24, 2004, as substituted by the Author on October 25, 2004 and therefore waive the statutory requirements for a public hearing on Bill Number 374 (LS).

Date: October 25, 2004

vicente (ben) c. pangelinan
Speaker

# I MINA' BENTE SIETE NA LIHESLATURAN GUAHAN

## 2004 (SECOND) Regular Session

Date: _10/25/04_

## VOTING SHEET

Bill No. _374 (LS)_

Resolution No. _____

Question: _____

_____

| NAME | YEAS | NAYS | NOT VOTING/ ABSTAINED | OUT DURING ROLL CALL | ABSENT |
|------|------|------|-----------------------|----------------------|--------|
| AGUON, Frank B., Jr. | ✓ | | | | |
| BROWN, Joanne M. S. | ✓ | | | | |
| CUNLIFFE, F. Randall    /// | | ✓ | | | |
| FERNANDEZ, Dr. Carmen | ✓ | | | | |
| FORBES, Mark | ✓ | | | | |
| KASPERBAUER, Lawrence F.    // | ✓ | | | | |
| KLITZKIE, Robert | ✓ | | | | |
| LEON GUERRERO, Lourdes A. | ✓ | | | | |
| LUJAN, Jesse A. | ✓ | | | | |
| MUÑA-BARNES, Tina Rose | ✓ | | | | |
| angelinan, vicente "ben" C. | ✓ | | | | |
| QUINATA, John "JQ" M. | ✓ | | | | |
| RESPICIO, Rory J. | ✓ | | | | |
| SANFORD, Antoinette "Toni" D. | ✓ | | | | |
| TENORIO, Ray    / | ✓ | | | | |

TOTAL     _14_     _1_     _0_     _0_     _0_

CERTIFIED TRUE AND CORRECT:

_[signature]_

Clerk of the Legislature

*3 Passes = No vote

EA = Excused Absence